IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MERCK & CO., INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 04-939 (GMS) |
| | ) | |
| TEVA PHARMACEUTICALS USA, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**OPENING BRIEF IN SUPPORT OF MOTION OF
MERCK & CO., INC. TO REOPEN FACT AND
EXPERT DISCOVERY AND OTHERWISE STAY THIS ACTION**

OF COUNSEL:

John F. Lynch
HOWREY, LLP
750 Bering Drive
Houston, TX   77057-2198
713.787.1400

Nicolas G. Barzoukas
Suzy S. Harbison
Jason C. Abair
WEIL, GOTSHAL & MANGES
700 Louisiana, Suite 1600
Houston, TX   77002
713.546.5000

Paul D. Matukaitis
MERCK & CO., INC.
One Merck Drive
Whitehouse Station, NJ   08889-0100
908.423.1000

Edward W. Murray
Gerard M. Devlin
MERCK & CO., INC.
126 E. Lincoln Avenue RY28-320
Rahway, NJ   07065-0907
732.594.4000

Dated:   June 9, 2006

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (# 2256)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE   19899-1347
302.658.9200

*Attorneys for Plaintiff
Merck & Co., Inc.*

**TABLE OF CONTENTS**

Page

I.   MERCK'S MOTION TO REOPEN FACT AND EXPERT DISCOVERY ......... 1

     A.   Background .................................................................................... 1

     B.   Legal Argument:   Discovery Should be Reopened Because Teva
          Withheld Its Own Highly Relevant Patent Applications from
          Merck ............................................................................................ 6

          1.   Teva Still Has Not Searched for Documents Covered by
               Merck's Document Requests ........................................................ 6

          2.   Teva's Representation that "Teva Pharmaceuticals USA,
               Inc." and "Teva Ltd." Operate as Separate Entities is a
               Farce ............................................................................................ 8

          3.   Merck Did Not Know That Teva Filed Patent Applications
               that Rely Solely Upon Data from Beagle Experiments Until
               the Recent Discovery of the '685 and '235 Applications ............ 10

          4.   The '685 and '235 Applications are Relevant to the
               ACTONEL® Once-Weekly Case ................................................ 11

          5.   Teva's Withholding of the '685 and '235 Applications Has
               Deprived Merck of Essential Fact and Expert Discovery ............ 12

II.  MERCK'S MOTION TO OTHERWISE STAY THIS ACTION ....................... 14

     A.   Background ........................................................................................ 14

          1.   Merck Physicians Invented Methods for the Once-Weekly
               Oral   Dosing of Bisphosphonates for the Treatment and
               Prevention of Osteoporosis ........................................................ 14

          2.   Teva Withheld the '685 Application in the Case Where
               Teva Challenged Merck's Patent Claims Covering
               FOSAMAX® Once-Weekly Tablets ........................................ 17

          3.   Merck Successfully Defended Its Patent Claims Covering
               FOSAMAX® Once-Weekly Tablets in this Court ...................... 18

          4.   On Appeal, the Federal Circuit Held that Merck's Patent
               Claims for FOSAMAX® Once-Weekly Tablets Were
               Invalid ...................................................................................... 19

          5.   Merck Seeks Relief from the Judgment in the
               FOSAMAX® Once-Weekly Case Under Fed. R. Civ. P.
               60(b) .......................................................................................... 21

     B.   Legal Argument: Trial of the ACTONEL® Once-Weekly Case
          Should Be Stayed Pending Resolution of the Rule 60(b) Case .............. 22

**TABLE OF CONTENTS**
(continued)

Page

1.    Teva Will Not Be Unduly Prejudiced or Placed at a Tactical Disadvantage with a Stay.................................................. 23

2.    A Stay Will Greatly Simplify Issues and Prevent Inconsistent Adjudications in the ACTONEL® Once-Weekly Case and Rule 60(b) Case.............................................. 23

3.    Fact Discovery is Far From Complete ......................................... 26

4.    A Stay of Trial is Appropriate in the ACTONEL® Once-Weekly Case ................................................................................. 26

III.    CONCLUSION .................................................................................. 27

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Afros S.P.A. v. Krauss-Maffei Corp.*, 113 F.R.D. 127 ........................................................9

    *Id.* at 130-32 .......................................................................................................9

*Bayer AG. v. Biovail Corp.*, 279 F.3d 1340 .....................................................................24

*Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*,
    402 U.S. 313 ................................................................................................................24

*Cheyney State College Faculty v. Hufstedler*, 703 F.2d 732 ...............................................22

*Cost Brothers, Inc. v. Travelers Indemnity Co.*, 760 F.2d 58 ..............................................22

*Japan Halon Co. v. Great Lakes Chemical Corp.*, 155 F.R.D. 626 ....................................9

*Levy v. Sterling Holding Co.*, 2004 WL 2251268.......................................................22, 25

    *Id.* at *2 .................................................................................................................26

*Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 126 S.Ct. 488 ............................21

*Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 288 F.Supp.2d 601 ....................19

*Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364 ...............20, 21, 25

*Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 405 F.3d 1388 ...........................21

*Micron Technology, Inc. v. Rambus, Inc.*, 189 F.Supp.2d 201 ..........................................24

*Poole v. Textron*, 192 F.R.D. 494 .......................................................................................9

*United Sweetener USA, Inc. v. Nutrasweet Co.*, 766 F.Supp. 212....................................23

*Xerox Corp. v. 3 Committee Corp.*, 69 F.Supp.2d 404 .....................................................23

## FEDERAL STATUTES

35 U.S.C. § 102....................................................................................................................18

35 U.S.C. § 103....................................................................................................................18

## INTRODUCTION

Plaintiff Merck & Co., Inc. ("Merck") is moving to reopen fact and expert discovery in this case because it recently learned that Defendant Teva Pharmaceuticals USA, Inc. ("Teva") has withheld critical discovery from Merck.   Teva has withheld its own highly relevant patent applications, which were prosecuted by Teva's trial counsel Kenyon & Kenyon ("Kenyon").   As underscored at a hearing with the Court last week, Teva still has not searched for relevant documents.

