EXHIBIT O

CLOCK COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MERCK & CO., INC.,

       Plaintiff,

v.

TEVA PHARMACEUTICALS USA, INC.,

       Defendant.

C.A. No. 01-0048 (JJF)
(CONSOLIDATED)

FILED
2003 APR 11  PM 4: 35
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

## MERCK'S MOTION TO ADD TEVA'S U.S. PATENT NO. 6,476,006 TO THE RECORD AS PLAINTIFF'S TRIAL EXHIBIT 301

Plaintiff Merck & Co., Inc. ("Merck") hereby moves to add to its trial exhibit list U.S. Patent No. 6,476,006 (the "'006 patent") entitled "Composition and Dosage Form for Delayed Gastric Release of Alendronate and/or Other Bisphosphonates," attached as Exhibit A which Teva should have produced, but failed to, in discovery. The original application for the '006 patent was filed in June 2000, by Teva Pharmaceutical Industries, Ltd. ("Teva Limited") and the patent issued on November 5, 2002. Teva Limited is the parent company of Teva and its representatives were present at the trial (Trial Transcript 3:3-9 (Galbraith)).

Merck discovered this highly probative patent just a week ago in connection with responding to new contentions of Teva. Specifically, at page 47 of its opening post-trial brief, served March 28, 2003, Teva now argues that the commercial success of once-weekly FOSAMAX® is not relevant to this case since "no one else had the incentive to develop new dosing forms of alendronate because no one else could bring an improved dosage form to

market" before September 2000.[1]  But the '006 patent reveals that Teva itself must have been developing new dosage forms for alendronate in Israel well before 2000.

Teva's '006 patent is also at odds with Teva's attack on the evidence introduced at trial that, in July 1997, skilled professionals would have expected that high unit doses of alendronate sodium would exacerbate the gastrointestinal side effects caused by the drug.  Teva even argued that this expectation was inconsistent with the facts and the science.  *See* Teva's Post-Trial Brief, at pp. 1, 27-28.  Yet, Teva had adopted and advanced Merck's view in the '006 patent while seeking the allowance of its own claims relating to a delayed gastric release dosage form for alendronate.  Specifically, Teva told the PTO that:

> Bis-phosphonates such as alendronate, residronate, etidronate and teludronate are commonly prescribed drugs ....  Despite their benefits, bis-phosphonates suffer from ... side effects that consist of irritation of the upper gastrointestinal mucosa [citing "Esophagitis and Alendronate"]. ...  Since bisphosphonates are not metabolized, dosing [frequency] could be lowered to once a week instead of daily (70 mg per dose once a week in place of 10 mg per dose daily) [citing the '329 patent].  ***While large dosing helps improve patient compliance, it has the potential of exacerbating the upper GI side effects of the drug.***

Exhibit A, at col. 3, ll. 34-42 (emphasis added).

Despite the '006 patent's relevance to this case, Teva never produced it.  This was improper especially since Teva's trial counsel, Kenyon & Kenyon, prosecuted the '006 patent for Teva before the PTO (*see* Exhibit A).

While responding to Teva's new argument that purportedly no one else had an incentive to develop new alendronate dosage forms, last week, Merck discovered the '006 patent, showing that Teva itself had been developing new dosage forms of alendronate since before 2000.  The

---

[1]  Teva never raised the argument that no one else had an incentive to develop new alendronate dosing forms in its responses to Merck's interrogatories, in its economist's, Dr. Rozek's, expert report, or in the Pre-Trial Order.  Teva mentioned it in passing during its opening statement at trial, but cited no evidence and adduced none at trial.

'006 patent was responsive to several Merck document requests, including Nos. 2, 13, 16, 31, 34, and 49, yet Teva never produced it. *See* Exhibit B, Merck's First Set of Document Requests. In this litigation, Merck questioned Teva's counsel several times about Teva's meager document production, and even filed a Motion to Compel Production (D.I. 95). Merck eventually agreed to withdraw its Motion to Compel only after Teva gave its assurances that it had conducted diligent searches, and that all responsive documents had been produced. *See, e.g.,* Exhibit C, October 9, 2002 letter from Danae Schuster to Scott Garber; and Exhibit D, December 11, 2002, letter from Maria Palmese to Nicolas Barzoukas.

That the '006 patent was filed by Teva's parent company, Teva Limited, does not relieve Teva of its obligation to have produced the '006 patent. First, Merck specifically requested documents of not only Teva USA, but also relevant documents from its parent. *See* Exh. B, Merck's First Set of Document Requests, at p. 4. ¶ I. Second, Teva had an obligation to produce the '006 patent and its file history, because both Teva and Kenyon & Kenyon had access to and control of these documents, they were highly relevant to the very issues Teva raised in this case, and they were well within its ability to obtain. In fact they were in Kenyon & Kenyon's files. *See Camden Iron and Metal, Inc. v. Marubeni America Corp.*, 138 F.R.D. 438, 443-44 (D.N.J. 1991) (Ordering defendant to produce documents held by its parent corporation because, among other things, the defendant "has easy and customary access to the [parent's] documents . . . [and] possesses the ability to obtain such documents . . . for its usual business needs. ***One such business need is to provide highly relevant documents in litigation***.") (emphasis added); *Cooper Indus., Inc. v. British Aerospace*, 102 F.R.D. 918, 919-20 (S.D.N.Y. 1984) (Granting Plaintiff's motion to compel documents and for sanctions when Defendant refused to produce available documents held by its foreign affiliate.) Here, not only Teva had access to this alendronate-

related patent and application in connection with its business (as Teva, by this lawsuit, is seeking to be in the alendronate business), but these documents were in its trial counsel's office.

For these reasons, Merck submits that the Court should grant Merck's motion and add Teva's U.S. Patent No. 6,476,006, entitled "Composition and Dosage Form for Delayed Gastric Release of Alendronate and/or Other Bisphosphonates," to the trial record as Plaintiff's Trial Exhibit 301.

MORRIS, NICHOLS, ARSHT & TUNNELL

_____
Mary B. Graham (#2256)
Maryellen Noreika(#3208)
MORRIS, NICHOLS, ARSHT & TUNNELL
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200

OF COUNSEL:                         ATTORNEYS FOR PLAINTIFF
                                    MERCK & CO., INC.
John F. Lynch
Nicolas G. Barzoukas
HOWREY SIMON ARNOLD
& WHITE, LLP
750 Bering Drive
Houston, TX 77057-2198
Telephone: 713.787.1400

Paul D. Matukaitis
MERCK & CO., INC.
One Merck Drive
Whitehouse Station, NJ  08889-0100

Edward W. Murray
Gerard M. Devlin, Jr.
MERCK & CO., INC.
126 East Lincoln Ave., RY28-320
Rahway, NJ 07065

Dated:  April 11, 2003

# EXHIBIT A



US006476006B2

(12) **United States Patent**
Flashner-Barak et al.

(10) **Patent No.:** US 6,476,006 B2
(45) **Date of Patent:** Nov. 5, 2002

(54) **COMPOSITION AND DOSAGE FORM FOR DELAYED GASTRIC RELEASE OF ALENDRONATE AND/OR OTHER BIS-PHOSPHONATES**

(75) Inventors: **Moshe Flashner-Barak**, Petach Tikva (IL); **Vered Rosenberger**, Jerusalem (IL); **Muzal Dahan**, Jerusalem (IL); **Yitzhak Lerner**, Petach Tikva (IL)

(73) Assignee: **Teva Pharmaceutical Industries, Ltd.**, Petah Tiqva (IL).

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/770,898**

(22) Filed: **Jan. 26, 2001**

(65) **Prior Publication Data**

US 2002/0015733 A1 Feb. 7, 2002

**Related U.S. Application Data**

(60) Provisional application No. 60/260,438, filed on Jan. 9, 2001, and provisional application No. 60/213,832, filed on Jun. 23, 2000.

(51) Int. Cl.[7] ........................ **A01N 57/26**; A61K 31/66
(52) U.S. Cl. ........................ **514/76**; 514/102; 514/106; 514/109
(58) Field of Search ........................ 424/484; 514/102, 514/106, 109, 76

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,996,431 A | 8/1961 | Barry | |
| 3,139,383 A | 6/1964 | Neville | |
| 3,995,058 A | 11/1976 | Hammond et al. | |
| 4,140,755 A | 2/1979 | Sheth et al. | |
| 4,167,558 A | 9/1979 | Sheth et al. | |
| 4,407,761 A | 10/1983 | Blum et al. | |
| 4,434,153 A | 2/1984 | Urquhart et al. | |
| 4,621,077 A | 11/1986 | Rosini et al. | |
| 4,704,285 A | 11/1987 | Alderman | |
| 4,705,651 A | 11/1987 | Staibano | |
| 4,721,613 A | 1/1988 | Urquhart et al. | |
| 4,752,470 A | 6/1988 | Mehta | |
| 4,756,911 A | 7/1988 | Drost et al. | |
| 4,758,436 A | 7/1988 | Caldwell et al. | |
| 4,764,380 A | 8/1988 | Urquhart et al. | |
| 4,767,627 A | 8/1988 | Caldwell et al. | |
| 4,853,229 A | 8/1989 | Theeuwes | |
| 4,922,007 A | 5/1990 | Kieczkowski et al. | |
| 4,983,398 A | 1/1991 | Gaylord et al. | |
| 5,007,790 A | 4/1991 | Shell | |
| 5,019,651 A | 5/1991 | Kieczkowski et al. | |
| 5,051,262 A | 9/1991 | Panoz et al. | |
| 5,198,229 A | 3/1993 | Wong et al. | |
| 5,356,887 A | 10/1994 | Brenner et al. | 514/108 |

| | | | |
|---|---|---|---|
| 5,431,920 A | * 7/1995 | Bechard | 424/480 |
| 5,648,491 A | 7/1997 | Dauer et al. | |
| 5,780,057 A | 7/1998 | Conte et al. | |
| 5,837,284 A | 11/1998 | Mehta et al. | |
| 5,840,756 A | 11/1998 | Cohen et al. | |
| 5,847,726 A | 12/1998 | Hori | |
| 6,120,803 A | 9/2000 | Wong et al. | |
| 6,121,253 A | * 9/2000 | Han et al. | 514/102 |
| 6,143,326 A | 11/2000 | Mockel et al. | |
| 6,207,197 B1 | 3/2001 | Illum et al. | |
| 6,261,601 B1 | 7/2001 | Talwar et al. | |
| 6,340,475 B2 | 1/2002 | Shell et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 761 209 | 3/1997 |
| GB | 2 118 042 A | 10/1983 |
| JP | H4-346919 | 12/1992 |
| WO | WO 96/39410 | 12/1996 |
| WO | WO 98/11879 | 3/1998 |
| WO | WO 99/04764 | 2/1999 |

OTHER PUBLICATIONS

US 6,034,101, 3/2000, Gupta et al. (withdrawn)
Hwang, Sung–Joo; Park, Haesun; Park, Kinam, "Gastric Retentive Drug–Delivery Systems", Critical Review in Therapeutic Drug Carrier Systems, 1998, vol. 15, Issue 3, pp. 243–284.
Chen, Jun; Park Kinam, "Synthesis and characterization of superporous hydrogel composites", Journal of Controlled Release 65, 2000, pp. 73–82.
The United States Pharmacopeia and The National Formulary, Jan. 1, 2000, 24/19, p. 2235 (1999).
Chen, Jun; Blevins, William E.; Park, Haesun; Park, Kinam, "Gastric retention properties of superporous hydrogel composites", Journal of Controlled Release 64, 2000, pp. 39–51.
M.I. Kabachnik, T. Ya. Medved, et al. "Synthesis and Acid–Base and Complexing Properties of Amino–Substituted α–Hydroxyalkylidenediphosphonic Acids," pp. 374–377.

