EXHIBIT R

# REDACTED

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

MERCK & CO., INC., )
)
    Plaintiff, )
)
    v. )    Civil Action No. 01-048 (JJF)
)    (Consolidated)
TEVA PHARMACEUTICALS USA, INC., )
)
    Defendant. )

## TEVA PHARMACEUTICALS USA, INC.'S
## POST-TRIAL BRIEF

Josy W. Ingersoll (#1088)
YOUNG, CONAWAY, STARGATT &
TAYLOR LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19899-0391
(302) 571-6600

Attorneys for defendant
Teva Pharmaceuticals USA, Inc.

OF COUNSEL
James Galbraith
Maria Luisa Palmese
William G. James, II
KENYON & KENYON
One Broadway
New York, NY 10004
(212) 425-7200

**NON – CONFIDENTIAL VERSION
AS AGREED BY PARTIES**

March 28, 2003

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................... 1

NATURE AND STAGE OF THE PROCEEDINGS ...................................... 2

SUMMARY OF THE ARGUMENT ............................................................. 4

STATEMENT OF FACTS ............................................................................. 5

I.   BONE BIOLOGY AND THE MECHANISM OF ACTION OF ALENDRONATE 5

II.  MERCK'S ONCE-DAILY ALENDRONATE PRODUCTS ...................................7

III. THE '329 PATENT ................................................................................... 8

IV.  THE SCOPE AND CONTENT OF THE PRIOR ART ........................................ 10

  A. April 1996 *Lunar News* ................................................................ 11

  B. July 1996 *Lunar News* ................................................................. 12

  C. In July 1997 Persons of Skill In the Art Would Have Expected Once-Weekly
     Dosing To Be Effective To Treat Osteoporosis and Would Have Known that the
     Weekly Dose Should Be About Seven Times the Daily Dose ........................... 13

  D. In July 1997 A Person Of Skill in the Art Would Have Expected Once-Weekly
     Dosing of Alendronate to Exhibit Tolerability Similar to That of Once-Daily
     Dosing .................................................................................... 14

    1.Merck's Clinical Trials and Clinical Experience Showed that 10 mg
      Alendronate Daily Was Well-Tolerated ...................................................... 14

    2.Merck's Trials and Clinical Experience Demonstrated That 40mg *Daily* was
      Well-tolerated .......................................................................... 16

    3.80 mg Alendronate *Daily* Was Shown to be Well-Tolerated .......................... 18

V.   THE LEVEL OF ORDINARY SKILL IN THE ART........................................... 18

VI.  THE DIFFERENCES BETWEEN THE CLAIMED INVENTION AND THE
     PRIOR ART ........................................................................................ 18

ARGUMENT ................................................................................................ 19

I.   THE JULY 1996 *LUNAR NEWS* ANTICIPATES CLAIMS 23 AND 37 ............. 19

A. The July 1996 *Lunar News* is Prior Art that Was Not Considered by the PTO Examiner .................................................................................................... 19

B. The July 1996 *Lunar News* Anticipates Claims 23 and 37 ............................... 20

   1. The July 1996 *Lunar News* ........................................................................... 20

   2. The July 1996 *Lunar News* Expressly Discloses all Elements of Claims 23 and 37 .................................................................................................................. 21

   3. Merck's Fear Defense is Irrelevant to Anticipation ........................................ 23

II. THE INVENTION OF CLAIMS 23 AND 37 WOULD HAVE BEEN OBVIOUS TO A PERSON OF SKILL IN THE ART IN JULY 1997 ...................................... 24

A. The *Lunar News* Taught the Claimed Invention ............................................. 26

B. A Motivation Existed to Employ Once-Weekly Dosing 27

C. A Person of Skill in the Art Would Not Have Been Deterred From Once-Weekly Dosing Because of "Fear" of Increased GI Side Effects ................................... 27

   1. The Early Reports of Esophagitis Would Not Have Deterred A Person of Skill in the Art from Once-Weekly Dosing ............................................................ 28

   2. The Evidence Does Not Support A Dose-Response Relationship Between Alendronate and Gastrointestinal Effects That Would Have Deterred A Person of Ordinary Skill in the Art From Once-Weekly Dosing ............................... 32

     (a) The Chesnut Study Would Not Have Deterred Once-Weekly Dosing ..... 32

     (b) Dr. Fennerty's Testimony Regarding A Dose-Response Relationship Was Discredited ........................................................................................... 35

   3. Before this Litigation, Merck Admitted that the Prior Art Data Available in July 1997 From Paget's Patients Showed that Once-Weekly Dosing Should Be Well-Tolerated .......................................................................................... 38

   4. A Person of Skill in the Art Would Not Have Been Deterred From Once-Weekly Dosing Because of the Alleged Dose-Related Effects of Prior Art Bisphosphonates ......................................................................................... 41

   5. Merck's Own Physician Survey Demonstrated the Absence of any "Fear" of Higher, Less-Frequent Doses of Alendronate ................................................ 43

D. The '329 Invention Does Not Provide "Unexpected Results" ......................... 44

E. Merck Did Not Carry Its Burden On Commercial Success .............................. 46

   1. Commercial Success Cannot be Probative in this Case ................................. 46

2.Merck Failed to Prove that the Once-Weekly Invention Contributed to Commercial Success ................................................................................. 47

(a) Sales of Once-Weekly Alendronate do Not Prove Commercial Success . 47

(b) Merck Failed to Consider other Market Factors ...................................... 48

(c) Merck Ignores its own Successful Marketing Efforts ............................. 51

3.Dr. Vellturo's Diffusion Model is Flawed ...................................................... 52

IV. THE '329 PATENT IS UNENFORCEABLE FOR INEQUITABLE CONDUCT 55

A. Merck and Dr. Yates Intentionally Withheld the July 1996 *Lunar News* .......... 55

B. Dr. Yates's Conduct was Inequitable; the '329 Patent is not Enforceable ......... 58

CONCLUSION ........................................................................................................... 60

# TABLE OF AUTHORITIES

Page

**Cases**

*Akzo N.V. v. United States International Trade Comm'n*, 808 F.2d 1471 (Fed. Cir. 1986) ....................................................................................................................... 25

*American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350 (Fed. Cir. 1984), *cert. denied*, 469 U.S. 821 (1984)................................................................................ 20

*Atlas Powder Co. v. IRECO Inc.*, 190 F.3d 1342 (Fed. Cir. 1999) .................... 19, 20, 24

*B.F. Goodrich Co. v. Aircraft Braking Systems Corp.*, 72 F.3d 1577 (Fed. Cir. 1996).... 27

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1374 (Fed. Cir. 2001) ................................................................................................................... 19, 24

*Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120 (Fed. Cir. 2000) ................................................................................................................. 46

*Brown and Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120  (Fed. Cir. 2000) ................................................................................................................. 25

*Celeritas Technologies v. Rockwell Int'l Corp.*, 150 F.3d 1354 (Fed. Cir.1998)............. 24

