887, 897 (Fed. Cir. 1985); *In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986);

*In re Lamberti*, 545 F.2d 747, 750 (C.C.P.A. 1976).

### B.    A Motivation Existed to Employ Once-Weekly Dosing

The dosing difficulties with alendronate were well known to persons skilled in the

art.  The patient was required to take the tablet before eating, to remain upright for a half

an hour, and to take the tablet with a full glass of water.  This regimen was highly

inconvenient, and was responsible for some patients discontinuing treatment (Russell

128), and for others cutting corners and risking the consequences of improper dosing.

Any dosing regimen that could reduce the inconvenience would have been welcomed.

Both the April and July 1996 editions of *Lunar News* explicitly state the

motivation to administer alendronate weekly: to improve patient convenience and

therefore compliance with the dosing instructions.  (Russell 150, 154).  Thus, the very

prior art that taught the claimed invention also disclosed the motivation to make it.  *See*

*B.F. Goodrich Co. v. Aircraft Braking Systems Corp.*, 72 F.3d 1577, 1582-83 (Fed. Cir.

1996); *Nursery Supplies, Inc. v. Lerio Corp.*, 45 U.S.P.Q.2d 1332, 1334 (M.D. Pa.

1997); *see also Milliken Research Corp. v. Dan River, Inc.*, 739 F.2d 587, 602 (Fed. Cir.

1984); *In re Bozek*, 416 F.2d 1385, 1390 (C.C.P.A. 1969).

### C.    A Person of Skill in the Art Would Not Have Been Deterred From Once-Weekly Dosing Because of "Fear" of Increased GI Side Effects

At trial, Merck never contended that the *Lunar News* and the other prior art did

not teach the claimed invention.  Instead, Merck argued that a person of ordinary skill in

the art would have rejected the April and July 1996 *Lunar News* teachings because of an

expectation that the higher dose would generate an increased incidence of gastrointestinal

side effects.  None of Merck's arguments withstands scrutiny.  Merck's fear defense was

concocted solely for litigation:  it is utterly inconsistent with the facts, with the science,

27

and with everything Merck said and did before this litigation inspired Merck to dream it up.

### 1.    The Early Reports of Esophagitis Would Not Have Deterred A Person of Skill in the Art from Once-Weekly Dosing

Shortly after Merck launched 10 mg daily alendronate, anecdotal case reports began to appear in the literature describing isolated instances of severe esophagitis that the authors associated with the administration of the 5 mg and 10 mg Fosamax tablets.[4] The evidence, however, showed that these events were exceedingly rare, occurring in about one of every 10,000 patients taking 10 mg of alendronate daily. (Markowitz 436-37). Indeed, it was their rarity and peculiarity that made them appropriate for medical case reports. The esophagitis cases were also for the most part reversible with proper treatment. (Markowitz 451). Although Merck attempted at trial to blur the distinction between these rare cases and the much more common mild, non-specific GI complaints, the two are not related. (Markowitz 448-49). The esophagitis case reports were associated primarily with tablets "sticking" in the esophagus because patients failed to follow the dosing instructions (i.e., so-called "pill esophagitis"), in contrast to non-

---

[4]    At trial, Merck referred to the use of the terms "serious" and "severe" within the arcane workings of the FDA. (Yates 542-43). Apparently, "severe" and "serious" are differentiated in part based on whether the patient was hospitalized, with "serious" effects defined counterintuitively as more severe than "severe." The experts at trial did not observe such strict definitional niceties. For example, Merck's expert, Dr. Fennerty, used the term "serious" to designate any effect that caused a patient to discontinue her medication. (Fennerty 304). "Severe" will be used here to designate esophageal effects of the type discussed in the case reports relied on by Merck, regardless of the FDA definition.

specific side effects, to which Merck did not assign a cause.[5] (Markowitz 442; Fennerty 278-79).

By March 1996, just five months after its launch in the U.S., almost a half-million patients had been prescribed Merck's 10 mg daily alendronate product. (DTX6 at 8; Markowitz 436). By that time, approximately 50 severe esophagitis cases (most of the cases that were later discussed in the literature) had already been reported to Merck. Merck, however, did not view these reports as significant, and took no action. (Hirsch dep. 62-63). In fact, Merck did not respond to the esophagitis reports until it learned that a letter written by a well-known bone specialist discussing two of these cases was circulating within the Mayo Clinic Health System. (Hirsch dep. 54-56). The facts show a stark contrast between the hyperbolic description of this episode by Merck at trial (*see* Fennerty 254-59; Merck Opening Statement 76-77), and the delayed reaction of Merck at the time.

When Merck finally acted, Dr. Hirsch testified that it brought "all of its resources to bear" on the issue raised by these reports of esophagitis, and took "all appropriate actions." (Hirsch dep. 61-62). After investigating, Merck concluded that the pill esophagitis cases were caused primarily by the failure of patients to adhere to the dosing instructions. (DTX315; DTX6; Markowitz 442; Hirsch dep. 66, 82-84;).

In view of its conclusion about the cause of the problem, Merck dealt with it by reemphasizing the dosing instructions. (Yates 569; Fennerty 282; Russell 194-95; Markowitz 442-44). In March 1996, Merck disseminated a "Dear Doctor" letter, informing physicians about the "infrequent" cases of esophagitis, stating that in a "large

---

[5]     Pill esophagitis is inflammation of the esophageal lining caused by direct contact with a medication that sticks in the esophagus instead of transiting to the stomach. (Markowitz 438-39).

majority" of the cases patients appeared not to have complied with the dosing instructions, and advocating "strict compliance" with those instructions. (DTX34). Merck's Dr. Yates testified that, in addition, Merck's sales representatives reemphasized the importance of the dosing instructions in meetings with doctors. (Yates 569). Merck took no other steps to deal with the issue. (Fennerty 282; Russell 195; Markowitz 444). The evidence shows that after Merck acted, the reporting of these esophagitis cases fell to almost nothing – less than one report per 100,000 patient-treatment months. (Yates 568-69; Fennerty 283-84; DTX486). Although at trial Merck presented the esophagitis cases as if they stunned the medical community, in fact, the number of patients being prescribed alendronate doubled between March of 1996 and October of 1996 (*Compare* DTX197 at MK0249547 and DTX395 at MK0250139), and the sales of alendronate increased by 72 percent between 1996 and 1997. (DTX374 at MK0391652-53).

Merck later reported on the severe esophagitis cases in an October 1996 DeGroen *et al.* article in the New England Journal of Medicine. (DTX6). The DeGroen paper reports that 51 patients experienced adverse effects classified as "serious" or "severe" out of the 470,000 patients worldwide who had received prescriptions for alendronate to treat osteoporosis up to that time. (DTX6 at 1018). Teva's gastroenterology expert, Dr. David Markowitz, testified that the extremely low incidence of these effects, and the description of the cases, led gastroenterologists to conclude at the time, as Merck had, that the likely cause of the problem was "pill esophagitis." (Markowitz 435, 438; *see also* Russell 193; DTX6). Merck's gastroenterology expert agreed. (Fennerty 282-83).