Merck asserted one of the patents in suit in this case in an earlier case against Teva, and it is now clear that Teva also withheld highly relevant documents in that case. Accordingly, Merck has filed a separate Complaint under Fed. R. Civ. P. 60(b) seeking relief from the judgment Teva obtained in the earlier case.   Merck also moves to stay trial in this case pending resolution of the Rule 60(b) case.   Merck's arguments are fully set forth below.

## I.    MERCK'S MOTION TO REOPEN FACT AND EXPERT DISCOVERY

### A.    Background

The Procter & Gamble Co. ("P&G") manufactures and sells ACTONEL® (risedronate sodium) tablets for the treatment and prevention of osteoporosis. Risedronate sodium is often referred to as "risedronate."   Risedronate belongs to a class of drugs known as bisphosphonates.   In 2002, Merck granted a license to P&G for methods for the oral once-weekly dosing of bisphosphonates covered by Merck's patents. Under the patent license from Merck, P&G launched its ACTONEL® once-weekly tablets.

1

Teva filed an Abbreviated New Drug Application ("ANDA") to bring generic copies of P&G's ACTONEL® once-weekly tablets to the market before the expiration of Merck's patents.[1]    As permitted by the terms of the patent license agreement, Merck sued Teva for patent infringement in this Court in August 2004 in the present action, captioned *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, C.A. No. 04-939 (the "ACTONEL® once-weekly case").   The two patents in suit are Merck's United States Patent Nos. 5,994,329 (the "'329 patent") and 6,432,932 (the "'932 patent") (collectively, "Merck's patents").   The '329 patent is attached as Exhibit A, and the '932 patent is attached as Exhibit B.[2]

In the ACTONEL® once-weekly case, Merck requested that Teva produce documents and things, including patent applications, related to Teva's research and development of risedronate.   The document requests Merck propounded in the ACTONEL® once-weekly case include:

> Request for Production No. 44   All documents and things relating to Defendant's research and development of tablets containing risedronate.
>
> Request for Production No. 45   All documents and things relating to patent applications, including the patents themselves, filed in any country by Defendant referencing, referring, or relating to risedronate.

*See* "Merck's First Set of Requests for Production," attached as Exhibit C.   These document requests cover, among other things, Teva's patent applications and experiments related to risedronate.

---

[1] In its ANDA, Teva also certified that United States Patent No. 5,583,122, which belongs to P&G, is also invalid.   P&G also sued Teva for patent infringement, and that case is pending as *The Procter & Gamble Company v. Teva Pharmaceuticals USA, Inc.*, 04-940 (JJF).

[2] The exhibits are being filed in an appendix of exhibits.

Merck's patents disclose and rely upon Merck's beagle experiments, which established that higher oral doses of bisphosphonates could be given once per week without exacerbating gastrointestinal side effects. The beagle studies published in Merck's patents explain Merck's experiments on 42 different beagles that were assigned to various groups, which included a control group, beagles subjected to various dosing regimens with three different concentrations of the bisphosphonate alendronate, and beagles dosed with risedronate. *See* Exhibit A, "Example 1," col. 14, ln. 9. Additionally, Merck's patents contain detailed observations of the beagle esophagi from each group, including eight full-page photomicrographs showing a close up view of a representative beagle esophagus from each group. *See* Exhibits A and B, Figs. 1-8. Figure 7 shows a representative photomicrograph of the esophagus of a beagle dosed with oral risedronate.

Teva and its experts argue that Merck's patent claims are invalid because the only data they rely upon is Merck's beagle experiments. For example, Teva's expert Dr. Wimalawansa opined in his expert report that:

> Example 1 of the specification purportedly evaluates the esophageal irritation potential of bisphosphonates using a dog model. In the experiments, the anesthetized dogs are dosed with solutions which remain in contact with the esophagus for 30 minutes. … However, the patent includes no data on less-than-daily administration of risedronate. Furthermore, the patent does not provide any data or teaching on the actual administration of risedronate to humans or animals for the purpose of inhibiting bone resorption, nor does it compare the efficacy and tolerability of any treatment regiment using risedronate in humans. **In fact, the only data contained in the patent are those in the dog model of Example 1.** [p., 27 (emphasis added)]

A copy of the expert report of Dr. Sunil Wimalawansa is attached as Exhibit D. Dr. David Markowitz, another one of Teva's experts, also attacked Merck's beagle

experiments in his expert report:

> **I have reviewed the dog studies relied upon by Merck** to show "unexpected" results in administering bisphosphonates on a once-weekly basis. **In my opinion those studies are irrelevant to the clinical administration of risedronate to patients.**   [p. 12, (emphasis added)]

A copy of the expert report of Dr. David Markowitz is attached as Exhibit E.

While analyzing Teva's experts' opinions about Merck's beagle experiments, Merck's counsel searched the publicly available patents and applications available from the web site of the United States Patent and Trademark Office ("PTO").   Specifically, Merck's counsel sought any of Teva's patents or applications related to bisphosphonates. Merck's counsel discovered that Teva had withheld at least two of its own patent applications that disclosed and relied solely upon experiments in which beagles were given oral doses of a bisphosphonate.

On December 16, 2002, Teva filed with the PTO a provisional patent application entitled "METHOD OF INCREASING BIOAVAILABILITY OF ALENDRONATE OR OTHER BISPHOSPHONATES BY PREDOSE ADMINISTRATION OF ALFACALCIDOL," which was assigned application No. 60/433,685 (the "'685 application").   A copy of the '685 application is attached as Exhibit F.   The withheld '685 application is generally directed to a method for giving a dose of a form of Vitamin D at least six hours before giving a dose of alendronate, which will purportedly increase the bioavailability of alendronate.   *See* Exhibit F at 3.   In addition to alendronate, the '685 application explains that risedronate may also be used in the practice of the invention.   *See* Exhibit F at 3.   In the single "Example" of the '685

application, Teva performed oral alendronate experiments in "an *in vivo* study in an animal model" using "six female beagle dogs."    *See* Exhibit F at 8.