* cited by examiner

*Primary Examiner*—Alton Pryor
(74) *Attorney, Agent, or Firm*—Kenyon & Kenyon

(57) **ABSTRACT**

The present invention provides compacted pharmaceutical composition for oral administration to a patient which expands upon contact with gastric fluid to retain a dosage form in the patient's stomach for an extended period of time, the formulation comprising a non-hydrated hydrogel, a superdisintegrant and tannic acid. The present invention further provides a pharmaceutical dosage form containing an active ingredient, and the compacted pharmaceutical composition. The invention further provides a dosage form suitable for delivering a therapeutic bis-phosphonate such as alendronate to the stomach of a patient over and extended period.

**42 Claims, No Drawings**

US 6,476,006 B2

**1**

# COMPOSITION AND DOSAGE FORM FOR DELAYED GASTRIC RELEASE OF ALENDRONATE AND/OR OTHER BIS-PHOSPHONATES

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims the benefit under 35 U.S.C. §119 (e) of U.S. provisional applications Ser. No. 60/213,832, filed Jun. 23, 2000 and Ser. No. 60/260,438, filed Jan. 9, 2001, the contents of which are incorporated herein by reference.

## FIELD OF THE INVENTION

The present invention relates to gastric retention systems and to pharmaceutical dosage forms that use them to release a drug in a patient's stomach or duodenum. More particularly, the invention relates to gastric retention systems suitable for use with bis-phosphonates such as alendronic acid and its pharmaceutically acceptable salts and hydrates thereof, to release these drugs in a controlled manner.

## BACKGROUND OF THE INVENTION

After discovery of a new drug for treatment of a human disease further investigation must be undertaken to determine whether it is most effective to administer the drug to a patient intravenously, transdermally, subcutaneously or orally. Orally administered drugs are easy to administer and therefore are often favored whenever an oral route is feasible. However, compliance problems sometimes occur with orally administered drugs when the dosage form is inconvenient to take or must be taken frequently or at inconvenient times. Orally administered drugs are often presented to a patient in such dosage forms as tablets, pills, lozenges and capsules. Most orally administered drugs are absorbed into the bloodstream from the patient's gastrointestinal tract, excepting inhalants which are absorbed by the lungs and sinuses.

Orally-administered drug may be absorbed more readily by the gastrointestinal ("GI") tract through either the stomach wall or the intestine wall. Few drugs are efficiently absorbed by the colon. Tablets that are designed to carry drugs that are more readily absorbed through the intestine wall are sometimes covered with a coating that is resistant to the acidic conditions of the stomach but which decomposes under the basic conditions of the intestine. This enteric coating allows the tablet to transit the stomach without releasing the active ingredient until it reaches the portion of the GI tract where it is most readily absorbed. This enteric-coating strategy is also effective when the drug is caustic to the lining of the stomach or decomposes under acidic conditions.

It is sometimes desirable that a drug be released in a patient's stomach rather than in the intestine. One such instance is when it is therapeutically advantageous to release the drug over several hours. The average residence time of solid food in the small intestine is about three hours. A controlled release pharmaceutical dosage form may pass through the stomach and intestine and into the colon before the active ingredient has been completely released. However, if the dosage form is retained in the stomach, complete release occurs upstream of the small intestine and the active ingredient will enter the intestine in an unbound state in which it can be readily absorbed before reaching the colon.

**2**

It is also desirable to release a drug in the stomach when it is unstable to the basic conditions of the intestine. A composition that is formulated to dissolve upon contact with any aqueous solution will at least partially dissolve in the stomach because it reaches the stomach before it reaches the intestine. However, the average residence time of food in the stomach is only about 1 to 3 hours. Unless the drug is very rapidly absorbed, or the residence time is increased, some of the drug will pass to the intestine. An unstable drug will at least partially decompose to a product compound that either is not absorbed or, if absorbed, may not exert the desired therapeutic effect. Accordingly, decomposition of a base sensitive drug that passes into the intestine reduces the effectiveness of the dosage and, as well, introduces an uncontrollable factor that is detrimental to accurate dosing.

For the foregoing reasons, formulation chemists have developed strategies to increase the retention time of oral dosages in the stomach. One of the general strategies, involves using an intragastric expanding dosage form that swells upon contact with stomach juices, preventing its passage through the pylorus. Intragastric expanding dosage forms use hydrogels which expand upon contact with water to expand the dosage form to sufficient size to prevent its passage through the pylorus. An example of such a dosage form is described in U.S. Pat. No. 4,434,153. The '153 patent discloses a device for executing a therapeutic program after oral ingestion, the device having a matrix formed of a non-hydrated hydrogel and a plurality of tiny pills containing a drug dispersed throughout the matrix.

As reviewed by Hwang, S. et al. "Gastric Retentive Drug-Delivery Systems," *Critical Reviews in Therapeutic Drug Carrier Systems,* 1998, 15, 243–284, one of the main problems with intragastric expanding hydrogels is that it can take several hours for the hydrogel to become fully hydrated and to swell to sufficient size to obstruct passage through the pylorus. Since food remains in the stomach on average from about 1 to 3 hours, there is a high probability that known expanding dosage forms like that of the '153 patent will pass through the pylorus before attaining a sufficient size to obstruct passage.

The rate-limiting factor in the expansion of ordinary hydrogels is the rate of delivery of water to non-surfacial hydrogel material in the dosage form. Conventional non-hydrated hydrogels are not very porous when dry and ingress of water into the hydrogel is slowed further by the formation of a low permeability gelatinous layer on the surface after initial contact with water. One approach to solving this problem uses so-called superporous hydrogels. Superporous hydrogels have networks of pores of 100 $\mu$ diameter or more. Pores of that diameter are capable of efficient water transport by capillary action. Water reaches the non-surfacial hydrogel material quickly resulting in a rapid expansion of the superporous hydrogel to its full extent. However, there are also shortcomings attendant to the use of superporous hydrogels. They tend to be structurally weak and some are unable to withstand the mechanical stresses of the natural contractions that propel food out of the stomach and into the intestine. The superporous hydrogels tend to break up into particles too small to be retained.

Non-superporous hydrogels do not suffer from mechanical strength problems to as great an extent as superporous hydrogels. An additional advantage of using conventional hydrogels is that their degradation/erosion rates are well studied. The blended composition of the present invention should be compared with the superporous hydrogels described in Chen, J. and Park, K. *Journal of Controlled Release* 2000, 65, 73–82, wherein the mechanical strength

US 6,476,006 B2

3

of superporous hydrogels is improved by the polymerization of precursor hydrogel monomers in the presence of several superdisintegrants. The result of the polymerization described by Chen and Park is a new substance having interconnecting cross-linking networks of polyacrylate and, e.g. cross-linked carboxymethyl cellulose sodium. Such interconnecting networks are not expected to have the same degradation rates as conventional hydrogels made from the same precursor hydrogel monomers.

Many disease therapies can benefit from improvements in controlled gastric release technology, such as osteoporosis and Paget's disease. Bis-phosphonates such as alendronate, residronate, etidronate and teludronate are commonly prescribed drugs for treatment of these diseases. Despite their benefits, bis-phosphonates suffer from very poor oral bio-availability (Gert, B. J.; Holland, S. D.; Kline, W. F.; Matuszewski, B. K.; Freeman, A.; Quan, H.; Lasseter, K. C.; Mucklow, J. C.; Porras, A. G.; Studies of the oral bioavail-ablity of alendronate, *Clinical Pharmacology & Therapeutics* (1995) 58, 288–298), serious interference of absorption by foods and beverages other than water (ibid.), and side effects that consist of irritation of the upper gastrointestinal mucosa (Liberman, U. A.; Hirsch, L. J.; Esophagitis and alendronate, *N. Engl. J. Med.* (1996) 335, 1069–70) with the potential for this irritation leading to more serious conditions (*Physicians' Desk Reference,* Fosamax, Warnings).

To overcome these limitations, the bis-phosphonates, such as alendronate, are given in relatively large doses in a fasting condition while maintaining an upright position for at least a half an hour after dosing (*Physicians' Desk Reference,* Fosamax, Dosage and Administration). The standard treatment with the bis-phosphonates is chronic and daily, so the inconvenience to the patient can lead to non compliance with the dosage regimen. Since bis-phosphonates are not metabolized, dosing could be lowered to once a week instead of daily (70 mg per dose once a week in place of 10 mg per dose daily) by administering very large sustained-release doses of the drug, (Daifotis, A. G.; Santora II, A. C.; Yates, A. G.; Methods for inhibiting bone resorption, U.S. Pat. No. 5,994,329). While large dosing helps improve patient compliance, it has the potential of exacerbating the upper GI side effects of the drug.

Alendronate is best absorbed from the upper GI tract (duodenum and jejunum) (Lin, J. H.; Bisphosphonates: a review of their pharmacokinetic properties, *Bone* (1996), 18, 75–85. Porras, A. G.; Holland, S. D.; Gertz, B. J.; Pharmacokinetics of Alendronate, *Clin Pharmacokinet* (1999) 36, 315–328), and is better absorbed at a pH of ~6 (Gert, B. J.; Holland, S. D.; Kline, W. F.; Matuszewski, B. K.; Freeman, A.; Quan, H.; Lasseter, K. C.; Mucklow, J. C.; Porras, A. G.; Studies of the oral bioavailablity of alendronate, *Clinical Pharmacology & Therapeutics* (1995) 58, 288–298). Only gastric retention with controlled release allows for the extended delivery of a drug to the duodenum. Controlled release of the drug to the duodenum and jejunum parts of the intestine should allow an improvement in bioavailability, thus allowing a lowering of the total dose of the drug.