*Chicago Rawhide Mfg. Co. v. Crane Packing Co.*, 523 F.2d 452 (7th Cir. 1975), *cert. denied*, 423 U.S. 1091 (1976)................................................................................. 47

*Ciba-Geigy Corp. v. Alza Corp.*, 864 F. Supp. 429 (D.N.J. 1994).................................. 20

*Cosden Oil & Chem. Co. v. American Hoechst Corp.*, 543 F. Supp. 522 (D. Del. 1982) 47

*Critikon Inc. v. Becton Dickinson Vascular Access Inc.*, 120 F.3d 1253 (Fed. Cir. 1997)58

*EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898 (Fed. Cir. 1985 ............................ 20

*GFI Inc. v. Franklin Corp.*, 265 F.3d 1268 (Fed. Cir. 2001); *Halliburton*, 925 F.2d at 1440.................................................................................................................. 59

*Graham v. John Deere Co.*, 383 U.S. 1 (1966) ............................................................. 25

*Halliburton Co. v. Schlumberger Tech. Corp.*, 925 F.2d 1435 (Fed. Cir. 1991) ....... 58, 59

*In re Berg*, 320 F.3d 1310 (Fed. Cir. 2003)................................................................... 25

*In re Bozek*, 416 F.2d 1385 (C.C.P.A. 1969)................................................................. 27

iv

*In re Cruciferous Sprout Patent Litigation*, 301 F.3d 1343 ............................................. 24

*In re DeBlauwe*, 736 F.2d 699 (Fed. Cir. 1984) .............................................................. 45

*In re Graves*, 69 F.3d 1147 (Fed. Cir. 1995) ................................................................... 20

*In re Inland Steel Co.*, 265 F.3d 1354 (Fed. Cir. 2001) ................................................... 44

*In re Lamberti*, 545 F.2d 747 (C.C.P.A. 1976) ................................................................ 27

*In re Longi*, 759 F.2d 887 (Fed. Cir. 1985) ..................................................................... 27

*In re Mayne*, 104 F.3d 1339 (Fed. Cir. 1997) ............................................................ 25, 45

*In re Merck & Co., Inc.*, 800 F.2d 1091 (Fed. Cir. 1986) ............................................... 27

*In re Napier*, 55 F.3d 610 (Fed. Cir. 1995) ..................................................................... 24

*In re Peterson*, 315 F.3d 1325 (Fed. Cir. 2003) .............................................................. 44

*In re Wiseman*, 596 F.2d 1019 (C.C.P.A. 1979) .............................................................. 44

*In re Woodruff*, 919 F.2d 1575 (Fed. Cir. 1990) ............................................................. 44

*Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376 (Fed. Cir. 2001) .................... 20

*Milliken Research Corp. v. Dan River, Inc.*, 739 F.2d 587 (Fed. Cir. 1984) .................... 27

*Minnesota Mining & Mfg. Co. v. Research Medical, Inc.*, 679 F. Supp. 1037 (D. Utah 1988) .............................................................................................................................. 47

*Molins PLC v. Textron, Inc.*, 48 F.3d 1172 (Fed. Cir. 1995) ........................................... 58

*Nursery Supplies, Inc. v. Lerio Corp.*, 45 U.S.P.Q.2d 1332 (M .D. Pa. 1997) ................. 27

*Paragon Poultry Lab., Inc. v. KLM Labs.*, 984 F.2d 1182 (Fed. Cir. 1993) .................... 59

*Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888 (Fed. Cir. 1984) ................ 25

*Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476 (Fed. Cir. 1997) ........................... 48

*Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714 (Fed. Cir. 1991) ...................................... 25

*Sibia Neurosciences, Inc. v. Cadus Pharmaceuticals Corp.*, 225 F.3d 1349 (Fed. Cir. 2000) .............................................................................................................................. 25

*Structural Rubber Products Co. v. Park Rubber Co.*, 749 F.2d 707 (Fed. Cir. 1984) ..... 20

*Teva Pharmaceuticals Ltd et al. v. Istituto Gentili SpA et al.* (High Court of Justice, Chancery Division, Patents Court, January 22, 2003) ........................................... 1, 2, 3

*Titanium Metals Corp. v. Banner*, 778 F.2d 775 (Fed. Cir. 1985) .................................... 24

**Statutes**

21 U.S.C. § 355(c)(3)(D)(ii) ......................................................................................... 47

21 U.S.C. §355(j)(2)(A)(vii)(IV)) ................................................................................... 2

35 U.S.C. § 103(a) ....................................................................................................... 24

35 U.S.C. § 271(e)(2)(A) ............................................................................................... 3

35 U.S.C. § 282 .......................................................................................................... 19

37 C.F.R. § 1.56 ......................................................................................................... 58

## INTRODUCTION

In October 1995, Merck launched its first alendronate sodium ("alendronate") products. The dosage strengths were 10 mg daily for treatment of osteoporosis and 40 mg daily for treatment of Paget's disease. Just six months later, in April 1996, a publication called *Lunar News* disclosed the once-weekly oral administration of alendronate at a higher dose to manage osteoporosis. Three months later, in July 1996, *Lunar News* again disclosed once-weekly administration of alendronate to manage osteoporosis, and this time it suggested specific dosage strengths.

A year later, in July 1997, more than a year after *Lunar News* had twice disclosed the concept, Merck filed a patent application directed to once-weekly administration of alendronate for, *inter alia*, the management of osteoporosis. Merck's patent application issued as U.S. Patent No. 5,994,329 (the "'329 patent"), the patent in suit here, the only asserted claims of which claim the once-weekly administration of alendronate to treat and prevent osteoporosis.

For the reasons set forth herein, the Court should find the asserted claims of the '329 patent invalid under 35 U.S.C. §§ 102 and 103 as anticipated by and as obvious in view of the *Lunar News* disclosures. Merck's only response to those disclosures is to argue that no person of skill in the art would have believed and followed the *Lunar News* teachings because of a fear that increased gastrointestinal side effects would accompany higher once-weekly doses of alendronate. The evidence at trial, however, showed that this "fear defense" is baseless, and that Merck concocted it solely for purposes of litigation.

This case does not represent the first time the patentability of Merck's invention has been litigated. In *Teva Pharmaceuticals Ltd et al. v. Istituto Gentili SpA et al.* (High

Court of Justice, Chancery Division, Patents Court, January 22, 2003), the British High Court held invalid Merck's European patent that corresponds to the '329 patent. That patent claimed the invention defined by claim 23 of the '329 patent: the weekly administration of 70 mg alendronate sodium to treat osteoporosis. In finding that patent invalid, the British Court specifically rejected the "fear defense" on which Merck relies here. (DTX405)

The Court should also find the '329 patent unenforceable. The evidence at trial showed that Merck's principal inventor had a copy of the July 1996 *Lunar News* before he filed his patent application, and was twice specifically directed to the relevant passages, but failed to disclose the reference to the PTO. Merck's position that the inventor did not read the references until after this lawsuit was underway is not credible, and the Court should find that the inventor acted with intent to deceive the PTO. This inequitable conduct renders the patent unenforceable.