The evidence demonstrates that these esophagitis case reports would not have deterred a person of skill in the art from administering a higher weekly dose of alendronate for osteoporosis. (Russell 195; Markowitz 447-48, 451-52). In fact, the

30

cases would have motivated adoption of the invention. (Russell 195-97; Markowitz 447-48). First, the events were rare. In a March 1996 presentation to the FDA addressing the esophagitis cases, Merck stated that the number of severe cases reported to that time was actually *lower* than the number of esophagitis cases that would have been expected in the same general population regardless of whether they were taking the medication. (DTX197 at MK0249562). Indeed, there was no evidence that any expert at trial, including gastroenterologists who had examined thousands of patients for upper gastrointestinal complaints, had ever seen one of these cases. (*See* Markowitz 446). In fact, pill esophagitis is associated with many common medications, including antibiotics and antiinflammatory drugs like aspirin. (Markowitz 441). The actual incidence of such cases in the population of people taking alendronate hardly rose to the level of the expected background incidence. (DTX197 at MK0249562).

Second, there was no evidence that the severe esophageal side effects were dose-related. Merck's Dr. Hirsch testified that Merck could not determine a dose-response relationship between the administration of alendronate and the severe esophagitis cases because the cases were so rare:

> Q.    But you didn't have any evidence that there was a dose-related effect between alendronate and severe cases of esophagitis?
>
> A.    I think, I think the scientifically correct answer to that question is that there were too few cases to be able to determine if there was or was not a dose relationship and you just can't tell, if something doesn't happen with a certain frequency, you cannot tell if there is or is not a dose relationship.

(Hirsch dep. 52; *see also* Hirsch dep. 54 (". . . the number of events of things like esophagitis was fairly small in the clinical trials and we could not determine with certainty whether there was or was not a dose-related effect.")). Thus, in July 1997 there

31

was no expectation that administering a higher dose once-weekly would be associated with a greater incidence or severity of esophagitis.

These severe esophagitis cases would not have deterred a person of skill in the art from administering higher once-weekly doses of alendronate to treat and prevent osteoporosis. In fact, the evidence presented at trial leads to the opposite conclusion. Once-weekly administration would have been expected to decrease the incidence of severe esophagitis cases because it would (1) improve patient compliance with the dosing instructions (Russell 195-96; Markowitz 485-86; Fennerty 311), which were intended to ensure safe passage of the drug to the stomach (Russell 127-28; Fennerty 310; Yates 627), and (2) decrease the frequency of administration, thereby decreasing the chances of a tablet "sticking" in the esophagus. (Russell 196-97; Markowitz 443).

**2.    The Evidence Does Not Support A Dose-Response Relationship Between Alendronate and Gastrointestinal Effects That Would Have Deterred A Person of Ordinary Skill in the Art From Once-Weekly Dosing**

(a)    The Chesnut Study Would Not Have Deterred Once-Weekly Dosing

Merck argues that the study by Chesnut establishes a dose-related gastrointestinal effect associated with the administration of alendronate to post-menopausal osteoporotic women, and that this effect would have discouraged a person of skill in the art from following the teaching in the *Lunar News* to use higher once-weekly dosing. The Chesnut results, however, even standing alone, do not represent a deterrent to following the teachings of the *Lunar News*. (Russell 184-85). That conclusion is reinforced when the Chesnut results are viewed in the context of all of the information available in July 1997. (Russell 185; Markowitz 451).

32

At trial, Merck's expert testified about excerpts from other papers that referred to the Chesnut data, and he tried to create the impression that each excerpt represented a different clinical study. (*See* Papapoulos 658-59). However, on cross-examination, Dr. Papapoulos was forced to admit that these other reports are derivative of Chesnut. (Papapoulos 702-05). The Chesnut study thus represents the only alendronate clinical data on which Merck's fear defense rests. (Yates 545).

In the Chesnut study, seven out of 63 post-menopausal osteoporotic women taking 40 mg alendronate per day dropped out of the study because of mild gastrointestinal adverse effects, compared with smaller percentages of dropouts in the groups taking lower dosages of alendronate daily. (Russell 183; DTX14). The side effects were not severe or serious like those in the case reports, but instead were mild and non-specific. (Russell 184-85).

Neither Chesnut nor his co-authors, including Dr. Santora, an inventor on the '329 patent drew any conclusion regarding the statistical significance of the reported results. Merck's witnesses at trial, however, testified that those results demonstrate a dose-response relationship between gastrointestinal side effects and the administration of alendronate that would have discouraged a person skilled in the art from giving larger once-weekly doses for osteoporosis. (Yates 539-41). The evidence does not support Merck's position.

First, the Chesnut data actually demonstrate that 90 percent of postmenopausal osteoporotic patients tolerated the 40 mg daily dose. (Russell 184-85). Moreover, the Chesnut study does not relate to weekly dosing; it reports on daily dosing. The daily dose used in Chesnut was 40 mg per day, or 280 mg per week, not 70 mg once per week. That a percentage of patients taking 280 mg of alendronate weekly discontinued their

33

medication because of mild gastrointestinal upset does not imply that a larger percentage would discontinue at 70 mg weekly. Finally, although Merck portrayed the 10 percent dropout rate reported by Chesnut as unacceptably high, it is the same as (or lower than) the dropout rate Merck's expert Dr. Papapoulos observed when he prescribed the 10 mg daily alendronate product in his clinical practice. He testified that approximately 10-12 percent of his patients taking daily alendronate for treatment of osteoporosis discontinued the product because of gastrointestinal complaints, but that he continued to prescribe the drug. (Papapoulos 651-52). Standing alone, Chesnut's reported discontinuation rate for 40 mg alendronate *daily* would not have deterred a person of skill in the art from giving either a 70 mg dose or a 35 mg dose once-*weekly* to treat or prevent osteoporosis. (Russell 184; Markowitz 450-51).

Indeed, before this litigation provided Merck with the motive to argue otherwise, its official position was that Chesnut's data supported the safety of Merck's proposed 70 mg weekly dose. In a formal 1998 presentation to the FDA seeking approval to conduct clinical trials on weekly dosing of 70 mg alendronate, Merck cited the Chesnut data as part of the evidence that weekly doses of 70 mg and 35 mg of alendronate for treatment and prevention of osteoporosis should be "very well tolerated." (DTX192 at 8). In that presentation, Merck cited the Chesnut data positively rather than negatively as it did at trial, advising the FDA that "90% of postmenopausal patients with osteoporosis remained on alendronate treatment at 40 mg daily for one year." (DTX192 at 8; *see* Russell 188-89). In fact, prior to this litigation, Merck never interpreted the Chesnut study as creating to an expectation that once-weekly dosing would not be adequately tolerated. (*See* DTX147 at MK0158265; DTX521 at 6; DTX2 at MK0223123). Merck's pre-litigation

34

view of the Chesnut report is correct; its litigation-induced contention is not credible and should be rejected.