On December 13, 2003, Teva also filed the international patent application entitled "METHOD OF INCREASING BIOAVAILABILITY OF ALENDRONATE OR OTHER BIS-PHOSPHONATE BY PREDOSE ADMINISTRATION OF VITAMIN D DERIVATIVE," which was published on international publication number WO 2004/053235 (the "'235 application") on July 15, 2004.    A copy of the '235 aplication is attached as Exhibit G.    The '235 application disclosed and relied upon the data from the beagle experiments of the '685 application, and also added experimental data from additional beagle experiments.    Like the '685 application, the '235 application explains that risedronate may also be used in the practice of the invention.    *See* Exhibit G at 8.

The importance of the '685 and '235 applications to the issues in the ACTONEL® once-weekly case cannot be overstated.    Through filing the '685 and '235 applications, Teva argued to the United States Patent and Trademark Office that its own beagle experiments provided sufficient support for patents for methods for oral dosing of bisphosphonates, including the risedronate.    Yet Teva and its experts have taken a different position in the ACTONEL® once-weekly case, which is that beagle experiments alone cannot provide sufficient basis for patents claiming methods for oral dosing of bisphosphonates.    Merck's patents and Teva's '685 and '235 applications suffer from the same "deficiency" opined upon by Teva's experts, which is that they rely solely upon data obtained from beagle experiments.    Teva's reasons for withholding the '685 and '235 applications are clear: they prove the falsity of Teva's litigation positions.

Incredibly, the '685 and '235 applications were prosecuted on Teva's behalf by Kenyon & Kenyon ("Kenyon"), the law firm serving as Teva's trial counsel in the ACTONEL® once-weekly case.    *See* Exhibit F at 1, and Exhibit G at 1.    Additionally, Teva also withheld the documents underlying its beagle experiments.

### B.    Legal Argument:    Discovery Should be Reopened Because Teva Withheld Its Own Highly Relevant Patent Applications from Merck

Merck moves to reopen fact and expert discovery in the ACTONEL® once-weekly case.    Given the relevance of the '685 and '235 applications to central issues in the ACTONEL® once-weekly case, Teva's decision to withhold them prevents Merck from obtaining critical fact discovery and hinders Merck from being able to prepare for trial.    Trial in this case is set for August 28, 2006.

As explained above, Merck's requests for production in the ACTONEL® once-weekly case cover Teva's withheld '685 and '235 applications.    Teva has offered a litany of excuses for why it was not required to produce documents like the '685 and '235 applications.    Assuming that Teva will make similar excuses in opposition to this Motion, Merck will explain why Teva's likely excuses are untenable.

### 1.    Teva Still Has Not Searched for Documents Covered by Merck's Document Requests

Teva still has not searched for highly relevant documents covered by Merck's document requests.    The '235 application is co-assigned to "Teva Pharmaceuticals USA, Inc." and "Teva Pharmaceutical Industries Ltd."    Teva's '235 application was also prosecuted by Kenyon, just like the '685 application.    Although Teva has boldly protested that it is not required to produce the documents of "Teva Ltd.," it has no excuse

for withholding highly relevant patent applications assigned to "Teva Pharmaceuticals USA, Inc." as covered by Merck's discovery requests.

Less than three months before trial in the ACTONEL® once-weekly case, it is also clear that Teva's "searches" for highly relevant documents have fallen far short of the requirements of Fed. R. Civ. P. 34.   Teva's dereliction of its discovery obligations was underscored during the June 2, 2006, teleconference with the Court, during which Teva's counsel from Kenyon expressed his ignorance of patent applications prosecuted by Kenyon co-assigned to "Teva Pharmaceuticals USA, Inc." and "Teva Ltd.":

> MR. BARZOUKAS [counsel for Merck]:   To address a couple of issues, we believe these documents were specifically requested.   I can short-circuit the argument between Teva USA and Teva Israel. This very document creates this issue.   This patent application which Teva claims was to Teva Israel actually has a counterpart, which is an international application under the Patent Cooperation Treaty.   In that application, Teva USA is actually one of the applicants.   So it was clearly a document that not only was within their custody  and control but in which they are named as an applicant with respect to the international application.

> THE COURT:   Let me get a reaction to that from Mr. Galbraith.

> MR. GALBRAITH [of Kenyon, counsel for Teva]:   That is the first I have heard of that, Your Honor.

A copy of the transcript from the June 2, 2006, hearing is attached as Exhibit H.   *See* Exhibit H at p. 12, ln. 2-16.   Teva has yet to search for highly relevant documents, including documents like the '235 application assigned to "Teva Pharmaceuticals USA, Inc." that were prosecuted by Teva's trial counsel in this case and are undoubtedly still in Kenyon's files.

### 2. Teva's Representation that "Teva Pharmaceuticals USA, Inc." and "Teva Ltd." Operate as Separate Entities is a Farce

Teva argues that it was not required to produce documents from "Teva, Ltd." (i.e., the named assignee of the '685 application), and goes to great lengths to misrepresent the supposedly separate relationship between "Teva, Ltd." and "Teva Pharmaceuticals USA, Inc." Teva's depiction of two independently operating corporate entities is a farce because these entities actually operate as one and the same:

- At the trial of the FOSAMAX® once-weekly case, Teva's lead trial counsel introduced his "client" to the court, which consisted of two "Teva Pharmaceuticals USA, Inc." employees, and a "Teva, Ltd." employee, Yehuda Livneh. *See* Exhibit I, March 04, 2003, trial transcript, pg 3, lns 1-9.

- During the FOSAMAX® once-weekly case, Teva's Vice-President of global generic research and development testified that he was unsure whether he worked for "Teva Pharmaceuticals USA, Inc." or "Teva, Ltd." Exhibit J, 30(b)(6) deposition of Christopher Pelloni, pg 14, ln 12 - pg. 15, ln 20.

- During the FOSAMAX® once-weekly case, Teva produced a "Teva Ltd." witness in response to Merck's request for a deposition under Fed. R. Civ. P. 30(b)(6). Exhibit K, biography of C. Pelloni from website of "Teva Ltd.," at 5 (showing that C. Pelloni was employed by "Teva Ltd." on October 23, 2002, the date of the 30(b)(6) deposition).

- Teva's privileged documents logs for the FOSAMAX® and ACTONEL® once-weekly cases are replete with entries showing that purportedly privileged communications were exchanged among Kenyon and employees of both "Teva Pharmaceuticals USA, Inc." and "Teva Ltd.," including opinions about Merck's patents. *See, e.g.,* Exhibit L, log of privileged documents from the FOSAMAX® once-weekly case, entry nos. 1, 8, 11-16, and Exhibit M, log of privileged documents from the ACTONEL® once-weekly case, entry nos. 11, 15, 20-24, 29, 31 and 57.