## SUMMARY OF THE INVENTION

We have now found a rapidly expanding oral dosage form that swells rapidly in the gastric juices of a patient, thereby increasing the likelihood that an active ingredient carried by the form will be released in the stomach. This oral design form employs a blend of a superdisintegrant, tannic acid and one or more conventional hydrogels. The dosage forms of the present invention swell rapidly, yet because they do not

4

require superporous hydrogels, do not have their associated mechanical strength problems.

The present invention further provides compacted pharmaceutical compositions for oral administration to a patient which expand upon contact with gastric fluid to retain a dosage form in the patient's stomach for an extended period of time, the formulation comprising a blend of a non-hydrated hydrogel, a superdisintegrant and tannic acid.

The present invention further provides a pharmaceutical dosage form containing an active ingredient and the compacted pharmaceutical composition.

Yet further, the present invention provides compositions and dosage forms for delayed release of bis-phosphonates. The dosage forms release the bis-phosphonates into the stomach of a patient suffering from osteoporosis or Paget's disease. The dosage forms include a drug delivery vehicle which retains the dosage form in the patient's stomach for an extended period of time. In some embodiments of the invention, the drug delivery vehicle further provides a means to slow the release of the bis-phosphonate. Bis-phosphonate is released into the stomach over at least a portion of the period that the dosage form is retained in the stomach.

## DETAILED DESCRIPTION OF THE INVENTION

The present invention provides a carrier composition for a pharmaceutically active ingredient and dosage forms containing the carrier composition and the active ingredient. Tablets containing the inventive composition swell rapidly on contact with aqueous solution, such as the gastric juices of a patient and simulated gastric fluid. Rapid swelling is achieved by a novel combination of hydrogel, superdisintegrant and tannic acid.

The preferred hydrogel of the present invention is hydroxypropylmethylcellulose, either alone or in combination with hydroxypropyl cellulose and/or a cross-linked acrylate polymer. Suitable cross-linked acrylate polymers include polyacrylic acid crosslinked with allyl sucrose commercially available under the trade name Carbopol® (BF Goodrich Chemical Ltd.) and polyacrylic acid cross linked with divinyl glycol. As further illustrated by Examples 5 and 8, below, a preferred hydrogel of the invention is a mixture of hydroxypropyl methylcellulose and hydroxypropyl cellulose. The most preferred hydrogel of the present invention is a combination of hydroxypropyl methylcellulose and hydroxypropyl cellulose in a weight ratio of from about 1:3 to about 5:3. The molecular weight of the hydrogels is not critical to practice of the invention.

The inventive composition also includes a superdisintegrant. Superdisintegrants are pharmaceutical excipients within a larger class of excipients known as disintegrants. Disintegrants are typically hydrophilic polymers of either natural or synthetic origin. Superdisintegrants are disintegrants that swell upon contact with water. Preferred superdisintegrants of the present invention swell to at least double their non-hydrated volume on contact with water. Exemplary of these superdisintegrants are cross-linked polyvinyl pyrrolidone (a.k.a. crospovidone), cross-linked carboxymethyl cellulose sodium (a.k.a. croscarmelose sodium) and sodium starch glycolate. Crospovidone is commercially available from BASF Corp. under the tradename Kollidon® CL and from International Specialty Chemicals Corp. under the tradename Polyplasdone®. Croscarmelose sodium is commercially available from FMC Corp. under the tradename Ac-Di-Sol® and from Avebe Corp. under the trade-

US 6,476,006 B2

5

name Primellose®. Sodium starch glycolate is commercially available from Penwest Pharmaceuticals Co. under the tradename Explotab® and from Avebe Corp. under the tradename Primojel®. The most preferred superdisintegrant is sodium starch glycolate.

The inventive composition further includes tannic acid. Tannic acid, also called tannin, gallotannin and gallotannic acid, is a naturally occurring constituent of the bark and fruit of many trees. The term "tannins" conventionally refers to two groups of compounds, "condensed tannins" and "hydrolyzable tannins." Merck Index monograph No. 8828 (9th ed. 1976). The hydrolyzable tannins are sugars that are esterified with one or more (polyhydroxylarene) formic acids. One common polyhydroxylarene formic acid is galloyl (i.e. 3,4, 5-trihydroxybenzoyl). Another common polyhydroxylarene formic acid substituent of tannins is meta-digallic acid. A common sugar moiety of tannins is glucose. The tannic acid of the present invention is selected from the hydrolyzable tannins, and especially glucose tannins in which one or more of the hydroxyl groups of glucose is esterified with gallic acid and/or meta-digallic acid.

The novel expanding composition of the present invention comprises hydroxypropyl methylcellulose, optionally in combination with other hydrogel polymers, a superdisintegrant and tannic acid. These excipients are preferably combined in a weight ratio, exclusive of any other excipients that may be present, of from about 20 wt. % to about 80 wt. % hydrogel, from about 10 wt. % to about 75 wt. % superdisintegrant and from about 2 wt. % to about 15 wt. % tannic acid. A preferred composition comprises from about 30 wt. % to about 55 wt. % superdisintegrant, about 5 wt. % (±2 wt. %) tannic acid, plus an amount of hydrogel sufficient to bring the total to 100 wt. %.

One especially preferred embodiment of the present invention is a rapidly expanding pharmaceutical composition comprising from about 10 wt. % to about 20 wt. % hydroxypropyl methyl cellulose, from about 45 wt. % to about 50 wt. % hydroxypropyl cellulose, about 25 wt. % to about 35 wt. % sodium starch glycolate and about 4 wt. % to about 6 wt. % tannic acid. A second especially preferred embodiment of the present invention is a rapidly expanding pharmaceutical composition comprising from about 20 wt. % to about 30 wt. % hydroxypropyl methyl cellulose, from about 10 wt. % to about 20 wt. % hydroxypropyl cellulose, about 45 wt. % to about 55 wt. % sodium starch glycolate and about 4 wt. % to about 6 wt. % tannic acid.

The novel composition of the invention can be prepared conventionally by dry blending. In order to form a structurally resilient mass upon contact with water or gastric fluid, the blended composition is compacted prior to hydration.

One object of the invention is to provide a dosage form such as a tablet that is retained in the stomach for an extended period of time by swelling to a size that prevents passage through the pylorus upon contact with gastric juices. Over time the swollen tablet degrades or erodes into particles that are sufficiently small to traverse the pylorus. The tablet may be compacted following conventional dry granulation or direct compression processing.

The pharmaceutical dosage forms of the present invention comprise the compacted expanding composition of the invention and an active ingredient. Active ingredients that may be carried by these dosage forms include, but are in no way limited to, bis-phosphonates such as alendronic acid and its pharmaceutically acceptable salts and hydrates, levodopa, carbidopa, methylphenidate, diltiazem, irinotecan and etoposide. Preferably, the pharmaceutical dosage forms

6

are retained in the stomach for three hours or more, more preferably about five hours or more. In order to obstruct passage through the pylorus, the dosage form preferably swells by a factor of five or more, more preferably about eight or more, within about fifteen minutes of contacting gastric fluid. Yet more preferably, such swelling is reached within about five minutes.

The novel composition of the invention can be prepared conventionally by dry blending. In order to form a structurally resilient mass upon contact with water or gastric fluid, the blended composition is compacted prior to hydration. The composition may be prepared following conventional dry granulation or direct compression techniques.

For instance, the blended composition may be compacted into a slug or a sheet and then comminuted into compacted granules. The compacted granules may be compressed subsequently into a final dosage form. It will be appreciated that the processes of slugging or roller compaction, followed by comminution and recompression render the hydrogel, superdisintegrant and tannic acid intragranular in the final dosage form. The active ingredient of the pharmaceutical may also be provided intragranularly by blending it with the expanding composition prior to compaction. Alternatively the active ingredient may be added after comminution of the compacted composition, which results in the active ingredient being extragranular.

As an alternative to dry granulation, the blended composition may be compressed directly into the final pharmaceutical dosage form using direct compression techniques. Direct compression produces a more uniform tablet without granules. Thus the active ingredient and any other desired excipients are blended with the composition prior to direct compression tableting. Such additional excipients that are particularly well suited to direct compression tableting include microcrystalline cellulose, spray dried lactose, dicalcium phosphate dihydrate and colloidal silica. An additional alternative to dry granulation is wet granulation. The blend of excipients may be granulated using water or an alcohol as a granulation solvent by standard granulation techniques known in the art followed by drying.

In addition to the above-described excipients, the rapidly expanding pharmaceutical composition and dosage form may further include any other excipients. One factor that must be taken into account in formulating a pharmaceutical composition is the mechanical process which the composition undergoes to be transformed into a dosage form, such as a tablet or capsule. Some excipients are added to facilitate this mechanical processing, such as glidants and tablet lubricants. Glidants improve the flow properties of the composition in powder or granule form while lubricants ease ejection of a tablet from the tableting dye in which it is formed by compression. Silicon dioxide is a common glidant, while magnesium is a common tablet lubricant. Thus, for example, the present inventive composition may further include silicon dioxide and magnesium stearate. Other excipients which may be mentioned are binders, that are added to prevent flaking and other types of physical disintegration of the tablet prior to ingestion by a patient. Yet other excipients are diluents whose presence causes the tablet to be larger and thus easier for a patient to handle.

Further increase in retention times can be realized by the addition of a compound that produces gas when contacted with acid, such as sodium bicarbonate. Sodium bicarbonate may be provided by blending into the expanding composition of the invention or may be an extragranular constituent of a tablet prepared by dry granulation. Sodium bicarbonate

US 6,476,006 B2

7

is preferably used at low concentration, of from about 0.5 wt. % to about 5 wt. % of expanding composition.

In addition to the above-described use of the expanding composition in tablets prepared by dry or wet granulation and compression, there are many other embodiments in which the expanding composition could be used to retain a drug delivery vehicle in the stomach. For instance, the expanding composition can be used to coat a smaller tablet (this is a preferred construction of a gastric retention dosage form of alendronate, described belo). The expanding composition can be used advantageously in this way in sustained delivery of a drug. After contact with aqueous fluid and swelling, the composition is highly porous. Thus, the release rate of a sustained release dosage form like a coated tablet or slowly desintegrating tablet is substantially unaffected by a coating of the expanding composition.