## NATURE AND STAGE OF THE PROCEEDINGS

This case arises from the filing by Teva of supplements to its Abbreviated New Drug Application ("ANDA") for approval to market generic versions of Merck's once-weekly 70 mg and 35 mg products, which are approved for treatment and prevention of osteoporosis, respectively. As part of its supplements Teva included "paragraph IV" certifications directed to the patents Merck had listed in the FDA's publication "Approved Drug Products with Therapeutic Equivalence Evaluations" (the "Orange Book") as covering Fosamax or its use (21 U.S.C. §355(j)(2)(A)(vii)(IV)). Initially, Teva filed paragraph IV certifications with respect to several patents listed by Merck in the Orange Book for 70 mg once-weekly Fosamax. When Merck later added U.S. Patent

2

6,225,294 to its Orange Book listing, Teva filed a paragraph IV certification against it. Later, Teva certified against all the patents Merck had listed for the 35 mg once-weekly product.

Because Teva was required to file paragraph IV certifications at different times, Merck filed three separate complaints, each within the 45-day period permitted by statute. (Civil Action Nos. 01-048 (JJF), 01-675 (JJF) and 01-728 (JJF)). Each of Merck's complaints alleges that Teva's ANDA filing was an act of infringement under 35 U.S.C. § 271(e)(2)(A), which defines filing an application for approval to market a drug covered by or whose use is covered by a patent listed in the Orange Book as an act of infringement. The three cases were later consolidated for all purposes as Civil Action No. 01-048 (JJF).

Merck has dismissed its claims relating to all originally asserted patents and claims except claims 23 and 37 of the '329 patent and claim 1 of U.S. Patent 4,621,077 (the "'077 patent"). The '077 patent was the subject of this Court's judgment entered December 2, 2002, the appeal from which is pending. The parties have agreed to be bound in this case by the outcome of that appeal, and the issues relating to the '077 patent were therefore not addressed at trial. (D.I. 128).

Finally, Teva has stipulated that if claims 23 and 37 of the '329 patent are valid, the commercial marketing of its proposed 70 mg and 35 mg alendronate sodium products would infringe those claims. Thus, the only issues to be addressed by the Court are the validity and enforceability of those two claims.

On February 11, 2003, Teva filed in this Court a "Motion to Preclude Plaintiff Merck & Co., Inc., From Relitigating the Factual Findings Underlying the Decision in *Teva Pharmaceuticals Ltd et al. v. Istituto Gentili SpA et al.*, (High Court of Justice,

Chancery Division, Patents Court, January 22, 2003)." Briefing on that motion was completed immediately prior to trial. For the reasons set forth in Teva's supporting papers, Merck is bound by the factual findings of the British court, many of which are directly applicable to this case.

## SUMMARY OF THE ARGUMENT

Claims 23 and 37 of the '329 patent are invalid. Those claims define a method of treatment (claim 23) and prevention (claim 37) of osteoporosis comprising administering alenronate to a patient at a once-weekly dose of 70 mg and 35 mg respectively.

The July 1996 issue of *Lunar News* discloses every element of these claims to a person skilled in the art. That publication, which is prior art under 35 U.S.C. § 102(a), anticipates both claims.

Even if not anticipated, the claimed invention would have been obvious. The July 1996 *Lunar News* and the immediately preceding issue, published in April 1996, both teach once-weekly administration of alendronate for treatment and prevention of osteoporosis. A person skilled in the art would have motivated by the known problems associated with the administration of alendronate to employ the method taught by the *Lunar News*, and would have understood that the dosing regimen taught by the *Lunar News* would be safe and effective. The person of skill in the art would also have understood that the appropriate dosage strength for once-weekly dosing to be 70 mg for treatment and 35 mg for prevention of osteoporosis.

Merck's principal defense to the *Lunar News* teachings is its litigation-inspired theory that a person skilled in the art would have been deterred from following those teachings because of a fear that doing so would cause increased incidence and severity of

4

gastrointestinal side effects.  The evidence at trial demonstrated that Merck's "fear

defense" is baseless, and should be rejected.

Merck's principal inventor, Dr. Yates, was twice directed to the July 1996 *Lunar*

*News*, but never disclosed it to the PTO, even though he recognizes that it is "material" as

that term is used in the patent law.  Dr. Yates's testimony that he never read the

publication is not credible and should be rejected.  The '329 patent is unenforceable for

inequitable conduct.


## STATEMENT OF FACTS

### I.     BONE BIOLOGY AND THE MECHANISM OF ACTION OF ALENDRONATE

At trial, Teva called as its principal expert witness Dr. R.G.G. Russell, one of the

world's leading experts in bone disease, and a pioneer in the use of bisphosphonates to

treat osteoporosis.  (DTX392).  As Dr. Russell explained, bone is the tissue that provides

mechanical support to the body.  It is made up of a protein matrix, which is overlaid with

mineral to give it hardness.  Two principal types of cells maintain bone: (1) osteoclasts,

which break down bone, and (2) osteoblasts, which build new bone.  (Russell 108-09;

DTX523 at 2). [1]   The process of bone destruction and rebuilding is known as bone

"remodeling."  In bone remodeling process, osteoclasts attach to the bone surface,

become activated, and erode away the bone material beneath them, leaving defects in the

bone structure.  The destruction of bone by osteoclasts is called bone "resorption."

Osteoblasts then attach to the eroded surface of these defects, lay down new bone, and

---

[1]     Trial testimony is cited herein by witness name and transcript page number.
Deposition testimony is cited as "[witness name] dep. __." Merck trial exhibits are cited
"PTX__," and Teva trial exhibits are cited "DTX__."

then become quiescent. In the normal healthy adult the remodeling process is balanced, i.e., bone is destroyed and built at the same rate. (Russell 109-10; DTX523 at 3- 4).

In osteoporosis, bone destruction and formation are no longer balanced and bone is destroyed faster than it is replaced. Osteoporosis therefore can lead to bone that is thinner, weaker, more fragile and porous. (Russell 110-15; DTX523 at 7, 8).

Osteoporosis is a serious, costly disease. Osteoporosis patients include those who have lost bone mass but have no other clinical signs; such patients are diagnosed with laboratory tests such as x-rays or bone density measurements. Other osteoporosis patients may be diagnosed only after suffering a wrist or hip fracture. Osteoporosis of the spine and the resulting fractures of vertebrae, results in stooping or bending and loss of height. In frail patients, hip fractures resulting from osteoporosis may be disabling, leading to a diminished quality of life. Hip fractures leave some patients bedridden, and can lead to increased mortality. (Russell 111-12, 115-16).