**(b)    Dr. Fennerty's Testimony Regarding A Dose-Response Relationship Was Discredited**

Merck's expert Dr. Fennerty testified, using overheated rhetoric, that the reports of the severe esophagitis cases (discussed above), the Chesnut study, and a 1997 study by Blank *et al.* in rats, "shocked" him at the time, and indicated to him that Merck might be seeing the "tip of an iceberg" of a toxicity problem. (Fennerty 269-70). This testimony is not supported by the facts.

First, Dr. Fennerty's opinions are directly contradicted by Merck's pre-litigation positions. In its presentations to the FDA, its letter to doctors, and its scientific publications, Merck never suggested or even hinted at the "potential epidemic of severe gastrointestinal injury" that Dr. Fennerty described. (Fennerty 254). To the contrary, Merck suggested that the severe problems actually occurred less frequently than might be expected. (DTX197 at MK0249562). In fact, Merck's only response to the rare instances of severe esophagitis cases was to emphasize its dosing instructions, and experience proved that Merck's response was entirely adequate to eliminate the problem in short order.

Second, Dr. Fennerty's testimony is not credible in light of the testimony of Dr. Markowitz, a gastroenterologist who in 1996-97 actually analyzed the gastrointestinal issues surrounding alendronate. (Markowitz 430-34; Russell 174-75). Dr. Markowitz testified that his contemporaneous investigations indicated that severe events were extremely rare with alendronate and that overall the drug was well-tolerated. (Markowitz 433). Dr. Markowitz's carefully considered conclusions, which were drawn at the time,

35

are consistent with Merck's conclusions before this litigation required Merck to adopt a different theory.

Third, Dr. Fennerty's testimony combines, with no scientific basis, reports of rarely-observed severe esophagitis, i.e., the case reports discussed above, with non-specific, mild gastrointestinal side effects that commonly occur in the general osteoporotic population, i.e., the effects reported by Chesnut. (*See* Markowitz 429; 448-49; DTX32 at 60). This combination of unrelated side effects and symptoms is misleading. Dr. Fennerty admitted that none of the patients discontinuing the Chesnut study did so because of severe esophagitis of the type discussed by DeGroen in 1996. (Fennerty 303-04). Further, in view of the high background incidence of these symptoms in the general population, there is no evidence of a causal relationship between the mild non-specific gastrointestinal symptoms and alendronate administration. (Markowitz 448-49; Sherwood dep. 196-97).

Fourth, Dr. Fennerty's testimony regarding the Blank paper, which reports on a study carried out with rats (PTX104), was discredited on cross-examination, with Dr. Fennerty eventually admitting that he did not know whether the results of the Blank study were applicable to humans, that he had never attempted to find out, and that if they were applicable to humans they predicted no difficulties with a 70 mg alendronate dose.

The Blank protocol is designed to induce lesions. To see any lesions at all, Blank was forced to administer alendronate at doses at least 750 times the daily dose administered to humans, and to administer them in conjunction with a drug known to cause gastric irritation. (Fennerty 288-89). On cross-examination, when asked to look more carefully at the data and to extrapolate them to human dosages, Dr. Fennerty admitted that the very plot he proffered as evidence of a "shocking" dose-response

36

relationship (Fennerty 269) predicted that *no discernible difference* between the gastrointestinal response to a 10 mg dose and the response to a 70 mg dose. In fact, Dr. Fennerty agreed that based on this plot the number of lesions expected using the 10 mg daily dose in human patients would be "virtually at zero," and that the number of lesions expected at a 70 mg once-weekly dose would be "virtually next to it." (Fennerty 292, 296; DTX526).

Realizing the implications of his admission, Dr. Fennerty retreated from his prior testimony and from the Blank study itself: he could not make the "assumption" that the injury pattern seen in humans and rats would be the same; he did not know the dose equivalency between rats and humans; the Blank study itself did not mean higher doses of alendronate were contraindicated; he had *never* investigated whether dosing in rats had any relationship to dosing in people; and, remarkably, he did not think that was necessary. (Fennerty 293-96).

In addition, Dr. Fennerty admitted that he was unaware that Merck's own scientists had published a paper highly critical of the Blank study, which pointed out several flaws in its methodology. (Fennerty 298). Dr. Chennekatu Peter, the veterinary pathologist who designed and carried out the dog studies described in the '329 patent (Peter dep. 53-54), published an article reporting on his own study of the gastrointestinal effects of bisphosphonates in rats. (PTX138). Dr. Peter reported that in his study, stomach lesions were only seen in rats to which alendronate was administered at doses "much higher" than (approximately 150 times) the doses used clinically in humans. (PTX138, Table 1). Dr. Peter then criticized the Blank study because the dose used by Blank were "very large in comparison to the recommended clinical dose for humans."

(PTX138 at 1010). Thus, prior to this litigation, Merck's own scientists discarded the same data that its expert relied on in forming his opinions.

Dr. Fennerty's opinions were not based on a scientific examination of the evidence. For example, his superficial and careless approach to the Blank study, and the fact that he was forced to recant all his direct testimony about it, in particular illustrates that his opinions are not trustworthy. His testimony regarding the expected gastrointestinal response to a higher dose of alendronate was not credible and should be given no weight.

### 3.    Before this Litigation, Merck Admitted that the Prior Art Data Available in July 1997 From Paget's Patients Showed that Once-Weekly Dosing Should Be Well-Tolerated

The data from the Paget's studies demonstrates that 40 mg and 80 mg of alendronate daily were well-tolerated, and that 40 mg daily was as well tolerated as placebo. In addition, by 1997, thousands of Paget's patients had taken the 40 mg daily dose clinically, with no greater degree of gastrointestinal complaints or severe complications. (Russell 190-91; Yates 608). Thus, the Paget's disease data provided compelling evidence that the once-weekly dose of 70 mg alendronate would have been well tolerated.

Confronted with the scientific evidence, most of it generated by studies supported by Merck and involving Merck scientists, Merck hatched a story for trial that the data generated in studies of Paget's patients cannot be used to draw conclusions regarding the tolerability of the drug in osteoporotic patients, and thus is irrelevant to the invention of claims 23 and 37 of the '329 patent. However, before this litigation provided Merck with a motive to adopt this story, its position, both internally and externally, was consistently the opposite.