- The website for "Teva Pharmaceuticals USA, Inc." contains a "News & Events" section. In that section, those seeking financial or corporate news about "Teva Pharmaceuticals USA, Inc." are told to click on a hyperlink connecting to the website of "Teva

Pharmaceutical Industries Ltd. *See* Exhibit N, pages from the website of "Teva USA."

- As explained above, "Teva Pharmaceutical Industries Ltd." and "Teva Pharmaceuticals USA, Inc." are co-assignees of the withheld '235 application, which relied upon the same beagle studies in the withheld '685 application. *See* Exhibit G at 1.

For all of these reasons, Teva cannot excuse itself from the obligation to produce the '685 and '235 applications and underlying documents under the guise that there is a separate "Teva Ltd." entity. *See Japan Halon Co. v. Great Lakes Chem. Corp.*, 155 F.R.D. 626, 628 (N.D. In. 1993)(defendant's "hypertechnical" argument about why it should not have to produce documents held by its parent company "is precisely the type that is considered obstructionist in violation of the letter and of the spirit of Fed. R. Civ. P. 34").

It also cannot be disputed that Teva had "possession, custody, or control" of the '685 application. *See* Fed. R. Civ. P. 34(a)(requiring production of documents in the "possession, custody, or control of the party upon whom the request is served"). In *Afros S.P.A. v. Krauss-Maffei Corp.*, 113 F.R.D. 127, 132 (D. Del. 1986), the Court ordered a party to produce documents in the possession of its German parent corporation, holding that the documents were within that party's "control." In so holding, the Court noted the close relationship between the parent and subsidiary companies. *Id.* at 130-32. Here, the '685 application was filed by "Teva Ltd." and deals with risedronate, the drug at issue in the ACTONEL® once-weekly case. In addition, the '685 application was in the files of Teva's trial counsel, Kenyon. That fact alone is enough to establish that the '685 application was in Teva's "control." *See Poole v. Textron*, 192 F.R.D. 494, 501 (D. Md. 2000)("Plaintiff asserts that 'documents in the possession, custody, or control of

a party's attorney or former attorney are within the party's 'control' for the purposes of Rule 34.   This Court agrees.")

### 3.    Merck Did Not Know That Teva Filed Patent Applications that Rely Solely Upon Data from Beagle Experiments Until the Recent Discovery of the '685 and '235 Applications

Teva will likely argue that it is too late for Merck to complain about Teva's contradictory positions about beagle experiments because Merck was aware of Teva's beagle experiments in the FOSAMAX® once-weekly case, which is discussed later in this brief.   Teva has directed Merck to "Example 13" of Teva's U.S. Patent No. 6,476,006 (the "'006 patent").   The '006 patent contains a mere eight lines of a rudimentary description of a test in which three beagles were given alendronate. The '006 patent also derives its support from a dozen previous chemistry lab experiments. In contrast, the '685 and '235 applications (and Merck's patents) rely solely upon beagle experiments set forth in multiple pages of their respective patent disclosures.

It is important to explain how Merck learned about Teva's '006 patent.   During post-trial briefing in another case involving one of the patents in suit, Merck's counsel searched the PTO's database for Teva's patent applications.   In that search, Merck discovered Teva's '006 patent.   The '006 patent disclosed and claimed dosage forms for risedronate and alendronate, and just like the '685 application, Teva also withheld it from Merck.   Merck's Motion to add the '006 patent as a trial exhibit is attached as Exhibit O, and a copy of the '006 patent is attached to that Motion as Exhibit A.   This Court

granted that Motion (Exhibit 0-1), even though Teva protested that the '006 patent was assigned to "Teva Pharmaceutical Industries, Ltd."[3]

> **4.     The '685 and '235 Applications are Relevant to the ACTONEL® Once-Weekly Case**

Teva has claimed that because the beagle experiments disclosed in its '685 and '235 applications are "completely different" from the beagle experiments disclosed in Merck's patents, they are irrelevant in analyzing Merck's beagle experiments.   At a recent deposition, Teva's expert Dr. Markowitz admitted that Teva's experiments reflected in the '685 application are comparable to Merck's experiments reflected in the '329 patent:

> Q.     Does the dosing of alendronate in this example follow the dosing instructions for alendronate? …
>
> THE WITNESS [Dr. Markowitz]:   I believe they gave it in dog food.   I will have to look at it.   They do give the meal four hours before. I don't think they give us enough information to say that this duplicates the human experience.   Obviously it can't duplicate it for a variety of reasons.   Dogs swallow differently.   I am not sure if they are taking a pill.   Obviously they can't be relied upon to, if it were a pill, swallow a pill without crushing it and for a beagle dog they are never up right in terms of their position of their esophagus so it does not duplicate the human experience, no.

*See* Exhibit P, transcript of May 31, 2006, deposition of Dr. David Markowitz at p. 134, ln. 2-24.   In other words, the purported difference in methodology between Merck's beagle experiments and Teva's beagle experiments is a red herring.   After all, neither Teva nor Merck performed these experiments for the beagle drug business.   Merck's

---

[3] By granting Merck's Motion to add the '006 patent as a trial exhibit, Teva was on notice that it must produce patent applications assigned to "Teva Ltd." in the ACTONEL® once-weekly case.   Instead, Teva repeated its flagrant disregard for Fed. R. Civ. P. 34 and withheld the '685 application.

and Teva's researchers used these beagle experiments to gain insight into novel human treatments.

The relevant issue is not the differences between the methods of Merck's and Teva's beagle experiments.   The relevant issue is Teva's inconsistent positions about the appropriateness of using data obtained from beagle experiments in the development of methods for the treatment and prevention of osteoporosis.   In the ACTONEL® once-weekly case, Teva and its experts argued that patent claims are invalid if they are based solely upon data obtained from beagle experiments.   Yet before the PTO, Teva filed the '685 and '235 applications based solely upon data obtained from beagle experiments, acknowledging that data obtained from beagle experiments do indeed provide sufficient basis for an invention in this field.    Teva's positions are irreconcilable, and its failure to produce the '685 and '235 applications is inexcusable.