The expanding composition is also suited for the retention of drugs in the stomach when such drugs are contained in tablets that are either partially embedded in the expanding composition or attached thereto by an adhesive. These tablets can be of a slow release nature giving slow or controlled release for an extended period of time in the stomach. These tablets can further be of a delayed pulse release nature. The expanding composition of this invention will retain these forms in the stomach until the delay time has passed whereupon the drug will be released in a burst or pulse fashion. Attaching, or partially embedding, several such tablets, each timed with a different relay to release, to the composition of this invention, allows versatile dosing schemes from one taken dose. For example, one could deliver three (or more) timed doses in a pulse fashion while the patient needs to take the dose only once. The three doses would mimic taking three doses of the drug at the prescribed times, with the drug being absorbed from the stomach with each dose. Such dosing allows for improved compliance to dosage schedules and in many cases will lead thereby to improved therapy.

Delayed dosage forms that are not coupled to gastric retention will deliver each such dose in a different part of the GI tract with different absorption profiles for each of the doses. Such therapy would not be equivalent to taking three doses of the drug at the prescribed times, wherein the drug would have been absorbed from the stomach in each case.

The present invention provides a delayed release dosage form containing the delivery vehicle/composition of the invention and a therapeutic bis-phosphonate that is capable of delivering the bis-phosphonate to the stomach of a patient several hours after administration.

Suitable bis-phosphonates include alendronic acid and its pharmaceutically acceptable salts and hydrates thereof, as well as residronate, etidronate and teludronate.

The bis-phosphonate drug delivery vehicle may be formed from the afore-described hydrogel, superdisintegrant and tannic acid by blending or granulating. Regardless of the method by which the hydrogel, superdisintegrant and tannic acid are combined, they are preferably combined in a weight ratio, exclusive of the bis-phosphonate and any other excipients that may be present, of from about 50 wt. % to about 80 wt. % hydrogel, from about 10 wt. % to about 30 wt. % superdisintegrant and from about 5 wt. % to about 15 wt. % tannic acid. A yet more preferred drug delivery vehicle comprises from about 15 wt. % to about 25 wt. % superdisintegrant, about 10 wt. % (±2 wt. %) tannic acid, plus an amount of hydrogel sufficient to bring the total to 100 wt. %. One especially preferred bis-phosphonate delivery vehicle comprises from about 15 wt. % to about 20 wt.

8

% hydroxypropyl methyl cellulose, from about 45 wt. % to about 55 wt. % hydroxypropyl cellulose, about 20 wt. % to about 25 wt. % carboxy methyl cellulose sodium and about 8 wt. % to about 12 wt. % tannic acid.

Dosage forms containing the drug delivery vehicle and bis-phosphonate swell rapidly on contact with aqueous solution, e.g. water, gastric fluid and acidic solutions like simulated gastric fluid. In order to obstruct passage through the pylorus, the drug delivery vehicle preferably swells by a factor of five or more, more preferably about eight or more, within about fifteen minutes of contacting gastric fluid. Yet more preferably, such swelling is reached within about five minutes. Preferably, the swelling causes retention of the pharmaceutical dosage forms in the stomach for three hours or more, more preferably about four hours or more, after which time the drug delivery vehicle either dissolves or degrades into fragments small enough to pass through the pylorus.

The invention further relates to specific pharmaceutical dosage forms containing a therapeutic bis-phosphonate and the drug delivery vehicle. These forms may have (a) a monolithic construction, such as a tablet made by conventional direct compression or granulation techniques wherein the active is dispersed in the drug delivery vehicle, (b) a layered construction wherein the active, alone or in mixture with any other excipients, form a layer that is bonded, e.g. by compression, to another layer formed of the drug delivery vehicle, (c) an encapsulated construction wherein either of the (a) or (b) type constructions are encapsulated, (d) a coated construction wherein a core containing the actives is coated with the drug delivery vehicle, and (e) a construction whereby the drug is incorporated in an optionally coated matrix tablet, said tablet being partially embedded in the drug delivery vehicle, or attached externally to the drug delivery vehicle by an adhesive.

A monolithic dosage form can be prepared by the direct compression and granulation methods previously described. The monolithic dosage form may be made in any shape desired, but it has been found that an ovoid or elliptical shape is advantageous for retaining the dosage form in the stomach. An ovoid or elliptical dosage form preferably is sized at between about 4 mm and 8 mm in two dimensions and between about 10 mm and 20 mm in the third dimension, more preferably about 6×6×16 mm. Monolithic dosage forms slow the release of the actives due to the diffusional barrier created by the surrounding swelled hydrogel. The diffusion may slow to the point that release occurs by erosion of the drug delivery vehicle.

In a monolithic dosage form, delayed release of the actives may be provided by coating the actives with a delay release coating according to methods known to the art. Thus, where the foregoing description of the present invention has described mixing, blending, granulating, compressing, etc. of the actives, it will be appreciated by those skilled in the art that the actives may previously have been coated with a coating that erodes slowly in gastric fluid to provide a delay in release of the actives. In particular, a monolithic dosage form may contain microgranules, microcapsules or coated beads containing the actives.

A particularly preferred bis-phosphonate dosage form is a coated construction wherein the drug delivery vehicle coats a core containing the active. This construction is illustrated in detail with Examples 9–12, below. A coated construction delays the release of the active by providing a diffusional barrier through which the active must pass before it is released. As illustrated in the Examples, a coated construc-

US 6,476,006 B2

**9**

tion can provide either a delayed/rapid release or a delayed/extended release of the active depending upon the formulation of the core.

A preferred layered construction is one which contains the drug delivery vehicle in one layer and the actives in another layer. Preferred dimensions for this embodiment are about 14×8 mm. A layered construction may be prepared by conventional multilayer compression techniques. A layered dosage form comprising two layers, one comprising the drug delivery vehicle and the other comprising the actives and any other desired excipients, may be made to delay release of the actives by coating only the actives-containing layer with a conventional coating resistant to gastric fluids. A further method of achieving a delay in the release is to formulate the drug containing layer as a matrix that delays diffusion and erosion or by incorporating the active substances in microcapsules or coated beads within the drug containing layer.

The drug delivery vehicle is also suited for the retention of the actives in the stomach when the actives are contained in tablets that are either partially embedded in the drug delivery vehicle or attached thereto by an adhesive. In addition to being of sustained release nature, these tablets can further be of a delayed pulse release nature or a delayed sustained release nature. The expanding composition of this invention will retain these forms in the stomach until the delay time has passed whereupon the drug will be released in a burst or pulse fashion or in a sustained fashion. Attaching, or partially embedding, several such tablets, each timed with a different delay to release, to the composition of this invention, allows versatile dosing schemes from one taken dose. For example, one could deliver three (or more) timed doses in a pulse fashion while the patient needs to take the dose only once. The three doses would mimic taking three doses of the drug at the prescribed times, with the drug

**10**

Having thus described the invention with reference to certain preferred embodiments, other embodiments will become apparent to one skilled in the art from consideration of the specification and examples. It is intended that the specification, including the examples, is considered exemplary only, with the scope and spirit of the invention being indicated by the claims which follow.

EXAMPLES

Examples 1–8

Materials

The HPMC used was HPMC K-15PM. The hydroxypropyl cellulose used was Klucel® HF NF, available from Hercules. The sodium croscarmellose used was Ac-Di-Sol® obtained from Avebe Corp. The crosslinked polyacrylic acid was Carbopol® 974P obtained from B.F. Goodrich Chemical Ltd. All materials were of pharmaceutical grade.

Preparation of Tablets

The compositions of each of the tablets are summarized in Table 1. All the compositions contain hydroxypropyl methyl cellulose, tannic acid, a superdisintegrant and 1% magnesium stearate. All of the excipients, except for magnesium stearate, were mixed simultaneously and thoroughly blended by hand. Magnesium stearate was then added at a level of 1% w/w and the blend was further mixed by hand until the magnesium stearate was uniformly distributed throughout the composition. The amount of each composition needed to produce a 5 mm thick tablet was determined and then that amount was compressed into 5 mm thick tablets on a Manesty f3 single punch tableting machine with a 10 mm diameter punch and die. Tablets ranged in weight from 350–400 mg and each had a hardness within the range of 5–7 KP as tested in an Erweka hardness tester.

TABLE 1

| Excipient | Example No. (wt. %) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| hydroxypropyl methylcellulose | 23.8 | 32.7 | 30.3 | 23.8 | 26.7 | 38.5 | 34.8 | 15.9 |
| Hydroxypropyl cellulose | 0.0 | 0.0 | 0.0 | 0.0 | 16.0 | 19.2 | 0.0 | 47.6 |
| cross-linked polyacrylic acid | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.7 | 0.0 |
| Total Hydrogel | 23.8% | 32.7% | 30.3% | 23.8% | 42.7% | 57.7% | 43.5% | 63.5% |
| Sodium starch glycolate | 71.4 | 65.4 | 60.6 | 0.0 | 53.3 | 38.5 | 52.2 | 31.7 |
| Sodium Croscarmellose | 0.0 | 0.0 | 0.0 | 71.4 | 0.0 | 0.0 | 0.0 | 0.0 |
| Tannic Acid | 4.8 | 2.0 | 9.1 | 4.8 | 4.0 | 3.8 | 4.3 | 4.8 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

being absorbed from the stomach with each dose. Such dosing allows for improved compliance to dosage schedules and in many cases will lead thereby to improved therapy. Delayed dosage forms that are not coupled to gastric retention will deliver each such dose in a different part of the GI tract with different absorption profiles for each of the doses. Such therapy would not be equivalent to taking three doses of the drug at the prescribed times, wherein the drug would have been absorbed from the stomach in each case.

In addition to the above-described dosage forms, there are many other dosage forms in which the drug delivery vehicle could be used to deliver a therapeutic bis-phosphonate over a sustained period in the stomach.

Swelling tests

The tablets were added to 40 ml of 0.1M HCl contained in a 50 ml beaker and maintained at 37±2° C. The tablets were removed after fifteen minutes with a tweezers and measured with a caliper. Gel strength was assessed qualitatively with the tweezers.

Results

The results of the swelling tests are summarized in Table 2. Swelling of the hydrogel was enhanced using either sodium croscarmellose or sodium starch glycolate. The formulation can optionally and advantageously contain a mixture of two hydrogel polymers demonstrated by the incorporation hydroxypropyl cellulose and carbopol in the

US 6,476,006 B2

**11**

formulations of Examples 5, 6 and 8. The tablet that expanded the most (36 times in volume) contained tannic acid at 5% with sodium croscarmellose as the disintegrant. The tablet with the second highest expansion (18x) also contained tannic acid at 5% but used sodium starch glyco-late. Both of those gels were qualitatively weak compared to those of examples 5–8. The best performing tablets in terms of a high degree of expansion and good mechanical strength are those of Examples 5 and 8, which contained tannic acid at 5 wt. %, used both hydroxypropyl methylcellulose and hydroxypropyl cellulose hydrogel polymers and contained sodium starch glycollate as disintegrant.