Osteoporosis is treated primarily by inhibiting bone resorption — thus restoring the balance between bone destruction and bone formation. Alendronate inhibits bone resorption by blocking the bone destroying effects of osteoclasts. (Russell 116-17). A small portion of the ingested drug makes its way to and adheres to the bone surface, where it resides until it is taken up by osteoclasts. The alendronate then inhibits the osteoclasts from resorbing bone. This process was well understood when Merck filed the '329 patent application in July 1997. (Russell 121-22; DTX523 at 10).

Paget's disease is a common bone disease characterized by increased bone resorption. In Paget's disease, increased bone remodeling occurs in localized areas of the skeleton. Patients with Paget's disease also exhibit a spectrum of clinical problems, but Paget's disease is often diagnosed in patients without symptoms during routine blood

6

tests or x-ray examinations, and treatment is often encouraged even for these asymptomatic patients. (Russell 96-98; DTX531 at 72). Depending on the site of involvement, if Paget's disease is not detected and treated early it can lead to increases in bone size, fractures, and deformity, potentially resulting in other complications. (Russell 97). Like osteoporosis, Paget's disease is treated by inhibiting bone resorption with alendronate. (Russell 125-26).

## II.    MERCK'S ONCE-DAILY ALENDRONATE PRODUCTS

Merck launched its daily Fosamax products in October 1995, about 21 months before filing the application for the '329 patent. Merck initially offered two daily dosage forms: a 10 mg tablet to treat osteoporosis, and a 40 mg tablet to treat Paget's disease. Early in 1997, Merck began to market a 5 mg daily tablet for prevention of osteoporosis. (Russell 125-27; DTX346).

The biological characteristics of alendronate required patients to follow a set of complicated and inconvenient dosing instructions. Because alendronate would be bound up by metal ions (e.g., calcium) in food and beverages, Merck instructed patients to take the product upon arising in the morning, with plain water, a half hour before eating. Because alendronate was recognized to be a potential irritant to the esophagus, patients were instructed to take the product with a full glass of water and to sit or stand upright for at least a half hour after taking the medication. The latter instruction was designed to ensure that the tablets would enter the stomach efficiently, without being held up in the esophagus where they could cause irritation. Patients, especially the very elderly, found these instructions to be inconvenient and difficult to adhere to on a daily basis, sometimes to the point where they stopped taking the medication. (Russell 126-28).

### III.    THE '329 PATENT

The '329 patent issued November 30, 1999, based on U.S. provisional

applications filed July 22 and July 23, 1997.  (DTX1).  Merck has stipulated that it will

not assert an invention date for the asserted claims of the '329 patent before July 22,

1997.  (D.I. 128).

The '329 patent discloses less-frequent-than-daily administration of

bisphosphonates (e.g., alendronate) to inhibit bone resorption.  Claims 23 and 37, the

only asserted claims, relate specifically to treatment and prevention of osteoporosis by

once-weekly administration of alendronate.  These claims are dependent from several

others and are summarized as follows:

> 23.    A method for treating osteoporosis in a human comprising orally
> administering about 70 mg of alendronate monosodium trihydrate,
> on an alendronic acid basis, as a unit dosage according to a
> continuous schedule having a dosing interval of once-weekly.

> 37.    A method for preventing osteoporosis in a human comprising
> orally administering about 35 mg of alendronate monosodium
> trihydrate, on an alendronic acid basis, as a unit dosage according
> to a continuous schedule having a dosing interval of once-weekly.[2]

The idea behind the asserted claims is simple.  Instead of taking 10 mg or 5 mg of

alendronate every day to treat and prevent osteoporosis, take seven times that amount

once per week.  The only difference between the claimed regimen and the prior regimen

is the frequency of administration and the strength of the dose.  Although the asserted

claims relate to the management of osteoporosis in humans, the '329 patent includes no

data derived from the administration of alendronate to humans at all, and no data or

---

[2]    Although Merck has made gastrointestinal side effects the centerpiece of this
case, nothing in the language of either asserted claim relates in any way to such side
effects or their minimization.

8

examples demonstrating the efficacy of the claimed methods at treating or preventing

osteoporosis in any species. (Russell 124-25; Yates 547-48).

The '329 patent specification recognizes that the inconvenience of the alendronate

dosing regimen provides a motivation to administer the drug less frequently, and

proposes the invention as a solution to that problem:

> [B]ecause bisphosphonates should be taken on an empty stomach followed
> by fasting and maintenance of an upright posture for at least 30 minutes,
> many patients find daily dosing to be burdensome. These factors can
> therefore interfere with patient compliance, and in severe cases even
> require cessation of treatment.

(DTX1, col. 2, line 67-col. 3, line 6);

> From a patient lifestyle standpoint, the methods of the present invention
> would also be more convenient than daily or cyclic dosing regimens.
> Patients would be subjected less frequently to the inconvenience of having
> to take the drug on an empty stomach and having to fast for at least 30
> minutes after dosing.

(DTX1, col. 4, lines 14-19).

Although the '329 patent contains no clinical data, the specification states without

qualification that the disclosed invention surprisingly results in fewer adverse

gastrointestinal side effects:

> [T]he administration of a bisphosphonate at a high relative dosage at a low
> relative dosing frequency causes *less* adverse gastrointestinal effects,
> particularly esophageal effects, compared to the administration of a low
> relative dosage at a high relative dosing frequency.

(DTX 1 at col. 3, line 64-col. 4, line 2) (emphasis added). At trial, Merck presented no

clinical evidence supporting this assertion. In fact, there is no evidence that the weekly

administration of alendronate provides a clinically significant safety advantage compared

to its daily administration (Russell 198-99), and Dr. Arthur Santora, an inventor on the

'329 patent, testified that Merck has never conducted a study that could demonstrate such

an advantage. (Santora dep. 295-97).

9

IV.    **THE SCOPE AND CONTENT OF THE PRIOR ART**

Just six months after the release of Merck's daily alendronate product, and well before Merck's alleged invention date of July 22, 1997, a publication called *Lunar News* disclosed the once-weekly administration of alendronate for management of osteoporosis. *Lunar News* was a periodical distributed approximately quarterly by Lunar Corporation, a company that manufactures and markets "bone densitometers." (Russell 128-29). Bone densitometers — devices that measure the amount of bone a patient has — form the basis for the diagnosis and clinical management of many osteoporosis patients. (Russell 129-30).

Lunar Corporation was founded and led by Dr. Richard Mazess, a Professor Emeritus at the University of Wisconsin. Dr. Mazess has a Ph.D. in physical anthropology and a research background in medical physics, physiology, and bone disease. In 1996, Lunar Corporation and Dr. Mazess were recognized leaders in bone densitometry. Dr. Mazess developed some of the first bone densitometers and is credited with making bone densitometry available for widespread use in the management of osteoporosis. (Russell 131-32, 227-28; Mazess dep. 30-31, 33-35, 43, 50-56). In 1996 Dr. Mazess was President and CEO of Lunar, and was the author of the articles appearing in *Lunar News*. (Mazess dep. 55-56).