Internally, in a May 20, 1997 "Tactical PAC" review seeking management approval to go forward with a once-weekly dosing program, Merck's scientists relied on the Paget's data to support the expected tolerability of the higher once-weekly dosing regimen. (DTX147 at MK0158265). Merck's own analysis, presented to Merck's management, confirmed that the Paget's data supported the safety of the proposed regimen:

> There is human safety data available on these higher doses. The largest experience is derived from the Paget's Disease studies including data on over 150 patients randomized to receive 3-6 months of daily treatment with alendronate 40 or 80 mg. This data is supplemented by short term clinical pharmacology studies with doses up to 100 mg. In all theses [sic] studies, *the 40 and 80 mg doses were well tolerated even when given on a daily basis*, although daily treatment with alendronate 40 mg was associated with a moderate increase in upper GI adverse events in the Phase II study of treatment of osteoporosis (Protocol 026).

(*Id.*) (emphasis added). In view of the Paget's data, Merck did not regard tolerability as a significant concern. To the contrary, Merck's scientists stated that higher once-weekly dosing would be "*unlikely* to have a greater potential to induce upper GI irritation." (DTX147 at MK0158265) (emphasis added). Indeed, the only concerns Merck had were economic: (1) whether a patent could be obtained for once-weekly dosing to "allow for extension of the FOSAMAX patent to 2018," and (2) the potential negative impact of once-weekly dosing on "pricing." (DTX147 at MK0158265).

Externally, in a March 1998 formal submission to the FDA, Merck maintained the position earlier taken internally that the data from Paget's disease studies provides an expectation that a once-weekly dose would be well-tolerated:

> Experience in Paget's disease (up to 80 mg alendronate for 6 months) suggests that dosing regimens of either 35 or 70 mg weekly, and 35 mg twice-weekly should be well-tolerated.

(DTX192 at 17).

39

Elsewhere in that same document, Merck drew both on the Paget's data and the

data from Chesnut in concluding that a once-weekly dose should be *very* well-tolerated:

> Oral doses of alendronate up to 80 mg daily for up to six months have
> been well-tolerated in patients with Paget's disease, and approximately
> 90% of postmenopausal patients with osteoporosis remained on
> alendronate treatment at 40 mg daily for one year. *Thus, alendronate
> dosing regimens of either 35 or 70 mg once-weekly, and 35 mg twice
> weekly should be very well-tolerated.*

(DTX192 at 8 (emphasis added)).  Slides for the FDA presentation held a few weeks later

reiterated that "Evidence for Safety" was found in the Paget's studies where patients were

treated with "80 mg/day for 3 to 6 months in 42 patients with good tolerability . . ."

(DTX521 at 6).  In that same slide, it is noted that there had been "[f]ew reports of UGI

[upper gastrointestinal] AEs [adverse events] from marketed use of 40 mg."  (DTX521 at

6).

In 2000, all three inventors listed on the '329 patent co-authored a publication

explaining the rationale for once-weekly dosing of alendronate.  (DTX2).  Under the

heading "Safety and Tolerability Studies in Humans," the inventors once again cited the

Paget's disease data as providing a "convincing" expectation that a once-weekly dosing

regimen would be tolerated by osteoporotic patients:

> Convincing human tolerability data for a higher dose of alendronate come
> from clinical trials of alendronate in the treatment of Paget's disease.
> Treatment with 40 mg alendronate daily for up to 1 year was associated
> with tolerability profiles comparable to those of the control agent (placebo
> or etidronate), and no patient discontinued alendronate treatment due to a
> serious drug-related adverse event.

(DTX2 at MK0223123).  As support for that proposition, the inventors cited the Paget's

disease studies by Siris, Reid, and Khan discussed *supra*.

Merck's pre-litigation documents, prepared for the most part by the inventors on

the '329 patent, demonstrate that Merck's litigation story, that the Paget's experience is

40

irrelevant to the question of the expected tolerability of once-weekly therapy with

alendronate, is not credible. Merck's story should be rejected.

> **4.    A Person of Skill in the Art Would Not Have Been Deterred From Once-Weekly Dosing Because of the Alleged Dose-Related Effects of Prior Art Bisphosphonates**

Merck also argued at trial that dose-related effects seen with prior art

bisphosphonates would have created an expectation that alendronate would have dose

dependent upper gastrointestinal side effects. This expectation, according to Merck,

would have deterred a person of ordinary skill in the art from administering a higher

once-weekly dose of alendronate for osteoporosis.

Merck argues that the data from pamidronate studies is especially pertinent

because of the structural similarity between that molecule and alendronate. Specifically,

Dr. Yates testified that "because of their structural similarity, actually one would expect

them to be more similar than different."[6] (Yates 617). This theory, like the other

elements of Merck's fear defense, is not supported scientifically and is inconsistent with

Merck's *ante litam motam* positions.

The sheer volume of data available in July 1997 from the use of the alendronate

makes reference to other bisphosphonates unnecessary. By July 1997, orders of

magnitude more data were available from clinical trials and clinical experience with

alendronate in treating both osteoporosis and Paget's disease than for any other

bisphosphonate. (Russell 162-64; Papapoulos 699-701; Fennerty 277-78). These data

demonstrated that at every daily dose alendronate was well-tolerated. Merck offers no

---

[6]    The irony of Merck's current position should not be lost. In the prior litigation between these parties, Merck successfully argued that the properties of alendronate could not be predicted from those of pamidronate, and that the use of alendronate for osteoporosis was therefore not obvious.

41

support for its argument that a person skilled in the art would ignore all this information about the drug in question in favor of the limited data available for other drugs that were never approved for osteoporosis in the U.S.

In fact, in writing about bisphosphonates, Merck's expert Dr. Papapoulos warned against what Merck is trying to do here – use the experience from one drug to predict the effects of another. He wrote that because of differences in their mechanisms of action, as well as their pharmacological and toxicological profiles, results from one bisphosphonate cannot be extrapolated to the whole class:

> Differences also exist in their pharmacological and toxicological profiles, as well as in their mechanism of action. It is, therefore important that the specific properties of every individual bisphosphonate be determined and that results obtained with one bisphosphonate not be extrapolated readily to the whole class.

(DTX527 at 543). When Merck itself considered the likely tolerability of its proposed 70 mg weekly dose, it did not consider data from the other bisphosphonates. Instead, it correctly recognized that those drugs were largely irrelevant in view of the vast pool of information about alendronate. Indeed, in the end, Dr. Papapoulos admitted that what he had written was correct, and that the data from the use of alendronate in Paget's disease was more relevant than the data from the prior art use of pamidronate. (Papapoulos 700-01). This conclusion was echoed by Teva's expert Dr. Markowitz:

> Q.    And you would never make the correlation between the experience from pamidronate to alendronate?
>
> A.    When I was reviewing the data, 500,000 patients or close to that number had already taken the drug alendronate, so there was much information on alendronate and positive GI events.
> So in drawing conclusions about how safe and well tolerated alendronate was, I can't imagine data on another drug, even if it was somewhat related, would inform my opinion about the drug alendronate.