     **5.**     **Teva's Withholding of the '685 and '235 Applications Has Deprived Merck of Essential Fact and Expert Discovery**

By keeping Merck in the dark about Teva's beagle experiments in the '685 application, Teva has prevented Merck from obtaining crucial discovery, including at least the following:

- Teva has withheld documents detailing Teva's beagle experiments, e.g., lab data, protocol, and documents detailing the reasons why the experiments were performed.

- Teva has withheld documents relating to the prosecution of the '685 and '235 applications and related patent applications.

- Merck could not depose the inventors of the '685 and '235 applications: Moshe Fleshner-Barak, E. Itzhak Lerner, and Vered Rosenberger.[4]

- Merck could not depose other Teva scientists involved in performing Teva's beagle experiments.

- Merck could not propound document requests and interrogatories based upon Teva's beagle experiments in the '685 and '235 applications.

- Merck was unable to depose the Kenyon attorneys who prepared the '685 application, John Starr, Steve Lee, and Charles Brainard.

- Merck's experts Dr. Socrates Papapoulos and Dr. M. Brian Fennerty were unable to review and analyze Teva's beagle experiments and to opine upon them in their expert reports.

Based upon Teva's withheld '685 and '235 applications and Teva's frequent failure to produce highly relevant documents (e.g., documents underlying Teva's beagle experiments, the '006 patent), Merck also believes that Teva probably withheld additional relevant discovery from Merck. Indeed, the '685 and '235 applications could be the mere tip of an iceberg of evidence Teva has withheld from Merck.

For all of these reasons, Merck moves to reopen fact and expert discovery so that Merck may obtain all of the highly relevant discovery that Teva has withheld from Merck in ACTONEL® once-weekly case. The data from the beagle experiments in Merck's patents are at the center of the ACTONEL® once-weekly case, Teva withheld its own

---

[4] During the June 2, 2006, teleconference with the Court, Teva correctly noted that these inventors were also inventors of the '006 patent, and Merck could have noticed their depositions during the ACTONEL® once-weekly case. While this is true, the passing reference to beagles in the '006 patent is much different than the withheld '685 and '235 applications. In light of Merck's recent discovery of the '685 and '235 applications, the depositions of these inventors is now a highly relevant fact discovery issue.

beagle experiments from Merck, and Merck needs fact discovery of Teva's beagle experiments.

## II.     MERCK'S MOTION TO OTHERWISE STAY THIS ACTION

Teva also withheld the '685 application in previous litigation between Merck and Teva involving the '329 patent.   Teva's withholding of the '685 application allowed Teva to obtain a judgment invalidating two of the claims of Merck's '329 patent.   Merck has filed a separate Complaint seeking relief under Fed. R. Civ. P. 60(b) from the judgment in that earlier case.   The recently filed case is known as *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, C.A. No. 06-310 (GMS) (the "Rule 60(b) case"). Because Merck faces a potential collateral estoppel problem in the ACTONEL® once-weekly case based upon the judgment in the prior case, Merck is moving for a stay of all proceedings in the ACTONEL® once-weekly case (other than fact and expert discovery as reopened), including all pretrial proceedings and trial, pending resolution of the Rule 60(b) case.

### A.     Background

#### 1.     Merck Physicians Invented Methods for the Once-Weekly Oral Dosing of Bisphosphonates for the Treatment and Prevention of Osteoporosis

In 1995, Merck received approval from the United States Food and Drug Administration ("FDA") for the first effective treatment of osteoporosis.   The active ingredient in Merck's treatment is a compound called "(4-amino-1-hydroxybutylidine) bisphosphonic acid monosodium salt trihydrate," which is usually simplified to "alendronate sodium" or "alendronate."   Merck's treatment at that time was a tablet containing the equivalent of 10 mg of the free alendronic acid, which patients were to

take orally once per day.   Merck commercialized its alendronate sodium tablets under the trademark FOSAMAX®.   These tablets are usually referred to as 10 mg FOSAMAX® tablets.   In April 1997, Merck gained approval for daily 5 mg FOSAMAX® tablets for the prevention of osteoporosis.

In 1996, shortly after Merck launched its 10 mg FOSAMAX® tablets, clinical case reports in medical journals began to circulate about upper gastrointestinal injuries, including severe esophagitis, associated with the ingestion of daily FOSAMAX® tablets. The case reports raised sufficient concern for Merck to warn prescribing physicians about the potential injuries through a "Dear Doctor" letter in March 1996, and to notify the FDA.   The commercial development of oral pamidronate, which is the bisphosphonate structurally closest to alendronate, was halted after reports of similar side effects.

By the time the prestigious *New England Journal of Medicine* published an article entitled "Esophagitis Associated with the Use of Alendronate" in October 1996, Merck scientists had commenced an introspective review of how the dosing regimen for the drug might be changed.   Merck undertook research efforts to understand and address the gastrointestinal side effects that were associated with alendronate.   Central to these efforts were Merck's beagle experiments.   In these experiments, Merck scientists exposed the gastrointestinal tracts of anesthetized beagles to alendronate in simulated gastric juice, and surprisingly discovered that single doses even at high concentrations were not causing the adverse effects that repetitive dosing caused.    Although this was an animal model, it gave three Merck physicians, Drs. Anastasia Daifotis, Arthur Santora, and John Yates the insight that a multiple of the daily dose administered weekly might be as well tolerated or even better tolerated than daily dosing.

15

The Merck physicians' insight cut against the great weight of the knowledge in the field because the gastrointestinal side effects associated with bisphosphonates had long been reported to be dose related. Therefore, increasing the oral dose by sevenfold was contrary to medical thinking.

In 1997, additional beagle experiments were undertaken at Merck that surprisingly confirmed the Merck physicians' idea that sevenfold the daily dose of alendronate could be given once per week without exacerbating gastrointestinal side effects, and perhaps with an even better tolerability profile. On July 22, 1997, Merck filed a patent application for the Merck physicians' invention, which described the beagle experiments.