TABLE 2

| Example No. | Degree of Swelling[a] | Strength |
|---|---|---|
| 1 | 18.1 | moderate |
| 2 | 12.7 | moderate |
| 3 | 7.2 | moderate |
| 4 | 36 | moderate |
| 5 | 10.4 | strong |
| 6 | 2 | strong |
| 7 | 4.5 | strong |
| 8 | 9.7 | strong |

[a]ratio of hydrated tablet volume to dry tablet volume

Example 9

Sodium alendronate monohydrate was formulated into an immediate release tablet of 5-mm diameter with the composition of Table 3 by mixing the powders and direct compression in a standard rotary tablet press. Tablet hardness was between 7 and 12 kP.

TABLE 3

| Component | Weight (mg) |
|---|---|
| Sodium alendronate monohydrate | 11.6 mg[a] |
| Microcrystalline cellulose | 30 mg |
| Lactose for direct compression | 20 mg |
| Magnesium stearate | 0.5 mg |

[a]equivalent to 10 mg alendronic acid

This tablet was embedded into 800 mg of gastric retention delivery system (GRDS) matrix of formulation of Table 4 formed by dry mixing of the components and compression in a Kilian RUD-20 press coat machine. The outer tablet is of oval shape with dimensions approximately 17×7×9 mm.

TABLE 4

| GRDS Component | weight % |
|---|---|
| HPMC (Methocel ® K-15M) | 17 |
| Tannic acid | 10 |
| HPC (Klucel ® HF) | 50 |
| Crosscarmellose (aci-di-sol ®) | 22 |
| Magnesium stearate | 1 |

The tablet was tested in a USP apparatus 2 dissolution tester at 37° C. in 500 ml 0.1N HCl to simulate gastric conditions. The tablet expanded in about 15 minutes to dimensions of 22×10×23 mm, large enough to effect gastric retention since the tablet in its swollen state will not fit through the pylorus. The results of the release of the alendronate are given in Table 5. Essentially no alendronate was released during the first three hours. The drug was then released at a relatively fast rate from the disintegrating inner tablet through the GRDS matrix.

**12**

TABLE 5

| Time (h) | Cumulative % release |
|---|---|
| 0 | 0 |
| 1 | 0 |
| 2 | 0 |
| 3 | 3 |
| 4 | 50 |
| 5 | 100 |

Example 10

Sodium alendronate monohydrate was formulated into an extended release tablet of 5-mm diameter with a composition shown in Table 6 by mixing the powders and direct compression in a standard rotary tablet press. Tablet hardness was between 7 and 12 kP.

TABLE 6

| Component | Weight (mg) |
|---|---|
| Sodium alendronate monohydrate | 11.6 mg[a] |
| Microcrystalline cellulose | 25 mg |
| Lactose | 25 mg |
| Magnesium stearate | 0.5 mg |

[a]equivalent to 10 mg alendronic acid

This tablet was embedded into 800 mg of Gastric Retention Delivery System (GRDS) matrix of formulation of Table 7 formed by dry mixing of the components and compression in a Kilian RUD-20 press coat machine. The outer tablet is of oval shape with dimensions about 17×7×9 mm.

TABLE 7

| Component | weight % |
|---|---|
| HPMC (Methocel K-15M) | 17 |
| Tannic acid | 10 |
| HPC (Klucel HF) | 50 |
| Crosscarmellose (aci-di-sol) | 22 |
| Magnesium stearate | 1 |

The tablet was tested in a USP apparatus 2 dissolution tester at 37° C. in 500 ml 0.1N HCl to simulate gastric conditions. The tablet expanded in 15 minutes to dimensions of 22×10×23 mm, sufficiently large to cause gastric retention. The results of the release of the alendronate are given in Table 8. Essentially no alendronate was released during the first three hours. The drug was then released at a slow extended release profile.

TABLE 8

| Time (h) | Cumulative % release |
|---|---|
| 0 | 0 |
| 1 | 0 |
| 2 | 0 |
| 3 | 2 |
| 4 | 9 |
| 5 | 15 |
| 6 | 21 |
| 7 | 27 |
| 8 | 32 |
| 9 | 36 |

Example 11

Sodium alendronate monohydrate (11.6 mg) was formulated into a tablet of 5-mm diameter with 50 mg of the

US 6,476,006 B2

13

GRDS composition shown in Table 7 above by mixing the powders and direct compression in a standard rotary tablet press. Tablet hardness was between 7 and 12 kP. This tablet is embedded into 800 mg of Gastric Retention Delivery System (GRDS) matrix formulation of Table X formed by dry mixing of the components and compression in a Kilian RUD-20 press coat machine. The outer tablet was of oval shape with dimensions about 17×7×9 mm.

The tablets were tested in a USP apparatus 2 dissolution tester at 37° C. in 500 ml 0.1N HCl to simulate gastric conditions. The tablet expand in about 15 minutes to dimensions of 22×10×23 mm, large enough to effect gastric retention. The results of the release of the alendronate are given in Table 9.

Essentially no alendronate was released during the first three hours. The drug was then released at a relatively constant pace from the inner tablet through the GRDS matrix.

TABLE 9

| Time (h) | Cumulative % release |
|----------|----------------------|
| 0 | 0 |
| 1 | 0 |
| 2 | 0 |
| 3 | 5 |
| 4 | 15 |
| 5 | 30 |
| 6 | 50 |
| 7 | 65 |
| 8 | 75 |
| 9 | 80 |
| 12 | 100 |

Example 12

Sodium alendronate monohydrate was granulated with 0.5% HPC (Klucel HF) in ethanol. The granule was dried and milled to a free flowing powder. This granulate was mixed with the GRDS matrix formulation of Table 7 in a ratio of 11.8 mg alendronate granulate to 850 mg GRDS matrix such that the alendronate matrix was dispersed homogeneously in the matrix. Tablets were pressed in a standard rotary press using oval tooling to give tablets with an approximate size of 17×7×8 mm. 500 grams of these tablets were coated in a perforated pan coater with 5% HPMC suspended in ethanol under the following conditions to give tablets with a coating level of 15% w/w.

| Coating conditions: | |
|---------------------|--|
| Bed temperature: | 40° C. |
| Solution flow rate: | 7.5 ml/min |
| Coating time: | about 20 minutes |

The tablets were tested in a USP apparatus 2 dissolution tester at 37° C. in 500 ml 0.1N HCl to simulate gastric conditions. The tablet expands quickly, but slower than in the previous examples (in about 45 minutes) to dimensions of 20×8×20 mm which is large enough to effect gastric retention. The results of the release of the alendronate are given in Table 10. A low level of alendronate was released during the first three hours. The drug was then released at a relatively constant pace from the GRDS matrix.

14

TABLE 10

| Time (h) | Cumulative % release |
|----------|----------------------|
| 0 | 0 |
| 1 | 1 |
| 2 | 3 |
| 3 | 5 |
| 4 | 25 |
| 5 | 45 |
| 6 | 65 |
| 7 | 85 |
| 8 | 100 |

Example 13

Tablets from example 11 were administered to 3 beagle dogs in a crossover design versus an immediate release alendronate formulation. Urine samples were collected for 48 hours and an overall AUC for alendronate was determined. The average bioavailability of the alendronate from the immediate release formulation was calculated to be ~1.5% while the bioavailability of the gastric retention alendronate was found to be greater than 3%

We claim:

1. A pharmaceutical dosage form for oral administration to a patient which provides delayed gastric release of a therapeutically effective amount of a therapeutic bis-phosphonate, the dosage form comprising the bis-phosphonate and a drug delivery vehicle comprising a non-hydrated hydrogel, a superdisintegrant and tannic acid wherein upon contact with gastric fluid or simulated gastric fluid the non-hydrated hydrogel hydrates and the delivery vehicle expands.

2. The pharmaceutical dosage form of claim 1 wherein the superdisintegrant swells to at least double its non-hydrated volume on contact with water.

3. The pharmaceutical dosage form of claim 1 wherein the tannic acid comprises from about 2 weight percent to about 15 weight percent of the drug delivery vehicle.

4. The pharmaceutical dosage form of claim 1 wherein the bis-phosphonate either is not released or is released at a low level for a period of two hours resulting in a cumulative release of about 5% or less.

5. The pharmaceutical dosage form of claim 1 wherein the bis-phosphonate either is not released or is released at a low level for a period of three hours resulting in a cumulative release of about 5% or less.

6. The pharmaceutical dosage form of claim 1 wherein essentially no bis-phosphonate is released for a period of two hours resulting in a cumulative release after three hours of about 5% or less.

7. The pharmaceutical dosage form of claim 1 wherein the bis-phosphonate is selected from the group consisting of alendronic acid and its pharmaceutically acceptable salts and hydrates thereof, residronate, etidronate and teludronate.

8. The pharmaceutical dosage form of claim 1 wherein the bis-phosphonate is alendronic acid or one of its pharmaceutically acceptable salts and hydrates thereof.

9. The pharmaceutical dosage form of claim 8 wherein the bis-phosphonate is monosodium alendronate monohydrate.

10. The pharmaceutical dosage form of claim 8 wherein the bis-phosphonate is monosodium alendronate trihydrate.

11. The pharmaceutical dosage form of claim 8 wherein the bis-phosphonate is alendronic acid.

12. The pharmaceutical dosage form of claim 1 wherein the hydrogel comprises hydroxypropyl methylcellulose.

13. The pharmaceutical dosage form of claim 12 wherein the hydrogel further comprises hydroxypropyl cellulose.

15

14. The pharmaceutical dosage form of claim 13 wherein the hydrogel comprises hydroxypropyl methylcellulose and hydroxypropyl cellulose in a weight ratio of from about 1:3 to about 5:3.

15. The pharmaceutical dosage form of claim 2 wherein the superdisintegrant is selected from the group consisting of cross-linked polyvinylpyrrolidone, cross-linked carboxymethyl cellulose sodium and sodium starch glycolate.

16. The pharmaceutical dosage form of claim 15 wherein the superdisintegrant is sodium starch glycolate.

17. The pharmaceutical dosage form of claim 15 wherein the superdisintegrant is cross-linked carboxymethyl cellulose sodium.

18. The pharmaceutical dosage form of claim 3 wherein tannic acid comprises from about 5 weight percent to about 15 weight percent of the drug delivery vehicle.

19. A method of treating bone disease in a human patient in need of such treatment by administering to the patient the pharmaceutical dosage form of claim 1.