Each issue of the *Lunar News* was widely distributed. (Mazess dep. 57). Both Teva's bone expert, Dr. Russell, and Merck's expert, Dr. Papapoulos, testified that they received the *Lunar News*, and copies were received at and circulated within Merck, including to Dr Yates, the principle inventor of the '329 patent. (DTX38; Russell 132-33; Papapoulos 662-63). The *Lunar News* included review articles on various topics

10

related to bone disease and osteoporosis. (Russell 129). The publication provided

exhaustive reviews of the pertinent literature, and the bibliographies of each issue

included hundreds of articles. (*See* DTX417 at 34-44; DTX418 at 27-36). Both Dr.

Russell and Merck's expert Dr. Papapoulos testified that the *Lunar News* was a valuable

resource in terms of providing current references in the pre-internet era. (Russell 133;

Papapoulos 687). Merck's Dr. Santora characterized the *Lunar News* as a "nice

exhaustive summary of the literature." (Santora dep. 39).

### A. April 1996 *Lunar News*

In a section entitled "Update: Bisphosphonate," the April 1996 edition of the

*Lunar News* discloses once-weekly dosing of alendronate. The article discusses the

difficulties of the dosing regimen, and then proposes once-weekly dosing of alendronate

as a solution:

> One of the difficulties with alendronate is its low oral bioavailability.
> When taken with water in a fasting state, only about 0.8% of the oral dose
> is bioavailable. Even coffee or juice reduces this by 60%, and a meal
> reduces it by >85%. Alendronate must be taken, after an overnight fast,
> 30-60 minutes before breakfast. Subjects should remain seated or
> standing; a very small group of patients have reported some upper
> gastrointestinal distress if this is not done. This regime may be difficult
> for the elderly to maintain chronically. *An intermittent treatment program
> (for example, once per week, or one week every three months), with higher
> oral dosing, needs to be tested.*

(DTX417 at 31) (citations omitted) (emphasis added).

The evidence at trial, including the testimony of Merck's expert, showed that a

person of skill in the art in 1996 reading this passage and following the direction to

administer alendronate once-weekly would have understood that the appropriate weekly

doses should be 70 mg for treatment of osteoporosis and 35 mg for prevention. (Russell

149-50, 152-53; Papapoulos 682, 684). Moreover, the evidence showed that the phrase

"needs to be tested" would have been understood to mean that the regimen should be

11

examined in a clinical trial so that it could be approved for use in patients. Teva's expert, Dr. Russell, testified that such clinical trial testing is a step that must be carried out for every drug, regardless of the state of knowledge or any expectation of success beforehand. (Russell 151-52).

### B.    July 1996 *Lunar News*

In July 1996, Lunar published another issue of the *Lunar News* disclosing weekly dosing of alendronate. The July 1996 *Lunar News* discussed the problem of the inconvenience of the alendronate dosing regimen, and again presented once-weekly dosing as a solution:

> The limited bioavailability of alendronate (0.8%) requires that it be taken on an empty stomach upon awakening with a full glass of water (not tea, coffee, or juice), and the patient must remain upright for 30 to 60 minutes. A few elderly women can tolerate this regime for a only [sic] week or two.
>
> \*              \*              \*
>
> The difficulties with oral bisphosphonates may favor their episodic (once/week), or cyclical (one week each month) administration. *Even oral alendronate potentially could be given in a 40 or 80 mg dose once/week to avoid dosing problems and reduce costs.*

(DTX418 at 23 (citations omitted) (emphasis added)).

The principal addition to the prior disclosure was the suggestion of specific dosage strengths: 40 mg and 80 mg once per week. The 40 mg and 80 mg dosages recited in the July 1996 *Lunar News* were based on the commercial availability of a 40 mg tablet, which Merck was marketing in 1996 for the treatment of Paget's disease. (Russell 141-42).

12

C.  **In July 1997 Persons of Skill In the Art Would Have Expected Once-Weekly Dosing To Be Effective To Treat Osteoporosis and Would Have Known that the Weekly Dose Should Be About Seven Times the Daily Dose**

In addition to the *Lunar News* disclosures discussed above, which specifically taught once-weekly dosing of alendronate, the prior art demonstrated that teaching to be soundly based on well-understood scientific principles and data reported in the technical literature.  Further, this same literature not only taught that once-weekly dosing would be effective, but taught the size of that effective dose.

Alendronate is taken up by bone, and it resides in bone for a long time.  Ten years after taking a dose of alendronate, approximately one-half of the alendronate initially attaching to bone will remain.  (Russell 119).  This characteristic of the compound affects how it behaves in a patient's body over time.  It is not disputed that in July 1997, a person of ordinary skill in the art would have expected the weekly administration of alendronate at seven times the daily dose to be as effective in treating osteoporosis as daily administration.  (Russell 144; Papapoulos 670-71; Yates 548-49).  This expectation was based on pre-clinical studies, which show that doses of alendronate administered weekly, twice-weekly, or even every two weeks were effective in inhibiting bone resorption.  (Russell 144-46; *see also* DTX80, 82, 396, 398, 399).

One of these studies, by Seedor *et al.*, also demonstrated that the total dose of alendronate administered over time, and not the frequency of dosing, determines alendronate's effect on bone resorption.  In terms of the asserted '329 patent claims, based on this study a person of skill in the art would have expected the effect of 70 mg or

35 mg weekly to be the same as 10 mg or 5 mg administered every day, respectively. (Russell 146-53; DTX80).

Moreover, it was known in July 1997 that the amount of alendronate absorbed from a dose was linear between 5 mg and 80 mg. (Russell 147-48; DTX3 at 15). Because of this linearity of absorption, a person skilled in the art would have expected the same amount of alendronate to be absorbed whether taken on a daily or weekly basis, as long as the total amounts were the same. (Russell 147-48).

### D.    In July 1997 A Person Of Skill in the Art Would Have Expected Once-Weekly Dosing of Alendronate to Exhibit Tolerability Similar to That of Once-Daily Dosing

The evidence demonstrates that no deterrent existed in the prior art to discourage a person of ordinary skill in the art from following the teachings of the April and July 1996 Lunar News and administering alendronate once-weekly at about seven times the daily dose. (Russell 154-55). The evidence shows that (1) Merck's 10 mg daily alendronate product was well-tolerated in Merck's very large clinical trials and in clinical practice, (2) 40 mg of alendronate *daily* was well-tolerated in clinical trials and clinical practice, and (3) even 80 mg of alendronate *daily* (i.e., 560 mg per week – eight times the claimed weekly dose) was well-tolerated in clinical trials. This clinical trial information and clinical experience, considered as a whole, would have led the person of ordinary skill in the art to expect that a weekly dose of 70 mg alendronate would be well-tolerated.