42

(Markowitz 463-64).  As with its attempt to discredit its own information from the

Paget's experience, Merck's litigation-motivated effort to shift the focus to other

bisphosphonates should be rejected.[7]

> **5.    Merck's Own Physician Survey Demonstrated the
> Absence of any "Fear" of Higher, Less-Frequent Doses of
> Alendronate**

Not only did the evidence at trial demonstrate that Merck's fear defense was not

based on scientific evidence, the medical community responsible for patient care in fact

did not harbor the fear that Merck argues would have deterred the administration of 70

mg once-weekly.  In 1997, Merck undertook a marketing survey of physicians to

ascertain how they would perceive several proposed new formulations and regimen

changes.  (DTX244 at MK0174863).  This survey entailed "in-depth" interviews with

319 physicians in May and June 1997, just before Merck filed its patent application.  (*Id.*

at MK0174864).  One of the alternatives about which Merck asked the physicians was

less-frequent dosing, specifically twice-weekly.  With regard to gastrointestinal upsets,

these physicians perceived that larger less-frequent doses would result in "less GI upset:"

> Twice weekly
> - Convenient/only twice a week
> - *Less frequent dosing = less GI upset*
> - Fits patients schedules

---

[7]    With respect to clodronate and etidronate, Dr. Russell testified that their side
effects differed in both type and associated dose from those of alendronate.  First, the
clodronate and etidronate effects were primarily associated with the lower gastrointestinal
tract (e.g., diarrhea), not the upper gastrointestinal tract (e.g., nausea and heartburn) that
Merck has focused on in this case.  Second, the effects were seen at doses 100 to 300
times larger than the doses used with alendronate.  The doses of etidronate and clodronate
generally associated with side effects were more than 1000 mg, and often more than 3000
mg.  (Russell 162-63).  Again, in light of the data available for alendronate in July 1997,
results from the use of these other bisphosphonates are essentially irrelevant.  (Russell
162-63).

(DTX244 at MK0174867) (emphasis added). The August 13, 1997 memorandum from Merck's marketing executive forwarding these results characterized them as demonstrating that "once-weekly" dosing appeared to be a "very strong" contender. (DTX244 at MK0174861).

This survey, which represent the only scientifically gathered evidence of physicians' perceptions of less frequent dosing of alendronate, demonstrates the bankruptcy of Merck's fear defense. Physicians had no "fear" of administering larger doses. The "perception" was, in fact, that larger less-frequent doses would cause "less GI upset."

The British court recognized Merck's fear defense for what it is: a theory ginned up solely for the purpose of litigation, which has no basis in the evidence. (*See* DTX405 ¶¶ 84-94). This Court, like the British court, should reject it.

### D.    The '329 Invention Does Not Provide "Unexpected Results"

Because the invention of claims 23 and 37 would have been obvious, and because the prior art disclosed its principal advantage – enhanced convenience and compliance – whether or not the invention provided other advantages not disclosed in the prior art is irrelevant. By virtue of the disclosures of *Lunar News*, the public had the invention; Merck cannot take it away from the public by alleging that it provided other benefits not described in the prior art. *In re Wiseman*, 596 F.2d 1019, 1023 (C.C.P.A. 1979).

Even if such undisclosed advantages were relevant, however, Merck would have the burden of establishing their existence, which it has failed to do. *In re Peterson*, 315 F.3d 1325, 1330 (Fed. Cir. 2003); *In re Inland Steel Co.*, 265 F.3d 1354, 1365 (Fed. Cir. 2001); *In re Woodruff*, 919 F.2d 1575, 1578 (Fed. Cir. 1990).

44

The '329 patent states that the dosing regimen provides "less gastrointestinal effects," an advantage Merck touts as "unexpected." This alleged advantage, however, is not supported by scientific evidence. *See e.g., In re DeBlauwe*, 736 F.2d 699, 705 (Fed. Cir. 1984); *Inland Steel*, 265 F.3d at 1365; *In re Mayne*, 104 F.3d 1339, 1343 (Fed. Cir. 1997). Since the gastrointestinal effects of 10 mg daily are comparable to placebo, the once-weekly regimen could logically demonstrate significantly "less" effects. Indeed, Dr. Russell testified without contradiction that no clinically significant difference exists between the two regimens in terms of gastrointestinal effects. (Russell 199-202). Dr. Santora, one of the inventors, testified that Merck could not claim a safety advantage for once-weekly dosing, and had never conducted a study that would support it. (Santora dep. 295-97).

The only data that Merck can allege that it had that was not possessed by people of skill in the art in July 1997 are the results of its dog studies. Merck's reliance on these studies is unfounded.

First, the asserted claims are limited to humans, so a result from an experiment on a beagle, whether expected or not, is not relevant. Second, the dog studies provide no data, expected or not, that is relevant to clinical experience. The designer of the studies, Merck's Dr. Peter, testified that the studies were never intended to provide information that was transferable to clinical treatment:

> Q.     I am trying to figure out whether you believe these dog studies
>        have any bearing whatsoever on the clinical situation in which
>        people take Alendronate sodium?
>
> A.     That was not the purpose of these studies.

(Peter dep. 81). Merck's gastroenterology expert echoed that sentiment, testifying that the studies have no relevance to the human clinical experience:

45

Q.    And the study has no data that's relevant to the human experience; is that right?

A.    Not directly relevant, no.

(Fennerty 314).  The dog studies represent a science project.  Whether or not they provide interesting information, they do not demonstrate that following the claimed method to treat or prevent osteoporosis provides any results that are "unexpected."

### E.    Merck Did Not Carry Its Burden On Commercial Success

At trial, Merck attempted to bolster the alleged nonobviousness of the invention of the '329 patent by touting the "commercial success" of its once-weekly alendronate products.  Merck's attempt fails because Merck never connected any economic success with the claimed invention.  Indeed, Merck made no attempt to do so, and its presentation ignored, rather than accounted for, the marketplace factors that influenced the sales of alendronate sodium.

Merck's burden was to demonstrate the commercial success of its invention, and to show that any commercial success was attributable to the invention. *Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000) ("a nexus between commercial success and the claimed features is required").  In particular, because once-daily Fosamax is prior art and was itself a highly successful product, Merck was required to show that the once-weekly product contributed an incremental success beyond that of the once-daily product, and that this increment could be tied to the patented invention.  Merck attempted to satisfy this burden by the use of a mathematical house of cards that collapsed at trial.

### 1.    Commercial Success Cannot be Probative in this Case

Merck's effort to tie alleged commercial success to obviousness does not get off the ground because commercial success cannot be relevant under the circumstances of

46

this case. The rationale that justifies considering commercial success as evidence of obviousness is the theory that commercial success demonstrates that persons skilled in the art had an economic motivation to solve the problem that the inventor solved. That they did not do so, and that the inventor did, may show that the invention was not obvious to others with the motive to make it. *Chicago Rawhide Mfg. Co. v. Crane Packing Co.*, 523 F.2d 452, 459 (7th Cir. 1975), *cert. denied*, 423 U.S. 1091 (1976); *Cosden Oil & Chem. Co. v. American Hoechst Corp.*, 543 F. Supp. 522, 541 (D. Del. 1982); *Minnesota Mining & Mfg. Co. v. Research Medical, Inc.*, 679 F. Supp. 1037, 1054 (D. Utah 1988) ("Commercial success is considered relevant to lack of obviousness on the rationale that competitors would have been motivated to make the invention sooner if it had been truly obvious").