On November 30, 1999, United States Patent No. 5,994,329 (the "'329 patent") issued to Anastasia G. Daifotis, Arthur C. Santora II, and John Yates entitled "METHOD FOR INHIBITING BONE RESORPTION." Among other things, the '329 patent discloses and claims methods for the treatment and prevention of osteoporosis while minimizing the occurrence of or potential for adverse gastrointestinal effects by giving sevenfold the daily dose of alendronate sodium once per week. *See* Exhibit A.

Merck supplemented its New Drug Application for FOSAMAX® tablets with the United States Food and Drug Administration. In October 2000, Merck received approval for 70 mg FOSAMAX® once-weekly tablets for the treatment of osteoporosis, and 35 mg FOSAMAX® once-weekly tablets for the prevention of osteoporosis.

2.     **Teva Withheld the '685 Application in the Case Where Teva Challenged Merck's Patent Claims Covering FOSAMAX® Once-Weekly Tablets**

Teva filed an ANDA to gain approval to market generic copies of Merck's high-dose once-weekly 70 and 35 mg FOSAMAX® once-weekly tablets before the expiration of the '329 patent.   In response, Merck filed suit against Teva for patent infringement in this Court on November 6, 2001.   That case became known as *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, (C.A. No. 01-048) (JJF)(the "FOSAMAX® once-weekly case").   Just as in the ACTONEL® once-weekly case, Teva was represented by Kenyon.

Merck served document requests on Teva that sought documents related to Teva's research and development projects for alendronate.   Merck suspected that Teva's document production was inadequate, particularly when various Teva witnesses admitted during their depositions that their files had never been searched in connection with the FOSAMAX® once-weekly case.   Merck moved to compel production from Teva.   In response to additional requests and communications from Merck, a partner attorney at Kenyon sent a letter (the "Kenyon letter") confirming that Teva had finally complied with Merck's document requests.   In particular, the Kenyon letter states:

> As discussed yesterday, I confirm that Teva has conducted a diligent search for documents responsive to Merck's document requests for all persons at Teva involved with the development of Teva's weekly alendronate sodium after the complaint in this action was filed and again after Merck served its document requests on Teva. … As we have now complied with your requests, we expect that Merck will withdraw it's [sic] motion to compel today.

A copy of the Kenyon letter is attached as Exhibit Q.

Merck relied upon the assurances in the Kenyon letter, and Merck withdrew its motion to compel.   All the while, Teva continued to withhold its beagle experiments from Merck, including the beagle studies in Teva's '685 application.   A mere five days after Teva sent the Kenyon letter, Teva filed the '685 application through its attorneys at Kenyon.   When Teva sent the Kenyon letter, Teva's beagle experiments had already been performed.

### 3.    Merck Successfully Defended Its Patent Claims Covering FOSAMAX® Once-Weekly Tablets in this Court

A bench trial was held in the FOSAMAX® once-weekly case on March 4-7, 2003. Teva's primary defense was that Merck's patent claims were invalid for anticipation (35 U.S.C. § 102) or obviousness (35 U.S.C. § 103) in light of the April and July 1996 editions of the *Lunar News*, a marketing circular for bone densitometers.   The *Lunar News* included a speculative suggestion as to the use of less frequent higher oral doses of alendronate while ignoring the obstacle presented by the expected side effects.[5]

The '329 patent contained Merck's beagle experiments and presented data that revealed that less frequent, higher oral doses of alendronate and other bisphosphonates could be given once per week without exacerbating the gastrointestinal side effects, and perhaps with an even better tolerability profile.   In contrast, the *Lunar News* articles were nothing more than wishful thinking.

---

[5]  The *Lunar News* articles also form the primary basis for Teva's defense that Merck's patent claims are invalid in the ACTONEL® once-weekly case.

Regardless, Teva belittled the beagle studies and argued that they added nothing to the knowledge of those skilled in the art, and therefore added no information beyond the speculations disclosed in the *Lunar News* articles.    In its post-trial brief, Teva argued:

> The only data that Merck can allege that it had that was not possessed by people of skill in the art in July 1997 are the results of its dog studies. Merck's reliance on these studies is unfounded.  **First, the asserted claims are limited to humans, so a result from an experiment on a beagle, whether expected or not, is not relevant.  Second, the dog studies provide no data, expected or not, that is relevant to clinical experience.**   [p. 45 (emphasis added)]

A copy of Teva's Post-Trial Brief is attached as Exhibit R.   In its post-trial reply brief, Teva argued:

> Although Merck will likely argue that the conclusions of its scientists were bolstered by the results of its dog experiments, that argument does not withstand scrutiny.  **In May 1997, the only pertinent dog experimental results Merck had were the initial comparisons of the effects of five consecutive exposures to acidic alendronate solution to a single exposure with the same solution.**   [p. 23 (emphasis added)]

A copy of Teva's Post-Trial Reply Brief is attached as Exhibit S.

On August 23, 2004, this Court issued its Opinion and rejected Teva's arguments and affirmed the validity of Claims 23 and 37 of the '329 patent in light of the *Lunar News* articles.   *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 288 F.Supp.2d 601 (D.Del. 2003).   A copy of the Court's opinion is attached as Exhibit T.

### 4.    On Appeal, the Federal Circuit Held that Merck's Patent Claims for FOSAMAX® Once-Weekly Tablets Were Invalid

Teva appealed to the United States Court of Appeals for the Federal Circuit. Teva stood fast to its rejected arguments that Claims 23 and 37 of the '329 patent were invalid for obviousness in light of the *Lunar News* articles.   Once again, Teva argued that the beagle studies added nothing to the knowledge of those skilled in the art, and

therefore provided no information beyond the speculations disclosed in the *Lunar News* articles.    In its Federal Circuit Reply brief, Teva argued:

> The '329 patent does not include data or reports of experimentation proving the workability of an idea that was contrary to some conventional wisdom.    Merck's inventors had no such information.    On the contrary, the patent provides nothing beyond what [] had already [been] disclosed in the *Lunar News*.    **Specifically, the '329 patent includes no clinical trial data or results from studies in people proving the safety and effectiveness of the once-weekly administration of alendronate.** … Recognizing this weakness, Merck now feebly attempts to rely on the beagle experiments described in Example 1 in the '329 patent.   [p. 18, (emphasis added)]

A copy of Teva's Federal Circuit Reply Brief is attached as Exhibit U.