20. The method of claim 19 wherein the bone disease is metastatic bone disease.

21. The method of claim 19 wherein the bone disease is osteoporosis.

22. The method of claim 19 wherein the bone disease is Paget's disease.

23. A method of inhibiting bone resorption in a human patient in need of such treatment by administering to the patient the pharmaceutical dosage form of claim 1.

24. A method of treating hypercalcemia in a human patient in need of such treatment by administering to the patient the pharmaceutical dosage form of claim 1.

25. A method of treating malignancy in bone of a human patient in need of such treatment by administering to the patient the pharmaceutical dosage form of claim 1.

26. The pharmaceutical dosage form of claim 1 wherein the drug delivery vehicle comprises of from about 50 wt. % to about 80 wt. % of a hydrogel, of from about 10 wt. % to about 30 wt. % of a superdisintegrant, and of from about 5 wt. % to about 10 wt. % tannic acid.

27. The pharmaceutical dosage form of claim 26 capable of being retained in the stomach of a human patient for a period of at least two hours.

28. The pharmaceutical dosage form of claim 26 capable of being retained in the stomach of a human patient for a period of at least three hours.

29. The pharmaceutical dosage form of claim 26 wherein the dosage form swells by a factor of five or more within about fifteen minutes of contacting aqueous solution.

30. The pharmaceutical dosage form of claim 29 wherein the dosage form swells by a factor of eight or more within about fifteen minutes of contacting aqueous solution.

31. The pharmaceutical dosage form of claim 29 wherein the dosage form swells by a factor of five or more within about five minutes of contacting aqueous solution.

16

32. The pharmaceutical dosage form of claim 26 further comprising a substance that emits gas upon contact with acid.

33. The pharmaceutical dosage form of claim 32 wherein the substance that emits gas upon contact with acid is sodium bicarbonate.

34. The pharmaceutical dosage form of claim 26 wherein the hydrogel comprises hydroxypropyl methylcellulose.

35. The pharmaceutical dosage form of claim 34 wherein the hydrogel further comprises hydroxypropyl cellulose.

36. The pharmaceutical dosage form of claim 35 wherein the hydrogel comprises hydroxypropyl methylcellulose and hydroxypropyl cellulose in a weight ratio of from about 1:3 to about 5:3.

37. The pharmaceutical dosage form of claim 26 wherein the superdisintegrant is selected form the group consisting of cross-linked polyvinylpyrrolidone, cross-linked carboxymethyl cellulose sodium and sodium starch glycolate.

38. A coated pharmaceutical dosage form comprising a core which contains a therapeutic bis-phosphonate and optionally other pharmaceutical excipients and a coating around the core, wherein the coating comprises a hydrogel, a superdisintegrant and tannic acid.

39. The coated pharmaceutical dosage form of claim 38 comprising from about 50 wt. % to about 80 wt. % of a hydrogel, from about 10 wt. % to about 30 wt. % of a superdisintegrant, and from about 5 wt. % to about 10 wt. % tannic acid.

40. A coated pharmaceutical dosage form having a core comprising about 18 wt. % sodium alendronate monohydrate, about 48 wt. % microcrystalline cellulose and about 32 wt. % lactose, the core having a coating thereon which comprises about 17 wt. % HPMC, about 10 wt. % tannic acid, about 50 wt. % HPC and about 22 wt. % crosslinked carboxymethyl cellulose sodium.

41. A coated pharmaceutical dosage form having a core comprising about 18 wt. % sodium alendronate monohydrate, about 41 wt. % microcrystalline cellulose and about 41 wt. % lactose, the core having a coating thereon which comprises about 17 wt. % HPMC, about 10 wt. % tannic acid, about 50 wt. % HPC and about 22 wt. % crosslinked carboxymethyl cellulose sodium.

42. A method of making the dosage form of claim 40 or 41 comprising the steps of mixing powdered sodium alendronate monohydrate, microcrystalline cellulose and lactose, tableting the mixed powders to make a core, dry mixing the HPMC, tannic acid, HPC and cross-linked carboxymethyl sodium to produce a coating mix, embedding the core in the coating mix and compacting the coating mix to produce the dosage form.

*    *    *    *    *

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MERCK & CO., INC.,

                Plaintiff,

        v.

TEVA PHARMACEUTICALS USA, INC

                Defendant.

C.A. No. 01-048-JJF
(Consolidated)

**MERCK & CO., INC.'S FIRST SET OF REQUESTS
FOR PRODUCTION OF DOCUMENTS AND THINGS (NOS. 1-60)
TO DEFENDANT TEVA PHARMACEUTICALS USA, INC.**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiff Merck &

Co., Inc. ("Merck") requests that Defendant Teva Pharmaceuticals USA, Inc. produce for

inspection and copying the following documents and things in their possession, custody, or

control. The requested documents and things are to be made available for inspection, copying,

and/or photographing at the offices of HOWREY SIMON ARNOLD & WHITE, LLP, 750

Bering Drive, Houston, Texas 77057, thirty (30) days after the service hereof, or at such other

time and location as may be mutually agreed upon by the parties. Documents either shall be

produced as required by Rule 34.

**DEFINITIONS AND INSTRUCTIONS**

The following definitions and instructions are applicable to terms employed in

this set of requests:

A.      These requests require you to produce all documents and things that are in

your actual or constructive possession, custody, or control or in the possession, custody or

control of your attorneys, accountants, representatives, consultants, agents, employees, or anyone

else acting on your behalf.

B.    The term "DOCUMENT" shall have the broadest meaning possible under the Federal Rules of Civil Procedure and shall include, but not be limited to, the original (or a copy when the original is not available), each non-identical copy (including those which are non-identical by reason of notations or markings, or by appearing in the files of a separate person), and any books, notebooks, pamphlets, periodicals, letters, reports, memoranda, handwritten notes, notations, messages, telegrams, wires, cables, press or news wire releases, records, studies, analyses, summaries, magazines, booklets, circulars, labels, catalogs, bulletins, instructions, operating or maintenance manuals, operating or product specifications, fabrication sheets, calendars, day-timers, notes or records of meetings, notices, purchase orders, bills, ledgers, checks, tabulations, questionnaires, surveys, drawings, sketches, schematics, blueprints, flow sheets, working papers, charts, graphs, indices, tapes, agreements, releases, appraisals, valuations, estimates, opinions, financial statements, accounting records, income statements, photographs, films or videotapes, tapes, minutes, contracts, leases, invoices, records of purchase or sale, correspondence, electronic or other transcription or taping of or notes pertaining to telephone or personal conversations or conferences, tape recordings, electromagnetic recordings, voice mail messages or transcriptions thereof, interoffice and intraoffice communications of all types, E-mail messages or printouts thereof, microfilms, CD ROMs, videotapes or cassettes, films, movies, computer printouts and all other written, printed, typed, punched, engraved, taped, filmed, recorded (electronically or otherwise), labeled, or graphic matter or thing, of whatever description, however produced or reproduced (including computer-stored or generated data, together with instructions or programs necessary to search and retrieve such data), and shall include all attachments to (including tangible things) and enclosures with (including tangible

things) any requested item, to which they are attached or with which they are enclosed, and each draft thereof.

C.     The term "THING" refers to any tangible object, other than a DOCUMENT, and includes objects of every kind and nature including, but not limited to, prototypes, models, samples and specimens.

D.     These requests shall include DOCUMENTS and THINGS created, acquired, or identified up to the date(s) of production and shall be deemed to be continuing. Therefore, Defendant shall promptly produce to Merck, as supplemental responses to these requests in accordance with FED. R. CIV. P. 26(e), any additional DOCUMENTS or THINGS that Defendant identify, acquire, or become aware of up to and including the time of trial.

E.     The term "communications" includes all discussions, conversations, interviews, negotiations, facsimiles, cablegrams, mailgrams, telegrams, telexes, cables or other forms of written or verbal interchange, however transmitted, including reports, notes, memoranda, lists, agenda, and other documents and records of communications, and when used shall require a statement of the name of the individual who made the communication, the person(s) to whom he made it, the date it was made, the form in which it was made, and whether or not it was recorded.

F.     Where identification of a DOCUMENT or THING is requested, such identification should be sufficient for the characterization of the DOCUMENT or THING in a request by Merck for production of DOCUMENTS under Rule 34 of the Federal Rules of Civil Procedure and should include, without limitation, the following information:

1.     identification of the author or maker;

2.     the date that the DOCUMENT or THING was generated;

-3-

3. the general nature of the DOCUMENT or THING, i.e., whether it is a letter, a memorandum, a photograph, etc.;

4. identification of the PERSON to whom the original was addressed;

5. identification of all recipients;

6. the identity of the PERSON now having possession of the original DOCUMENT or THING and the location of the original; and

7. the identity of each PERSON now having possession of a copy of the DOCUMENT or THING and the location of each such copy.

G. The word "PERSON" or "PERSONS" shall mean an individual, corporation, proprietorship, partnership, association, joint venture, or any other entity.

H. Where identification of a PERSON is required, such identification shall, without limitation, include the following information:

1. the PERSON's full name;

2. whether it is an individual, corporation, proprietorship, partnership, association, or other entity;

3. current or last known business address;

4. if the PERSON is an individual, the individual's home address, or if it is not known, the individual's last known home address; and

5. if the PERSON is an individual, the individual's present employer and position.

I. "Teva USA" shall mean Teva Pharmaceutical USA, Inc., and shall include (a) any divisions, departments, parents, subsidiaries, other organizational or operational units, and agents of Teva Pharmaceutical USA, Inc.; (b) all predecessor or successor companies or corporations; (c) all companies, corporations, partnerships, associations, or other business entities which are or have been under the common ownership or control, in any manner, Teva Pharmaceutical USA, Inc. and (d) each of the present and former officers, directors, employees, agents, attorneys, or other representatives of any of them.

-4-

J.    "Defendant" shall mean Teva USA.

K.    In the event Defendant claims that a request is overly broad, Defendant is requested to respond to that portion of the request which is unobjectionable and specifically identify the respect in which the request is allegedly overly broad.

L.    In the event Defendant claims that a request is unduly burdensome, Defendant is requested to respond to that portion of the request which is unobjectionable and specifically identify the respect in which the request is allegedly unduly burdensome.

M.    With respect to any DOCUMENT or THING that Defendant is unwilling to produce for inspection by Merck's counsel because the DOCUMENT or THING is asserted to be immune from discovery under the attorney-client privilege or work-product immunity, state separately with respect to each such DOCUMENT or THING sufficient information to disclose:

1.    the general nature of each such DOCUMENT and/or THING, i.e., whether it is a letter, memorandum, report, pamphlet, etc.;

2.    the date on which each such DOCUMENT and/or THING was reproduced or transcribed;

3.    the name and business address of the PERSON who signed or prepared each such DOCUMENT and/or THING or both and the name and business address of each such PERSON who has edited, corrected, revised, or amended the same;

4.    the name and business address of each PERSON to whom any such DOCUMENT or THING was given or sent, or otherwise known to Defendant as being an intended or actual recipient of a copy thereof;

5.    the name and address of the PERSON having possession, custody, or control of each such DOCUMENT or tangible THING;

6.    a brief indication of the subject matter of each such DOCUMENT or THING; and

7.    the grounds for the claimed privilege or immunity as to each such DOCUMENT or THING.