### 1.    Merck's Clinical Trials and Clinical Experience Showed that 10 mg Alendronate Daily Was Well-Tolerated

Before approving alendronate, the FDA required Merck to perform clinical trials large enough to demonstrate that Fosamax was effective at preventing osteoporotic fractures. (Russell 158). This requirement necessitated the treatment of many patients over an extended period. Dr. Laurence Hirsch, Merck's Executive Director for Clinical

14

Research, and the scientist supervising the '329 patent inventors in 1995-96, called the Fosamax trials "the largest and most accelerated program" Merck had ever done. (DTX312 at 16-17; Hirsch dep. 22, 34-35). He characterized the Fosamax clinical program as "unparalleled in terms of actual patient years of exposure in controlled clinical trials." (DTX312 at 17; Hirsch dep. 36-37). All these clinical trials, which were carried out and reported in the literature before July 1997, demonstrated that daily Fosamax was well tolerated in osteoporosis patients, and that no statistically significant difference existed in the frequency or severity of upper gastrointestinal adverse events between alendronate and placebo. (Russell 169).

Upper gastrointestinal symptoms include nausea, gastric (i.e., stomach) pain, dyspepsia (i.e., stomach upset), heartburn, and abdominal distension. These mild symptoms are common in the general population and are especially common in the population of people that would ordinarily take Fosamax. In fact, ten to 40 percent of the osteoporosis population experience these symptoms whether taking medication or not. (Russell 156-57). Dr. Louis Sherwood, Merck's Senior Vice President for U.S. Medical and Scientific Affairs in 1996-97, testified that Merck's clinical trials had demonstrated that 20-25 percent of older women given a placebo (i.e., a tablet without alendronate in it) have gastrointestinal side effects. (Sherwood dep. 6, 192-93).

In Merck's clinical trials, the rates of gastrointestinal side effects in patients taking 10 mg alendronate daily could not be distinguished from the rates seen in patients taking placebo. In 1995, Liberman *et al.* reported on a Merck-sponsored clinical trial involving almost 900 women and daily alendronate doses up to 20 mg. The authors concluded that alendronate was "well tolerated," and that no difference in adverse effects could be detected between alendronate and placebo. (DTX276; Russell 160-61).

15

Reporting on a related trial involving approximately 500 women, Devogelaer stated in 1995 that a similar incidence of "drug-related" adverse events was seen in alendronate- and placebo-treated patients. (DTX401 at 147; Russell 165-66). In another Merck study, the Fracture Intervention Trial ("FIT"), more than 2000 patients were treated with either alendronate or placebo. (DTX341). A 1996 report on the FIT stated that no difference could be discerned between the alendronate- and placebo-treated groups for any category of upper gastrointestinal adverse events. Significantly, the authors reported that forty percent of women taking placebo complained of upper gastrointestinal problems. (DTX341 at 1539; Russell 167-68).

These results, demonstrating that daily alendronate was well tolerated and had a side effect profile indistinguishable from placebo in clinical trials, were repeatedly touted by Merck scientists, including Dr. Yates, at scientific meetings following the launch of Fosamax in 1995. (Russell 169-70). Indeed, Dr. Yates reported the tolerability of daily administration of 10 mg alendronate in Merck's clinical trials to be "remarkably similar" to placebo. (Yates 560). Moreover, before this litigation began he wrote that actual post-marketing clinical experience with alendronate was remarkably consistent with the results of Merck's clinical trials:

> [O]n closer inspection, there is a remarkable consistency between the upper GI safety data from placebo-controlled alendronate clinical trials of postmenopausal osteoporosis treatment and the range of experience in clinical practice.

(DTX272 at 2; *see* Yates 563).

### 2.    Merck's Trials and Clinical Experience Demonstrated That 40 mg *Daily* was Well-tolerated

Merck's clinical trials also demonstrated that patients easily tolerated the 40 mg alendronate daily dose. In 1993, Harris reported on a study involving the use of placebo,

5 mg, 20 mg, or 40 mg Fosamax daily. He concluded that "[a]lendronate was well tolerated over the entire dose range." (DTX 340 at 1403; Russell 170-71). In 1995, Chesnut reported the results of a study in post-menopausal osteoporotic women treated with placebo, 5 mg, 10 mg, 20 mg and 40 mg daily in various combinations over a three-year period. (DTX14). Chesnut reported that seven of 63 patients taking the 40 mg daily dose withdrew from treatment because of gastrointestinal side effects, although none of these side effects was serious. (DTX14 at 150; Russell 183-84). Thus, Chesnut demonstrated that approximately 90 percent of post-menopausal osteoporotic patients had no difficulty tolerating the 40 mg daily dose. (Russell 184-85; *see also* DTX192 at 8).

In 1996, Dr. Ethel Siris (and Merck's Dr. Yates) reported a study comparing the administration of 40 mg of alendronate daily to etidronate for the treatment of Paget's disease. Drs. Siris and Yates concluded that 40 mg alendronate daily was "well tolerated and had a safety profile similar to that of etidronate." (DTX271; Russell 175). Similarly, in 1996 Dr. Reid (again with Dr. Yates) reported the results of a study in Paget's patients treated with either 40 mg of alendronate or placebo daily. (DTX15). Drs. Reid and Yates reported that the administration of 40 mg of alendronate daily was "well tolerated" and that there was no difference between alendronate and placebo in terms of adverse experiences. (Russell 178; DTX15 at 345).

The actual clinical experience with 40 mg alendronate daily after the product was marketed conforms to the reported clinical trial experience. By March of 1996, just five months after Fosamax was launched in the U.S., 5000 patients had received the 40 mg daily dose of alendronate for Paget's disease. (DTX6 at 1018). There is no evidence that the thousands of patients taking this dose experienced any greater degree of gastrointestinal side effects, even though the dose is four times the daily dose used for

17

osteoporosis and four times the "about 70 mg" weekly dose recited in claim 23. (Russell 172-73; *see also* DTX521 at 6).

### 3.    80 mg Alendronate *Daily* Was Shown to be Well-Tolerated

Prior to July 1997, studies had shown that even higher daily doses of alendronate were well tolerated. In 1997, Khan *et al.* published the results of a study comparing 40 mg alendronate daily with 80 mg alendronate daily in the treatment of Paget's disease. (DTX342). Khan reported that there was "no apparent dose response" between 40 mg daily and 80 mg daily in terms of gastrointestinal side effects, and Merck concluded from his data that the 80 mg dose was "well tolerated" (DTX 342 at 269; DTX192 at 8).

These studies show that patients dealt well with daily doses of alendronate from 10 mg to 80 mg. The data certainly support an expectation that patients would likewise deal well with a 70 mg dose that they took only once per week.

## V.    THE LEVEL OF ORDINARY SKILL IN THE ART

The '329 patent is directed to scientists with an M.D. and/or Ph.D., or their equivalent, working in the field of and doing research on osteoporosis. Such a person would also be familiar with the publications and technical literature in the field of bisphosphonates and osteoporosis. (Russell 143-44).

## VI.    THE DIFFERENCES BETWEEN THE CLAIMED INVENTION AND THE PRIOR ART

The prior art in this case spells out the claimed invention. No differences exist between it and the prior art. As discussed below, the July 1996 *Lunar News* anticipates claims 23 and 37. At a minimum, the background prior art discussed above teaches any differences between the *Lunar News* disclosures and the invention of claims 23 and 37.