This rationale, however, does not apply in this case. In relying on commercial success, Merck ignores that it was the only entity allowed by law to market alendronate for the first five years after it was approved. This new chemical exclusivity prevented any one else from marketing alendronate until September 2000 irrespective of any patent rights. *See* 21 U.S.C. § 355(c)(3)(D)(ii). Thus, no one else had the incentive to develop new dosing forms of alendronate because no one else could bring an improved dosage form to market. Accordingly, even if Merck could prove "commercial success," that success would be irrelevant to the obviousness issue.

    **2.    Merck Failed to Prove that the Once-Weekly Invention Contributed to Commercial Success**

        **(a)    Sales of Once-Weekly Alendronate do Not Prove Commercial Success**

Merck's expert, Dr. Vellturo, did not demonstrate any connection between the patented invention and Merck's sales of once-weekly Fosamax. In fact, he did not even

opine that the two were connected, stating only that "commercial success could be at least in part, significant part, attributable to the Daifotis patents." (Vellturo 715). This passing reference does not establish any connection between the alleged commercial success and the invention as described in the patent. In fact, the evidence indicates that any incremental success of the once-weekly Fosamax product was attributable to other factors.

After its introduction as a once-daily product in 1995, sales of Fosamax steadily increased. (DTX374). At the time the once-weekly product was introduced in 2000, the once-daily sales were still increasing. Merck claims that overall Fosamax sales increased dramatically when the once-weekly product was introduced. (Vellturo 718-19). However, the percentage increase in sales is much less dramatic than Merck claims.


# REDACTED


Thus, the sales figures, taken by themselves, do not show anything about the commercial success of the claimed invention. *See Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1482-83 (Fed. Cir. 1997) (sales figures alone do not establish commercial success).

### (b)    Merck Failed to Consider other Market Factors

Merck's emphasis on sales and prescriptions as the only indicia of success cannot establish that the once-weekly product was incrementally more successful than the prior art product – once-daily alendronate. Unlike Dr. Vellturo, Teva's expert, Dr. Richard Rozek, an economist with many years' experience actually analyzing the pharmaceutical

industry (Rozek 806-12), actually delved into the dynamics of the marketplace as it existed during the relevant period. As he pointed out, Merck failed to consider any of the other events that were occurring in the marketplace that contributed to the sales of once-weekly alendronate, and Merck did not consider several of its own initiatives and strategy choices that also affected those sales. (Rozek 814-15, 835).

Several significant events occurred in the osteoporosis treatment market immediately preceding or contemporaneously with the launch of Fosamax once-weekly. All these events tended to push sales up. Merck ignored these events, myopically attributing Fosamax once-weekly sales to the patented invention. (Rozek 814-15).

First, Merck failed to account for the effect of the increasing number of Americans over the age of 50. (Rozek 816-17). Merck used the number of women above the age of 50 as an estimate for people at risk for osteoporosis (DTX510 at 2), but this number is continuously increasing, a fact that must drive up the sales of osteoporosis treatments. (DTX355 at 2, 8 and DTX434).

Second, Merck ignored the fact that awareness of osteoporosis is always increasing. (Rozek 817-19). An increase in awareness of osteoporosis can come from many sources, including the National Osteoporosis Foundation, advertising by Merck and advertising by its competitors. Merck itself has vigorously attempted to raise awareness of osteoporosis through its promotional efforts, has tracked its effectiveness in doing so, and believes that even the actions of competitors are likely to increase awareness and drive sales. (DTX379 at MK0270410; DTX497).

The increase in the number of people seeking treatment for osteoporosis is another factor that Merck ignored. (Rozek 820-21). As of November 2000, the number of osteoporosis sufferers who are turning to drug therapy had nearly doubled from the

49

previous year. (DTX441). In addition, the number of people diagnosed with the disease has also increased. One indication of this is the increase in bone mineral density (BMD) testing. Merck's own documents discuss the increase in BMD testing sites, noting that in the number of BMD testing centers increased from 700 in 1995 to 12,000 in 2001. (DTX355 at 8). Merck acknowledges that increasing the number of women diagnosed with a BMD is "critical to the long term penetration of the osteoporosis market and the success of Fosamax." (DTX358 at MK0377332). Obviously, any increase in the number of people seeking osteoporosis treatment would have a positive effect on Fosamax sales.

Merck also overlooked the additional indications that Fosamax received from the FDA. Fosamax received several new approvals, including the indication to prevent and treat osteoporosis in men, at about the time of the once-weekly launch. (Rozek 822-25). These new indications had at least two benefits for Fosamax sales. First, new indications increase the number of potential users. (Rozek 824; DTX355 at 2). Second, a new indication gives the sales force a new reason to take its messages to doctors and reinforces existing positive clinical data. (Rozek 824; Counihan dep. 204-05).

Not only did many positive factors, all unconnected with the patented invention, converge at about the time Merck introduced once-weekly Fosamax, but other events had negative impacts on competitive products. (Rozek 825-26). These adverse events included an FDA warning Eli Lilly about its misleading advertising of Evista, reports on the lead content of calcium supplements and reports that hormone replacement therapy (HRT) increases the likelihood of breast cancer. (Rozek 825-30; DTX447; DTX450; DTX451). Merck itself recognized the opportunity that these events created for Fosamax.

# REDACTED

# REDACTED

**(c)      Merck Ignores its own Successful Marketing Efforts**

Merck attributes the sales of the once-weekly product to the merits of the invention.  In fact, Merck's own extraordinary marketing efforts, undertaken at about the time of the launch of the once-weekly product, were designed to and no doubt succeeded in boosting sales.

First, Merck spent heavily on promotional expenditures in the quarter in which Fosamax once-weekly was launched.

# REDACTED

The reason pharmaceutical companies spend money on promotions is to increase awareness and sales of their products.  (Rozek 839-40; Counihan dep. 41).  In addition to the increase in promotional dollars that corresponded to the launch of the once-weekly product, Merck also changed the focus of its promotional expenditures to concentrate exclusively on the once-weekly product.  (DTX355).

Sampling is another form of promotion, which is also effective to drive the use of a pharmaceutical product.  (Rozek 841-42).

# REDACTED

Discounting the price of a pharmaceutical product has the effect of increasing sales.  (Rozek 848).  It is a fundamental law of economics that reducing the price of a

51

product will increase its sales. (Rozek 848).

# REDACTED

In short, the marketplace was highly complex, and a variety of important factors, unrelated to the '329 patent, contributed to changes in sales volume. Merck never even attempted to deal with these other factors.