But this time, the outcome was different.    A divided panel of the Federal Circuit accepted Teva's arguments, reversed this Court, and held that Claims 23 and 37 of the '329 patent were invalid as obvious in view of the *Lunar News* articles.   *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005).    A copy of the Federal Circuit's opinion is attached as Exhibit V.

In examining the differences between the *Lunar News* articles and the '329 patent, the Federal Circuit panel majority accepted Teva's arguments, and dismissed the experimental results data obtained from the beagle studies.

> The '329 patent sets forth no human clinical or laboratory data showing the safety and tolerability of the treatment methods claimed by the patent. The only data provided in the '329 patent was generated in beagles, an experiment discredited at trial and disregarded by the district court in its decision.    So while the district court may be correct in finding the *Lunar News* articles may have invited skepticism based on concerns for dose-related GI problems, the claimed invention adds nothing beyond the teachings of those articles.

395 F.3d at 1374. *See* Exhibit V. The Federal Circuit's dismissal of Merck's beagle experiments lies at the very heart of its holding that Claims 23 and 37 of the '329 patent are invalid.

Merck petitioned the Federal Circuit for rehearing and rehearing *en banc*. That petition was denied. *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 405 F.3d 1388 (Fed. Cir. 2005). Merck filed a writ of certiorari with the United States Supreme Court, and the writ was denied. *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 126 S.Ct. 488 (2005).

### 5.    Merck Seeks Relief from the Judgment in the FOSAMAX® Once-Weekly Case Under Fed. R. Civ. P. 60(b)

Teva procured the judgment invalidating Merck's patent claims in the FOSAMAX® once-weekly case by making misrepresentations and withholding its own '685 application and documents underlying its own beagle experiments. In the FOSAMAX® once-weekly case, Teva argued that Merck's patent claims were invalid because the only data in the '329 patent came from Merck's beagle experiments, and that data added "nothing" to the prior art. The Federal Circuit accepted Teva's arguments and held Merck's patent claims invalid as obvious. *Merck & Co. Inc. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d at 1364, 1374 (Fed. Cir. 2005); *See* Exhibit V. But while Teva disparaged Merck's beagle experiments in the FOSAMAX® once-weekly case, Teva filed the '685 application that relied upon nothing but data obtained from beagle experiments. Teva hid the '685 application from Merck, this Court, and the Federal Circuit.

21

On May 10, 2006, Merck filed a Complaint under Fed. R. Civ. P. 60(b) to seek relief from the judgment in the FOSAMAX® once-weekly case.    In the Rule 60(b) case, Merck requests vacation of the judgment entered in the FOSAMAX® once-weekly case, and that Teva be enjoined from asserting any estoppel based upon the findings from the Federal Circuit's opinion in the FOSAMAX® once-weekly case.

> **B.    Legal Argument: Trial of the ACTONEL® Once-Weekly Case Should Be Stayed Pending Resolution of the Rule 60(b) Case**

Merck moves for a stay in the ACTONEL® once-weekly case pending the outcome of the Rule 60(b) case for two reasons.    First, as explained above, fact and expert discovery are far from complete in the ACTONEL® once-weekly case because Teva has withheld highly relevant evidence from Merck.    Second, not staying this case runs the risk that this Court could render inconsistent opinions in the ACTONEL® once-weekly case and the Rule 60(b) case.

The power to stay proceedings "is incidental to the power inherent in every court to control the disposition of the cases on its docket with economy of time and effort for itself, for counsel, and for litigants." *Cheyney State College Faculty v. Hufstedler*, 703 F.2d 732, 738 (3d Cir. 1983).    The decision to stay a case is firmly within the discretion of the Court.    *See Levy v. Sterling Holding Co.*, 2004 WL 2251268 (D.Del. 2004)(Sleet, J.), *citing Cost Bros., Inc. v. Travelers Indem. Co.*, 760 F.2d 58 (3d Cir. 1985).

In determining whether a stay is appropriate, the Court's discretion is guided by the following factors: (1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and the trial of the case; and (3) whether discovery is complete and whether a

trial date has been set.   *Xerox Corp. v. 3 Comm Corp.*, 69 F.Supp.2d 404, 406, (W.D.NY.

1999); *cf. United Sweetener USA, Inc. v. Nutrasweet Co.*, 766 F.Supp. 212, 217 (D.Del.

1991)(stating a similar test).   As set forth below, a stay of trial is appropriate in the

ACTONEL® once-weekly case.

> **1.      Teva Will Not Be Unduly Prejudiced or Placed at a Tactical Disadvantage with a Stay**

Teva will not be unduly prejudiced or placed in a tactical disadvantage with a stay

in this case.   Merck's motion for stay is based upon *Teva's* withholding of *Teva's* patent

applications and the documents underlying them.   Should Teva complain that it will be

prejudiced or placed at a tactical disadvantage, it can blame only itself for the failure to

produce critical, highly relevant Teva patent applications covered by Merck's document

requests.

Even if Teva prevails in the Rule 60(b) case, it will not have been prejudiced by a

stay in the ACTONEL® once-weekly case.   If Teva prevails in the Rule 60(b) case by

showing that the judgment in the FOSAMAX® once-weekly case was properly reached

and not affected by Teva's highly relevant withheld evidence, Teva may very well prevail

in the ACTONEL® once-weekly case.   As Teva has stated, the issues in the

FOSAMAX® once-weekly case and ACTONEL® once-weekly cases "largely overlap."

> **2.      A Stay Will Greatly Simplify Issues and Prevent Inconsistent Adjudications in the ACTONEL® Once-Weekly Case and Rule 60(b) Case**

A stay will also greatly simplify issues in the ACTONEL® once-weekly case by

avoiding the risk of inconsistent adjudications.   The fact findings from the judgment in

the FOSAMAX® once-weekly case – from which Merck seeks relief in the Rule 60(b)

case – present a potential collateral estoppel problem in the ACTONEL® once-weekly case.