N.      For any requested DOCUMENT that has been destroyed after January 25, 2001, Defendant shall identify each DOCUMENT, set forth the contents of each destroyed DOCUMENT, the date of such destruction, the identity of any individuals who authorized the destruction, and other circumstances related to such destruction.

O.      "The term '077 patent" refers to U.S. Patent No. 4,621,077, entitled "Pharmacologically Active Biphosphonates, Process for the Preparation Thereof and Pharmaceutical Compositions Therefrom."

P.      "The term '941 patent" refers to U.S. Patent No. 5,358,941, entitled "Dry Mix Formulation for Bisphosphonic Acids with Lactose."

Q.      "The term '590 patent" refers to U.S. Patent No. 5,681,590, entitled "Dry Mix Formulations for Bisphosphonic Acids."

R.      "The term '726 patent" refers to U.S. Patent No. 5,849,726, entitled "Anhydrous Alendronate Monosodium Salt Formulations."

S.      "The term '207 patent" refers to U.S Patent No. 6,008,207, entitled "Anhydrous Alendronate Monosodium Salt Formulations."

T.      "The '410 patent" refers to U.S. Patent No. 6,090,410, entitled "Dry Mix Formulations for Bisphosphonic Acids."

U.      "The '329 patent" refers to U.S. Patent No. 5,994,329, entitled "Method for Inhibiting Bone Resorption."

V.      "The '801 patent" refers to U.S. Patent No. 6,015,801, entitled "Method for Inhibiting Bone Resorption."

W.      "The '294 patent" refers to U.S. Patent No.6,225,294 B1, entitled "Method for Inhibiting Bone Resorption."

X.    The term "patents-in-suit" refers to the '077, '941, '590, '726, '410, '801, '329, '294, and '207 patents.

Y.    The term "Abbreviated New Drug Applications" refers to an Abbreviated New Drug Application filed with the Food and Drug Administration.

Z.    "FDA " refers to the United States Food and Drug Administration.

AA.    "Prior art" solely for the purpose of Merck's requests shall mean any publication or activity predating the applicable date of filing for each of the patents-in-suit dealing with alendronate or any other pharmaceutically active biphosphonates and including but not limited to any publication or activity falling within 35 U.S.C. § 102 with respect to any of the patents-in-suit.

BB.    The    term    "alendronate"    means    4-amino-1-hydroxybutane-1,1-biphosphonic acid, any analog, and includes its monosodium acid salt form.

CC.    A document or communication "relating to," "related to," or "concerning" a given subject means all documents or communications that constitute, contain, embody, comprise, reflect, identify, state, refer to, deal with, comment on, mention, respond to, describe, involve, or are in any way pertinent to that subject, including, but not limited to, documents concerning the presentation of other documents.

DD.    "Any" or "each" should be understood to include and encompass "all"; "or" should be understood to include and encompass "and"; and "and" should be understood to include and encompass "or".

EE.    The use of the singular form of any word includes the plural and vice versa.

FF.     For purposes of these requests, terms not specifically defined shall be given their ordinary meaning.  Should Defendant be unable to understand the meaning of any term Defendant is invited to immediately seek its clarification through Merck's counsel.

## REQUESTS FOR PRODUCTION

DOCUMENT REQUEST NO. 1

All opinions, legal or otherwise, relating to the validity, invalidity, infringement, non-infringement, enforceability, non-enforceability, liability, or license (either express or implied) to Defendant for any of the patents-in-suit or any other affirmative defense.

DOCUMENT REQUEST NO. 2

All documents and things, including correspondence with counsel, relating to the validity, invalidity, infringement, non-infringement, enforceability, non-enforceability, liability, or license (either express or implied) to Defendant for any of the patents-in-suit or any other affirmative defense.

DOCUMENT REQUEST NO. 3

All documents and things relating to patent clearances, freedom to operate opinions or other mechanisms to avoid infringement or willful infringement by Defendant of any of the patents-in-suit.

DOCUMENT REQUEST NO. 4

All opinions, legal or otherwise, relating to the validity of the patent term extension or the patent term restoration of the '077 patent.

DOCUMENT REQUEST NO. 5

All documents and things, including correspondence with counsel, relating to validity of the patent term extension or the patent term restoration of the '077 patent to Defendant.

DOCUMENT REQUEST NO. 6

All documents and things relating to any policies or practices of Defendant concerning patent clearances, freedom to operate opinions or other mechanisms to avoid infringement or willful infringement by Defendant of the patents of others.

DOCUMENT REQUEST NO. 7

All Abbreviated New Drug Applications filed by Defendant with the FDA for alendronate formulations or other pharmaceutically active biphosphonate formulations.

DOCUMENT REQUEST NO. 8

All supplements and amendments to Abbreviated New Drug Applications filed by Defendant with the FDA for alendronate formulations or other pharmaceutically active biphosphonate formulations.

DOCUMENT REQUEST NO. 9

All documents and things relating to or constituting correspondence or other communications, including but not limited to draft documents and correspondence, among Defendant and/or between Defendant and/or any other person and any foreign or domestic regulatory agency including, but not limited to, the FDA or a foreign counterpart concerning alendronate or any other pharmaceutically active biphosphonate.

DOCUMENT REQUEST NO. 10

All documents and things relating to the patent certifications made by Defendant as part of an Abbreviated New Drug Application alendronate formulations or any other pharmaceutically active biphosphonate formulations.

DOCUMENT REQUEST NO. 11

All documents and things relating to Defendant's decision to file an Abbreviated New Drug Application alendronate formulations or any other pharmaceutically active

biphosphonate formulations, including, but not limited to, the timing of the filing, the cost for the filing, and any cost or benefit analysis.

DOCUMENT REQUEST NO. 12

All documents and things relating to the timing, schedule, timetable or projection of approval of Defendant's Abbreviated New Drug Application for alendronate formulations or any other pharmaceutically active biphosphonate formulations.

DOCUMENT REQUEST NO. 13

All documents and things relating to any labeling, promotion, advertising or claims by Defendant for alendronate formulations or any other pharmaceutically active biphosphonate formulations in the U.S or any other country.

DOCUMENT REQUEST NO. 14

All documents and things relating to Defendant's decision for file a patent certification as part of an Abbreviated New Drug Application for alendronate formulations or any other pharmaceutically active biphosphonate formulation.

DOCUMENT REQUEST NO. 15

All documents and things relating to FDA notification of "tentative approval" of the Abbreviated New Drug Application for Defendant's alendronate formulations.

DOCUMENT REQUEST NO. 16

All documents and things relating to the patents-in-suit.

DOCUMENT REQUEST NO. 17

All documents and things relating to the first awareness of the patents-in-suit by Defendant.

DOCUMENT REQUEST NO. 18

All documents and things created before the filing of this suit concerning or constituting any prior art search relating to any of the patents-in-suit.

DOCUMENT REQUEST NO. 19

All prior art that Defendant contend supports an allegation that any claim of the patents-in-suit is invalid.

DOCUMENT REQUEST NO. 20

All documents and things forming the basis of, or relating to, Defendant's certification that any of the patents-in-suit are not, and/or will not be, infringed by Defendant.

DOCUMENT REQUEST NO. 21

All documents and things forming the basis of, or relating to, Defendant's certification that any of the patents-in-suit are unenforceable.

DOCUMENT REQUEST NO. 22

All documents and things forming the basis of, or relating to, any and all defenses pleaded by Defendant that any claim of the patents-in-suit is invalid.

DOCUMENT REQUEST NO. 23

All documents and things forming the basis of, or relating to, Defendant's certification that any of the patents-in-suit are invalid as lacking a written description.

DOCUMENT REQUEST NO. 24

All documents and things forming the basis of, or relating to, Defendant's certification that any of the patents-in-suit are invalid as the specification does not enable the claims.

DOCUMENT REQUEST NO. 25

All documents and things forming the basis of, or relating to, Defendant's certification that any of the patents-in-suit are invalid as indefinite.

DOCUMENT REQUEST NO. 26

All documents and things forming the basis of, or relating to, Defendant's certification that any of the patents-in-suit are invalid as lacking utility.

DOCUMENT REQUEST NO. 27

All documents and things forming the basis of, or relating to, Defendant's certification that any of the patents-in-suit are anticipated by the prior art.

DOCUMENT REQUEST NO. 28

All documents and things forming the basis of, or relating to, Defendant's certification that any of the patents-in-suit are invalid as obvious in light of the prior art.

DOCUMENT REQUEST NO. 29

All documents and things relating to the April 21, 1997 patent term restoration of the '077 patent under 35 U.S.C. § 156.

DOCUMENT REQUEST NO. 30

All documents related to Defendant's patent certification and Notice of Patent Certification for Abbreviated New Drug Applications for alendronate formulations.

DOCUMENT REQUEST NO. 31

All documents and things relating to any legal or administrative proceedings concerning the manufacture, importation, sale, and/or offer for sale of pharmaceutical formulations of alendronate or any other pharmaceutically active biphosphonate in the U.S. by Defendant or any other person.

DOCUMENT REQUEST NO. 32

All documents and things concerning any indemnification and/or insurance provided to, received, or granted by Defendant against or for the infringement of any of the patents-in-suit.

DOCUMENT REQUEST NO. 33

All documents and things relating to Defendant's production or attempted production of alendronate formulations or any other pharmaceutically active biphosphonate formulations.

DOCUMENT REQUEST NO. 34

All documents relating to research and development of manufacturing processes for alendronate formulations or any other pharmaceutically active biphosphonate formulations.

DOCUMENT REQUEST NO. 35

All documents and things relating to or comprising communications among Defendant and/or between Defendant and any other person concerning the design, development, testing, structure, function and/or operation of manufacturing facilities for the production of alendronate formulations or any other pharmaceutically active biphosphonate formulations.

DOCUMENT REQUEST NO. 36

All documents and things relating to U.S. or foreign lawsuits, pending or previously resolved, or investigations regarding Defendant's production of alendronate formulations or any other pharmaceutically active biphosphonate formulations.

DOCUMENT REQUEST NO. 37

All documents and things relating to any manufacture, importation, sale, and/or offer for sale of pharmaceutical formulations of alendronate or any other pharmaceutically active biphosphonate in the U.S. by Defendant or any other person.