18

The prior art laboratory, clinical trial and actual clinical experience available to persons of ordinary skill in the art in July 1997 disclosed once-weekly dosing of alendronate and the motivation for that regimen, taught the appropriate dose, taught that the dose would be effective, and provided assurance that the dose would be safe and well tolerated by patients.

## ARGUMENT

### I.    THE JULY 1996 *LUNAR NEWS* ANTICIPATES CLAIMS 23 AND 37

#### A.    The July 1996 *Lunar News* is Prior Art that Was Not Considered by the PTO Examiner

The July 1996 *Lunar News* was a printed publication. It was widely distributed, having a circulation among the relevant audience of about 20,000. (Mazess dep. 57). That particular issue was in the hands of Merck at least as early as September 1996. (DTX38). Since Merck has stipulated that it does not assert an invention date before July 22, 1997 (D.I. 128), the July 1996 *Lunar News* is prior art under 35 U.S.C. § 102(a).

Because a patent is presumed valid, 35 U.S.C. § 282, Teva has the burden of proving that the '329 patent claims are invalid by clear and convincing evidence. *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1374 (Fed. Cir. 2001); *Atlas Powder Co. v. IRECO Inc.*, 190 F.3d 1342, 1347 (Fed. Cir. 1999). Teva's burden is more easily carried here, however, because Merck failed to provide the PTO with the July 1996 *Lunar News*. Indeed, despite the fact that Dr. Yates, the principal inventor, had twice been directed to the July 1996 *Lunar News*, neither Merck nor anyone on its behalf ever disclosed it to the PTO, and the examiner never uncovered it on his own. The fact that this prior art was not before the Examiner makes the presumption of validity associated with the '329 patent more easily overcome because no deference is due to the PTO with

respect to evidence that it did not consider. *Structural Rubber Products Co. v. Park Rubber Co.*, 749 F.2d 707, 714 (Fed. Cir. 1984) ("Deference is due the Patent and Trademark Office decision to issue the patent with respect to evidence bearing on validity which it considered but no such deference is due with respect to evidence it did not consider."); *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 905 (Fed. Cir. 1985); *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1358-60 (Fed. Cir. 1984), *cert. denied*, 469 U.S. 821 (1984).

### B.    The July 1996 *Lunar News* Anticipates Claims 23 and 37

To be patentable, an invention must be new.  Under 35 U.S.C. § 102(a), a person is not entitled to a patent if the claimed invention was "... described in a printed publication" before the invention thereof.  This requirement ensures that the public is not deprived of information that is already within the public domain.   If the invention is not new, it is said to be anticipated.  A prior art reference anticipates a claimed invention if it discloses every limitation of the claim, either expressly or inherently.  *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001);  *Atlas Powder Co.*, 190 F.3d at 1346; *Ciba-Geigy Corp. v. Alza Corp.*, 864 F. Supp. 429, 434-35 (D.N.J. 1994), *aff'd in pertinent part*, 68 F.3d 487 (Fed. Cir. 1995).  Anticipation is a question of fact.  *In re Graves*, 69 F.3d 1147, 1151 (Fed. Cir. 1995).

### 1.    The July 1996 *Lunar News*

The section of the July 1996 *Lunar News* entitled "Update:  Bisphosphonate" discusses the use of bisphosphonates for managing osteoporosis.  It describes bisphosphonates as a "... major focus for researchers dealing with osteoporosis,"  and identifies "[a]lendronate (Fosamax by Merck)" as "the current leader among bisphosphonates in several countries."  (DTX418 at 23).  The article continues, providing

an update on the use of bisphosphonates, and in discussing the well-known problems associated with oral alendronate therapy, suggests administering alendronate orally in "40 or 80 mg" doses once weekly rather than daily:

> Even oral alendronate potentially could be given in a 40 or 80 mg dose once/week to avoid dosing problems and reduce costs.

(DTX418 at 23). This disclosure anticipates both claims 23 and 37.

### 2.    The July 1996 *Lunar News* Expressly Discloses all Elements of Claims 23 and 37

Claim 23 defines a method of treating osteoporosis which comprises orally administering about 70 mg alendronate monosodium trihydrate, on an active alendronic acid basis, once-weekly. The July 1996 *Lunar News* expressly discloses each of these elements. It discusses the use of bisphosphonates, including alendronate, in "dealing with osteoporosis," which means the treatment and prevention of osteoporosis. (Russell 137). The July 1996 *Lunar News* also specifies that the alendronate therapy it is discussing includes "oral" alendronate therapy, and that the term "alendronate" refers to "Fosamax by Merck." The active ingredient of Fosamax was well known to be alendronate monosodium trihydrate, and the dosage strengths of Fosamax were known to be reported on an alendronic acid basis. (DTX394; Russell 138-39). The article then specifies that the drug can be administered on a weekly basis at a dose of 80 mg: "...oral alendronate potentially could be given in a 40 or 80 mg dose once/week." (DTX418 at 23). The undisputed testimony at trial demonstrated that to a person skilled in the art, 80 mg alendronate once per week is clinically indistinguishable from 70 mg once a week, and is therefore "about 70 mg." (Russell 138). Indeed, Merck itself viewed 80 mg and 70 mg as the same weekly dose. (DTX147 at MK0158265). The July 1996 *Lunar News* therefore discloses every element of claim 23: Treatment of osteoporosis by

21

oral administration of about 70 mg alendronate monosodium trihydrate on an alendronic acid basis once weekly.

Claim 37 claims a method for preventing osteoporosis in a human being comprising orally administering about 35 mg of alendronate sodium on an alendronic acid basis as a unit dosage according to a continuous schedule having a dosing interval of once-weekly. (DTX1). Thus, the only differences between the two claims are that claim 23 is directed to "treatment" of osteoporosis with a 70 mg weekly dose, and claim 37 is directed to "prevention" with a 35 mg weekly dose.

As discussed above, the July 1996 *Lunar News* deals with both treatment and prevention of osteoporosis with alendronate and discloses the use of a 40 mg once-weekly oral dose. Again, the undisputed testimony at trial demonstrated that to a person skilled in the art, 40 mg alendronate once per week is clinically indistinguishable from 35 mg once a week and therefore is "about 35 mg." (Russell 140; DTX147 at MK0158265). The July 1996 *Lunar News* therefore discloses every element of claim 37: prevention of osteoporosis by oral administration of about 35 mg alendronate monosodium trihydrate on an alendronic acid basis once-weekly.

The following chart summarizes the application of the July 1996 *Lunar News* to the asserted claims, and demonstrates a one-to-one correspondence between the publication and each claim element.