### 3.    Dr. Vellturo's Diffusion Model is Flawed

To camouflage its failure to consider the most basic marketplace factors, Merck's expert applied over it a veneer of economic sophistication in the form of a so-called "diffusion model." In essence, Dr. Vellturo gathered "cumulative new prescription" data for once-daily Fosamax, and fit it to an equation. He then extrapolated the once-daily sales as "predicted" by the equation, and assumed that this extrapolation is an accurate assessment of what would have happened in the absence of the once-weekly product. He noted that actual sales of Fosamax after the introduction of the once-weekly dose were higher than the "prediction," and assumed that any difference between the two is attributable to the advantages of Fosamax once-weekly. (Vellturo 737-38)

Dr. Vellturo's "model" was wrong in conception, wrong in application, and wrong in execution. A diffusion model is designed to measure the spread of an innovation through a specific social system that consists of potential "adopters" of the innovation. (DTX382). The authors of the paper on which Dr. Vellturo based his diffusion model state that diffusion modeling is not particularly useful as a forecasting tool, the use for which Dr. Vellturo employed it. (DTX382).

The use of a diffusion model to analyze Fosamax is also inappropriate because

several key assumptions underlying the use of a diffusion model do not apply to
Fosamax. (Rozek 852). Diffusion models are relatively simple. In order for a diffusion
model to be effective in modeling the spread of an innovation, certain restrictive,
underlying assumptions must describe the innovation to be modeled, none of which apply
to the Fosamax market. (DTX382 at.24-25):

- The number of potential adopters must not increase or decrease over time.
  (DTX382 at 24-25). As already discussed above, the number and percentage
  of Americans over the age of 50 is continually increasing. (DTX355 and
  DTX434). The authors of the paper on which Dr. Vellturo bases his diffusion
  model warn of this very situation, "if the fundamental diffusion model were
  applied to a diffusion process that is dynamic, incorrect parameter estimates
  and/or incorrect forecasts may result to the extent that [the number of potential
  users] fluctuates." (DTX382). Dr. Vellturo claimed to have checked this
  assumption by using a diffusion model that allows for steady-state growth
  (Vellturo 733), but as Dr. Rozek pointed out, Dr. Vellturo did it wrong.
  (Rozek 859; DTX538).

- The product being analyzed must be independent of other innovations and
  products. (DTX382 at 24-25). This assumption does not describe Fosamax.
  (Rozek 853-54). Merck states that Fosamax competes with the other members
  of the FAME market and with other products such as hormone replacement
  therapy and calcium supplements. (DTX350; DTX362).

- The nature of the Fosamax product changed over time by the introduction of
  new indications. (Rozek 854-55). This characteristic violates another
  assumption for the appropriate use of a diffusion model. (DTX382, at 24-25).

- Fosamax exhibits "stages of adoption," another factor not permitted by a diffusion model. (DTX382 at 24-25; Rozek 855-56). A diffusion model does account for users starting and then stopping use of the innovation, something that happens for Fosamax.

Finally, Dr. Vellturo's model was fatally flawed because he used the wrong data to generate it. As a surrogate for "adopters," Dr. Vellturo used "cumulative new prescriptions," a parameter which, because it is cumulative, must in fact always increase over time. Yet the form of the equation Dr. Vellturo used requires that the number of adopters in the social system reach a maximum at some point. Thus, Dr. Vellturo's model predicts an event, the leveling off of the number of adopters, that cannot possibly happen to the parameter he is modeling. (Vellturo 751-52). In other words, the model makes no sense from the beginning.

Indeed, that Dr. Vellturo's methodology makes no sense is clear from the fact that it shows the same phenomenon no matter what date is used. That is, Dr. Vellturo claims to have demonstrated an upward break in actual sales compared to predicted sales that coincides with the introduction of once-weekly Fosamax. Yet he would have seen exactly the same phenomenon had he based his model on any other date. (Rozek 863-64). Thus, his model can predict whatever Merck wants it to demonstrate.

Merck never showed that the sales of once-weekly Fosamax were attributable in any way to the invention claimed in the '329 patent, as distinguished from the benefits of the drug itself and the other factors that existed in the marketplace. For this reason, Merck has failed to satisfy its burden of demonstrating commercial success.

IV.    **THE '329 PATENT IS UNENFORCEABLE FOR INEQUITABLE CONDUCT**

    A.    **Merck and Dr. Yates Intentionally Withheld the July 1996 *Lunar News***

Merck nowhere contests that the July 1996 issue of the *Lunar News* discloses the concept claimed in the '329 patent – the weekly dosing of alendronate for the management of osteoporosis. Notwithstanding that Merck and Dr. Yates had this reference, no one connected with Merck disclosed it to the examiner who allowed the '329 patent. The withholding of this reference was intentional, and the patent is therefore unenforceable for inequitable conduct.

Dr. Yates was charged with keeping abreast of the literature about bone disease in general and had a special responsibility to be aware of Lunar publications in light of his position with the Bone Measurement Institute (an entity created by Merck that had dealings with the principal makers of bone densitometers). (Yates dep. 20-23, 39-43). An employee in Merck's marketing department was responsible for tracking the comments made in the *Lunar News* in order to assess their impact on Merck and facilitate a response, if necessary. (Yates dep. at 18) From time to time, this employee distributed excerpts from the Lunar News that concerned Merck or its products to Merck scientists and executives. (DTX38; DTX50; Yates 533). Thus, Dr. Yates would occasionally receive copies or portions of the Lunar News for his review. (DTX38; Yates 533).

Among the portions Dr. Yates received were excerpts from the July 1996 *Lunar News* attached to a memorandum dated September 3, 1996. (DTX38; Yates 570-71). At that time, Dr. Yates's only responsibilities involved alendronate. (Yates 574). The memorandum states that one of the subjects addressed in the attached *Lunar News*

excerpts was "alendronate." In fact, the attached excerpt contained the portion of the July 1996 issue that describes the once-weekly dosing of alendronate at 40 mg or 80 mg for osteoporosis. (DTX38 at 13). In the margin next to that description is a large handwritten question mark.

In 1997, the business relationship between Merck and Lunar Corp. deteriorated, and on February 7, 1997, Dr. Mazess wrote a letter to Ray Gilmartin, President of Merck, discussing that relationship. (DTX42 at MK0334167). Attached to the letter was the section of the July 1996 issue of *Lunar News* that discussed the once-weekly dosing of alendronate for osteoporosis. (DTX42 at MK0334177; Yates 576-77). Merck and Lunar Corp. agreed to meet to discuss their relationship and attempt to resolve the issues between the companies. (Yates 575). The agenda prepared by the parties contained as a line item Dr. Mazess's letter to Mr. Gilmartin. (DTX44; Yates 576-78).