Collateral estoppel is not a matter within the exclusive jurisdiction of the Federal Circuit, and therefore, the principles of collateral estoppel are set forth by the law of the circuit in which the district court sits. *See Bayer AG. v. Biovail Corp.*, 279 F.3d 1340, 1345 (Fed. Cir.2002). Collateral estoppel is appropriate if: (1) the issue is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) plaintiff had a full and fair opportunity to litigate the issue in the first action. *Micron Technology, Inc. v. Rambus, Inc.*, 189 F.Supp.2d 201, 209 (D.Del.2002). Additionally, the doctrine of collateral estoppel applies in patent cases. *See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313 (1971).

As stated above, the Federal Circuit held that Claims 23 and 37 of the '329 patent were invalid as obvious in the FOSAMAX® once-weekly case. The ultimate issue of obviousness turns on four factual determinations: (1) the scope and content of the prior art, (2) the level of ordinary skill in the art, (3) the differences between the claimed invention and the prior art, and (4) the objective issue of nonobviousness. In the obviousness analysis, Merck's beagle experiments take center stage:

> The '329 patent sets forth no human clinical or laboratory data showing the safety and tolerability of the treatment methods claimed by the patent. **The only data provided in the '329 patent was generated in beagles**, an experiment discredited at trial and disregarded by the district court in its decision. So while the district court may be correct in finding the *Lunar News* articles may have invited skepticism based on concerns for dose-related GI problems, **the claimed invention adds nothing beyond the teachings of those articles**.

*Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364, 1374 (Fed. Cir. 2005)(emphasis added); *See* Exhibit V.   Given the status quo, Merck faces a potential collateral estoppel problem based upon the fact findings in the FOSAMAX® once-weekly case.   Merck believes that its beagle experiments provide an adequate basis for the patent claims asserted in the ACTONEL® once-weekly case, but the Federal Circuit found differently in the FOSAMAX® once-weekly case with regard to Claims 23 and 37 of the '329 patent.   Merck therefore seeks relief from the judgment in the FOSAMAX® once-weekly case under Fed. R. Civ. P. 60(b) based upon the discovery of Teva's withheld '685 application, which relies solely upon data obtained from beagle experiments.   If the ACTONEL® once-weekly case is not stayed, it is possible that that this Court could render inconsistent opinions on the validity of patents (e.g., Merck's '329 and '932 patents) that rely solely upon data obtained from beagle experiments.

This Court has stayed cases in similar situations.   For example, in a shareholder's derivative suit, this Court stayed proceedings pending the SEC's decision to amend rules that would have a dispositive effect on issues in that case.   *Levy v. Sterling Holding Co., LLC*, 2004 WL 2251268 (D.Del. 2004).   As this Court observed:

> Not staying the proceedings, however runs the risk of inconsistent adjudications. … All that remains is for the SEC to decide whether it will adopt the proposed amendments.   … By staying the action and awaiting the decision of the SEC, in the event of adoption, a further conflict with other circuit courts that will have to apply the amended SEC Rules…may be avoided.

*Id*. at *2.    Similarly, staying the trial of the ACTONEL® once-weekly case pending resolution of the Rule 60(b) case will ensure that consistent judgments are rendered with regard to Merck's patents covering the once-weekly dosing of bisphosphonates.

### 3.    Fact Discovery is Far From Complete

Although a trial date has been set, fact and expert discovery are far from complete in the ACTONEL® once-weekly case.    As described above, Teva's withholding of its '685 and '235 applications demonstrates that Merck has been deprived of highly relevant fact discovery.    Accordingly, Merck has moved for reopening fact and expert discovery.    A stay of trial and pre-trial proceedings (e.g., preparation of the pre-trial order) would allow Merck to obtain that critical, highly relevant fact and expert discovery in addition to ensuring consistent judgments on Merck's patents covering once-weekly dosing of bisphosphonates.

### 4.    A Stay of Trial is Appropriate in the ACTONEL® Once-Weekly Case

In conclusion, a stay of trial will allow Merck to obtain critical, highly relevant discovery that Teva has withheld, and will avoid the risk of inconsistent judgments.[6]    If trial is stayed in the ACTONEL® once-weekly case, it may be prudent to consolidate reopened discovery in the ACTONEL® once-weekly case with fact discovery in the Rule 60(b) case to conserve the resources of the Court and the parties.    Fact discovery in both cases would substantially overlap because discovery in both cases will focus upon Teva's

---

[6] In the alternative, Merck requests that Teva be precluded from asserting collateral estoppel as to issues decided by the Federal Circuit in the FOSAMAX® once-weekly case.

beagle experiments, Teva's patents and applications, and additional documents that Teva withheld from Merck.

## III.    CONCLUSION

For all of the reasons above, Merck asks that its motion to reopen fact and expert discovery in the ACTONEL® once-weekly case and otherwise to stay the ACTONEL® once-weekly case be granted.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Mary B. Graham (#2256)*
_____

OF COUNSEL:

John F. Lynch
HOWREY, LLP
750 Bering Drive
Houston, TX   77057-2198
713.787.1400

Nicolas G. Barzoukas
Suzy S. Harbison
Jason C. Abair
WEIL, GOTSHAL & MANGES
700 Louisiana, Suite 1600
Houston, TX   77002
713.546.5000

Paul D. Matukaitis
MERCK & CO., INC.
One Merck Drive
Whitehouse Station, NJ   08889-0100
908.423.1000

Edward W. Murray
Gerard M. Devlin
MERCK & CO., INC.
126 E. Lincoln Avenue RY28-320
Rahway, NJ   07065-0907
732.594.4000

Dated:   June 9, 2006
524155

Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE    19899-1347
302.658.9200

*Attorneys for Plaintiff*
*Merck & Co., Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 9, 2006, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to the following:

> Josy Ingersoll, Esquire
> YOUNG CONAWAY STARGATT & TAYLOR, LLP
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, DE   19801

Additionally, I hereby certify that true and correct copies of the foregoing were caused to be served on June 9, 2006 upon the following individuals in the manner indicated:

**BY HAND AND E-MAIL**

Josy Ingersoll, Esquire
YOUNG CONAWAY STARGATT &
    TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE   19801

**BY E-MAIL**

James Galbraith, Esquire
KENYON & KENYON
One Broadway
New York, NY   10004

*/s/ Mary B. Graham (#2256)*

_____
        Mary B. Graham (#2256)

28