-14-

DOCUMENT REQUEST NO. 38

All documents and things relating to any supply agreement for alendronate or any other pharmaceutically active biphosphonate.

DOCUMENT REQUEST NO. 39

All documents and things constituting or relating to negotiations between Defendant and suppliers or potential suppliers of alendronate or any other pharmaceutically active biphosphonate.

DOCUMENT REQUEST NO. 40

All documents and things relating to any desire, consideration or need by Defendant to obtain or not obtain a license under any of the patents-in-suit.

DOCUMENT REQUEST NO. 41

All documents and things constituting or relating to licenses and/or agreements for alendronate or any other pharmaceutically active biphosphonate among Defendant and/or between Defendant and any other person.

DOCUMENT REQUEST NO. 42

All documents and things related to licensing agreements among Defendant and/or between Defendant and any other person for the production, distribution or sale of alendronate formulations or any other pharmaceutically active biphosphonate formulations.

DOCUMENT REQUEST NO. 43

All documents and things concerning marketing or whether to market alendronate formulations or any other pharmaceutically active biphosphonate formulations in the U.S. or any other country.

DOCUMENT REQUEST NO. 44

All documents and things relating to market share and market potential for alendronate formulations or any other pharmaceutically active biphosphonate formulations in the U.S. or any other country.

DOCUMENT REQUEST NO. 45

All documents and things relating to the dollar amounts expended by Defendant or any other person for the promotion of alendronate formulations or any other pharmaceutically active biphosphonate formulations in the U.S. or any other country.

DOCUMENT REQUEST NO. 46

All documents and things relating to all forms of promotions for or marketing of alendronate formulations or any other pharmaceutically active biphosphonate formulations in the U.S. or any other country by Defendant or any other person.

DOCUMENT REQUEST NO. 47

All documents and things created after January 1, 1993, relating to any market survey, market analysis, sales projections or forecast of customer demand with respect to alendronate formulations or any other pharmaceutically active biphosphonate formulations in the U.S. or any other country.

DOCUMENT REQUEST NO. 48

All documents and things relating to any communications to or from Defendant's sales forces, agents, dealers, representatives, distributors, the press, or any news wire service relating to this lawsuit, and/or any of the patents-in-suit.

DOCUMENT REQUEST NO. 49

All documents and things relating to research and development of alendronate and alendronate formulations or any other pharmaceutically active biphosphonate and its formulations.

DOCUMENT REQUEST NO. 50

Two hundred alendronate tablets for each dosage form produced by Defendant for the purpose of obtaining FDA approval.

DOCUMENT REQUEST NO. 51

All documents and things relating to any tests comparing Merck's alendronate product with the alendronate product that Defendant produced.

DOCUMENT REQUEST NO. 52

Any samples of Merck products that contain alendronate or any other pharmaceutically active biphosphonate that have been tested or examined by Defendant or any persons working on their behalf.

DOCUMENT REQUEST NO. 53

All documents and things relating to any testing performed using Merck's alendronate product.

DOCUMENT REQUEST NO. 54

All documents and things relating to Defendant's knowledge of Merck's activities in the research, patenting, development, manufacture, use or sale of any pharmaceutical formulation of alendronate or any other pharmaceutically active biphosphonate.

DOCUMENT REQUEST NO. 55

All documents and things Defendant contemplate introducing at trial.

-17-

DOCUMENT REQUEST NO. 56

All documents and/or things relating to any experts Defendant contemplate calling at trial, including but not limited to the educational and technical training of each expert and any publications authored by such expert.

DOCUMENT REQUEST NO. 57

All documents and things, including but not limited to organizational charts, showing identity and job titles of employees since January 1, 1993 to the present for all of Defendant's divisions and/or subsidiaries involved in the research, development, production, design, manufacture or sale of alendronate formulations or any other pharmaceutically active biphosphonate formulations.

DOCUMENT REQUEST NO. 58

All documents and things setting forth Defendant's document retention and/or destruction policies.

DOCUMENT REQUEST NO. 59

All documents and things relating to or constituting applications by Defendant to obtain regulatory approval for alendronate or any other pharmaceutically active biphosphonate in a foreign country.

DOCUMENT REQUEST NO. 60

Two grams of each ingredient in the alendronate tablets produced by Defendant for the purpose of obtaining FDA approval.

MORRIS, NICHOLS, ARSHT & TUNNELL

_Mary B. Graham_

Mary B. Graham (#2256)
Maryellen Noreika(#3208)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200

ATTORNEYS FOR PLAINTIFF
MERCK & CO., INC.

OF COUNSEL:

John F. Lynch
Nicolas G. Barzoukas
HOWREY SIMON ARNOLD
& WHITE, LLP
750 Bering Drive
Houston, TX 77057-2198
Telephone: 713.787.1400

Paul D. Matukaitis
MERCK & CO., INC.
One Merck Drive
Whitehouse Station, NJ 08889-0100

Edward W. Murray
Gerard M. Devlin, Jr.
MERCK & CO., INC.
126 E. Lincoln Avenue
Rahway, NJ 07065-0907

March 19, 2002

279874

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that true and correct copies of the foregoing were caused to be served on March 19, 2002 upon the following individuals:

### BY HAND:

Josy W. Ingersoll, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

### BY FACSIMILE:

James Galbraith, Esquire
Kenyon & Kenyon
One Broadway
New York, NY  10004


Mary B. Graham

156010

# EXHIBIT C



**KENYON & KENYON**
Intellectual Property Law

Danae M. Schuster
(212) 908-6090
dschuster@kenyon.com

One Broadway
New York, NY 10004-1050
212.425.7200
Fax 212.425.5288

October 9, 2002

**VIA FACSIMILE: (713) 787-1440**
*Confirmation by Post*

Scott Garber, Esq.
HOWREY SIMON ARNOLD & WHITE, L.L.P.
750 Bering Drive
Houston, TX 77057-2198

Re: *Merck v. Teva*

Dear Scott:

    I have your letters of September 13, 2002 and September 25, 2002. With respect to your concern about Teva's document production, we confirmed that all additional responsive documents have now been produced. Enclosed please find Teva's documents bearing production numbers T 007117 to T 007146, Teva's most recent draft of its package insert.

    Contrary to your assertions in your letter of September 25, 2002, Ms. Jaskot was prepared and did adequately answer questions relating to Topics 6 and 7 of Merck's Rule 30(b)(6) notice of August 21, 2002 (*see, e.g.*, pp 94-96, 109:14-110:5, 120-124, 131-134). In addition, as Ms. Jaskot testified, she was fully aware that she had been designated as Teva's corporate representative for Topic 7 (*see* p11:5-6).

                Sincerely,

                Danae M. Schuster

cc: Jason Abair, Esq. (w/o enclosures)

New York    Washington, DC    Silicon Valley    www.kenyon.com



**KENYON & KENYON**
Intellectual Property Law

One Broadway
New York, NY 10004-1050
212.425.7200
Fax 212.425.5288

## Fax Transmission

From:          **Danae M. Schuster**          Date:     October 9, 2002

Direct Dial:   212.908.6090                    Fax:      212.425.5288

                                               Total number of pages:   31
                                               (including cover)

*Please deliver to:*

| Name | Company | Fax | Phone |
|------|---------|-----|-------|
| Scott Garber | Howrey Simon Arnold & White, L.L.P. | (713) 787-1440 | (713) 787-1400 |
| Jason Abair, Esq. | Howrey Simon Arnold & White, L.L.P. | (713) 787-1440 | (713) 787-1400 |

Comments:

☐ Original will not follow  ☐ Original will follow by  ☐ Regular Mail  ☐ Overnight Delivery  ☐ Hand Delivery

The information contained in this facsimile transmission, including any attachments, is subject to the attorney-client privilege, the attorney work product privilege or is confidential information intended only for the use of the named recipient. If the reader of this Notice is not the intended recipient or the employee or agent responsible for delivering this transmission to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone , so that we may arrange for its return or destruction at our cost. Thank you.

New York   Washington, DC   Silicon Valley   www.kenyon.com

# EXHIBIT D


**KENYON & KENYON**
Intellectual Property Law

Maria Luisa Palmese
(212) 908-6444
mpalmese@kenyon.com

One Broadway
New York, NY 10004-1050
212.425.7200
Fax 212.425.5288

December 11, 2002

**VIA FACSIMILE: (713) 787-1440**
**Confirmation by DHL Courier**
Nicolas G. Barzoukas, Esq.
HOWREY SIMON ARNOLD & WHITE, L.L.P.
750 Bering Drive
Houston, TX 77057-2198

Re: *Merck v. Teva*

Dear Nick:

I have Jason Abair's letter dated December 10, 2002.

As discussed yesterday, I confirm that Teva has conducted a diligent search for documents responsive to Merck's document requests for all persons at Teva involved with the development of Teva's weekly alendronate sodium after the complaint in this action was filed and again after Merck served its document requests on Teva.

I also confirm that Teva agrees to exchange its source log with Merck on Friday, December 13, 2002.

As we have now complied with your requests, we expect that Merck will withdraw it's motion to compel today.

Sincerely,

Maria Luisa Palmese

cc: Jason C. Abair, Esq. (via facsimile)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that true and correct copies of the foregoing were caused to be served on April 11, 2003, upon the following counsel of record:

### VIA HAND DELIVERY

Josy Ingersoll, Esq.
Adam Poff, Esq.
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801Fax:  (302) 571-1253

### VIA FEDERAL EXPRESS

James Galbraith, Esq.
KENYON & KENYON
One Broadway
New York, NY  10004
Fax:  (212) 425-5288

_____
Mary B. Graham

# TAB 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2003 JUL 22  AM 10: 08

MERCK & CO., INC.              :
                              :
         Plaintiff,           :
                              :
    v.                        : Civil Action No. 01-048-JJF
                              : (Consolidated)
TEVA PHARMACEUTICALS, INC.    :
                              :
         Defendant.           :

### ORDER

WHEREAS, currently before the Court is the parties' joint application to supplement the record in this case with handwritten annotations and Plaintiff's Motion to Add Teva's U.S. Patent No. 6,476,006 to the record as Plaintiff's Trial Exhibit 301 (D.I. 144);

NOW THEREFORE, IT IS HEREBY ORDERED this 22 day of July, 2003, that:

1) the parties' joint application to supplement the record with handwritten annotations is **GRANTED**;

2) Plaintiff's Motion to Add Teva's U.S. Patent No. 6,476,006 to the record as Plaintiff's Trial Exhibit 301 (D.I. 144) is **GRANTED.**

_____
UNITED STATES DISTRICT JUDGE