22

| Claim 23 | Claim 37 | July 1996 *Lunar News* |
|---|---|---|
| A method of treating osteoporosis in a human comprising | A method of preventing osteoporosis in a human comprising | The subject of the article is the use of bisphosphonates in "*dealing with osteoporosis*" in humans. (DTX418 at 23). Dealing with osteoporosis includes both prevention and treatment of osteoporosis. (Russell 140). |
| orally administering | | "*Even oral alendronate potentially could be given...*" (DTX418 at 23; Russell 137). |
| about 70 mg | about 35 mg | "*... in a 40 or 80 mg ...*" (DTX418 at 23). Eighty milligrams is "about 70 mg" because for practical purposes the doses are the same, and clinically would have the same effect on patients. (Russell 137-38). Similarly, 40 mg is "about 35 mg". (Russell 140-41). |
| of alendronate monosodium trihydrate | | The article identifies alendronate as "*Fosamax by Merck,*" the active ingredient of which is alendronate monosodium trihydrate. (DTX418 at 23; Russell 138). |
| on an alendronic acid basis | | Fosamax dosage strengths are reported on an alendronic acid basis. (DTX393 at A45, DTX394 at 1). |
| as a unit dosage | | "*... dose ...*" (DTX418 at 23; Russell 139). |
| according to a continuous schedule having a dosing interval of once-weekly | | "*... once/week ...*" (DTX418 at 23; Russell 139). |

Since the July 1996 *Lunar News* discloses every element of claims 23 and 37, the subject-matter claimed by them is not new and those claims are invalid under 35 U.S.C. § 102(a).

### 3. Merck's Fear Defense is Irrelevant to Anticipation

Merck's "fear defense" is irrelevant to anticipation. First, claims 23 and 37 do not require that the once-weekly administration of alendronate meet any standard of safety or tolerability. Even if they did, such a requirement would not avoid anticipation, because

23

the property of tolerability is inherent in the method disclosed in the prior art.

(Papapoulos 670-71). *See In re Cruciferous Sprout Patent Litigation*, 301 F.3d 1343,

1349-50 (Fed. Cir. 2002); *Atlas Powder Co., supra*; and *Titanium Metals Corp. v.

Banner*, 778 F.2d 775, 775 (Fed. Cir. 1985).

Second, although, as discussed below, Merck's fear defense is a baseless, it has

no bearing on the issue of anticipation in any event. The concept of "teaching away"

from an invention is inapplicable to an anticipation analysis and the Court should not

consider it. *Bristol-Myers Squibb Co.*, 246 F.3d at 1378; *Celeritas Technologies v.

Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed. Cir.1998).

## II.    THE INVENTION OF CLAIMS 23 AND 37 WOULD HAVE BEEN OBVIOUS TO A PERSON OF SKILL IN THE ART IN JULY 1997

Claims 23 and 37 of the '329 patent are invalid if the claimed inventions would

have been obvious to a person of ordinary skill in the art at the time the invention was

made. 35 U.S.C. § 103(a).[3] The invention date here is no earlier than July 22, 1997.

(D.I. 128). Thus, the issue is whether the prior art, taken as a whole, provided some

teaching, suggestion or incentive as of July 1997 that would have rendered the claimed

invention obvious to a person of ordinary skill in the art. *In re Napier*, 55 F.3d 610, 613

(Fed. Cir. 1995) (the test for obviousness is whether the prior art "would have rendered

the claimed invention obvious to one of ordinary skill in the art"); *Brown and Williamson*

---

[3]      Section 103(a):

    A patent may not be obtained though the invention is not
identically disclosed or described as set forth in section 102 of this title, if
the differences between the subject matter sought to be patented and the
prior art are such that the subject matter as a whole would have been
obvious at the time the invention was made to a person having ordinary
skill in the art to which said subject matter pertains.

*Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1124 (Fed. Cir. 2000); *In re Mayne*, 104 F.3d 1339, 1341 (Fed. Cir. 1997).

Under *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966), an obviousness determination requires a court to make fact findings as to (1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, and (3) the level of skill in the art. *See also Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 716 (Fed. Cir. 1991); *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 894 (Fed. Cir. 1984). The ultimate determination of obviousness is a question of law based on these underlying facts. *Graham*, 383 U.S. 1, 17-18 (1996); *In re Berg*, 320 F.3d 1310, 1312 (Fed. Cir. 2003); *Sibia Neurosciences, Inc. v. Cadus Pharmaceuticals Corp.*, 225 F.3d 1349, 1355 (Fed. Cir. 2000); *Akzo N.V. v. United States International Trade Comm'n*, 808 F.2d 1471, 1480 (Fed. Cir. 1986), *cert. denied*, 482 U.S. 909 (1987).

Of course, the statutory presumption of validity applies to obviousness just as it does to anticipation. As discussed above, however, because neither the April and July 1996 issues of *Lunar News* was before the examiner, no deference is due to the PTO with respect to them, and Teva's burden is more easily carried. At trial, Teva carried that burden, proving by clear and convincing evidence that the subject matter of claims 23 and 37 would have been obvious in view of the April and July 1996 *Lunar News* articles, when those references are viewed against the backdrop of what was known to those skilled in the art. Merck's answer to that prior art – that fear of increased GI side effects would have deterred a person of skill in the art from carrying out the teaching of the *Lunar News* articles – was cobbled together for this litigation.

25

A.    The *Lunar News* Taught the Claimed Invention

Both the April and July 1996 editions of the *Lunar News* explicitly disclose the

weekly administration of alendronate for osteoporosis. (*See* DTX417 at 31; DTX418 at

23). A person skilled in the art would have understood in July 1997 that the weekly dose

for treatment and prevention of osteoporosis should be "about 70 mg," and "about 35

mg" respectively, and these doses are explicitly set out in the July 1996 *Lunar News*.

(Russell 137-40, 149-53).

Not only did the *Lunar News* disclose the concept of once-weekly dosing and

provide the appropriate dose, a person of ordinary skill would have predicted the *Lunar

News* teaching to be effective. The biological properties of alendronate were well known

long before 1997, and pre-clinical studies had demonstrated to persons skilled in the art

that alendronate would exhibit a sustained response on bone resorption without the need

for daily dosing. (Yates 548-49). Thus, the parties' experts and Merck's inventor agreed

that in July 1997 a person of ordinary skill in the art would have known that weekly

dosing of alendronate would be effective to inhibit bone resorption and to manage

osteoporosis. (Russell 144-45; Papapoulos 667-71; *see also* Yates 548-49). In addition,

it was known that absorption of alendronate was linear at least up to 80 mg, so that a

sevenfold increase in the dose would lead to a sevenfold increase in the amount of drug

absorbed. (DTX3 at 15; Russell 147-48). Indeed, Merck's expert, Dr. Papapoulos,

conceded that a person following the April 1996 *Lunar News* would have used 70 mg and

35 mg doses. (Papapoulos 682-84). For this reason, the person of ordinary skill would

have had at least a reasonable basis to believe that the proposed weekly regimen would

be effective. That reasonable expectation is all the law requires. *In re Longi*, 759 F.2d