The meeting with Lunar Corp. took place on May 21, 1997, the day after Merck management had given Dr. Yates the go-ahead to develop the once-weekly dosage form of alendronate. (Yates 576-79). Among those attending for Merck were, in addition to Dr. Yates, two highly-placed executives for Merck, Dr. Louis Sherwood (Vice President of Medical and Scientific Affairs) and Dr. Jeremy Allen. Among those present for Lunar were Dr. Mazess, author of the *Lunar News*. (Yates 530-31; Beckman dep. 20-21; Mazess dep. 175-77).

At the May 21, 1997 meeting, Merck's delegation was sharply critical of comments Dr. Mazess had made the in the *Lunar News*. (Yates dep. 213). Dr. Sherwood, in particular, was upset about Dr. Mazess's recommendations regarding the less frequent dosing of alendronate at a higher dose. (Weissburg dep. 18, 69). Indeed, Dr. Sherwood had previously complained about Dr. Mazess's once-weekly dosing

recommendations when he approached Dr. Mazess at the American Society for Bone Mineral Research conference in Seattle in September 1996. (Mazess dep. 155-57).

Dr. Yates is an inventor on other patents, and in 1997 he had an understanding of the concept of "materiality." He acknowledged that the July 1996 *Lunar News* is material prior art to the '329 patent. Dr. Yates was also an active participant in the prosecution of the '329 patent. He attended the pivotal interview with the examiner that resulted in allowance of the claims. (DTX17 at 70). However, at no time during the prosecution of the application for the '329 patent did Merck or any of the inventors disclose that issue of *Lunar News* to the examiner. (Yates 575).

On August 26, 1998, Merck filed an "Information Disclosure Statement" in connection with the application for the '329 patent. With that statement, Merck included a disclosure from the April 1997 *Lunar News*, but did not disclose the July 1996 issue. (DTX17 at 63). The July 1996 issue of *Lunar News* is not cumulative of the April 1997 Lunar News. Whereas the April 1997 issue was published only a few months before the July 22, 1997 priority date for the '329 patent and potentially could have been eliminated as prior art by showing an earlier date of invention, the July 1996 issue was published almost a year before, and possibly more than a year before, the earliest filing date for the '329 patent. In addition, although the April 1997 issue discloses once-weekly dosing, the July 1996 issues discloses dosing at 80 mg per week, which is clinically indistinguishable from the claimed "about 70 mg." (Russell 137-38). It is therefore more material than the April 1997 issue in two different respects.

Dr. Yates's testimony (Yates 572-78) that he did not read either the *Lunar News* disclosures attached to the September 6, 1996 memorandum or the letter to Dr. Gilmartin, which was the subject of a meeting for which Dr. Yates traveled from New Jersey to

Wisconsin, is not credible. It is especially not credible in light of the testimony from other attendees of the May 21, 1997 meeting that the subject of once-weekly dosing and the *Lunar News* publication of that concept were discussed at that meeting. Dr. Yates must have been aware of the July 1996 *Lunar News* disclosure, and must have understood its materiality at the time. Under the circumstances, the Court should conclude that Dr. Yates acted with intent to deceive the patent examiner.

### B.    Dr. Yates's Conduct was Inequitable; the '329 Patent is not Enforceable

In the interests of effective patent examination and fairness to the public, applicants for patents have a duty to prosecute patent applications in the Patent Office with candor, good faith, and honesty. 37 C.F.R. § 1.56. A violation of this duty renders all claims of the issued patent unenforceable. *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1180-81 (Fed. Cir. 1995). To comply with this duty, applicants must disclose to the Patent Office all information they are aware of that is material to the examination of the application. *Critikon Inc. v. Becton Dickinson Vascular Access Inc.*, 120 F.3d 1253, 1256 (Fed. Cir. 1997).

To determine whether a patent is unenforceable, the trial court conducts a two-part analysis. First, it must determine if the statement or omission meets a threshold of materiality. Second, it determines whether the evidence shows a threshold level of intent to mislead the Patent and Trademark Office. *Halliburton Co. v. Schlumberger Tech. Corp.*, 925 F.2d 1435, 1439 (Fed. Cir. 1991).

The July 1996 *Lunar News* was highly material. It specifically disclosed the invention (weekly dosing of alendronate), the motivation to make the invention (dosing inconvenience), and the dosage strength (80 mg, or "about 70 mg"). There can be no question that a reasonable examiner would have considered the reference important to the

allowability of the claims. *GFI Inc. v. Franklin Corp.*, 265 F.3d 1268, 1274 (Fed. Cir. 2001); *Halliburton*, 925 F.2d at 1440. Indeed, any argument that the reference is not material is foreclosed by Dr. Yates's admission that it is. (Yates 575).

The evidence shows that Dr. Yates acted with intent to deceive the examiner. This intent can be inferred from the surrounding circumstances. *Paragon Podiatry Lab., Inc. v. KLM Labs.*, 984 F.2d 1182, 1194 (Fed. Cir. 1993). Here, Dr. Yates's sole project was alendronate. In September 1996 he received a memorandum discussing *Lunar News*'s comments about alendronate, and attaching the relevant portions of the July issue. His testimony that despite the fact that alendronate was all he worked on he did not read the attachments is not credible.

Likewise not credible is his testimony that he did not focus on the July 1996 issue again when he went to the May 21, 1997 meeting with Lunar Corp., at which the letter to Merck's president with its attached copy of the July 1996 *Lunar News* was an agenda item. His denial that once-weekly alendronate was discussed at the meeting is also not credible in light of the testimony of the other attendees.

Because of the high level of materiality of the July 1996 *Lunar News*, the evidence establishes the requisite intent required to compel a holding of unenforceability. *Halliburton, supra.* The '329 patent is unenforceable because Dr. Yates intentionally failed to disclose the July 1996 *Lunar News*.

## CONCLUSION

For the foregoing reasons, the Court should find that claims 23 and 37 of the '329

patent are invalid and unenforceable.

Respectfully submitted,

YOUNG CONAWAY STARGATT &
   TAYLOR LLP

March 28, 2003                     By_____

                             Josy W. Ingersoll (#1088)
                             Adam W. Poff (#3990)
                             The Brandywine Building
                             1000 West Street, 17th Floor
                             Wilmington, DE 19899-0391
                             (302) 571-6600

                    Attorneys for defendant
                    Teva Pharmaceuticals USA, Inc.

OF COUNSEL
James Galbraith
Maria Luisa Palmese
William G. James, II
KENYON & KENYON
One Broadway
New York, New York 10004
(212) 425-7200

60

## CERTIFICATE OF SERVICE

I, Adam W. Poff, Esquire, hereby certify that I caused copies of the foregoing document to be served on March 28, 2003 upon the following counsel of record in the manner indicated:

### BY HAND DELIVERY

Mary B. Graham, Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
Wilmington, DE 19801

### BY FACSIMILE AND FEDERAL EXPRESS

Nicholas G. Barzoukas, Esquire
Howrey, Simon, Arnold & White
750 Bering Dr.
Houston, TX 77057-2198

_____
Adam W. Poff