# EXHIBIT S

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

MERCK & CO., INC.,                    )
                                      )
            Plaintiff,                )
                                      )
      v.                              )        Civil Action No. 01-048 (JJF)
                                      )        (Consolidated)
TEVA PHARMACEUTICALS USA, INC.,       )
                                      )
            Defendant.                )


**TEVA PHARMACEUTICALS USA, INC.'S
POST-TRIAL REPLY BRIEF**


                    Josy W. Ingersoll (#1088)
                    Adam W. Poff (#3990)
                    YOUNG, CONAWAY, STARGATT &
                        TAYLOR LLP
                    The Brandywine Building, 17th Floor
                    1000 West Street
                    Wilmington, DE 19899-0391
                    (302) 571-6600

                    Attorneys for defendant
                    Teva Pharmaceuticals USA, Inc.


OF COUNSEL
James Galbraith
Maria Luisa Palmese
William G. James, II
KENYON & KENYON
One Broadway
New York, NY 10004
(212) 425-7200

April 11, 2003

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

ARGUMENT ........................................................................................................2

I.    THE JULY 1996 *LUNAR NEWS* ANTICIPATES CLAIMS 23 AND 37.... ..........2

    A.    "About" Means "About"...........................................................................2

    B.    The July 1996 Lunar News Disclosure is Enabling ....................................6

II.   TEVA PROVED BY CLEAR AND CONVINCING EVIDENCE
      THAT THE CLAIMED INVENTION WOULD HAVE BEEN
      OBVIOUS IN JULY 1997...........................................................................8

    A.    The Facts Proving Obviousness are Not in Dispute.. ................................9

    B.    Teva Proved a Reasonable Expectation of Success in July 1997.............10

            1.    Merck's Emphasis on a "Dose Related" Effect is Misplaced
                Because the Prior Art Taught that Alendronate should be
                Safe at the Relevant Doses.............................................................12

            2.    Merck Confuses Different Types of Side Effects To Cloud the
                Issues In this Case........................................................................13

            3.    The Chesnut Data would Not have Deterred Once-Weekly
                Dosing .........................................................................................17

            4.    The Prior Bisphosphonates are Irrelevant......................................18

            5.    Merck's Arguments about Weekly Risedronate and
                 Intravenous Alendronate are without Merit....................................21

            6.    Physicians Did Not Harbor a "Fear" of Higher Less-Frequent
                Doses.........................................................................................22

             7.    Merck's Scientists Believed Increased Gastrointestinal Effects
                 Were "Unlikely" Based on the Evidence Provided in the Prior
                Art. ............................................................................................23

    C.    Merck's Arguments that the Paget's Data Should be Disregarded Are
        Groundless..... ...........................................................................................24

1.     Merck's Argument That the Paget's Data
Should Be Disregarded is Without Scientific Basis.. ...................24

2.     Merck's Attacks on Dr. Russell Are Unfounded....... ...................27

     (a)     Dr. Russell's Not Editing Every Line of Dr. Fleisch's
Book Proves Nothing.........................................................27

     (b)     Dr. Russell' s Canadian Declaration has Nothing to Do
With Gastrointestinal Side Effects....................................29

D.     Merck Did Not Prove "Unexpected Results" ...........................................31

E.     Merck Failed to Demonstrate "Commercial Success"..............................33

1.     Merck Failed to Demonstrate a Nexus between the Success of
Fosamax and the Invention of the '329 Patent..............................33

2.     Merck Abandoned its Attempt to Demonstrate a Nexus....... .........34

3.     Teva's ANDA Filing Does Not Demonstrate Commercial
Success.........................................................................................36

4.     Merck's Sales of Once-Weekly Fosamax Do Not Establish
Commercial Success ................................................................37

CONCLUSION...................................................................................................... 39

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313 (Fed. Cir. 2003) ................ 7

*Bell Atlantic Network Services, Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258 (Fed. Cir. 2001) ................................................................................................ 3

*Bristol-Myers Squibb Co. v. Ben Venue Laboratories Inc.*, 246 F.3d 1368 ...................... 8

*Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120  (Fed. Cir. 2000) ........................................................................................................ 34

*Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553 (Fed. Cir. 1995) ............. 6

*In re Donohue*, 766 F.2d 531 (Fed. Cir. 1985) ........................................................... 7, 8

*In re Heldt*, 433 F.2d 808 (C.C.P.A. 1970) .................................................................. 22

*In re Longi*, 759 F.2d 887 (Fed. Cir. 1985) ................................................................. 12

*In re Merck & Co.*, 800 F.2d 1091 (Fed. Cir. 1986) ...................................................... 12

*In re O'Farrell*, 853 F.2d 894 (Fed. Cir. 1988) ........................................................... 11

*In re Sabatino*, 480 F.2d 911 (C.C.P.A. 1973) ............................................................. 6

*In re Samour*, 571 F.2d 559, 563n.6 (C.C.P.A. 1978) .................................................. 8

*Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323 (Fed. Cir. 2001) ......... 3

*Nursury Supplies, Inc. v. Lerio Corp.*, 45 U.S.P.Q.2d 1332 (M.D. Pa. 1997) ................ 35

*Pfaff v. Wells Electronics, Inc.*, 124 F.3d 1429 (Fed. Cir.1997) .................................... 35

*Riverwood International Corp. v. Mead Corp.*, 212 F.3d 1365 (Fed. Cir.), *cert. denied*, 531 U.S. 1012 (2000) ............................................................................................... 34

*Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002) ............... 3

*Unique Concepts, Inc. v. Brown*, 939 F.2d 1558 (Fed. Cir. 1991) .................................. 6

**Statutes**

35 U.S.C. § 102(a) ........................................................................................... 9

35 U.S.C. § 103(a) ........................................................................................... 11

# INTRODUCTION

Merck does not dispute that the July 1996 *Lunar News* discloses every detail of the invention of the asserted claims of the '329 patent to a person skilled in the art. Merck's argument that the publication does not anticipate those claims is based on its convoluted definition of "about," which Merck's own experts never endorsed, and on a misinterpretation of the patent law's "enablement" requirement.

Merck likewise does not dispute that to a person of ordinary skill in the art, the April and July 1996 issues of *Lunar News* teach both the claimed invention and the motivation for adopting it. Moreover, the evidence at trial showed that Merck's "fear defense" was baseless. The expectation of persons skilled in the art in July 1997 would have been and in fact was that once-weekly dosing would be safe and well-tolerated. Indeed, before Merck had the motive to concoct the fear defense, its consistent official position was precisely the opposite of the story it tried to present at trial. Before it needed the fear defense to shore up its patent, Merck told its management, the FDA and the public that prior experience with alendronate did not caution against the use of once-weekly administration, but instead affirmatively supported the safety of that regimen. Merck's sudden turnabout by itself demonstrates that the fear defense is groundless.

Similarly, in an attempt to avoid the impact of the prior art, at trial Merck floated Dr. Vellturo's "diffusion model" as the flagship of a commercial success argument. That model, however, sank without a trace, and Merck's post-trial submissions abandoned any attempt to salvage it. Merck's commercial success argument is not only not supported, it is irrelevant under the circumstances of this case.

The asserted claims of the '329 patent represent an attempt to claim as an invention what everyone skilled in the art knew and what others had explicitly disclosed. Claims 23 and 37 are both anticipated by and obvious in view of the prior art and are therefore invalid.

## ARGUMENT

I.     **THE JULY 1996 *LUNAR NEWS* ANTICIPATES CLAIMS 23 AND 37**

Merck does not dispute that the *Lunar News* discloses once-weekly administration of alendronate sodium for the treatment and prevention of osteoporosis. Nor does Merck dispute that the *Lunar News* discloses using "about 70 mg" and "about 35 mg" of alendronate sodium on an alendronic acid active basis for this purpose, as those terms would be understood by a person skilled in the art. Instead, Merck contends that the July 1996 *Lunar News* reference does not anticipate claims 23 and 37 of the '329 patent because the term "about" in claims 23 and 37 does not mean "about." Instead, Merck proposes a construction that would make the word superfluous. Merck also claims that the reference is not "enabling." Merck is wrong on both counts.

A.     **"About" Means "About"**

Claim 23 requires administration of "about 70 mg of alendronate monosodium trihydrate, on an alendronic acid active basis" and claim 37 requires administration of "about 35 mg of alendronate monosodium trihydrate, on an alendronic acid active basis." Dr. Russell testified that to a person of ordinary skill in the art, 40 mg and 80 mg, both of which are disclosed in the July 1996 *Lunar News*, are "about 35 mg" and "about 70 mg," respectively. (Russell 137-42). Dr. Russell's testimony accurately reflects the ordinary

usage of "about," i.e., "approximately,"[1] and Merck does not dispute that in the context of administering alendronate for the treatment and prevention of osteoporosis, to a person of ordinary skill in the art 80 mg and 40 mg are "about 70 mg" and "about 35 mg," respectively.  Instead, Merck claims that "about" does not in fact mean "about" because the specification has redefined it so that it has no meaning in the context of the claim. Merck attempts to support this contention by pointing to a sentence in the specification, which it claims defines the term "about."  Merck's reliance on this sentence, however, is misplaced.

The threshold question in claim interpretation is the ordinary meaning of the terms of the claim.  *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001).  Merck does not dispute Teva's and Dr. Russell's application of the ordinary meaning of terms "about 70 mg" and "about 35 mg."  Instead, Merck argues that in this case the inventors have chosen to be their own lexicographers by providing an alternative definition.  In doing so, Merck ignores that a claim term must be given its ordinary meaning unless the specification *clearly compels* a contrary interpretation.  *Bell Atlantic Network Services, Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001); *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002) (emphasis added).  The specification here does not meet that strict criterion.

Merck cites to only one sentence of the specification of the '329 patent for its proposed alternative definition of "about":

> Because of the mixed nomenclature currently in use by those or [sic]
> ordinary skill in the art, reference to a specific weight or percentage of

---

[1]    Webster's Third New International Dictionary (1993); American Heritage Dictionary of the English Language (1978).

> bisphosphonate compound in the present invention is on an acid active
> weight basis, unless indicated otherwise herein. For example, the phrase
> "*about 70 mg* of bone resorption inhibiting bisphosphonate selected from
> the group consisting of alendronate, pharmaceutically acceptable salts
> thereof and mixtures thereof, on an alendronic acid active weight basis"
> *means that the amount of bisphosphonate compound selected is calculated
> based on 70 mg of alendronic acid.*"

(Col. 10, line 65-col. 11, line 8 (emphasis added)). Merck argues that this text imparts a

special meaning to the word "about." According to Merck, the word it is used to account

for the fact that different alendronate salts have different molecular weights, and that to

deliver the same amount of physiologically active compound to the bone they must be

administered at slightly different dosage strengths.

Merck's argument makes no sense, however, because the claim itself accounts for

this phenomenon by directing that the compound be administered on the basis of a

common denominator, i.e., "on an alendronic acid active basis." That is, the claim

requires that the amount of "alendronate sodium trihydrate" be sufficient to deliver the

same amount of active material as "about 70 mg" of alendronic acid.[2] The word "about"

therefore does not perform the function which Merck assigns to it, and must be in the

claim for another purpose: to have its ordinary meaning of "approximately."

As Dr. Russell testified, Merck's interpretation of the patent text is a "curious use

of the English language." (Russell 338-39). In fact, if "about" is interpreted as Merck

argues it should be, the term is meaningless as it appears in the claims:

> Q:    But in the patent it gives you a precise reference and says when we
>       say about 70 milligrams of a bone resorption inhibiting
>       bisphosphonate, what we mean is that amount of bisphosphonate

---

[2]       In other words, because alendronate sodium has a higher molecular weight than
alendronic acid, to deliver 70 mg on "on an alendronic acid active basis" Merck's
Fosamax tablets actually contain more than 90 mg of the salt. Similarly, to deliver 35 mg
"on an alendronic acid active basis," Merck's Fosamax tablets actually contain more than
50 mg of the salt. (DTX394).

> that will deliver an equivalent amount, the equivalent of 70
> milligrams of alendronic acid; correct?
>
> A:   Yes.  I have difficulty with this statement because the reason if it's
>       that precise at 70, why does it use the phrase about?

(Russell 338-39).  As Dr. Russell concluded, although the sentence to which Merck

points is intrinsically confusing, its purpose is not to define the term "about," but only to

illustrate what is meant by "on an alendronic acid active basis:"

> Q:   When you read that, and when you read it now, is it your
>       understanding as somebody skilled in the art that that's a definition
>       of the word "about"?
>
> A:   It's definitely not an English dictionary definition of the word
>       "about."
>
> Q:   They're defining what is meant by acid active weight basis, but
>       they're not defining what is meant by "about"; is that right?
>
> A:   Yes.

(Russell 403-04).  Merck's experts offered no testimony about their interpretation of the

passage on which Merck relies, and Dr. Russell's testimony on this issue is unchallenged.

Thus, the specification of the patent does not *clearly compel* an alternative meaning of

the term "about," and the ordinary meaning must control.

    The ordinary meaning must control for another reason as well. The Federal

Circuit has repeatedly held that every limitation in the patent claim must have some

meaning.  *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1557 (Fed. Cir.

1995), *cert. denied*, 518 U.S. 1020 (1996), *quoting In re Sabatino*, 480 F.2d 911, 913

(C.C.P.A. 1973) ("Claim limitations defining the subject matter of the invention are *never*

disregarded"); *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1562 (Fed. Cir. 1991)

("All the limitations of a claim must be considered meaningful").  Yet as discussed

above, Merck's redefinition of the term "about" would effectively read the term out of

the claim, because the function Merck assigns to it is fulfilled by the reference to

"alendronic acid active basis." Merck's interpretation is therefore wrong. Since Merck

does not dispute that the ordinary meaning of "about 70 mg" and "about 35 mg"

encompass the 80 mg and 40 mg dosage strengths disclosed in the July 1996 *Lunar News*,

that publication anticipates claims 23 and 37.

**B.    The July 1996 Lunar News Disclosure is Enabling**

Merck also argues that July 1996 *Lunar News* disclosure does not anticipate

claims 23 and 37 of the '329 patent because it is not enabling. Again Merck is wrong.

This time Merck misconstrues the enablement requirement. Merck concludes that the

*Lunar News* reference could only be enabling if it addressed the alleged expectation of

physicians in the field that alendronate sodium administered at higher doses would not be

safe and well tolerated. Merck's conclusion is based on its assertion that "when the

invention is a method of treatment, it is not enabled when the expectation is that the

treatment's side effects would not be tolerable and safe." Not surprisingly Merck cites no

legal authority for this proposition, because none exists.

A prior art reference is "enabled" if it allows a person of ordinary skill in the art

to carry out the invention. *Amgen Inc. v. Hoechst Marion Roussel, Inc.,* 314 F.3d 1313,

1354 (Fed. Cir. 2003); *In re Donohue,* 766 F.2d 531, 533 (Fed. Cir. 1985). The July

1996 *Lunar News* meets this definition. The invention, as described in claims 23 and 37

of the '329 patent, is the treatment or prevention of osteoporosis by oral administration to

humans of "about 70 mg" or "about 35 mg" alendronate on a once-weekly basis. The

July 1996 *Lunar News* teaches exactly that. Furthermore, 40 mg alendronate tablets were

commercially available, so that a patient could easily take one or two of them to arrive at the 40 mg and 80 mg strengths that *Lunar News* describes.  In any case, even in the absence of commercially available tablets, it would have been "trivial" to make a dosage form containing the suggested amount.  (Santora dep. 159, 162).

Finally, Merck's expert Dr. Papapoulos admitted that the *Lunar News* reference would have enabled a person of ordinary skill in the art to practice the invention before July of 1997.  He conceded that if such a person had administered oral alendronate according to the *Lunar News* disclosure, it would have been a safe and effective therapy for dealing with osteoporosis.  (Papapoulos 670-71).

The fact that patients were not actually administered alendronate according to the method disclosed in the *Lunar News* does not negate that the *Lunar News* is enabling.  "It is not . . . necessary that an invention disclosed in a publication shall have actually been made in order to satisfy the enablement requirement."  *In re Donohue*, 766 F.2d at 533; *Bristol-Myers Squibb Co. v. Ben Venue Laboratories Inc.*, 246 F.3d 1368, 1379 ("Rather, anticipation only requires that those suggestions be enabling to one of skill in the art"); *In re Samour*, 571 F.2d 559, 563n.6 (C.C.P.A. 1978) ("[W]hether or not [the claimed invention] had been made previously is not essential to a determination that a method of preparing it would have been know by . . . one of ordinary skill in the art.").

Moreover, it is irrelevant whether a physician would have expected the method of treatment disclosed in the *Lunar News* to be safe and tolerable.  In *Bristol-Myers Squibb Co.*, several of the claims at issue were directed to a method of treating cancer by, *inter alia*, premedicating the patients.  The Court found a prior art reference to be enabling and to anticipate these claims, even though the reference did not describe premedication, and

even though the reference stated "further studies are needed to see if pretreatment regimens . . . will permit the *safe administration* of this compound." *Bristol-Myers Squibb Co.,* 246 F.3d at 1378-79 (emphasis added). Thus, even if the prior art reference explicitly states that safety testing needs to be done, it is nevertheless enabling.

Finally, Merck's importation of a "safety and tolerability" requirement into the enablement analysis is a poorly disguised attempt to assert the fear defense where the law prohibits it. By asserting that the July 1996 *Lunar News* is not enabling because it fails to address expectations about safety and tolerability, Merck is in effect asserting that the prior art "taught away" from the invention. Although the evidence demonstrated that the fear defense is bogus and that the prior art did not teach away from the invention, it is also well established that "teaching away" has no bearing on the issue of anticipation. *Bristol-Myers Squibb Co.*, 246 F.3d at 1378 ("[T]he question of whether a reference 'teaches away' from the invention is inapplicable to an anticipation analysis."). Since claims 23 and 37 do not contain a safety or tolerability limitation, the safety and tolerability issues are not relevant for purposes of anticipation.

The dosing regimen covered by claims 23 and 37 of the '329 patent was available to the public almost a year prior to Merck's alleged invention date. Merck's patent claims must therefore be held invalid under 35 U.S.C. § 102(a).

## II.    TEVA PROVED BY CLEAR AND CONVINCING EVIDENCE THAT THE CLAIMED INVENTION WOULD HAVE BEEN OBVIOUS IN JULY 1997

Merck clings to the argument, built on irrelevant scraps of information and half truths, that persons of skill in the art would have tossed aside the teachings of the *Lunar News* because of a "fear" or "expectation" that the obvious once-weekly dosages would

lead to unacceptable side effects. (Merck's Opening Br. at 30-31). However, Merck cannot escape that before this litigation provided Merck with a motive to argue otherwise, Merck scientists relying on the same prior art Teva relies on here stated unequivocally that once-weekly dosing was "*unlikely* to have a greater potential to induce upper GI irritation" than daily dosing. (DTX147 at MK0158265 (emphasis added)). This statement, made before Merck filed for the '329 patent, similar subsequent statements made by Merck and its scientists, and the reported perceptions of physicians prescribing alendronate, demonstrate that the alleged "fear" of increased side effects with once-weekly dosing never existed, and was made up for this case.

Far from showing an "expectation" of failure with once-weekly dosing, the evidence unequivocally demonstrates the opposite: in July 1997 once-weekly dosing was expected to be well-tolerated. Each piece of the rickety contraption that is Merck's fear defense collapses under scrutiny, and with it Merck's rebuttal to Teva's proof that claims 23 and 37 are invalid.

A.     The Facts Proving Obviousness are Not in Dispute

Merck nowhere argues that the April and July 1996 *Lunar News* articles do not teach the invention of claims 23 and 37 of the '329 patent. In fact, these references unambiguously disclose once-weekly administration of alendronate for osteoporosis. Merck does not dispute that motivation existed to administer alendronate once-weekly. Likewise, Merck concedes that in July 1997 a person skilled in the art would have understood the appropriate weekly doses to be 70 mg and 35 mg for treatment and prevention of osteoporosis, respectively. (Papapoulos 682, 684; Russell 149-50; 152-53). Moreover, Merck admits that in July 1997 "those of skill in the art knew that once-

weekly administration of alendronate would be efficacious." (Merck Opening Br. at 29).
For these reasons, a person of skill in the art reading the April and July 1996 *Lunar News*
would have recognized that the references describe an effective method of treating and
preventing osteoporosis. Thus, no dispute exists regarding the salient facts: in July 1997
the prior art expressly taught once-weekly dosing for osteoporosis, it provided the
motivation to do so, it taught the appropriate doses, and it taught that the regimen would
be effective. In view of those facts, the invention of claims 23 and 37 would have been
obvious and those claims are therefore invalid under 35 U.S.C. § 103(a). (*See* Teva
Opening Br. at 24-28).

> **B.    Teva Proved a Reasonable Expectation of Success in July 1997**

Merck argues that in July 1997 an "expectation" existed "that alendronate sodium
doses higher than 20 mg presented an unfavorable tolerability and safety profile," and
that because the *Lunar News* did not address this expectation, the claimed invention
cannot have been obvious. (Merck Opening Br. at 30-31). This argument fails (1)
factually, because the evidence shows that no such expectation of an unfavorable
tolerability and safety profile existed (Teva Opening Br. at 27-44), and (2) legally,
because Merck misstates the requirement for an expectation of success under section 103.

Merck's argument amounts to a contention that to be effective as prior art the
*Lunar News* had to set forth *proof* that the disclosed method would have a "favorable"
tolerability profile (which Merck nowhere defines). (*See* Merck Opening Br. at 30).
Since the '329 patent itself includes no such proof of or claims to any such profile,
Merck's argument implies that the prior art must show more than the '329 patent itself
shows or claims. That is not the law. "Obviousness does not require absolute

predictability of success." *In re O'Farrell*, 853 F.2d 894, 903 (Fed. Cir. 1988). In *O'Farrell*, the patent applicant argued that a prior art article that disclosed "virtually all" the claimed method nevertheless failed to render the claimed invention obvious because of unpredictability in the field. According to the applicant, the article offered nothing more than "speculation" that had never been carried out, and that it was therefore not certain at the time the reference was published whether its disclosure could be carried out. According to the applicant, without such certainty, the prior art disclosures, which "hindsight" demonstrated were correct, were "merely invitations" to make the claimed invention. *Id.* at 902. The Federal Circuit rejected that standard, holding that for obviousness "all that is required is a reasonable expectation of success." *Id.* at 904.

Like the applicant in *O'Farrell*, Merck argues that Teva's case is "rooted in hindsight." (Merck Opening Br. at 30). According to Merck, because it did not provide certainty of success, the *Lunar News* teachings of once-weekly dosing were "nothing more than an unsupported shot in the dark." *Id.* This argument is indistinguishable from the contention squarely rejected in *O'Farrell*. The law does not require "certainty"; instead, it requires a "reasonable expectation of success." *Id.* at 904; *In re Longi*, 759 F.2d 887, 897 (Fed. Cir. 1985); *In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986). Merck does not dispute that Teva has proved by clear and convincing evidence that in July 1997 a "reasonable expectation" existed that once-weekly alendronate would have an acceptable tolerability profile. Moreover, Teva demonstrated that Merck repeatedly relied on the same evidence prior to this litigation to convey that same expectation of tolerability.

1.    **Merck's Emphasis on a "Dose Related" Effect is Misplaced Because the Prior Art Taught that Alendronate should be Safe at the Relevant Doses**

Merck spends much of its brief arguing that persons skilled in the art in July 1997 would have known that "bisphosphonates" demonstrated "dose-related" gastrointestinal effects. This argument is a red herring. Even if Merck had proved that those skilled in the art would have speculated that ever-higher once-weekly doses might lead to "increased" side effects at some point, that speculation would be irrelevant here because those same persons *knew* the results of administering the doses of alendronate required for once-weekly treatment and prevention of osteoporosis, i.e., "about 70 mg" or "about 35 mg" respectively.[3] In July 1997 persons of skill in the art knew from the prior art that *daily* doses of 40 mg and 80 mg were well-tolerated. (Teva Opening Br. at 16-18). Whether a "dose-related" side effect might show up at a still higher dose is irrelevant.

Merck itself relied on those same results. Internally before management, and externally before the FDA and the scientific community, Merck repeatedly characterized the prior art to the '329 patent as demonstrating that once-weekly doses of alendronate for osteoporosis would be well-tolerated. (Teva Opening Br. at 38-41). Merck's scientists told management in May 1997, just two months before the '329 patent application was filed, that "40 and 80 mg doses were well tolerated *even when given on a daily basis*." (DTX147 at MK0158265 (emphasis added)). The bottom line is that, like Merck's own scientists, persons of skill in the art in July 1997 knew what happened at the relevant doses of "about 70 mg" and "about 35 mg." At those doses, alendronate was

---

[3]    In every instance, Merck neglects to state whether doses were being administered daily or weekly. Merck argues about side effects seen with "10 mg," "20 mg," and "40 mg" doses, but it never makes clear that those doses were administered daily, and thus do not reflect side effects that would be seen with single once-weekly doses.

well-tolerated. Whether at even higher doses, a "dose relationship" would lead to unacceptable side effects is irrelevant to the question of what would have been expected at the claimed doses. (*See* Teva Opening Br. at 38-41).

### 2. Merck Confuses Different Types of Side Effects To Cloud the Issues In this Case

Merck misleadingly lumps together the severe esophagitis cases seen early in the marketing of alendronate with mild non-specific symptoms that have never been proved to be associated with alendronate. For example, Merck states that the severe esophagitis cases were "a warning flag" about the "viability of alendronate" in the treatment of "elderly postmenopausal women," and that "[s]ince the gastrointestinal side effects associated with bisphosphonates had long been reported to be dose related, increasing the dose was contrary to prevailing medical thinking." (Merck Opening Br. at 2). These statements contradict what Merck knew and recognized before this litigation provided a motive to confuse the record: the rare, severe esophagitis cases and the more common general "gastrointestinal side effects" were unrelated.

Neither Merck nor anyone else ever viewed the esophagitis cases as calling into question the "viability of alendronate." The evidence is in fact directly contrary. Merck never mentioned, suggested, or even hinted to the FDA or to the public that the severe esophagitis cases might affect the viability of the drug. These "pill esophagitis" cases were very rare; in fact, their number did not rise to the expected incidence of such cases in the treated population. (DTX197 at MK0249562). Merck did not react to the "warning flag" until it was forced to do so for public relations reasons. (*See* Hirsch dep. 54-56, 62-63). Moreover, Merck responded simply by reemphasizing the dosing instructions for alendronate in a letter to physicians and in meetings between its sales

personnel and doctors. After that response, which Merck's executives and Teva's witnesses agree was complete and appropriate, the rare events became even more rare. (Hirsch dep. 61-62; Yates 568-69; Fennerty 283-84; Markowitz 459-60; DTX486).

Moreover, prescribing physicians did not doubt the "viability of alendronate." Their practices belie the "anxiety" Merck ascribes to them; physicians *doubled* the number of alendronate prescriptions they wrote from approximately 500,000 in March 1996 (when the "clarion call" went out regarding the esophagitis cases) to one million when Merck met with the FDA just seven months later. (DTX197 at MK0249547; DTX395 at MK0250139). Doctors recognized what Dr. Markowitz understood at the time: the rare esophagitis case were anomalies, attributable largely to patients' failure to comply with dosing instructions, and unrelated to the dosage strength. (Markowitz 433-41). These cases did not represent a deterrent to prescribing the drug for other patients. (Teva Opening Br. at 30-32).

Not only did the severe esophagitis cases not deter doctors from continuing to prescribe and indeed expanding the number of prescriptions of once-daily alendronate, they would not have been a deterrent to once-weekly dosing in July 1997. To the contrary, the evidence shows that once-weekly dosing would have been expected to *decrease* the number of severe "pill esophagitis" cases by decreasing the number of tablets administered and increasing patient compliance with the dosing instructions. (Russell 195-97; Markowitz 441-43, 447, 485-86; Fennerty 310-11; Yates 627).

Merck cites the testimony of Dr. Fennerty for the proposition that the "gastroenterology community" thought that the severe esophagitis cases indicated that "we may be sitting on the tip of an iceberg of [a] potential epidemic of severe

gastrointestinal injury." (Merck FF 52). As discussed in Teva's Opening Brief, Dr. Fennerty's overwrought testimony is not credible. Dr. Fennerty's testimony is contrary to Merck's own statements to the FDA and the medical community regarding the severe esophagitis cases. Dr. Fennerty's testimony is also contrary to that of Teva's Dr. Markowitz, a gastroenterologist who, unlike Dr. Fennerty, actually investigated the esophagitis case reports in 1996-97 in conjunction with well-known bone researchers. Indeed, Dr. Fennerty's testimony demonstrated that he did not bother to investigate whether the articles that formed the basis for his alleged "alarm" in 1996, in particular an article about rats by Blank *et al.*, bore any relationship to the effects seen with alendronate in the clinical setting.[4]  (Teva Opening Br. at 35-38).

Finally, Dr. Fennerty mixed together the severe esophagitis cases with evidence of general non-specific gastrointestinal complaints, something that Merck's scientists made clear was improper because the latter effects could not be attributed to alendronate with certainty. In particular, Dr. Anastasia Daifotis, one of inventors on the '329 patent, stated that although the severe esophagitis cases could be causally associated with alendronate, the general complaints could not because of the background incidence of such complaints in the general population:

> Based upon a complete review of data from large, randomised studies and postmarketing experience with alendronate, the only GI adverse experiences that have been causally associated with alendronate are rare esophageal events, generally presenting as retrosternal pain or burning or difficulty swallowing. These events must be discerned from general complaints of abdominal discomfort, which commonly occur in this population, irrespective of treatment with alendronate.

---

[4]      As discussed in Teva's Opening Brief, Dr. Fennerty admitted at trial that when the data from the Blank study is properly analyzed, it predicts that there would be "no discernible difference" between the gastrointestinal side effects expected with 10 mg and 70 mg doses. (Teva Opening Br. at 36-37).

(DTX32 at 60).  Merck's reliance on Dr. Fennerty's testimony, and its misleading

pooling of information regarding severe esophagitis cases and general non-specific

gastrointestinal complaints, are deliberately misleading and scientifically baseless.

Likewise unavailing is Merck's reliance on a "study" by Ettinger, which was

published in 1998.  First, the report was not published until after the filing date of the

'329 patent, and could not have informed the person of skill in the art.  Second, Merck's

reliance on Dr. Papapoulos's testimony that Ettinger's "findings" were "clinically

extremely important" is misplaced.  (Merck FF 53).  On cross-examination, Dr.

Papapoulos admitted that the report was "not scientifically very interesting."

(Papapoulos 694).  In fact, Dr. Papapoulos understates the difficulties with the Ettinger

report; it is junk science, and Merck's inventor, Dr. Yates, said as much on several

occasions.  For example, in an October 9, 1998 press release, Merck strongly criticized

the Ettinger article as "scientifically inaccurate" and "potentially harmful to patients":

> We strongly disagree with the conclusions of both articles and believe
> them to be not only scientifically inaccurate, but also potentially harmful
> to patients.

(DTX534 at MK0165968).  With regard to the discontinuation rate Ettinger reported for

patients taking alendronate, which Dr. Papapoulos said "confirms what every single

clinician was seeing in daily practice," Merck said that the reported percentage of patients

experiencing gastrointestinal symptoms was "entirely consistent with the known

prevalence of such disorders in the general population."  (*Id.*).  In a letter to the editor of

the journal that published Dr. Ettinger's report, Dr. Yates echoed the conclusions of

Merck's press release, characterizing Dr. Ettinger's conclusions as "not supported."

(DTX273 at MK0232110).  Merck's reliance on the Ettinger study here, after having so

resoundingly disparaged it in the past, illustrates the weakness of Merck's case.

3.    **The Chesnut Data would Not have Deterred Once-Weekly
       Dosing**

Merck's final refuge is the Chesnut study, but that report provides no shelter.

According to Merck, the Chesnut study demonstrates that alendronate exhibits a dose-

related effect that is peculiar to postmenopausal osteoporotic women (and apparently no

other patient population) that would have deterred a person of skill in the art from

administering alendronate at the claimed once-weekly doses.  Merck states that the

Chesnut data led Merck's scientists to avoid doses larger than 20 mg daily in post-

menopausal osteoporotic women.  (Merck Opening Br. at 12-13).  However, in order to

gain approval for a once-weekly clinical trial, Merck told the FDA exactly the opposite of

what it told the Court.  In a formal submission to the FDA, Merck and Dr. Yates stated

that the Chesnut data (along with data from Paget's studies) supported the conclusion

that once-weekly alendronate should be "very well tolerated."  In stark contrast to the

ominous spin Merck places on Chesnut now when it is attempting to salvage its patent,

before the FDA Merck presented the Chesnut data positively, stating that the study

demonstrated that "90% of postmenopausal patients with osteoporosis remained on

alendronate treatment at 40 mg daily for one year."  (DTX192 at 8).  No witness at trial

contradicted that conclusion, and it confirms the testimony of Teva's experts that the

results of the Chesnut study standing alone would not have deterred a person of skill in

the art from administering alendronate for osteoporosis on a once-weekly basis.  (Russell

184-85; Markowitz 450-51).

Moreover, viewed in context, together with all the data available on daily doses of alendronate, the Chesnut data would not have deterred once-weekly dosing. When the Chesnut data are viewed in the context of the data available in July 1997 from the administration of 40 mg alendronate *daily* to postmenopausal women (Harris study), up to 80 mg daily to Paget's patients in clinical trials (Siris, Reid and Khan studies), and 40 mg daily to thousands of Paget's patients in clinical practice, the person skilled in the art would have believed that the once-weekly administration of 70 mg alendronate would have at least a "reasonable probability" of success. (Teva Opening Br. at 16-18, 32-35).

### 4.    The Prior Bisphosphonates are Irrelevant

Merck points to the data from the use of the old bisphosphonates etidronate, clodronate and pamidronate as part of the evidence for its argument that persons skilled in the art understood that there was a "dose-relationship" between the administration of bisphosphonates and gastrointestinal side effects. (Merck's Opening Br. at 7-10). Merck's retreat to this argument is remarkable, in view of its position in the litigation involving the '077 patent that alendronate was such a leap forward in bisphosphonate therapy as to be incomparable to any prior compound.

In July 1997, vastly more information was available on the use of alendronate (the compound in question) than about the older bisphosphonates, which had by then largely fallen into disuse. (Papapoulos 699-701; Russell 162-64; Fennerty 277-78). Thus, data from the older compounds are irrelevant and reference to them unnecessary. (Russell 161-65; Markowitz 452-53; 463-64).

In addition, the side effects associated with etidronate and clodronate were largely unrelated to the upper gastrointestinal side effects that were of concern for alendronate,

and were attributable in part to the much larger doses employed for those compounds (e.g., 100-300 times higher than the doses of alendronate). (Russell 163-65; *see also* Merck FF 23, 31). At these enormous doses, the principal side effect seen with the use of etidronate and clodronate was diarrhea, which is not an upper gastrointestinal phenomenon. The record is devoid of any report linking diarrhea and alendronate at any dose. Thus, the etidronate and clodronate side effect experience is irrelevant to the expectation that persons of skill in the art would have had about the once-weekly administration of 70 mg and 35 mg of alendronate in July 1997. Merck citations to Dr. Russell's observations about dividing the etidronate and clodronate doses to deal with diarrhea are beside the point, as is its reliance on what Dr. Russell did or did not mention to Dr. Fleisch about those compounds.

Merck also relies on experience with pamidronate, and again notes that alendronate has "only one more carbon atom" than pamidronate (Merck FF 42), a fact that Merck previously told this Court was irrelevant to whether the compounds could be expected to have similar properties. Merck asserts that Ciba-Geigy discontinued research on pamidronate after esophagitis was observed in one of the clinical trials,[5] and that in light of all the evidence on pamidronate, including Dr. Papapoulos's personal observations, a person of skill in the art would conclude that pamidronate demonstrates dose-related gastrointestinal effects. (Merck Opening Br. 8-10; Merck FF 34). However, like etidronate and clodronate, the evidence from pamidronate is not relevant to the claimed invention.

---

[5]     Merck implies that Ciba-Geigy withdrew its pamidronate product from development because of the esophagitis it observed. However, no witness with personal knowledge of Ciba-Geigy's decision-making ever testified to that fact.

Before this litigation, neither Merck nor Dr. Papapoulos had ever extrapolated from pamidronate side effects to those of alendronate. On the contrary, in 1995, Merck's scientists contrasted the relative absence of gastrointestinal side effects observed with alendronate from the experience with prior bisphosphonates, including pamidronate and etidronate:

> Dose-dependent upper gastrointestinal irritation is the primary side effect associated with several other bisphosphonates, which are administered at higher doses.

(DTX276 at 1441; *see* Russell 161-62). Dr. Papapoulos also distinguished sharply between alendronate and the other bisphosphonates, admitting that information from the use of alendronate in Paget's disease patients, which demonstrated that 80 mg daily was well-tolerated, was more relevant than information from the administration of pamidronate. (Papapoulos 700-01). This testimony is consistent with his pre-litigation writings, which state that because of significant differences between bisphosphonates, results from one bisphosphonate should not be extrapolated to others. (DTX527 at 543). Describing and comparing the gastrointestinal side effects of alendronate and pamidronate in 1999, Dr. Papapoulos did not mention dose-relatedness with regard to alendronate side effects, but drew a sharp distinction with pamidronate, stating that "[w]ith oral pamidronate, GI effects appear to be dose-related." (DTX527 at 547).

Finally, Merck's attempt to extrapolate from pamidronate to alendronate fails on its own terms. Dr. Papapoulos testified that pamidronate administered at 150 mg per day for osteoporosis was a "very good" product, that it was as well-tolerated as daily alendronate, and that he used daily pamidronate for osteoporosis even after its development was halted. (Papapoulos 645-46).

The drug at issue here is alendronate. At the relevant time, the information available about that drug demonstrated, as Merck repeatedly stated, that weekly dosing at 70 mg and 35 mg would be safe and effective. Merck's arguments based on discredited attempts to extrapolate from non-analogous observations about remotely related compounds are scientifically unsound and should be rejected.

### 5. Merck's Arguments about Weekly Risedronate and Intravenous Alendronate are without Merit

Merck argues that Dr. Russell's not advising Proctor & Gamble to make a once-weekly version of its own bisphosphonate, risedronate, after reading the *Lunar News* in 1996, is evidence that Dr. Russell did not believe that the claimed invention was obvious before this litigation. (Merck Opening Br. at 21). This argument is silly. The claimed invention of the '329 patent relates to alendronate, not risedronate, and the April and July 1996 *Lunar News* articles do not mention risedronate, much less its weekly dosing. Thus, evidence of Dr. Russell's opinions concerning risedronate in July 1997 is irrelevant to the obviousness of the claimed invention.

Likewise baseless is Merck's contention that Dr. Russell's suggestion to use intravenous alendronate to avoid gastrointestinal effects implies that he did not believe that once-weekly alendronate was obvious. (Merck Opening Br. at 21). Intravenous alendronate had been used and described in the literature prior to July 1997, and it had been shown to be effective. (DTX400; DTX192 at MR0066685). Thus, in mentioning intravenous alendronate administration, Dr. Russell was simply summarizing what was disclosed in the literature. The passage pointed out by Merck is not Dr. Russell's exhaustive assessment of all of the possible means of administering alendronate. It is one

idea. Moreover, the fact that several means exist to address an issue does not make any one of them non-obvious. *See In re Heldt*, 433 F.2d 808, 812 (C.C.P.A. 1970).

### 6. Physicians Did Not Harbor a "Fear" of Higher Less-Frequent Doses

In the end, all Merck's various attempts to build the image of perceived intolerability of alendronate at larger, less-frequent doses collapse in light of Merck's own study of what prescribing physicians said they expected before the patent application was filed in July 1997. (Teva Opening Br. at 43-44). Far from expressing "fear" of increased doses administered less frequently, the consensus of hundreds of physicians in 1997 was that "less frequent dosing = less GI upset." (DTX244 at MK0174867). This evidence that doctors were not "afraid" of giving larger, less-frequent doses contradicts Merck's unsupported arguments about physicians' perceptions.

In the same vein, Merck argues as "proof" that the *Lunar News* was not "enabling" the fact that "no one suggested it or carried forward the torch of once weekly dosing." (Merck's Opening Br. at 6). This statement is not true. In fact, in June 1996, shortly after the publication of the April 1996 *Lunar News* and more than a year before Merck filed the '329 patent application, Merck's executives in Europe became aware of a group of Italian clinical investigators seeking permission to pursue a clinical trial on once-weekly alendronate. (*See* Drake dep. 70-72). These executives notified Merck personnel in the U.S., and by August 1996 all three of the inventors listed on the '329 patent had in turn been notified. (Daifotis dep. 92-93; Santora dep. 179-81; Yates dep. 106-08; *see also* Wold-Olsen dep. 86-88). Thus, Merck knew even before it filed its the patent application that the "torch of once weekly dosing" would have been carried forward by others had Merck allowed them to do so.

7. **Merck's Scientists Believed Increased Gastrointestinal Effects Were "Unlikely" Based on the Evidence Provided in the Prior Art**

In May 1997, Merck's scientists (including Dr. Yates) told Merck management that once-weekly administration of alendronate was "unlikely to have greater potential to induce upper GI irritation." That conclusion was based on the data from Paget's patients and the data from the Chesnut study. (DTX147 at MK0158265; Yates 581-82, 584-87). Merck's scientists had no expectation of increased gastrointestinal side effects at once-weekly doses.

Although Merck will likely argue that the conclusions of its scientists were bolstered by the results of its dog experiments, that argument does not withstand scrutiny. In May 1997, the only pertinent dog experimental results Merck had were the initial comparisons of the effects of five consecutive exposures to acidic alendronate solution to a single exposure with the same solution. (Yates 592). Although the designer of the dog experiments testified that they were not intended to predict anything about human patients (Peter dep. 65-67), Dr. Yates testified that the initial data spurred the conception of his invention. (*See* Merck FF 92-93). Irrespective of Dr. Yates's mental processes, the prior art report by Sorrentino (PTX98) had already disclosed what Dr. Yates said he concluded from the initial dog experiments, and had disclosed that conclusion with respect to patients taking alendronate tablets, not dogs whose innards were bathed with alendronate solutions. Faced with this prior art disclosure, Dr. Yates retracted his testimony and instead testified that the invention was supported by later experiments comparing daily administration with one solution to single exposures with a more concentrated solution. (Yates 558). Those later "high dose" experiments, however,

were not available in May 1997 when Dr. Yates stated that once-weekly dosing was "unlikely" to demonstrate increased gastrointestinal effects.[6] (Yates 592). Thus, when Merck's scientists concluded that once-weekly administration of alendronate was likely to be well-tolerated, they possessed the same information relied on by Teva here.

C.    **Merck's Arguments that the Paget's Data Should be Disregarded Are Groundless**

Teva's proof that a person of skill in the art would have reasonably expected once-weekly dosing of alendronate to be adequately tolerated was based in part on the results of studies in Paget's patients. Merck argues that these results are irrelevant because, according to Merck, in 1997 it was generally accepted that one "could not extrapolate from Pagetic patients to osteoporotic patients." (Merck Opening Br. at 18). In the end, Merck's argument is impeached by its own repeated reliance on the Paget's data to support the expected tolerability of once-weekly dosing. (Teva Opening Br. 38-41). Merck's attempts to shore up its position do not rely on scientific evidence, but instead are based on irrelevant sideshows.

1.    **Merck's Argument That the Paget's Data Should Be Disregarded is Without Scientific Basis**

Merck offered no scientific basis for its position that a person skilled in the art would have ignored the data from the Paget's disease clinical trials in assessing the tolerability of alendronate in osteoporosis patients. The best that Merck could do was to

---

[6]    In fact, the Lufkin article about pamidronate, which Merck relies upon heavily, illustrates the same phenomenon with pamidronate as that disclosed by the initial dog experiments. Lufkin demonstrated in people that daily administration of 150 mg pamidronate resulted in esophagitis, while *weekly* administration of pamidronate did not. (PTX87 at 321 (five patients taking 150 mg pamidronate daily developed esophagitis while none of the patients taking the drug weekly developed that condition)). That is the same result observed with the initial dog experiments: repeated daily exposure irritated the dog esophagi, while a single exposure did not.

offer Dr. Papapoulos's opinion that physicians treating both Paget's patients and osteoporosis patients would "probably" understand that the two conditions would have different "toleration level."[7] (Papapoulos 710-11). This conclusory opinion, that "physicians" would have such an "understanding" is without support in the scientific literature. Merck could not produce one article, book, or other reference demonstrating scientifically that the gastrointestinal tracts of Paget's patients and osteoporosis patients are somehow different, or that Paget's patients are more "stoic." In fact, the evidence at trial showed that Paget's patients and osteoporosis patients are more alike than different.

Both osteoporosis patients and Paget's patients exhibit a spectrum of clinical signs, extending from basically nothing to extreme pain and deformity.[8] (Teva Opening Br. at 7). In 1997 both Paget's patients and osteoporosis patients who were not experiencing any pain or symptoms were treated with alendronate. Indeed, Merck's expert, Dr. Papapoulos, was forced to call into doubt the inerrancy of Dr. Fleisch's "bible" when he disagreed with the statement in the 1996 edition that treatment should be offered to all symptomatic and asymptomatic Paget's patients. (Papapoulos 691-93). No basis exists for the "pain-related" stoicism that Merck says differentiates Paget's patients

---

[7]    Although this testimony, offered on redirect examination after the opportunity to cross-examine had passed, is devoid of scientific underpinnings, and is at odds with Merck's own use of the Paget's data, it was also beyond the scope of the cross-examination. Teva objected at the time, and the Court should therefore disregard it. *United States v. Riggi*, 951 F.2d 1368, 1375 (3d Cir. 1991).

[8]    Merck calls osteoporosis an "asymptomatic disease." (Merck FF 69). That is not true. As support for this unqualified characterization of osteoporosis generally, Merck cites to Dr. Russell's testimony that "some" patients may be "asymptomatic in terms of bone pain." Setting Merck's distortion of the record aside, the evidence in this case overwhelmingly shows that osteoporosis is a serious disease that results in decreased quality of life, pain, deformity, especially of the spine, and, if accompanied by fracture, increased mortality. (Russell 111-12, 115-16). Merck's attempt to downplay the seriousness of the disease is curious in light of its concomitant argument about the huge commercial success Merck has experienced with alendronate.

from osteoporosis patients, and thus no basis exists for Merck's unqualified assertion that Paget's patients are "highly motivated to accept treatment." (Merck FF 71).

In fact, the conduct of clinical trials ensures that the Paget's disease clinical trial data with respect to side effects are directly applicable here. In most clinical trials, the investigators specifically question the patients about side effects – they do not merely record complaints. Thus, even those patients who are less likely to complain about non-serious side effects in clinical practice would still report them in a clinical trial. (Markowitz 425-26; Russell 176-79).

In addition, the use of a placebo control can ensure that the alleged "stoicism" of Paget's disease patients does not bias the results. The Reid study (of which Dr. Yates is a co-author) demonstrated that the Paget's disease patients who received 40 mg alendronate every day had no greater incidence of side effects than those patients receiving placebo. This use of a control corrects for any bias inherent in the patient population. (Russell 409-10).

At the end of the day, Merck and its scientists cannot escape their prior admissions. As Teva demonstrated at trial, before it needed to hatch a theory to support its patent, Merck repeatedly cited the Paget's disease data as supporting the notion that once-weekly alendronate would be well-tolerated in osteoporosis patients. (Teva Opening Br. at 38-41). The admissions of Merck and its scientists confirm that in July 1997 the scientific evidence demonstrated a reasonable expectation that once-weekly administration of "about 70 mg" and "about 35 mg" alendronate for treatment and prevention of osteoporosis would be well-tolerated. (Markowitz 449-52). Merck's fear defense does not withstand scrutiny, and claims 23 and 37 of the '329 patent should be

found invalid because the claimed invention would have been obvious in view of the prior art.

## 2.    Merck's Attacks on Dr. Russell Are Unfounded

Unable to find scientific support for its fear defense, Merck is reduced to attacking Dr. Russell, accusing him of changing his position, and of making statements inconsistent with his prior expressed beliefs.  Merck's accusations are false.

### (a)    Dr. Russell's Not Editing Every Line of Dr. Fleisch's Book Proves Nothing

At trial Merck produced a copy of proofs of Dr. Fleisch's book that included some handwritten editorial suggestions Dr. Russell had supplied in 1999 as a friendly favor to Dr. Fleisch.  Apparently Dr. Fleisch, desperate to preserve his income stream based on Merck's sales of Fosamax,[9] turned over to Merck's lawyers his private correspondence with Dr. Russell, which included these notes.  Dr. Fleisch's book contains a statement in the section on alendronate that makes two observations without citation to any authority:  (1) that alendronate was well tolerated up to a daily dose of 20 mg, but that at 40 mg daily *some* post-menopausal osteoporotic patients had "signs of upper gastrointestinal intolerance," and (2) that 40 mg daily was well tolerated in patients with Paget's disease.  (*See* Merck Opening Br. at 18).  According to Merck, Dr. Fleisch's observations prove that osteoporosis patients and Paget's patients tolerate alendronate differently.  Merck further asserts that Dr. Russell's not suggesting changes to the way in which those observations are expressed demonstrates his agreement with Merck's interpretation.

---

[9]    Merck admits that Dr. Fleisch receives income from sales of Fosamax.  (Merck opening 80).  The amount of that income is such that Merck and Dr. Fleisch insisted that the details of the arrangement be admitted into evidence in the prior litigation under seal.

In fact, the quotation from Dr. Fleisch's book that Dr. Russell did not change is nothing more than two factual observations: Chesnut observed that some osteoporosis patients treated with 40 mg daily experienced gastrointestinal intolerance, and 40 mg daily is well-tolerated in Paget's patients. Those facts do not support Merck's conclusion that it was "generally accepted" in 1997 that one could not "extrapolate from Pagetic patients to osteoporosis patients." (Merck Opening Br. at 18). In 1997, Merck's scientists were extrapolating from Paget's disease patients to osteoporosis patients (and relying on the Chesnut data) to support their contention that once-weekly dosing was "unlikely" to exhibit increased gastrointestinal side effects in osteoporotic patients. (DTX 147 at MK0158265). Indeed, Merck's scientists continued to repeatedly extrapolate from Paget's disease to osteoporosis until this litigation. (Teva Opening Br. at 38-41).

That Merck would attempt to use as scientific "evidence" its distortion of Dr. Fleisch's book and the absence of editorial comments from Dr. Russell that would have prevented that distortion demonstrates how little substance Merck's case has. This incident vividly illustrates the adage that "no good deed goes unpunished." Dr. Fleisch, whose income is related to Merck's winning this case, showed up at trial for the sole purpose of bringing along the private comments provided by his old friend Dr. Russell and turning them over to Merck's lawyers. The fact that in 1999 Dr. Russell did not foresee the nonsensical inference Merck was going to draw from Dr. Fleisch's observations and edit them to head off that inference is not proof that Dr. Russell agreed with the spin Merck places on those few sentences now. Merck's argument that Dr. Russell is changing his story is silly.

Although what Dr. Russell did or did not suggest with respect to Dr. Fleisch's prose style is irrelevant, that Merck did not call Dr. Fleisch to testify is itself noteworthy. He traveled from Switzerland and was in the courtroom throughout the trial. He is certainly motivated to help Merck because, if Merck loses this case and generic competition enters the market, Dr. Fleisch stands to lose a source of income. Notwithstanding Merck's characterization of him as the "father" of bisphosphonates and the author of what Merck calls the bisphosphonate "bible," Merck did not call him to testify and have him describe the state of clinical knowledge. In fact, notwithstanding his contributions to physiological research on bisphosphonates, Dr. Fleisch could not shed light on these questions because he does not do clinical research, and does not see or treat patients. (Papapoulos 705; Russell 95). The statements Merck relies on from Dr. Fleisch's book are derivative of other researchers' work. Dr. Fleisch has no personal knowledge about the clinical aspects of the bisphosphonates his book discusses.

### (b) Dr. Russell' s Canadian Declaration has Nothing to Do With Gastrointestinal Side Effects

Merck also relies on a declaration that Dr. Russell submitted in a Canadian litigation relating to a patent on a complicated regimen for cyclical administration of etidronate. According to Merck, this declaration also indicates that Dr. Russell is changing his story and "adopting" Teva's position. This too is wrong.

Dr. Russell's declaration was limited to opinions concerning the obviousness of a cyclical protocol for treating and preventing osteoporosis with etidronate. (PTX297 at ¶58). This protocol is specific to etidronate, and the declaration had nothing to do with alendronate. Dr. Russell offered his opinion that it would not have been obvious that intermittently administered low doses of etidronate would be effective to treat

osteoporosis. In particular, Dr. Russell was responding to another declaration that stated

that the *dosing regimen* for etidronate in osteoporosis could be gleaned from studies in

Paget's patients. It is in this context that Dr. Russell states "[t]here is no precedent from

the studies on etidronate in osteoporosis from which one could predict effective *doses*."

(PTX297 ¶ 76 (emphasis added)). Dr. Russell explained at trial that his declaration dealt

with selection of dosing regimens for different diseases, not whether to expect undue

gastrointestinal side effects:

> Q.    Now in this case, you are extrapolating from Paget's disease
>       to osteoporosis; correct?
>
> A.    In this case here?
>
> Q.    Yes.
>
> A.    Yes. But in relation to the gastrointestinal side effects, not in
>       terms of how you would determine doses, which is the topic under
>       discussion in the paragraph that you're showing on the board there.

(Russell 375). That testimony was not challenged.

Dr. Russell also testified that the "side effects" alluded to in Merck's snippets

from his Canadian declaration refer to impairment of bone mineralization. That is,

although editronate inhibits bone resorption, it also inhibits the formation of the mineral

component of new bone, a side effect not associated with alendronate. Thus, the "side

effect" to which Dr. Russell referred was not an upper gastrointestinal side effect, and has

nothing to do with the issues in this case. (Russell 375-76).

Dr. Russell's Canadian declaration says nothing about extrapolation of

gastrointestinal side effects from Paget's disease patients to osteoporosis patients.

Merck's deliberate misrepresentation of this evidence by itself demonstrates how little

support Merck can find for its positions.

Merck's attempt to impeach Dr. Russell were based on trivialities and misrepresentations. Dr. Russell's expertise was unchallenged, and the substance of his opinions were soundly based on the scientific evidence, and in the end were consistent with every representation Merck itself made before the need to salvage the '329 patent provided it the motive to advance its current theories.

### D.     Merck Did Not Prove "Unexpected Results"

Merck's attempt to imply that once-weekly alendronate provided an "unexpected result" is unsupported.[10] Merck relies on a paper by Schnitzer et al., which Merck characterizes as "acknowledg[ing] that once-weekly dosing of alendronate sodium could be a better dosing regimen." (Merck FF 95). This statement, according to Merck, confirms the results of Merck's dog experiments. However, Merck's assertion that once-weekly dosing "could be" better shows that Merck has no evidence that it is. The evidence does not support the conclusion that once-weekly dosing is superior to daily dosing in terms of gastrointestinal side effects.

Schnitzer could not say that once-weekly dosing was significantly better than daily dosing with regards to gastrointestinal side effects because daily dosing had been demonstrated to be indistinguishable from placebo. In fact, the Schnitzer study could not demonstrate significant differences between once-weekly and once-daily dosing because it was not adequately powered to do so, i.e., it was not large enough. Merck's Senior Director of Clinical Research, Dr. John Orloff, testified that the Schnitzer study could not prove the superiority of once-weekly dosing because daily dosing demonstrated an incidence of gastrointestinal side effects similar to placebo:

---

[10]     It is also irrelevant. See Teva Opening Br. at 44.

Q.    But as you testified earlier, the Protocol 118 was not designed to distinguish any differences in safety profiles between the once -weekly dosing and the daily dosing, is that correct?

A.    We did not have sufficient power based on our prior experience in clinical studies to be able to show a lower incidence of upper GI events, given that in studies of similar size, the daily dosing regimen had an incidence that was similar to placebo. So in these clinical studies of this size, we did not have power to be able to discern that.

(Orloff dep. at 13, 50-51; *see also* Santora dep. 199-200).

With regard to the statement from Schnitzer cited by Merck that there was "a trend toward a lower incidence" of gastrointestinal side effects with once-weekly dosing, Dr. Orloff testified that "it wasn't statistically significant." (Orloff dep. 59-60). One of Merck's other inventors, Dr. Daifotis, agreed that there was no statistically significant difference between patients on 10 mg daily and patients on 70 mg once-weekly with respect to any single type of gastrointestinal event. (Daifotis dep. 338-39). Thus, any attempt by Merck to imply that once-weekly dosing provides a significant advantage over once-daily dosing must be viewed skeptically. Indeed, Dr. Russell testified that there is no evidence of a clinically significant safety advantage in administering alendronate once-weekly instead of once-daily. (Russell 198-200). That testimony was unchallenged.

### E.    Merck Failed to Demonstrate "Commercial Success"

Merck's post-trial submissions include several claims about the purported commercial success of once-weekly Fosamax.  First, Merck asserts that the commercial success of a product that embodies a patented invention is a factor that should be considered in determining whether an invention would have been obvious.  This proposition is uncontroversial in an appropriate case, i.e., a case in which, unlike this one, others were free to compete with the patentee.  Merck, however, does not address this threshold issue:  whether, in view of Merck's FDA-granted exclusivity for alendronate that precluded competition for the first five years of Fosamax marketing, commercial success is even a relevant inquiry.  (*See* Teva Opening Br. at 46-47 and cases cited therein).  Second, even if commercial success is relevant here, the evidence taken as a whole is not sufficient to demonstrate that any commercial success seen with once-weekly Fosamax is attributable to the invention claimed in the '329 patent.

### 1.    Merck Failed to Demonstrate a Nexus between the Success of Fosamax and the Invention of the '329 Patent

Merck ignores its obligation to demonstrate the connection between any success of the product and the claimed features of the invention.  *See Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000) ("A nexus between commercial success and the claimed features is required."); *Riverwood International Corp. v. Mead Corp.*, 212 F.3d 1365, 1367 (Fed. Cir.), *cert. denied*, 531 U.S. 1012 (2000) (a trial court did not err in finding that (1) the patent owner "presented some evidence of commercial success" but (2) "much of that success was attributable to factors outside the scope of claims 1 and 13 of the . . . patent.").  Although the Fosamax 35 and 70 mg once-weekly tablets embody the claimed invention, those products embody

much more.  The efficacy and safety of alendronate were known well before the

introduction of Fosamax once-weekly, and those attributes made once-daily Fosamax a

hugely successful product.  (Russell 144-45; Papapoulos 667-71; Yates 548-49).  Indeed,

"a market leader who led with sales of a prior product cannot establish a nexus by the fact

that it led with a new product." *Nursury Supplies, Inc. v. Lerio Corp.*, 45 U.S.P.Q.2d

1332, 1333 (M.D. Pa. 1997).

Merck has not carried its burden here – to establish that the incremental success,

if any, of once-weekly Fosamax was attributable to the claimed features of the invention.

*See Pfaff v. Wells Electronics, Inc.*, 124 F.3d 1429 (Fed. Cir.1997), *aff'd*, 525 U.S. 55

(1998) (court discounted evidence of commercial success in view of patentee's failure to

establish that the success was attributable to the barb element, the only element not

disclosed in the prior art).  In fact, Merck's documents state that the efficacy of the

product is the primary consideration motivating doctors and patients to use Fosamax

(DTX381 at MK0369615 and DTX499 at MK0334115), and for osteoporosis therapy, the

efficacy of once-weekly dosing is identical to that of once-daily dosing.  (Russell 144-45;

Papapoulos 667-71; Yates 548-49).  At best, Merck has proved the undisputed fact that

once-weekly Fosamax is a successful product..  Merck has not proved, however, that any

commercial success was attributable to the features of the claimed invention that were not

disclosed in the prior art.

### 2.    Merck Abandoned its Attempt to Demonstrate a Nexus

The sales of once-daily Fosamax were increasing from the day Merck introduced

it, and were still increasing on the day Merck launched Fosamax once-weekly.  Thus, to

try to show commercial success of the once-weekly product, Merck attempted to

demonstrate that the sales growth for Fosamax was greater than it would have been in the absence of the once-weekly dose. To this end, Merck's expert Dr. Vellturo created a mathematical "diffusion model." The evidence at trial, including the cross-examination of Dr. Vellturo, showed, however, that the diffusion model was so riddled with flaws and inappropriate assumptions that Merck has apparently abandoned it altogether. (*See* Teva Opening Br. at 52-54). Despite the fact that the diffusion model was the centerpiece of Merck's commercial success case, it received not a single mention in Merck's post-trial brief.

In addition to not connecting the patent to the success of the product, Merck also failed to consider and account for other factors in the marketplace that would have had a positive impact on Fosamax once-weekly sales. These factors coalesced about the time of the launch of once-weekly Fosamax, and all of them favored Fosamax over its competitors. (Teva Opening Br. at 48-51). In addition, Merck has ignored that its own actions drove the sales of Fosamax. (*Id.* at 51-52). These efforts included increased promotional expenditures and a shift in marketing focus exclusively to the once-weekly product. (DTX355 at 4 and DTX344).

Attempting to downplay the effects of its own promotional efforts, Merck asserts that the alleged increase in sales occurred without a corresponding increase in promotional expenditures. (Merck Opening Br. at 32-33). However, during the quarter in which Fosamax once weekly was launched, such expenditures were the third highest ever for Fosamax. (DTX344). Merck presumably does not spend its promotional money unless it expects those expenditures to generate additional sales. To argue that the

Merck's sudden increase in promotional spending at the same time it was launching once-weekly Fosamax had no effect on sales of that product is not credible.

### 3. Teva's ANDA Filing Does Not Demonstrate Commercial Success

Perhaps recognizing the failure of its attempt to prove commercial success, Merck now relies on Teva's filing of an Abbreviated New Drug Application ("ANDA") as "the most undeniable indicium of commercial success." (Merck Opening Br. at 32). Teva's ANDA filing is irrelevant to the issue here: whether the success of Fosamax is attributable to the claimed invention. That Teva chose to seek approval to market a generic version of the weekly product shows that Teva believes once-weekly Fosamax is a successful product, a fact not in dispute. The filing is not, however, evidence that the success is attributable to the invention claimed in the '329 patent, as distinguished from other factors.

The fact that Teva is seeking to compete with a once-weekly product only tends to show that that product is supplanting the once-daily version. As Merck's expert Dr. Velluro recognized, however, mere "switching" from the daily form to the weekly regimen does not establish the incremental commercial success necessary (but not sufficient) to demonstrate a connection between the patented invention and commercial success. In fact, Merck's documents show that Merck's marketing efforts were directed to switching the marketplace to a "Once Weekly World," and to the elimination of the daily dosing form. (*See* DTX355 at 24 and 33). Merck has focused all its promotional efforts on the once weekly product (Counihan dep. 153-54), and has discontinued sampling of the daily product. (Counihan dep. 145-47). Obviously, to the extent Merck has switched the market over to once-weekly, Teva has been required to follow that

market.  Merck again misses the point:  merely because the product is successful does not mean that it is a "commercial success" under the patent law.  Such commercial success must be attributable to the invention of the patent, not to other factors, including, for example in this case, Merck's actions to influence the market.

**4.    Merck's Sales of Once-Weekly Fosamax Do Not Establish Commercial Success**

Having observed the demise of its pseudo-scientific diffusion model theory of commercial success, Merck now emphasizes the sales figures and the dollar sales growth for Fosamax. A more appropriate measure of success, however, is the percent increase from year to year.  The average increase in sales from 1996 through 2000 was 42.2 percent.  (DTX374 and PTX166).  The percentage increase for 2001, the first full year of once-weekly sales, was virtually the same – 42.5 percent.  (DTX374).  By Merck's own estimate the percentage increase in 2003 will be only 28 percent (DTX362 at 46), the second lowest yearly increase in the history of the Fosamax franchise.  Thus, sales of once-weekly Fosamax have merely continued the trend established by the once-daily product, which has the identical therapeutic benefits.

Attempting to make its sales figures appear dramatic, Merck misrepresents the significance of a chart prepared by Dr. Rozek.  (Merck Opening Br. at 33; PTX299).  Dr. Rozek's chart, which Merck displayed at trial, plotted "new prescriptions" for Fosamax. The chart is accurate, but the inferences Merck draws from it are not.  Dr. Rozek was not attempting to use a plot of "new prescriptions" as a visual guide to sales growth.  As Dr. Vellturo admitted, to prepare such a plot, the data must first be corrected for switching from daily to weekly, because a "new prescription" that merely represents a patient changing from daily to weekly Fosamax cannot be a measure of the incremental success

of the once-weekly invention. (Vellturo 780-81 and 800). In fact, Dr. Vellturo included a "switching" correction in his analysis (*see, e.g.*, DTX543), as did Dr. Rozek in other of his visual summaries (*see, e.g.*, DTX540), and these plots do not demonstrate a sharp increase in new prescriptions with the introduction of once-weekly Fosamax. The bottom line with respect to sales, however, is Merck's admission that the once-weekly product did not create new growth trends; instead, it merely continued the strong growth of Fosamax. (DTX355 at 4).

It was Merck's burden to show the relevance of "commercial success" to this case, to show that the "commercial success" actually occurred, and to show that any "commercial success" was connected to the advantages of the patented invention. Merck failed to show any of them.

## CONCLUSION

For the reasons set forth herein and in Teva's Opening Brief and Proposed

Findings of Fact and Conclusions of Law, claims 23 and 37 of the '329 patent are invalid

and unenforceable.

Respectfully submitted,

YOUNG, CONAWAY, STARGATT &
TAYLOR LLP

April 11, 2003                                   By_____

Josy W. Ingersoll (#1088)
Adam W. Poff (#3990)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19899-0391
(302) 571-6600

Attorneys for defendant
Teva Pharmaceuticals USA, Inc.

OF COUNSEL
James Galbraith
Maria Luisa Palmese
William G. James, II
KENYON & KENYON
One Broadway
New York, New York 10004
(212) 425-7200

## CERTIFICATE OF SERVICE

I, Adam W. Poff, Esquire, hereby certify that I caused copies of the foregoing document to be served on April 11, 2003 upon the following counsel of record in the manner indicated:

### BY HAND DELIVERY

Mary B. Graham, Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
Wilmington, DE 19801

### BY FEDERAL EXPRESS

Nicholas G. Barzoukas, Esquire
Howrey, Simon, Arnold & White
750 Bering Dr.
Houston, TX 77057-2198

_____
Adam W. Poff

EXHIBIT T

than an angle normal to the surface being inspected.

15. The Magistrate Judge's construction of "plurality of scan path segments" is not adopted. "Plurality of scan path segments" means more than one distinct scan segment. The Court otherwise adopts the reasoning of the Magistrate Judge.

16. The Magistrate Judge's construction of "gallery definition means" is adopted with modification. "Gallery definition means" is supported by the structure of conventional computer hardware and software with the function of determining what items may be displayed by the "gallery display means" of the claims.

17. KLA's motion for partial summary judgment of the '259 patent for obviousness (D.I. 584) is denied.

18. ADE's cross-motion of non-obviousness of the '259 patent (D.I. 602) is denied.

19. KLA's motion for partial summary judgment of invalidity of the '259 patent under 35 U.S.C. § 112, ¶ 1 (D.I. 587) is denied.

20. KLA's motion for partial summary judgment of non-infringement of the '259 patent by KLA's SP1–TBI device (D.I. 566) is granted, as KLA's SP1-TBI device does not satisfy the "oblique zone" limitation.

21. KLA's motion for partial summary judgment of non-infringement of the '259 patent by KLA's SP1–TBI and SP1–DLS devices (D.I. 590) is moot as to the SP1–TBI device and denied as to the SP1–DLS device.

22. The Magistrate Judge's finding that KLA's motion for partial summary judgment of non-willful infringement of the '525 patent (D.I. 249) is moot is adopted by the Court.

23. The Magistrate Judge's finding that KLA's motion to dismiss ADE's claims of willful infringement of the '525 and '259 patents (D.I. 253) is moot as to the '525 patent is adopted. As to the '259 patent, the motion (D.I. 253) is denied.



MERCK & CO., INC., Plaintiff,

v.

TEVA PHARMACEUTICALS USA, INC. Defendant.

No. CIV.A.01–048–JJF.

United States District Court, D. Delaware.

Aug. 28, 2003.

As Amended Jan. 7, 2004.

Patentee brought infringement action against competitor, alleging that its patent for an osteoporosis drug was infringed by competitor's proposed generic drug. The District Court, Farnan, J., held that: (1) determination of British court that European drug patent was invalid as obvious was not entitled to collateral estoppel effect; (2) claims in patent referring to dosage of "about 70/35 mg" of alendronic acid meant equivalent of 70/35 mg of alendronic acid when taking into account molecular weight variances; (3) newsletter article did not anticipate patent; (4) patent was not invalid as obvious; and (5) patentee's fail-

ure to disclose newsletter article during application was not inequitable conduct.

Ordered accordingly.

**1. Judgment ⟷713(1)**

Collateral estoppel is appropriate if: (1) the issue is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) plaintiff had a full and fair opportunity to litigate the issue in the first action.

**2. Patents ⟷327(13)**

Doctrine of collateral estoppel applies in patent cases.

**3. Patents ⟷327(21)**

Determination of British court that European drug patent was invalid as obvious was not entitled to collateral estoppel effect in action for infringement on the United States patent; standards for determining obviousness in the United States and Britain were different, and British court's factual findings relating to obviousness were not essential to its decision.

**4. Patents ⟷112.5**

The party challenging the patent bears the burden of proving by clear and convincing evidence that the patent is invalid. 35 U.S.C.A. § 282.

**5. Patents ⟷112.5**

Clear and convincing evidence necessary to establish a patent's invalidity is evidence that places in the fact finder an abiding conviction that the truth of the factual contentions are highly probable. 35 U.S.C.A. § 282.

**6. Patents ⟷314(5)**

The first step in any patent invalidity analysis is claim construction, which is an issue of law.

**7. Patents ⟷161**

A patent claim term should be construed to mean what one of ordinary skill in the art at the time of the invention would have understood the term to mean.

**8. Patents ⟷157(2)**

When conducting a patent claim construction analysis, a district court should be cognizant of the fact that claims should be construed, if possible, to uphold their validity.

**9. Patents ⟷165(1), 167(1), 168(2.1)**

The starting point for a patent claim construction analysis is the claims themselves; then remainder of the intrinsic evidence should be examined, beginning with the specification and concluding with the prosecution history.

**10. Patents ⟷161, 162**

Generally, there is a strong presumption in favor of the ordinary meaning of claim language as understood by those of ordinary skill in the art; however, a patentee may act as his own lexicographer and use the specification to supply implicit or explicit meanings for claim terms.

**11. Patents ⟷162**

The patentee's lexicography must, appear with reasonable clarity, deliberateness, and precision before it can affect the claim.

**12. Patents ⟷159**

If the meaning of a patent claim term is clear from the totality of the intrinsic evidence, than the claim may be construed; if, however, the meaning of a claim term is genuinely ambiguous after examining the intrinsic evidence, than a court may consult extrinsic evidence.

**13. Patents ⟷101(2)**

Claims in patent for osteoporosis drug, referring to dosage of "about 70/35

mg" of alendronic acid, meant equivalent of 70/35 mg of alendronic acid when taking into account molecular weight variances for its derivatives that carried accessories; term "about" did not mean "approximately," since patentee explicitly defined term so that tablets contained the same number of core molecules as 70/35 mg of alendronic acid regardless of the final weight of the actual active ingredient in tablet.

**14. Patents ⬄72(1)**

Anticipation is determined through a comparison of the patent claim language with a single prior art reference. 35 U.S.C.A. § 102(e)(2).

**15. Patents ⬄72(1)**

Anticipation requires that every element of the patent claim be found either expressly or inherently in a single prior art reference. 35 U.S.C.A. § 102(e).

**16. Patents ⬄68**

If the prior art reference does not expressly state an element of patent claim, that reference may still anticipate if that element is inherent in its disclosure; inherency is established if the evidence makes clear that the missing descriptive matter is necessarily present in the thing described in the reference and, and that it would be so recognized by persons of ordinary skill. 35 U.S.C.A. § 102(e).

**17. Patents ⬄68**

Although inherency cannot be established through probabilities, recognition by a person of ordinary skill in the art before the critical date of the patent is not required to show inherent anticipation. 35 U.S.C.A. § 102(e).

**18. Patents ⬄70**

Newsletter article referencing weekly 40 or 80 mg dose of oral alendronate for treatment of osteoporosis did not anticipate patent for osteoporosis drug, which expressly disclosed weekly doses of "about 35 mg" and "about 70 mg" of alendronate sodium "on an alendronic acid basis," absent evidence that the dosages referred to in the article and the dosages referred to in the patent were equivalent. 35 U.S.C.A. § 102(e).

**19. Patents ⬄16(2, 3), 36.1(1), 36.2(1)**

The underlying factual inquiries in obviousness determination require consideration of: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) any secondary considerations of nonobviousness such as commercial success, long felt but unsolved need, failure of others, and acquiescence of others in the industry that the patent is valid. 35 U.S.C.A. § 103.

**20. Patents ⬄36(2)**

As with anticipation, the burden of demonstrating obviousness of patent is with the challenger and invalidity must be proven by clear and convincing evidence. 35 U.S.C.A. § 103.

**21. Patents ⬄16.25**

Patent for osteoporosis drug, which expressly disclosed weekly doses of "about 35 mg" and "about 70 mg" of alendronate sodium, was not invalid as obvious, despite prior newsletter article that disclosed weekly 40 or 80 mg dose of oral alendronate for treatment of osteoporosis; newsletter article did not overcome the serious side effect concerns associated with the higher dosage levels it described, and weekly dosing regimen described in patent was commercially successful. 35 U.S.C.A. § 103.

**22. Patents ⬄26(1)**

In order to establish obviousness from a combination of elements disclosed in prior art, there must be some motivation,

suggestion, or teaching of the desirability of making the specific combination that was made by the applicant. 35 U.S.C.A. § 103.

**23. Patents ⊂⊃97**

Duty of candor, good faith, and honesty imposed on patent applicants and their patent attorneys includes the duty to submit truthful information and the duty to disclose to the Patent and Trademark Office (PTO) information known to the patent applicants or their attorneys which is material to the examination of the patent application. 37 C.F.R. § 1.56(a).

**24. Patents ⊂⊃97**

Breach of the duty of candor, good faith, and honesty by patent applicant or patent attorney may constitute inequitable conduct. 37 C.F.R. § 1.56(a).

**25. Patents ⊂⊃97**

If it is established that a patent applicant engaged in inequitable conduct before the Patent and Trademark Office (PTO), the entire patent application so procured is rendered unenforceable. 37 C.F.R. § 1.56(a).

**26. Patents ⊂⊃97**

A patent applicant engages in inequitable conduct before the Patent and Trademark Office (PTO) when he withholds or misrepresents information material to the patentability of his invention, with an intent to deceive. 37 C.F.R. § 1.56(a).

**27. Patents ⊂⊃97**

Inequitable conduct by patent applicant encompasses affirmative misrepresentations of material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive. 37 C.F.R. § 1.56(a).

**28. Patents ⊂⊃97**

A reference withheld from patent application is considered material if there is a

substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. 37 C.F.R. § 1.56(a).

**29. Patents ⊂⊃97**

After determining if patent applicant withheld information that is material, the court must then determine whether the evidence demonstrates a threshold level of intent to mislead the Patent and Trademark Office (PTO) in determining if patent is invalid because of inequitable conduct.

**30. Patents ⊂⊃97**

Once materiality and intent to deceive Patent and Trademark Office (PTO) are established, the court should then weigh the findings and their premises and determine, in its discretion, whether to hold the patent unenforceable because of inequitable conduct. 37 C.F.R. § 1.56(a).

**31. Patents ⊂⊃97**

Applicant's failure to disclose newsletter article that disclosed weekly 40 or 80 mg dose of oral alendronate for treatment of osteoporosis when applying for patent that disclosed weekly doses of "about 35 mg" and "about 70 mg" of alendronate sodium to treat osteoporosis was not inequitable conduct that rendered patent invalid; article did not reflect the claimed invention directly and did not render the claimed invention invalid as either obvious or anticipated, and evidence failed to establish intent to deceive. 37 C.F.R. § 1.56(a).

**32. Patents ⊂⊃97**

In a case involving an omission of a material reference to the Patent and Trademark Office (PTO), there must be clear and convincing evidence that the applicant made a deliberate decision to withhold a known reference to establish inequitable conduct. 37 C.F.R. § 1.56(a).

Patents ⚙328(2)

    4,621,077.  Cited.

Patents ⚙328(2)

    5,994,329.  Valid.

————————

Mary B. Graham and Maryellen Noreika, Esquires of Morris, Nichols, Arsht & Tunnell, Wilmington, DE. Of Counsel: John F. Lynch, Nicolas G. Barzoukas, and Stephen E. Edwards, Esquires of Howrey Simon Arnold & White, LLP, Houston, TX. Paul D. Matukaitis, Edward W. Murray, and Gerard M. Devlin, Jr. Esquires of Merck & Co., Whitehouse Station, NJ, for Plaintiff.

Josy W. Ingersoll, and Adam W. Poff Esquires of Young, Conaway Stargatt & Taylor, LLP, Wilmington, DE. Of Counsel: James Galbraith, Maria Luisa Palmese and William G. James, II, Esquires of Kenyon & Kenyon, New York City, for Defendant Teva Pharmaceuticals, USA, Inc.

*OPINION*

FARNAN, District Judge.

**I.  Procedural Background**

Plaintiff, Merck & Co., Inc. ("Merck") is a Delaware corporation with its principal place of business in New Jersey. Defendant, Teva Pharmaceuticals USA, Inc. ("Teva") is a New Jesey corporation with its principal place of business in Pennsylvania. Merck is the owner of the entire right, title and interest in United States Patent No. 5,994,329, entitled "Method for Inhibiting Bone Resorption" (the "'329 Patent"), which issued November 30, 1999, naming as inventors Anastasia G. Daifotis, Arthur C. Santora II, and John Yates. Merck filed the application for the '329 Patent on July 22, 1997. The '329 Patent

is set to expire on August 14, 2018.  (PTX 1).

Merck listed the '329 Patent in the Federal Drug Administration's ("FDA") publication "Approved Drug Products with Therapeutic Equivalence Evaluations" (the "Orange Book") in connection with its 70 mg and 35 mg dosage for alendronate sodium, which Merck markets under the name "Fosamax."  On October 3, 2000, Teva filed a supplement to an existing Abbreviated New Drug Application ("ANDA") seeking FDA approval to market generic versions of Merck's 70 mg alendronate sodium product for weekly administration.  Included with Teva's ANDA filing were "paragraph IV" certifications (21 U.S.C. § 355(j)(2)(A)(vii)(IV)) asserting that the Patents listed in the Orange Book, including the '329 Patent, are invalid, unenforceable or would not be infringed by the commercial marketing of Teva's proposed product.  Merck filed this action on January 21, 2001, alleging that Teva's filing of its supplement was an act of infringement under 35 U.S.C. § 271(e)(2)(A).  Thereafter, Merck listed U.S. Patent No. 6,225,294 (the " '294 Patent") in the Orange book and Teva filed a paragraph IV certification asserting that the '294 Patent is invalid, unenforceable or would not be infringed by the commercial marketing of Teva's proposed 70 mg alendronate sodium product.  On October 4, 2001, Merck filed Civil Action No. 01–675–JJF, alleging that Teva's filing of its supplemental ANDA was an act of infringement of the '294 Patent under 35 U.S.C. § 271(e)(2)(A).

Subsequently, Teva filed another supplement to its ANDA, seeking approval to market a generic version of Merck's 35 mg Fosamax product.  The supplement also included a paragraph IV certification asserting that all the listed patents were invalid, unenforceable or would not be infringed by Teva's commercial marketing of its proposed product.  On November 6,

2001, Merck filed Civil Action No. 01–728, alleging that the filing of Teva's supplement to the ANDA was an act of infringement under 35 U.S.C. § 271(e)(2)(A). On January 14, 2002, the Court consolidated all three cases under Civil Action No. 01–048.

One of the listed patents against which Teva certified was U.S. Patent No. 4,621,-077 ("the '077 Patent"), which had already been the subject of litigation between the parties in this Court (Civil Action No. 00–035–JJF) in connection with Teva's application to market alendronate sodium for daily administration. The Court entered judgment in favor of Merck in that case on December 2, 2002, and an appeal from that judgment is now pending in the United States Court of Appeals for the Federal Circuit. (D.I.123–1). The parties agreed that they will be bound in this case, with regard to issues concerning the '077 Patent, by a final decision in the prior litigation. (D.I.128). Prior to trial Merck stipulated that the only claims at issue in this litigation are claims 23 and 37 of the '329 Patent and further stipulated that it would not allege an invention date for those claims prior to July 22, 1997. (D.I.128).

Teva stipulated that if found valid and enforceable, claims 23 and 37 of the '329 Patent would be infringed by the commercial marketing of Teva's proposed 70 mg and 35 mg alendronate sodium products for weekly administration. (D.I. 109, Pretrial Order, Tab 1, ¶¶ 8–9). The issues of validity and enforceability of the '329 Patent were tried before the Court from March 4–7, 2003.

The Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. § 1338(a). Additionally, venue is appropriate under 28 U.S.C. § 1391(c) and § 1400(b). Neither jurisdiction nor venue are contested by the parties. This Opinion constitutes the Court's Findings of Fact and Conclusions of Law with respect to the issues tried before the Court.

## II. The '329 Patent and Bone Biology In General

The '329 Patent discloses less-frequent-than daily administration of bisphosphonates (*e.g.*, alendronate) to inhibit bone resorption. (D.I. 143 at 8). Claims 23 and 37, the only asserted claims, relate specifically to the treatment and prevention of osteoporosis by once-weekly administration of alendronate. Osteoporosis is related to processes that are imbalanced in bone, and therefore, the Court will discuss the background of bone biology as it relates to osteoporosis and the use of alendronate for treatment of the disease.

Bone is the tissue that provides mechanical support to the body. It is made up of a protein matrix, which is overlaid with mineral to give it hardness. (Russell[1] at 108–109; DTX 523 at 2). Two principal types of cells maintain bone: 1) osteoclasts, which break down bone, and 2) osteoblasts, which build new bone. *Id.* The process of bone destruction and rebuilding is known as "remodeling." In the bone remodeling process, osteoclasts attach to the bone surface, become activated, and erode away the bone material beneath them, leaving defects in the bone structure. The destruction of bone by osteoclasts is called bone "resorption." Osteoblasts then attach to the eroded surface of these defects, lay down new bone, and then become inactive. In the normal healthy adult the remodeling process is balanced. In other words, bone is destroyed and

---

**1.** The bench trial transcript is cited throughout the Opinion by a notation to the witness and the page number of the transcript.

built at the same rate. (Russell at 109–110; DTX 523 at 3–4).

In osteoporosis, bone destruction and formation are no longer balanced and bone is destroyed faster than it is replaced. Therefore, osteoporosis can lead to bone that is thinner, weaker, more fragile and porous. (Russell at 110–115; DTX 523 at 7, 8). Osteoporosis is treated primarily by inhibiting bone resorption-thus restoring the balance between bone destruction and formation. Alendronate inhibits bone resorption by blocking the bone destroying effects of osteoclasts. (Russell at 116–117). A small portion of the ingested drug makes its way to and adheres to the bone surface, where it resides until it is taken up by osteoclasts. The alendronate then inhibits the osteoclasts from resorbing bone. (Russell at 121–122; DTX 523 at 10).

Paget's disease is also a common bone disease characterized by increased bone resorption. In Paget's disease, increased bone remodeling occurs in localized areas of the skeleton. If Paget's disease is not detected and treated early it can lead to an increase in bone size, fractures, and deformity. (Russell at 97). Like osteoporosis, Paget's disease is treated by inhibiting bone resorption with alendronate. (Russell at 125–126).

### III. Teva's Motion in Limine to Preclude Merck From Relitigating the Factual Findings Underlying the Decision in *Teva Pharmaceuticals Ltd. et al. v. Instituto Gentili Spa et al.* (D.I.113).

Teva filed a Motion in Limine to Preclude Merck from Relitigating the Factual Findings Underlying the Decision in *Teva Pharmaceuticals Ltd et al. Istituto Gentili Spa et al.*, (High Court of Justice, Chancery Division, Patents Court, January 21, 2003)). (D.I.113). Accordingly, the Court will discuss the motion in limine before it delves into the issues of validity and enforceability of the '329 Patent.

Teva's principal defense in this case is that claims 23 and 37 are invalid because the claimed invention is anticipated or would have been obvious in view of the prior art. At the same time that the parties were litigating the validity of the '329 Patent in this Court, they were also involved in a case in the British High Court of Justice (the "High Court"). That case was a challenge by Teva and others to the validity of the European Patent No. 998,-292 (the "'292 Patent"), which corresponds to the '329 Patent, and is based on the same provisional applications filed in July 1997. Teva, by its motion, contends that the '292 Patent covers the identical concept as the '329 Patent: the once-weekly dosing of alendronate sodium to treat osteoporosis, using seven times the normal daily dose.[2]

The High Court conducted a full trial on the merits from November 5–8, 2002, and heard further arguments from counsel on November 12–13, 2002. The trial involved live testimony from Merck's expert Dr. Socrates Papapoulos, who is Merck's expert in this case. In addition, Merck offered the testimony of Dr. Yates, the principal inventor of the '329 Patent, who also testified in this case. On January 22, 2003, Justice Jacob of the High Court found that the claimed invention was invalid because it would have been obvious to a person skilled in the art, it claims a method of treatment, and is incapable of industrial application.

---

**2.** This claim is in the form of a "Swiss claim." Such claims are used in attempts to avoid restrictions on claiming methods of treatment, which are unpatentable in many countries.

**A.  Applicable Legal Principles**

**[1, 2]**  Teva contends that the Court should adopt the High Court's factual findings concerning obviousness pursuant to the doctrine of collateral estoppel.  Collateral estoppel is appropriate if:  (1) the issue is identical to one decided in the first action;  (2) the issue was actually litigated in the first action;  (3) resolution of the issue was essential to a final judgment in the first action;  and (4) plaintiff had a full and fair opportunity to litigate the issue in the first action.  *Micron Technology, Inc. v. Rambus, Inc.*, 189 F.Supp.2d 201, 209 (D.Del.2002) (citations omitted).  Additionally, the doctrine of collateral estoppel applies in patent cases.  *See Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

**B.  Parties' Contentions**

**1.  Teva's Contentions**

By its motion, Teva contends that Merck had the identical motivation in litigating the British case as it does in the instant case:  to discredit the *Lunar News* (a prior art reference) and Teva's reliance on its teachings.  Moreover, Teva contends that Merck's barristers were afforded a full and fair opportunity to cross-examine all of Teva's witnesses and did so at length.  Teva contends that the evidence was heard by Justice Jacob of the High Court, who is experienced in patents.

On January 22, 2003, Justice Jacob found the '292 Patent invalid and entered judgment against Merck.  In its motion, Teva concedes that the legal standard may vary between Britain and the United States;  nevertheless, Teva contends that regardless of the differences, if any, between the legal standards for determining validity, collateral estoppel should still apply to the resolution of the underlying factual issues.  Specifically, Teva contends

that all of the elements of collateral estoppel are met in this case with regard to the High Court's factual findings on obviousness.

First, Teva contends that collateral estoppel applies to fact findings of foreign courts.  Teva argues that courts have recently recognized that parties who litigate in a foreign court should be bound by the results of that litigation to the extent that the requirements of the collateral estoppel doctrine are met.  For example, Teva points to *Vas–Cath, Inc. v. Mahurkar*, 745 F.Supp. 517 (N.D.Ill.1990), *rev'd on other grounds*, 935 F.2d 1555 (Fed.Cir.1991), where the parties extensively litigated the issue of obviousness in Canada, and the district court held that the parties were bound by the fact-finding of the Canadian Court.  Additionally, Teva points to *Northlake Marketing & Supply, Inc. v. Glaverbel, S.A.*, 958 F.Supp. 373, 379 (N.D.Ill. 1997) ("*Northlake I*") and *Northlake Marketing & Supply, Inc. v. Glaverbel, S.A.*, 986 F.Supp. 471, 475–76 (N.D.Ill.1997) ("*Northlake II*"), where the parties had previously litigated the validity of a Belgian patent that corresponded to the United States patent in suit.  The district court in those cases held that the Belgian Court's conclusions about the scope and content of prior art were binding on the parties in the United States litigation.

Further, Teva directs the Court to *Oneac Corp. v. Raychem Corp.*, 20 F.Supp.2d 1233, 1242–1243 (N.D.Ill.1998), where a corresponding European patent was litigated in the High Court and the district court held that with respect to the United States patent, it would not give preclusive effect to questions of law or mixed questions of law and fact, but it would adopt the British Court's factual findings.  Additionally, Teva points to Federal Circuit decisions that have declined to afford col-

lateral estoppel effects to judgments in foreign cases, but distinguishes them on the basis that those decisions were predicated on what the Federal Circuit views as different standards of patentability in other countries. *See, e.g., Medtronic Inc. v. Daig Corp.,* 789 F.2d 903 (Fed.Cir.1986)(declining to adopt German tribunal's determination that corresponding German patent was invalid in view of different legal standards); *In re Dulberg,* 472 F.2d 1394 (Cust. & Pat.App.1973) (same).

Second, Teva contends that the issues were the same in the British litigation; the obviousness of administering alendronate sodium once a week at a dose of about seven times the daily dose. Further, Teva argues that the issue of the scope and content of the prior art are the same in both cases; whether the *Lunar News* publications taught the administration of alendronate sodium once a week, and whether the prior art taught that the dose should approximate seven times the daily dose. In addition, Teva argues that Merck's fear defense is an issue in both cases. Merck claims that persons skilled in the art would have rejected the *Lunar News* teachings because of the fear that patients would not tolerate the larger dose. Merck raised the issue in Britain, and after considering the evidence, the High Court concluded that the "fear defense fails". For example, the High Court found that the rare instances of esophageal side effects were attributed primarily to failure to follow the dosing instructions (D.I.114, Ex. A, ¶ 65).

Third, Teva argues that the same issues were actually litigated in the High Court. For instance, Teva contends, the parties fully aired all factual evidence, where both sides had qualified expert witnesses to explain the evidence to the Court. Further, Teva argues that all witnesses appeared live and were extensively cross-examined

and after the trial both parties provided written submissions and appeared for extensive argument before Justice Jacob. As a result, Teva argues, Merck cannot contend that these issues were not litigated.

Fourth, Teva argues that the issues were determined by a valid and final judgment. Teva points out that the judgment of the High Court was the "Approved Judgement of that Court." It was issued on January 21, 2003 and reissued in corrected form January 22, 2003. Teva notes that Merck has appealed the judgment, but that fact does not imply that the judgment is not final for purposes of collateral estoppel. In fact, Teva argues that it is well settled that the pendency of an appeal does not diminish the preclusive effect of an appealed judgment. (D.I. 114 at 13) (quoting *Rice v. Department of Treasury,* 998 F.2d 997, 999 (Fed.Cir.1993)).

Lastly, Teva contends that the resolution of obviousness was essential to the judgment in the High Court. Specifically, it contends that Justice Jacobs was required to and did evaluate and interpret the prior art provided by Merck's witnesses, and that, all findings on these issues were necessary to his final judgment that the patent was invalid for obviousness. Based on this, Teva argues that the High Court's factual findings should be given preclusive effect.

### 2.  Merck's Contentions

In response, Merck argues that there is no transnational collateral estoppel as to the validity of a United States Patent. First, Merck contends that Teva fails to point to a single Federal Circuit case where, a foreign court's judgment that the patent was invalid, or the factual underpinnings of such a judgment, was given collateral estoppel effect in a case litigating the validity of a United States Patent. In fact,

Merck argues that the Federal Circuit and its predecessor court have rejected such attempts. For example in *Medtronic Inc. v. Daig Corp.,* 789 F.2d 903 (Fed.Cir.1986), *cert. denied,* 479 U.S. 931, 107 S.Ct. 402, 93 L.Ed.2d 355 (1986), the Federal Circuit rejected the argument that it should adopt the conclusion of a German tribunal that a German counterpart was obvious and stated, "[t]his argument is specious. The patent laws of the United States are the laws governing a determination of obviousness/nonobviousness of a United States patent in a federal court." *Id.* at 907–908.

Additionally, Merck contends that the predecessor to the Federal Circuit came to the same conclusion in *In re Dulberg* 472 F.2d 1394, 1398 (Cust. & Pat.App.1973) and *In re Larsen,* 49 C.C.P.A. 711, 292 F.2d 531, 533 (Cust. & Pat.App.1961), where in both cases, the court refused to consider the actions of a foreign country's patent office with respect to the patentability of the subject matter before the court.

Further, Merck argues that district courts have refused to give collateral estoppel effect to a foreign court's judgment. For example, Merck points to *Cuno, Inc. v. Pall Corp.,* 729 F.Supp. 234 (E.D.N.Y. 1989), where the High Court found the European counterpart of the United States patent at issue to be valid and infringed, and when the plaintiff sought to have the United States district court give collateral estoppel effect to certain factual findings, the court denied the request and stated that:

> Even if the court were to apply collateral estoppel to certain factual findings made by the British Court—as opposed to importing its legal conclusions wholesale-it is not clear that the trial time would be significantly shortened. Furthermore, the Federal Circuit's reluctance to give collateral estoppel effect to

foreign judgments would seem to apply here to foreign findings of facts insofar as those findings involve mixed questions of fact and foreign law. *Id.* at 238–239.

Moreover, Merck distinguishes the cases cited by Teva. First, in regard to the *Oneac* case, Merck points out that the court refused to give preclusive effect to questions of law or mixed questions of law and fact, and to the extent that certain factual findings were given collateral estoppel effect, it was because both parties to the suit agreed to be bound by those factual determinations. *Oneac Corp.,* 20 F.Supp.2d at 1242–1243. Additionally, Merck points to the *Vas–Cath* case where the Northern District of Illinois adopted certain factual findings of a Canadian Court in regard to the validity of a patent, after parsing out the Canadian judgment, comparing the relative Canadian and United States' laws and making its own conclusions regarding the applicability of the factual determinations in the context of the United States' legal framework. Additionally, in the *Northlake* cases, Merck points out that the district court adopted only certain factual findings from a previous Belgian proceeding after careful review of those findings and contends that most importantly, the issues that were precluded limited the evidence that the patent challenger could rely on. *See Northlake II,* 986 F.Supp. at 475–476; *Northlake I,* 958 F.Supp. at 379.

Next, Merck argues that the requirements for collateral estoppel have not been met. First, Merck contends that the High Court's factual findings regarding obviousness were not essential to the final judgment because the High Court found that the '292 was invalid based on three grounds: 1) invalid as a method of treatment; 2) incapable of industrial application; and 3) invalid as obviousnot obviousness alone.

MERCK & CO., INC. v. TEVA PHARMACEUTICALS USA    **611**
Cite as 288 F.Supp.2d 601 (D.Del. 2003)

Lastly, Merck argues that the facts and applicable legal standard is different. Specifically, Merck contends that in the United States obviousness is ultimately a question of law which rests on the following factual inquiries: 1) the scope and content of prior art; 2) the level of ordinary skill in the art; 3) the differences between the claimed invention and the prior art; and 4) objective considerations of nonobviousness. *See Advanced Display Systems, Inc. v. Kent State Univ.,* 212 F.3d 1272, 1284–85 (Fed.Cir.2000). On the other hand, Merck argues, in Britain, the determination of obviousness is based on the following factual inquiries: 1) identifying the inventive concept embodied in the patent in suit; 2) assuming the mantle of the normally skilled but unimaginative addressee in the art at the priority date and impute to him what was, at that date, common general knowledge in the art; 3) identifying what, if any, differences exist between the matter cited as being made available to the public and the alleged invention; 4) determining whether, viewed without any knowledge of the alleged invention, those differences constitute steps which would have been obvious to the skilled man or whether they required any degree of invention. (D.I. 126 at 17) (citing *Windsurfing International, Inc. v. Tabur Marine (Great Britain) Ltd.,* 1985 R.P.C. 59, 60–61 (1985 Ct. Of Appeal)). Merck contends that although these standards are similar, the United States Court is required to consider objective considerations of obviousness, while in Britain they are not. Accordingly, Merck contends that collateral estoppel is improper.

### C. Discussion

[3] As outlined above, the standards for determining obviousness in the United States and Britain are different. In fact, for purposes of this motion, Teva concedes that there may be differences in the legal standards for validity between the United States and Britain. Additionally, after reviewing the "factual findings" of the High Court, the Court finds that many of the principles are mixed questions of law and fact. The cases cited demonstrate that mixed questions of law and fact should not be adopted if there are two different legal standards, as in this case. *See, e.g., Oneac Corp.,* 20 F.Supp.2d at 1242–1243 (declining to adopt mixed questions of law and fact). Additionally, in *Oneac* the court only adopted factual findings from a foreign tribunal where the parties agreed to be bound by such factual findings. *Id.* at 1242–43. This is not the situation in the instant case because Merck opposes any adoption of the High Court's factual findings. Also, the Court finds that Merck has successfully distinguished the *Northlake* cases from the instant case, where in the *Northlake* cases the issues that were precluded limited the evidence that the patent challenger could rely on and the adopted factual findings did not go to the validity of the patent in suit.

The Court also concludes that all of the elements necessary for a finding of collateral estoppel are not present in this case. Specifically, the High Court's factual findings relating to obviousness were not essential to the High Court's decision because that decision was based on three separate grounds as detailed above. The Third Circuit has stated that "if a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone." *Arab African Int'l Bank v. Epstein,* 958 F.2d 532, 535, (3d Cir.1992) (quoting Restatement (Second) of Judgments § 27, cmt. i), *rev'd in part on other grounds,* 10 F.3d 168 (3d Cir.1993). The Court concludes that based

on this standard, the High Court's finding of obviousness cannot be said to be essential to the final determination.

There may be cases where "the balance tips in favor of preclusion because of the fullness with which the issue was litigated and decided in the first action." *Masco Corp. v. United States*, 303 F.3d 1316, 1329–1330 (Fed.Cir.2002). However, the Court concludes that this is not such a case, especially in light of the fact that the Federal Circuit has cautioned courts against giving too much weight to foreign tribunals who are confronted with the same prior art. *See Heidelberger Druckmaschinen AG v. Hantscho Comm. Prods., Inc.*, 21 F.3d 1068, 1072 (Fed.Cir.1994) (recognizing that theories and laws of patentability differ from country to country and stating that "[c]aution is required when applying the action of a foreign patent examiner to deciding whether the requirements of 35 U.S.C. § 103 are met under United States law, for international uniformity in theory and practice has not been achieved."). While the Court has reviewed Justice Jacob's factual findings in regard to obviousness, based on the aforementioned reasons, the Court declines to adopt them and will make independent findings of fact on the issue of validity. Accordingly, Teva's motion will be denied.

## IV. Invalidity

[4, 5] Once issued a patent is presumed to be valid. *See* 35 U.S.C. § 282. The party challenging the patent bears the burden of proving by clear and convincing evidence that the patent is invalid. *See Helifix Ltd. v. Blok–Lok Ltd.*, 208 F.3d 1339, 1346 (Fed.Cir.2000). Clear and convincing evidence is evidence that places in the fact finder "an abiding conviction that the truth of [the] factual contentions are 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984).

Defendants contend that the '329 Patent is invalid and therefore cannot be infringed. Defendants argue invalidity on two grounds: anticipation by the July 1996 *Lunar News* reference under 35 U.S.C. § 102(a), and obviousness under 35 U.S.C. § 103. For the reasons set forth below, the Court concludes that the '329 Patent is valid.

## A. Claim Construction

[6–8] The first step in any invalidity analysis is claim construction which is an issue of law. *SIBIA Neurosciences, Inc. v. Cadus Pharmaceutical Corp.*, 225 F.3d 1349, 1355 (Fed.Cir.2000); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). A claim term should be construed to mean "what one of ordinary skill in the art at the time of the invention would have understood the term to mean." *E.g., Markman*, 52 F.3d at 986. Further, when conducting a claim construction analysis, a district court should be cognizant of the fact that claims should be construed, if possible, to uphold their validity. *In re Yamamoto*, 740 F.2d 1569, 1571 n. * (Fed. Cir.1984) (citations omitted).

[9] The starting point for a claim construction analysis is the claims themselves. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d at 1582; *see also Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1305 (Fed.Cir.1999) (stating that "[t]he starting point for any claim construction must be the claims themselves."). Thereafter, the remainder of the intrinsic evidence should be examined beginning with the specification and concluding with the prosecution history. *Vitronics*, 90 F.3d at 1582 (outlining this order for examination in claim construction).

MERCK & CO., INC. v. TEVA PHARMACEUTICALS USA    **613**
Cite as 288 F.Supp.2d 601 (D.Del. 2003)

**[10, 11]** Generally, there is a strong presumption in favor of the ordinary meaning of claim language as understood by those of ordinary skill in the art. *Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1268 (Fed.Cir.2001). However, it is well-settled that a patentee may act as his own lexicographer and use the specification to supply implicit or explicit meanings for claim terms. *Bell Atl. Network Servs.*, 262 F.3d at 1268 (Fed.Cir.2001); *Vitronics Corp.*, 90 F.3d at 1582; *Markman*, 52 F.3d at 980 (noting that patentee is free to be his own lexicographer, but emphasizing that any special definitions given to words must be clearly set forth in patent). "[T]he patentee's lexicography must, appear 'with reasonable clarity, deliberateness, and precision' before it can affect the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir.1998) (quoting *In re Paulsen*, 30 F.3d 1475, 1480 (Fed.Cir.1994)).

**[12]** If the meaning of a claim term is clear from the totality of the intrinsic evidence, than the claim may be construed. If, however, the meaning of a claim term is "genuinely ambiguous" after examining the intrinsic evidence, than a court may consult extrinsic evidence. *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed.Cir.1997).

Claim terms in claims 23 and 37 of the '329 Patent are disputed in this case. Accordingly, the Court will focus its discussion on these claims

**[13]** In full, claim 23 of the '329 Patent provides, "[a] method according to claim 22 wherein said unit dosage of said bisphosphonate comprises *about 70 mg* of alendronate monosodium trihydrate on an alendronic acid active basis." (PTX 1, '329 Patent at col. 21, lines 24–27) (emphasis added).

In full, claim 37 of the '329 Patent provides, "[a] method according to claim 36 wherein said bisphosphonate unit dosage comprises *about 35 mg* of alendronate monosodium trihydrate, on an alendronic acid active basis." (PTX 1, '329 Patent at col. 22, lines 24–26) (emphasis added).

Teva contends that the term "about" in claims 23 and 37 should be construed according to its ordinary meaning of "approximately." (D.I. 147 at 3). Merck contends that the patentee in this case acted as his own lexicographer and set out the meaning of "about" in the specification where the specification explains that the term "about" accounts for the variability of weight of the active ingredient that would result from the use of different salts of alendronic acids. (D.I. 141 at 42). Thus, Merck contends that the phrase "about 70 mg" as used in claim 23 and "about 35 mg" as used in claim 37 means 70 and 35 mg respectively of the active ingredient on an alendronic acid active basis. *Id.* at 43. In other words, Merck contends that, regardless of the final weight of the actual active ingredient in the tablet, it contains the same number of alendronate core molecules as 70/35 mg of alendronic acid.

In rebuttal, Teva contends that Merck's proffered construction makes no sense. Teva points out that according to Merck, the word "about" is used to account for the fact that different alendronate salts have different molecular weights, and that to deliver the same amount of physiologically active compound to the bone they must be delivered at slightly different dosage strengths. (D.I. 147 at 4). Teva contends that Merck's interpretation is nonsensical because the claim itself accounts for this phenomenon by directing that the compound be administered on the basis of a common denominator, *i.e.*, "on an alendronic active basis." *Id.* In other words, Teva contends that the claims require that

the amount "alendronate sodium trihyd-rate" be sufficient to deliver the same amount of active material as "about 70/35 mg" of alendronic acid. *Id.* As a result, Teva contends, the term "about" does not perform the function which Merck assigns to it, and must be in the claim for another purpose, that is, to have its ordinary meaning of "approximately."

After reviewing the claim terms and the specification, the Court concludes that the patentee explicitly and with reasonable clarity and precision defined the term "about 70 mg" in claim 23 and "about 35 mg" to mean the equivalent of 70/35 mg of alendronic acid when taking into account molecular weight variances for its deriva-tives that carry accessories. Simply put, no matter what the final weight of the actual active ingredient in the tablet is, it contains the same number of alendronate core molecules as 70/35 mg of alendronic acid.

The relevant portion of the '329 Patent specification provides:

> Because of the mixed nomenclature cur-rently in use by those or [sic] ordinary skill in the art, reference to a specific weight or percentage of bisphosphonate compound in the present invention is on an active weight basis unless otherwise indicated herein. For example the phrase "about 70 mg of bone resorption inhibiting bisphosphonate selected from the group consisting of alendronate, pharmaceutically acceptable salts there-of and mixtures thereof, on an alendron-ic acid weight basis" *means that the amount of bisphosphonate compound selected is calculated based on 70 mg of alendronic acid.*

PTX 1, the '329 Patent, col. 10, 65–col. 11, line 8. (emphasis added). The Court con-cludes that the specification clearly indi-cates that the terms "about 70 mg" and "about 35 mg" refer to the fact that de-pending on the derivative of the alendronic acid that could be used in the final formula-tion, different weights will be needed in order to get the same effect as 70 or 35 mg of the seminal compound, alendronic acid. As Merck points out, the alendronate sodi-um in Fosamax includes an atom of sodium metal for each molecule of alendronate sodium. (D.I. 138 at 24). If a formulator was to select a different salt which in-cludes a metal atom that is heavier than salt, *e.g.,* a potassium or barium atom, the total amount of material in each tablet would have to increase if the amount of alendronic acid were to remain the same. By conforming the weight of the alendro-nate derivative in the claim of the '329 Patent to the equivalent weight of the alendronic acid, a formulator can consis-tently know how many basic units (alen-dronic acid units) are to be used, even though the final total weight may be differ-ent. Examples 7 and 8 of the '329 Patent reinforce this conclusion. They provide for oral formulations "containing about 35 mg" and "about 70 mg" of alendronate "on an alendronic acid active basis." The claims at issue use the same phraseology and the ingredient tables in the examples are consistent with the premise that "about" accounts for the fact that alendro-nate derivatives have accessories that add to the weight of the molecules. Thus, in the examples "about 35 mg" turns out to be 45.68 mg of alendronate monosodium trihydrate and the "about 70 mg" turns out to be 91.35 mg of alendronate monosodium trihydrate. *See* PTX 1, the '329 Patent col. 19 lines 13–15, col. 19, lines 44–46, col. 19 lines 20–21, col. 19 lines 51–52.

Although the Court finds that Dr. Rus-sell, is competent in the area of bisphos-phonates, it does not find his opinion as to the definition of the phrases "about 70/35 mg" in the '329 Patent persuasive. During

cross examination on this issue, Dr. Russell testified as follows:

Q.  Now is it true that when you deal with the claims in this case, the claims recite 70 and 35; correct?  That is 70 mg a week and 35?

A.  The claims say about 70 and about . . . .

Q.  And what does "about" mean to you?

A.  Well about to me depends how precise a definition we want.  But for purposes of how close the 40 and 80 are to about 35 and 70, I've given you my opinion on that, that for practical purposes, those would be the same, they would be indistinguishable in their effects, given everything else we know about the properties of these drugs.

Q.  But the claim itself, what the claim really means, is 70, not 80; correct?

A.  It says about 70 and about 35.

Q.  Did you read the patent, Dr. Russell, the entire body of the patent?

A.  Yes, I have.

Q.  So in the patent, does it tell you what about 70 means?

A.  There is a reference somewhere to about in the patent as I recall, but I'd need to be directed to where it was.

Q.  Why don't you go to the first, in the patent, which is Defendant's Exhibit 1 and Plaintiff's Exhibit 1, at column 11, lines-about 1 through 9. It says here in the definitional context exactly what about 70 milligrams means; correct?

A.  It well, there's almost an intrinsic contradiction in this, because the definition here is talking about 70, and then referring to whatever salt form is used being referenced to the alendronic acid itself, yes.

Q.  But in the patent it gives you a precise reference and says when we say about 70 milligrams of a bone resorption inhibiting bisphosphonate, what we mean is that amount of a bisphosphonate that will deliver an equivalent amount, the equivalent of 70 milligrams of alendronic acid; correct?

A.  Yes. I have difficulty with this statement because the reason if it's that precise at 70, why does it use the phrase about?

Q.  But they gave you that exact definition; correct?

A.  *It's a curious use of the English language.*

Q.  I understand, but it is what it says, and perhaps the person wanted to say if it's a certain salt one, you might use 71, and if it's a certain salt 2, you might use 73.  Isn't that what's indicated in this?

A.  Possibly.

Q.  But that's what the definition says; right?

A.  *That is the definition as it's described in the patent.*

Russell at 337–339. (emphasis added).  Although Dr. Russell opined that the explicit definition of the disputed claim terms in the specification was "a curious use of the English Language," he testified that Merck's proffered construction is the definition as it is described in the patent.  The Court finds Dr. Russell's interpretation unpersuasive, especially in light of the fact that patentees may give special meanings to claim terms either explicitly or implicitly in patent specifications.  Further, with regard to Teva's claim that there is no function to Merck's proffered construction, the Court finds this argument unpersuasive given the clear directive in the specification to construe the term "about 70/35 mg" to mean the equivalent of 70/35 mg of alendronic acid when taking into account molecular weight variances for its derivatives and the fact that depending on the derivative of alendronic acid used in the

oral formulation, different weights will be needed in order to get the same effect as 70 or 35 mg of alendronic acid. *See Bell Atl. Network Servs.*, 262 F.3d at 1268 (noting that the specification must express a clear intent to redefine a claim term). Accordingly, the Court will accept Merck's proffered construction and construe the disputed claim terms "about 70/35 mg" to mean the equivalent of 70/35 mg of alendronic acid when taking into account molecular weight variances for its derivatives that carry accessories.

**B.  Anticipation**

[14–17] Anticipation is determined through a comparison of the claim language with a single prior art reference. *See Wesley Jessen Corp. v. Bausch & Lomb, Inc.*, 209 F.Supp.2d 348, 391 (D.Del. 2002).

Anticipation under 35 U.S.C. § 102 requires that every element of the claim be found either expressly or inherently "in a single prior art reference." *In re Robertson*, 169 F.3d 743, 745 (Fed.Cir.1999). Thus, if the prior art reference does not expressly state an element of the claim, "that reference may still anticipate if that element is 'inherent' in its disclosure." *Id.* Inherency is established if the evidence makes "clear that the missing descriptive matter is necessarily present in the thing described in the reference and, and that it would be so recognized by persons of ordinary skill." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed.Cir. 1991). Although inherency cannot be established through probabilities, recognition by a person of ordinary skill in the art before the critical date of the patent is not

required to show inherent anticipation. *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1377 (Fed.Cir.2003) (rejecting the contention that inherent anticipation requires recognition in the prior art before the critical date); *In re Robertson*, 169 F.3d at 745 (noting that inherent anticipation cannot be demonstrated through probabilities).

**1.  The Parties' Contentions**

Teva contends that a July 1996 *Lunar News* article expressly anticipates claims 23 and 37 of the '329 Patent. Teva points out that since Merck has stipulated that it does not assert an invention date before July, 22, 1997, the July 1996 *Lunar News* is prior art under 35 U.S.C. § 102(a). (D.I. 143 at 19). Further, Teva points out that although it has the burden of proving invalidity by clear and convincing evidence, that burden is more easily met in this situation because Merck failed to provide the PTO with the July 1996 *Lunar News*.

Teva contends that the July 1996 *Lunar News* discloses every element of claims 23 and 37 of the '329 Patent. Teva points out that claim 23 defines a method of treating osteoporosis which comprises of oral administration of "about 70 mg" alendronate monosodium trihydrate, on an active alendronic acid basis, once-weekly. Similarly, Teva argues the July 1996 *Lunar News* discloses the same elements where it discusses the use of bisphosphonates, including alendronate, "in dealing with osteoporosis," which means the treatment and prevention of osteoporosis. (D.I. 143 at 21; Russell at 137). Further, Teva contends that the July 1996 *Lunar News* also specifies that the alendronate therapy it is

discussing includes "oral" alendronate therapy, and that the term "alendronate" refers to "Fosamax by Merck." Teva also contends that the active ingredient of Fosamax was well known to be alendronate monosodium trihydrate, and the dosage strength of Fosamax was known to be reported on an alendronic acid basis. (D.I. 143 at 21; DTX 394; Russell at 138–39). Teva also points out that the article specifies that the drug can be administered on a weekly basis at a dose of 80 mg where it states that, "...oral alendronate potentially could be given in a 40 or 80 mg dose once/week." (D.I. 143 at 21)(quoting DTX 418 at 23). Teva directs the Court to Dr. Russell's testimony where he opines that to a person skilled in the art, 80 mg of alendronate once per week is clinically indistinguishable from 70 mg once a week, and is therefore "about 70 mg." (D.I. 143 at 21; Russell at 138). Teva also contends that Merck itself viewed 80 mg and 70 mg as the same weekly dose. (D.I. 143 at 21; DTX 147 at MK0158265). Thus, Teva contends the July 1996 *Lunar News* Article discloses every element of claim 23: treatment of osteoporosis by the administration of about 70 mg monosodium trihydrate on an alendronic acid basis once-weekly. (D.I. 143 at 22).

Teva further contends that the July 1996 *Lunar News* anticipates claim 37 of the '329 Patent. Claim 37 claims a method for preventing osteoporosis in a human being comprising of orally administering about 35 mg of alendronate sodium on an alendronic acid basis as a unit dosage according to a continuous schedule having a dosage interval of once-weekly. (D.I. 143 at 22; DTX 1). Teva points out that the only difference between the two claims is that claim 23 is directed to "treatment" of osteoporosis with a 70 mg weekly dose, and claim 37 is directed to "prevention" with a 35 mg weekly dose. Teva reiterates the contention that the July 1996 *Lunar News* deals with both the treatment and prevention of osteoporosis and discloses the use of a 40 mg once-weekly oral dose. (D.I. 143 at 22). Teva again directs the Court to Dr. Russell's testimony where he testified that to a person skilled in the art, a 40 mg dose of alendronate once per week is clinically indistinguishable from 35 mg once per week and is therefore "about 35 mg." (D.I. 143 at 22; Russell at 140; DTX 147 at MKO158265). As a result, Teva contends that the July 1996 *Lunar News* discloses every element of claim 37: prevention of osteoporosis by oral administration of about 35 mg alendronate monosodium trihydrate on an alendronic acid basis once weekly. (D.I. 143 at 22).

Teva contends that Merck's "fear defense" is irrelevant to anticipation. First, Teva points out that claims 23 and 37 do not require that once-weekly administration of alendronate meet any standard of safety or tolerability. (D.I. 143 at 23). Even if they did, Teva argues, such a requirement would not avoid anticipation because the property of tolerability is inherent in the method disclosed in prior art. Further, Teva argues that the concept of "teaching away" from an invention is inapplicable in an anticipation analysis, and therefore, the Court should not consider it. (D.I. 143 at 24). Based on this, Teva contends that claims 23 and 37 are anticipated by the July 1996 *Lunar News*, and are therefore, invalid.

In reply, Merck contends that the July 1996 *Lunar News* fails to anticipate claims 23 and 37 of the '329 Patent. Merck points out that the claims require the use of 70 or 35 mg of alendronate sodium on an *alendronic acid active basis* and even if one were to read the July 1996 *Lunar News* suggestion that "[e]ven alendronate potentially could be given in a 40 or 80 mg dose once/week" as referring to the amount on an alendronic acid active basis,

**618**                    **288 FEDERAL SUPPLEMENT, 2d SERIES**

80 mg is not the same as 70 mg and 40 mg is not the same as 35 mg. Merck argues that the unambiguous weight requirement for alendronate in claims 23 and 37 is not met by the *Lunar News'* suggestion of 80 or 40 mg, and therefore, it fails to anticipate claims 23 and 37. (D.I. 138 at 27). Further, Merck argues that the July 1996 *Lunar News* is not enabling, and therefore, cannot anticipate. Specifically, Merck contends that in order for a disclosure to be enabling it must allow one of skill in the art to practice the invention, and the July 1996 *Lunar News* falls short of this standard because it fails to address the expectation by physicians in the field during 1996–1997 that alendronate sodium at doses over 20 mg would not be well-tolerated in the prevention and treatment of osteoporosis. Merck points to Dr. Fennerty's testimony to establish that a knowledgeable gastroenterologist during the applicable period would have been "extraordinarily concerned" about suggesting 40 or 80 mg of alendronate to treat osteoporosis. (D.I. 138 at 28; Fennerty at 270–271).

Further, Merck argues that Dr. Papapoulos, Merck's expert with extensive bisphosphonate and clinical osteoporosis experience, corroborates this sentiment. (D.I. 138 at 28). Merck argues that given the state of the medical knowledge at the time, a physician would not administer those high dosages when managing osteoporosis, and as a result, the July 1996

*Lunar News* fails to anticipate claims 23 and 37 of the '329 Patent.

## 2. Whether the July 1996 Lunar News Anticipates the '329 Patent

**[18]**  After a review of the record evidence, the Court concludes that claims 23 and 37 of the '329 Patent are not anticipated under 35 U.S.C. § 102(a). Specifically, the Court concludes that Teva has failed to prove by clear and convincing evidence that the July 1996 *Lunar News* expressly or inherently discloses the dosage amounts for alendronate in claims 23 and 37. As a threshold matter and contrary to Teva's contentions, it has to prove invalidity by clear and convincing evidence. *See American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed.Cir.1984) (citations omitted) (stating that when a challenger produces prior art not before the PTO "the standard of proof does not change; it must be by clear and convincing evidence or its equivalent.") With this standard in mind, the Court will consider the parties' contentions with regard to anticipation.

The Lunar corporation was a manufacturer of bone densitometry equipment, which is a diagnostic tool for osteoporosis. (Russell at 129). The *Lunar News* was a quarterly newsletter distributed by the Lunar Corporation to its customers. (Mazess Dep. at 55–56; Russell at 129). It was authored by Dr. Richard Mazess [1], the former President of the Lunar Corporation. The July 1996 edition [2] contained a

---

1.  Dr. Mazess does not possess an MD, has no formal training in pharmacology, and obtained his bachelors degree and Ph.D. in anthropology. (Mazess Dep. at 30–32).

2.  The Court understands that Teva is not contending that the April 1996 edition of the *Lunar News* anticipates the '329 Patent. *See* D.I. 143, Opening Brief at 19–24 (failing to assert that the April 1996 *Lunar News* anticipates claims 23 and 37 of the '329 Patent).

However, even if Teva made this assertion, the Court concludes that the April 1996 *Lunar News* did not anticipate claims 23 and 37 because it does not suggest *any* dosage amounts in connection with its discussion of once-weekly dosing of alendronate. (DTX 417). Thus, it does not disclose all of the elements of claims 23 and 37, namely "about 35/70 mg" of alendronate, and therefore, cannot anticipate the claims either expressly or inherently.

section entitled, "Update Bisphosphonate." (PTX 29 at 23). The section discusses bisphosphonates as a treatment for osteoporosis. *Id.* Specifically, in reference to the use of alendronate for treatment of osteoporosis, it states that "[s]ome United States physicians are reluctant to treat because of: a) side effects; b) difficulty of dosing; and (c) high costs ($700/year)." (PTX 19 at 23). To address the difficulty of dosing and high costs the article suggests:

> The difficulties with oral bisphosphonates may favor their episodic (once/week) or cyclical (one week each month) administration. Even oral alendronate potentially could be given in a 40 or 80 mg dose once/week to avoid dosing problems and reduce costs.

PTX 29 at 23. Teva contends that the July 1996 *Lunar News* article discloses all of the elements in claim 23 of the '329 Patent. Specifically, Teva argues that the July 1996 *Lunar News* discloses the following elements: 1) A method of treating osteoporosis in a human; 2) orally administering; 3) about 70 mg; 4) of alendronate monosodium trihydrate; 5) on an alendronic acid active basis; 6) as a unit dosage; and 7) according to a continuous schedule having a dosing interval once-weekly. (D.I. 143 at 23). Merck asserts that the July 1996 *Lunar News* article does not anticipate claim 23 because it fails to reference 70 mg of alendronate sodium on an alendronic acid active basis as required by claim 23. (D.I. 141 at 44).

After reviewing the July 1996 *Lunar News* in light of the '329 Patent, and the Court's construction of the claim terms, the Court is not persuaded that Teva has demonstrated by clear and convincing evidence that claims 23 and 37 of the '329 Patent are anticipated by the July 1996 *Lunar News.* The July 1996 *Lunar News* fails to reference *70 mg* of alendronate

sodium *on an alendronic acid basis* as required by the claim. Instead it references an 80 mg dose of oral alendronate. Thus, it does not expressly disclose "about 70 mg" of alendronate sodium "on an alendronic acid basis." Likewise, the Court is not persuaded that Teva has demonstrated inherency. Although Dr. Russell testified that 80 mg and "about 70 mg" are the same for all practical purposes because they have the same effect on patients, he did not testify that this element was "necessarily present" in the July 1996 *Lunar News* reference or that its disclosure was sufficient to show that this element was the natural result flowing from the operation as taught. In fact, in the Court's view, Dr. Russell's testimony was insufficient on this issue, and was, at best, conclusory. For example, although Dr. Russell testified that 80 mg and 70 mg are the same for all practical purposes because they would have the same effect, the Court recognizes that in rendering his opinion Dr. Russell did not take into account the Court's construction of the term "about 70 mg". (Russell at 137–139). Further, the Court notes that Dr. Russell provided no evidence to support his conclusion that 70 and 80 mg were equivalent. In fact, Dr. Papapoulos testified on cross-examination that one would need to test the 80 and 70 mg doses before concluding with any certainty that they are the same and the regulations regarding the filing of an ANDA recognize that any change in the dosage of a drug would require additional data. (Papapoulos at 676–678; 21 U.S.C. § 355(j)(2); 21 C.F.R. § 314.93). Dr. Russell, provided no such data. Based on this, the Court concludes that Teva has failed to demonstrate that the July 1996 *Lunar News* inherently or expressly disclosed the element of "about 70 mg" of alendronate sodium "on an alendronic acid active basis" as required by claim 23 of the '329 Patent.

Similarly, the Court concludes that the July 1996 *Lunar News* fails to disclose "about 35 mg" as required by claim 37 of the '329 Patent. Specifically, the July 1996 *Lunar News* fails to reference "35 mg" of alendronate sodium "on an alendronic acid active basis" as required by the claim. Although it references "40 mg", in light of the Court's claim construction of "about 35 mg" to mean the equivalent of 35 mg of alendronic acid when taking into account molecular weight variances for its derivatives that carry accessories, the Court concludes that the July 1996 *Lunar News* reference does not expressly disclose "about 35 mg" as required by claim 37. Likewise, the Court concludes that Teva's inherency argument as to claim 37 must also fail. Dr. Russell testified that a 40 mg dose is about the same as a 35 mg for all practical purposes. (Russell art 140–141). However, the Court finds Dr. Russell's opinion on this issue to be conclusory because he provides no evidence, statistical tests or data to support this assertion. Further, Dr. Russell did not testify that this element was "necessarily present" in the July 1996 *Lunar News* reference or that its disclosure was sufficient to show that this element was the natural result flowing from the operation as taught. Based on this, the Court finds that the evidence is insufficient to show that each element of claims 23 and 37 of the '329 Patent were present in the prior art reference expressly or inherently. Accordingly, the Court concludes that Teva has failed to establish by clear and convincing evidence that the '329 Patent was anticipated by the July 1996 *Lunar News*. Because the Court concludes that claims 23 and 37 of the '329 Patent were not anticipated by the July 1996 *Lunar News,* the Court will not address the parties' contentions concerning enablement of the prior art.

## C. Obviousness

[19, 20] Teva contends that the '329 Patent is invalid, under 35 U.S.C. § 103, as obvious. In pertinent part, 35 U.S.C. § 103 provides that a patent may not be obtained "if the differences between the subject matter sought to be patented and prior art are such that the subject matter as a whole would have been obvious to a person having ordinary skill in the art . . ." 35 U.S.C. § 103. The obviousness determination is a question of law which is based on several underlying factual inquiries. *See Richardson–Vicks Inc. v. Upjohn Co.,* 122 F.3d 1476, 1479 (Fed.Cir. 1997). The underlying factual inquiries require consideration of the four "Graham" factors which are: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) any secondary considerations of nonobviousness such as commercial success, long felt but unsolved need, failure of others, and acquiescence of others in the industry that the patent is valid. *See Graham v. John Deere Co. of Kansas City,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1996). Additionally, as with anticipation, the burden of demonstrating obviousness is with the challenger and invalidity must be proven by clear and convincing evidence. *C.R. Bard, Inc. v. M3 Systems,* 157 F.3d 1340, 1351 (Fed.Cir.1998).

### 1. The Parties' Contentions

Teva contends that the '329 Patent is invalid as obvious because both the April 1996 and July 1996 editions of *Lunar News* explicitly disclose the weekly administration of alendronate for osteoporosis and a person skilled in the art would have understood in July 1997 that the weekly dose for treatment and prevention of osteoporosis should be "about 70 mg" and "about 35 mg" respectively, and that these

doses are explicitly set out in the July 1996 *Lunar News.* Teva argues that not only did the *Lunar News* disclose the concept of once-weekly dosing and provide the appropriate dose, a person of ordinary skill would have predicted the *Lunar News* teaching to be effective. (D.I. 143 at 26).

Further, Teva contends that there was a motivation to employ once-weekly dosing because of the inconvenience of the dosing regimen which consisted of taking the tablet before eating, remaining upright for a half an hour and taking the tablet with a full glass of water. *Id.* at 27. Teva points out that the April 1996 and July 1996 editions of *Lunar News* explicitly stated the motivation to administer alendronate weekly; to improve patient convenience and compliance with the dosing instructions. *Id.* Thus, Teva argues that the prior art that claimed the invention also disclosed the motivation to make it. *Id.*

Teva contends that a person of skill in the art would not have been deterred from once-weekly dosing because of the fear of increased gastrointestinal side effects. *Id.* As to this point Teva argues that the early reports of esophagitis would not have deterred a person of skill in the art from once-weekly dosing because the early reports showed that these events were rare, occurring in one out of every ten thousand patients taking 10 mg of alendronate daily, and that these effects were for the most part reversible with proper treatment. *Id.* at 28; Markowitz at 436–37; 451. Teva also points out that in March 1996, five months after the launch of 10 mg daily alendronate tablet, ten million patients had been prescribed the tablet and fifty cases of severe esophagitis had been reported to Merck, and Merck took no action until it learned that a letter written by a well-known bone-specialist discussing two such cases was circulating within the Mayo

Clinic Health System. (D.I. 143 at 29; Hirsch Dep. at 54–56). When it finally took action, Teva argues, Merck's investigation concluded that the pill esophagitis cases were caused primarily by the failure of patients to adhere to the dosing instructions. (D.I. 143 at 29; Markowitz at 442; Hirsch Dep. at 66; 82–84).

Teva also points out that in March 1996, Merck disseminated a "Dear Doctor" letter, informing physicians about the infrequent cases of esophagitis, stating that in a "large majority" of cases patients appeared to have not complied with the dosing instructions, and advocating "strict compliance" with those instructions. (D.I. 143 at 30; DTX 34). Merck later reported on the severe esophagitis cases in the October 1996 De Groen *et al.*[3] article in the *New England Journal of Medicine.* (PTX 91). The De Groen paper reported that 51 patients experienced adverse effects classified as "serious" or "severe" out of the 470,000 patients worldwide who had received prescriptions for alendronate to treat osteoporosis up to that time. (D.I. 143 at 30). Teva directs the Court to its gastroenterology expert, Dr. David Markowitz, who testified that the extremely low incidence of these effects, and the description of the cases, led gastroenterologists to conclude at the time that the likely cause of the problem was "pill esophagitis." (D.I. 143 at 30; Markowitz 435, 438). Teva argues that the evidence presented at trial leads to the conclusion that once-weekly administration would have been expected to decrease the incidence of severe esophagitis cases because it would: 1) improve patient compliance with the dosing instructions (Russell at 195–96; Markowitz at 485–86; Fennerty at 311); and 2) decrease the frequency of administration, thereby decreasing the chances of

**3.** De Groen *et al., The New England Journal of*     *Medicine,* 1996 (PTX 91).

the tablet "sticking" in the esophagus (Russell at 196–197; Markowitz at 443).

Teva also asserts that the evidence presented at trial does not support a dose-response relationship between alendronate and gastrointestinal effects that would have deterred a person of ordinary skill in the art from once-weekly dosing. (D.I. 143 at 32). For example, Teva argues that the results of the Chestnut[4] study related to daily and not weekly dosing and demonstrated that 90% of postmenopausal women with osteoporosis tolerated the 40 mg daily dose. *Id.* at 34. Also, Teva contends that Dr. Fennerty's testimony regarding a dose-related relationship was discredited by Merck's pre-litigation behavior and directs the Court to the testimony of Dr. Markowitz who testified that his contemporaneous investigations indicated that severe events were extremely rare with alendronate and that overall the drug was well tolerated. *Id.* at 35.

In addition, Teva contends that before this litigation, Merck admitted that prior art data available in July 1997 from Paget's patients showed that once weekly dosing would be well-tolerated. For example, Teva directs the Court to a May 1997 "Tactical PAC" review seeking management approval to go forward with the once-weekly dosing program where it stated that "the 40 and 80 mg doses were well-tolerated even when given on a daily basis." (D.I. 143 at 39, DTX 147 at MK0158265). Further, Teva points out that Merck, in a formal submission to the FDA maintained that data from Paget's disease provided an expectation that once-weekly doses would be well tolerated. (D.I. 143 at 39; DTX 192 at 17).

Teva also argues that a person of skill in the art would not have been deterred from once-weekly dosing because of the alleged dose-related effects of prior art bisphosphonates, because the magnitude of data available on alendronate in treating osteoporosis and Paget's disease made reference to other bisphosphonates unnecessary. (D.I. 143 at 41). Teva also points out that Merck's Physician Survey conducted in 1997 indicated that physicians perceived that larger less-frequent doses would result in "less-GI upset." (D.I. 143 at 43; DTX 244 at MK0174861).

Teva also contends that the '329 invention did not provide unexpected results because the prior art disclosed its principal advantage; convenience and compliance. (D.I. 143 at 44). Additionally, Teva contends that Merck did not carry its burden of demonstrating commercial success because it was required to show that the once-weekly product contributed to the incremental success beyond the daily product and that Merck's expert, Dr. Vellturo failed to demonstrate any connection between the patented invention and Merck's sales of once-weekly Fosamax. Specifically, Teva contends that Dr. Vellturo did not opine that the two were connected but merely asserted that "commercial success could be at least in part, significant part, attributable to the Daifotis patients." D.I. 143 at 48; Vellturo at 715. Further, Teva suggests that Dr. Vellturo's analysis is flawed because of his emphasis on sales and prescriptions as the only indicia of success without considering any other market factors such as the increased awareness about osteoporosis and the effect of the increasing number of Americans over the age of sixty, like its own expert, economist, Dr. Richard Rozek took into account. (D.I. 143 at 48). Additionally, with regard to commercial success, Teva contends that Merck ignored its own successful marketing efforts such as its heavy promotional expenditures during the appli-

---

**4.** Chestnut *et al., The American Journal of* *Medicine,* 1995, (PTX 69).

cable period when examining the commercial success of the once-weekly dose of alendronate. (D.I. 143 at 51). Finally, Teva argues that Dr. Vellturo's diffusion model is flawed because a diffusion model in not particularly useful as a forecasting devise, and therefore, its use in this context is inappropriate and alternatively argues that Dr. Vellturo's use of the model is incorrect. (D.I. 143 at 54).

In response, Merck contends that the once-weekly high dose regimen of the '329 Patent was not obvious to a skilled practitioner in 1997 because without hindsight, the overwhelming knowledge in the field was that high oral unit doses would not be safe and tolerable for osteoporotic women. Merck points out that Dr. Russell, Teva's expert, acknowledged that a person of ordinary skill "would be familiar with publications in the field and the technical background in this field of bisphosphonates and osteoporosis." (Russell at 144). Thus, according to Dr. Russell's interpretation of one of ordinary skill, Merck argues, a skilled practitioner would know that: 1) etidronate and clodronate caused gastrointestinal side effects at high doses; 2) pamidronate caused dose-related gastrointestinal side effects that even led to the discontinuation of its development as an oral medication; 3) alendronate caused dose-related gastrointestinal side-effects; and 4) alendronate sodium, even though proven to be safe and tolerable at 10 and 5 mg doses, could still potentially cause severe upper gastrointestinal injuries. (D.I. 145 at 10–11) (citations omitted). Merck contends that the overwhelming knowledge, laid out by contemporaneous publications in respected peer-reviewed medical journals establishes that the pre-invention expectation by those skilled in the art was that one could not use alendronate sodium at unit doses higher than 20 mg for the management of osteoporosis. *Id.* at 11.

Further, Merck asserts that Teva's "spin" on the Chestnut study is flawed. Specifically, Merck points out that in the Chestnut study only one out of sixty two women (1.6%) withdrew from the 10 and 5 mg doses, but seven out of sixty three women (11.1 %) withdrew from the 40 mg alendronate treatment. *Id.;* PTX 69 at 150; Markowitz at 479–482; Fennerty at 266. Moreover, contrary to Teva's assertion, Merck points out that it informed the FDA that the Chestnut Study had led it to "limit the maximum dose to 20 mg in subsequent osteoporosis treatment studies." (D.I. 145 at 15; PTX 202 at MK250180; PFF 66). Additionally, Merck asserts that as Dr. Papapoulos testified, a skilled practitioner at the time knew that in actual clinical practice 10 to 12 percent of patients discontinued 10 mg Fosamax treatment because of gastrointestinal side effects. (D.I. 145 at 12; Papapoulos at 651–652). Thus, Merck argues that any reasonable clinician, viewing this data could compare these ratios and would expect the discontinuation rate for osteoporotic women in actual practice, outside the confines of a controlled clinical environment, to have been unacceptably high at a 40 mg dose. Merck asserts that Teva failed to consider that clinical studies are different than daily practice and that discontinuations are far less common in the context of a clinical study. (D.I. 145 at 12; PFF 60; Fennerty at 262–64).

In reference to Teva's reliance on internal and FDA submitted documents, Merck contends that these publications as presented by Teva were taken out of context, and therefore, do not bolster Teva's argument with regard to obviousness. Merck argues that Teva improperly relied on these documents because these documents reflect the inventors' rationales to overcome the skepticism about high unit doses and the inventors' insights about their own invention. In regard to extrapolating re-

sults from the Paget's disease experience to doses for osteoporosis, Merck points out that Professor Fleish's book, which Dr. Russell later edited, reflected the thinking in the art that the tolerability for alendronate sodium appeared to be higher for the Pagetic disease population than the osteoporosis population. (D.I. 145 at 15).

Merck also contends that it has never disputed that it was known that once-weekly dosing would be efficacious in providing the alendronate sodium needed to inhibit bone resorption, but notes that it was the safety concern about high oral doses (higher than 20 mg) that obscured the advantageous once-weekly invention for the management of osteoporosis. (D.I. 145 at 15). Further, Merck points out that it did not rely on the case reports such as *De Groen* as evidence of a dose-response, rather, Merck claims, the case reports simply raised the awareness of physicians that alendronate sodium was a potentially dangerous agent and that Teva's expert, Dr. Markowitz admitted that the case reports were clinically significant. (D.I. 145 at 18; Markowitz at 468). Merck also rebuts the contention that it took no action in response to the case reports and points out that it promptly obtained data about each case, constructed a data base and organized a meeting with Dr. De Groen and other consultants by March 1996. Then, on March 15, 1996 Merck sent out a "Dear Doctor" letter informing physicians about the potential upper gastrointestinal injuries and emphasizing the importance of following directions in order to minimize them. Merck also undertook internal studies to understand the problem, including dog studies. (D.I. 145 at 19; PTX 67; PFF 88).

In reference to Dr. Fennerty's testimony, Merck contends that Teva mischaracterized his testimony regarding the Blank [5]

article. Merck asserts that the Blank study provided a glimpse as to what happens when the use of aminobisphosphonates is combined with Non–Steroidal Anti–Flammatory Drugs ("NSAIDs") such as aspirin and ibubrofen. This study was published during February of 1997 in the peer reviewed *Digestive Diseases and Sciences*, and it showed clear dose-related upper gastrointestinal injuries from alendronate sodium when it was combined with the NSAID indomethacin in a rat model. (D.I. 145 at 20; PTX 104 at 284 fig. 3). Merck contends that Dr. Fennerty observed that when placed in the mosaic of prior art showing the dose dependent injuries from bisphosphonates, the Blank study was important to gastroenterologists, and he never retreated from this position. (Fennerty at 270, 292–94). Additionally, Merck points out that Teva itself stated to the PTO in 2000, in an attempt to gain the issuance of claims for a delayed gastric release alendronate formulation, that bisphosphonates as a class exhibit side effects that "consist of irritation of the upper gastrointestinal mucosa . . . with the potential for this irritation leading to more serious conditions." (PTX 301, U.S. Patent No. 6,476,006 ("the '006 Patent") at col.3, lines 25–25). Merck contends that Teva also told the PTO that the "larger" once weekly doses have "the potential of exacerbating the upper GI side effects of the drug." D.I. 145 at 21 (quoting the '006 Patent at col. 3, lines 12–14).

Merck argues that Teva's reliance on the 1997 Physicians Survey is misplaced because it did not address the use of higher doses. Specifically, Merck points out that at issue is the invention of administering seven-fold the daily dose of alendronate sodium once a week, and in the survey, a twice-weekly dosing schedule was

**5.** Blank *et al., Digestive Diseases and Sciences,*    1997 (PTX 106).

inquired about along with other choices that included placing alendronate sodium in diet colas and cranberry juice. (D.I. 145 at 22; DTX 244 at 174866). Merck points out that the invention of the '329 Patent does not lie solely in the less frequent dosing, but in the fact that an entire weekly complement of daily doses could be administered as a single unit dose and that the marketing survey inquired about twice weekly dosing without any mention of increasing the dose. Therefore, Merck argues that it does not bear any relevance to the invention of once-weekly dosing at sevenfold the daily dose. (D.I. 145 at 22).

In regard to secondary considerations, Merck contends that contrary to Teva's assertion that commercial success is irrelevant in the obviousness inquiry because Merck was the only entity allowed to market alendronate sodium tablets, its direct competitors, including Procter & Gamble, had an incentive to develop an improved dosage form. (D.I. 145 at 23). Further, in reference to commercial success, Merck contends that the increased sales for the Fosamax franchise upon the launch of the once-weekly dosing regimen is dramatic regardless of which way it is viewed. (D.I. 145 at 25). Specifically, Merck points out that the Fosamax franchise sales followed a constant increase trend from 1996 until the introduction of once-weekly Fosamax in 2000, where if the trend established before the once-weekly dose was introduced had continued, an increase of 18.9% over the prior year would have resulted. However, after the once-weekly dosing was introduced, a dramatic increase of 42.5% was realized. (D.I. 145 at 26; PTX 166; Vellturo at 718–720). Additionally, Merck contends that Teva's attempt to discredit Dr. Vellturo's diffusion model was unsuccessful. Merck argues that, in any event, Dr. Vellturo testified that his opinion regarding the commercial success of the '329 Patent was not based on model,

but on a fundamental shift in the constant trends he observed regarding the Fosamax franchise's sales increases, market share, prescription volume and on an evaluation of the market share and prescription volume data for the osteoporosis market as a whole, and that the diffusion model only confirmed the opinion he formed based on the aforementioned factors. (D.I. 145 at 26; Vellturo at 718–728, 735, 755–757). Finally, Merck notes that Dr. Rozek, Teva's expert on obviousness, provided no ultimate conclusion about the commercial success of the once-weekly dosing of Fosamax or any of the factors he believed Dr. Vellturo should have considered. (D.I. 145 at 26).

## 2. Whether the '329 Patent Was Obvious in View of the Prior Art

[21, 22]  After reviewing the relevant prior art in light of the evidence and the factors related to the obviousness inquiry, the Court concludes that Teva has failed to establish by clear and convincing evidence that the '329 Patent was obvious in light of the prior art references. The Court in its obviousness analysis must be cognizant of "hindsight syndrome." *In re Werner Kotzab,* 217 F.3d 1365, 1369–1370 (Fed.Cir. 2000). The Federal Circuit has instructed that, "the best defense against the subtle but powerful attraction of a hindsight-based obviousness analysis is rigorous application of the requirement for a showing of the teaching or motivation to combine prior art references." *In re Gartside,* 203 F.3d 1305, 1319 (Fed.Cir.2000). Therefore, in order to establish obviousness from a combination of elements disclosed in prior art, "there must be some motivation, suggestion or teaching of the desirability of making the specific combination that was made by the applicant." *Kotzab,* 217 F.3d at 1370. With this standard in mind, the Court will discuss the relevant

factors of the obviousness inquiry as they relate to the '329 Patent.

### i.  Level of One Skilled in the Art

For the purposes of the obviousness inquiry, the Court finds that at the time of the filing of the '329 Patent, a person of ordinary skill in the art was an individual who would have an M.D. and/or Ph.D. and was working in the field of and doing research on osteoporosis. Such a person would be familiar with the publications and technical literature and background in the field of bisphosphonates and osteoporosis. (D.I. 142 at 17–18; D.I. 141 at 41). The Court bases this finding on a combination of Merck and Teva's proffered interpretation of one skilled in the art and finds that there are no significant differences between the two proffered definitions.

### ii.  Scope and Content of Prior Art

At the outset, the Court notes that Merck has never disputed that it was known that once-weekly dosing would be efficacious in providing the alendronate sodium needed to inhibit bone resorption. (D.I. 145 at 15). However, Merck contends that it is the safety concern about high oral doses, specifically unit doses higher than 20 mg, that obscured the advantageous once-weekly invention for the management of osteoporosis. *Id.* Thus, the issue is when viewing the mosaic of the prior art, whether those of ordinary skill in the art would have had the motivation to formulate a once-weekly seven-fold daily dose of alendronate sodium, despite safety concerns.

The Court concludes that the history of bisphosphonates as a class is minimally relevant to the instant discussion because although alendronate is a bisphosphonate and general knowledge of bisphosphonates is certainly within the knowledge of one of ordinary skill in the art during the relevant time period, it was also well known

that each bisphosphonate had its own unique characteristics. (*See* DTX 547 at 543) (Dr. Papapoulos, Merck's expert, noting that because of differences in mechanisms of action and pharmacological and toxicological profiles, it is "important that specific properties of every individual bisphosphonate be determined and that results obtained with one bisphosphonate not be extrapolated readily to the whole class."). As a result, although the earlier bisphosphonates etidronate, clodronate and pamidronate had dose related gastrointestinal side effects, the Court concludes that this fact holds little weight in its obviousness analysis given the unique characteristics of each bisphosphonate, particularly with side effects. (Papapoulos at 653–654; Russell at 384–385; PTX 110 at 127, 129, 130; PTX 111 at 148, 149, 152; PTX 112 at 154, 15, 1585; PTX 113 at 170, 171, 175; PTX at 289, E91, C278, C279).

Therefore, the Court will focus its discussion on the prior art dealing with alendronate. The 1995, 1997, and 2000 editions of "Bisphosphonates in Bone Disease" written by Professor Herbert Fleish, who is described as the "father of bisphosphonates", reported that oral alendronate sodium can cause gastrointestinal disturbances at doses of 40 mg. (PTX 111 at 148; PTX 112 at 153; PTX 113 at 169; *see also* PTX 300 at 26). Further, in the 1997 and 2000 editions, Dr. Fleish reported that a 40 mg dose may cause gastrointestinal disturbances in patients with osteoporosis, but that the same dose was well tolerated in patients with Paget's disease. (PTX 112 at 153; PTX 113 at 169).

Additionally, the Court finds that case reports are probative in its obviousness inquiry because, as Dr. Fennerty testified, they often contain information that would alter the way a physician would treat patients. (Fennerty at 247–248). Case re-

ports are publications usually involving one or a few patients that have an outcome of clinical relevance or importance. (Fennerty at 246–247). In October 1995, Maconi [6] published a case report in the *American Journal of Gastroenterology*, which reported that an osteoporosis patient after taking 5 mg of alendronate, had an endoscopy which revealed severe damage to the esophagus. (Fennerty at 249–250). Dr. Fennerty testified that this case report was significant because the particular journal it was published in was "clinically relevant" and because this "severity of injury had never been reported in a patient taking a bisphosphonate prior to this, especially a bisphosphonate that was being used now very commonly in clinical practice as it had just been released at about the time the case report was published." (Fennerty at 250). In October 1996, De Groen published an article in *The New England Journal of Medicine* which set out three case reports describing the side effects of alendronate sodium. (PTX 91). The first case report reported that a 73–year–old woman developed chest pain and dysphagia after her first dose of 10 mg of alendronate sodium. (PTX 91 at 1016–1017). After two more doses she was transferred to the Mayo Clinic where an endoscopy revealed severe ulcerative esophagitis. (PTX 91 at 1017; Fennerty at 254–56). The other two case reports revealed that two additional women developed severe esophageal injury as a result of taking 10 mg oral dose of alendronate sodium. (PTX 91 at 1017; Fennerty 254–256). The article also revealed that Merck revised dosing instructions in the Fosamax product circular based on the results noted in the paper so as to further minimize potential for prolonged contact of the drug with the esophagus and thus, to reduce the

risk of injury. (PTX 91 at 1020). Additional case reports published by Abdelmalek (PTX 96), Sorrentino (PTX 98), Naylor (PTX 101), Rimmer (PTX 102), Pizzanni (PTX 109) and Girelli (PTX 106) also suggested evidence that alendronate sodium may be associated with severe side effects not recognized in clinical trials. (Fennerty at 259).

The Court also finds that several studies dealing with alendronate are significant. In 1993, Harris [7] published an early Phase II study, which is a dose-ranging study used to determine the dose and the preliminary data on both the safety and efficacy of a drug, sponsored by Merck in the *Journal of Clinical Endocrinology and Metabolism* investigating the effects of oral alendronate sodium treatment. (PTX 116; Russell at 159, 364–65). The women in this study were between the ages of 40 and 60 and did not have osteoporosis. The women were treated with alendronate sodium doses from 5 to 40 mg for six weeks and the dosages were well-tolerated. (PTX 116 at 1399).

Merck then sponsored a study investigating the effects of a range of different oral doses of alendronate for the treatment of osteoporosis. (PTX 69). The results of this study were published by Chestnut in 1995 in the *American Journal of Medicine*. The Chestnut study lasted for two years and involved 188 women with osteoporosis. (PTX 69; Yates at 502–504). Of these women, 31 were exposed to placebo, 32 to 5mg, 30 to 10 mg, 32 to 20 mg and 63 to 40 mg of alendronate sodium. (PTX 69 at Table 1). As of 1996, the Chestnut study was the only study that administered alendronate sodium to osteoporosis patients. (PTX 69; Markowitz at 478–479). Chestnut reported that nine women

6. Maconi, *The American Journal of Gastroenterology,* (1995) (PTX 90).

7. Harris, *Journal of Clinical Endocrinology and Metabolism,* (1993) (PTX 116).

discontinued alendronate sodium therapy due to gastrointestinal side effects that included nausea, dyspepsia, mild esophagitis/gastritis and abdominal pain. (PTX 69 at 150; Markowitz at 479–482; Fennerty at 265–66). Nine women withdrew from treatment because of these side effects: seven women withdrew from the 40 mg dose, one woman withdrew from the 20 mg dose and one women withdrew from the group taking between 5 and 10 mg doses. (PTX 69 at 150; Markowitz at 479–482; Fennerty at 266; Yates at 539–540). Chestnut also reported that the gastrointestinal side effects "occurred primarily in the first year during treatment with 40 mg alendronate." (PTX 69 at 150, col. 1). Dr. Fennerty testified that the fact that 11.1% (7 out of 63) withdrew from the 40 mg alendronate dose was noteworthy within the context of a clinical trial.[8]

Teva contends that the April and July 1996 editions of the *Lunar News* render claims 29 and 37 of the '329 Patent obvious. The July 1996 *Lunar News* issue contained a section entitled, "Update Bisphosphonate." (PTX 29 at 23). The section discusses bisphosphonates as a treatment for osteoporosis. *Id.* In reference to the use of alendronate for treatment of osteoporosis, it states that "[s]ome United States physicians are reluctant to treat because of: a) side effects; b) difficulty of dosing; and (c) high costs ($700/year)." (PTX 19 at 23). To address the difficulty of dosing and high costs the article suggested:

> The difficulties with oral bisphosphonates may favor their episodic (once/

week) or cyclical (one week each month) administration. Even oral alendronate potentially could be given in a 40 or 80 mg dose once/week to avoid dosing problems and reduce costs.

PTX 29 at 23. In a section entitled "Update: Bisphosphonates," the April 1996 edition of the *Lunar News* discusses difficulties of the dosing regimen associated with alendronate and states:

> one of the difficulties with alendronate is its low oral bioavailability. When taken with water in a fasting state, only about 0.8% of the oral dose is bioavailable. Even coffee or juice reduces this by 60%, and a meal reduces it by > 85%. Alendronate must be taken, after an overnight fast, 30–60 minutes before breakfast. Subjects should remain seated or standing; a very small group of patients have reported some upper gastrointestinal distress if this is not done. This regime may be difficult for the elderly maintain chronically. An intermittent treatment program (for example, once per week, or one week every three months), with higher oral dosing, needs to be tested.

DTX 417 at 31. (citations omitted).

### iii. *Differences Between the Prior Art and the Claims at Issue*

The Court concludes that the prior art cited above demonstrates that the suggestion to give 40 or 80 mg of alendronate sodium to treat or prevent osteoporosis was not clinically useful or obvious in July 1997 because of the known dose-related gastrointestinal side effects. Further, the

---

8. The Court concludes that studies dealing with Paget's disease are not relevant to its analysis because it was well-known to those of ordinary skill in the art that patients with Paget's disease tolerate higher doses of alendronate than patients with osteoporosis. (Papapoulos at 710–711; PTX 112 at 153; PTX 113 at 169; see also PTX 300 at 26). Thus,

the Court finds that tolerability of alendronate sodium from studies involving Paget's patients should not be extrapolated to a discussion of osteoporosis about the tolerability of alendronate. For this reason, the Court will not address studies dealing with Paget's disease and the tolerability of higher doses of alendronate sodium.

Court is not persuaded that the two *Lunar News* articles, not published in peer-reviewed journals or authored by one skilled in the art, either alone or in combination, overcome the serious side effect concerns associated with higher dosage units of alendronate sodium. For example, Dr. Fennerty, whom the Court finds very credible, testified that in light of the prior art, any physician would have been "extraordinarily concerned" to suggest a 40 or 80 mg dose because alendronate sodium was a new compound that had been associated with dose-related injury and severe injuries in case reports. (Fennerty at 270–271; *see also* PTX 69, 91, PTX 300 at 14). In this regard Dr. Fennerty testified:

> Q: Now in July of '97 or any period preceding that, what would your opinion be about a suggestion that you give 40 or 80 milligrams of alendronate to an osteoporotic woman?
>
> A. Given what I just described, a new compound, a Dear [D]octor letter, publications in the New England Journal of severe caustic injury, smattering case reports around that, the Chestnut [sic] paper before talking about as you go up on a dose, that you may be seeing more adverse effects, the smattering of papers, and now animal data showing that types of patients that use NSAIDS use some higher dose of these compounds, shows evidence of gastric injury in the model, I would have been extraordinarily concerned about anybody suggesting that this was a useful clinical approach at that point in time.

(Fennerty at 270–21). Additionally, Dr. Papapoulous testified about the concerns of side effects associated with the suggestion in the July 1996 *Lunar News* where he stated, "[Lunar News] is using 40 and 80 not on any scientific rationale, but because it is available. Secondly, he doesn't tell us how he's going to address the issue of side effects, which is one of the main points in this particular article." Papapoulos at 665–666. Thus, in light of the case reports, and the Chestnut study, in conjunction with observations written about alendronate by Dr. Fleish, the Court concludes that the *Lunar News* references did not render the seven-fold daily dose of alendronate for the treatment and prevention of osteoporosis obvious given the clearly documented and known dose related gastrointestinal side effects associated with high doses (over 20 mg) of oral alendronate.

First, the April 1996 *Lunar News* did not deal with the specific dosages of 70 or 35 mg in relation to its discussion of once-weekly dosing of alendronate. Second, the July 1996 *Lunar News* listed 40 and 80 as compared to 70 and 35 mg dosages as suggested by the '329 Patent and did not deal with the problem of known gastrointestinal side effects. Additionally, in reaching its conclusion, the Court gives more weight to the prior art references written and reviewed by those skilled in the art such as the Chestnut study and the De Groen case report as opposed to the *Lunar News,* a quarterly newsletter written by someone without a Ph.D. or MD. in the applicable field.

### iv. *Secondary Indicia of Non–Obviousness*

As for the secondary considerations of non-obviousness, the Court finds that Merck has presented sufficient evidence to show that the 35 mg and 70 mg once-weekly dosing of Fosamax was commercially successful. On this issue, the Court finds Dr. Vellturo's testimony persuasive. Dr. Vellturo testified regarding the evidence of increased sales after the launch of once-weekly Fosamax.

Originally, Merck's Fosamax osteoporosis product line consisted of once-daily 10 and 5 mg Fosamax tablets. (D.I. 138 at

32). Dr. Vellturo testified that daily Fosamax was a successful product that enjoyed an average increase in sales of 152 million dollars per year for each of the four years preceding the introduction of the once-weekly Fosamax. (Vellturo at 718–720; PTX 166; PTX 300 at 37). In 2001, the first full year following the launch of the once-weekly dosing regimen, the sales increase was 343 million dollars, more than double the expected increase, without any corresponding relative increase in expenditures. (Vellturo at 719–720; PTX 166; PTX 300 at 37).

The Court finds that further evidence of the success of the once-weekly dosing regimen is present in the prescription data for the Fosamax tablets. A sharp increase in physician adoption of Fosamax upon the introduction of the once-weekly dosing regimen is manifested in the number of total prescriptions reported each month for Fosamax. (Vellturo at 723; PTX 164; PTX 300 at 32, 33, 36). The marked increase in prescription volume of once weekly dosages of Fosamax tablets is more compelling in light of its effects on the osteoporosis market in general. FAME is an acronym for the four prescription drug products whose primary indication is for the treatment of osteoporosis, (i.e., Fosamax, Actonel, Miacalcin, and Evista). (Vellturo at 722, 753–754). IMS is a data collection firm specializing in data reflecting the prescribing patterns of physicians and in prescription volume data. (Vellturo at 716–717). Within six months of its launch, once-weekly Fosamax tablets became the most prescribed drug in the FAME market. (PTX 164; PTX 165; PTX 300 at 33). Based on the IMS data points present in the plot of monthly total prescriptions, it can be calculated that the Fosamax franchise share of the FAME market grew from 45 % to 55 % in the first six months after the introduction of the once-weekly dosing regimen. (PTX 164; PTX 300 at 33).

Teva's expert Dr. Rozek testified that the increase in Fosamax sales could be due to other factors such as the increasing number of Americans over the age of sixty, the increasing awareness of osteoporosis, an increase in the number of people seeking treatment for osteoporosis and Merck's marketing efforts. However, the Court finds Dr. Rozek's explanation unpersuasive because he offered no affirmative opinion as to what affect these factors would have on the analysis of the FAME market as a whole or with Fosamax individually. (Rozek at 871–72; 869; 878). In fact, Dr. Rozek testified the he was "not instructed to do anything affirmative with regard to the measuring of any relationship that might exist between the ['329 Patent] and sales, or success of Fosamax." (Rozek at 869). In the Court's view, Dr. Rozek's suggestion that there are factors that Dr. Vellturo should have considered, is not sufficient to rebut the affirmative evidence of the commercial success of the once-weekly dosing regimen. (Rozek at 878–79). Also, the Court concludes that Merck has shown a sufficient nexus between the claimed secondary considerations and the patented method given the testimony of Dr. Vellturo and the timing of the launch of the once-weekly dosing regimen for Fosamax. Accordingly, the Court has given the above discussed secondary considerations the importance they deserve in reaching its conclusion of nonobviousness. *See Minnesota Mining & Manufacturing Co. v. Johnson & Johnson Orthopaedics, Inc.* 976 F.2d 1559, 1573 (Fed.Cir.1992) (noting the importance of secondary considerations in the obviousness analysis).

v. *Summary*

In sum, the Court concludes that Teva has not proven by clear and convincing evidence that it was obvious to combine

the *Lunar News* suggestions in light of the knowledge of one of ordinary skill in the art of the gastrointestinal side effects accompanying large doses of oral alendronate. In addition, the Court finds that the significant secondary considerations offered by Merck undermine any claim of obviousness, and accordingly, the Court concludes that Teva has not proven by clear and convincing evidence that the '329 Patent was obvious in light of prior art.

## V. Unenforceability Due To Inequitable Conduct

### A. The Inequitable Conduct Standard

**[23–25]** As a general matter, patent applicants and their patent attorneys have a duty of candor, good faith and honesty in their dealings with the PTO. 37 C.F.R. § 1.56(a). The duty of candor, good faith and honesty includes the duty to submit truthful information and the duty to disclose to the PTO information known to the patent applicants or their attorneys which is material to the examination of the patent application. *Elk Corp. of Dallas v. GAF Bldg. Materials Corp.*, 168 F.3d 28, 30 (Fed.Cir.1999). Breach of the duty of candor, good faith and honesty may constitute inequitable conduct. *Id.* If it is established that a patent applicant engaged in inequitable conduct before the PTO, the entire patent application so procured is rendered unenforceable. *Kingsdown Medical Consultants v. Hollister Incorporated*, 863 F.2d 867, 877 (Fed.Cir.1988).

**[26, 27]** A patent applicant engages in inequitable conduct before the PTO when he withholds or misrepresents information material to the patentability of his invention, with an intent to deceive. *See Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1064 (Fed.Cir.1998); (citing *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed.Cir.1995)). Inequita-

ble conduct encompasses affirmative misrepresentations of material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive. *Baxter Int'l, Inc. v. McGaw Inc.*, 149 F.3d 1321, 1327 (Fed.Cir.1998) (citing *Nobelpharma*, 141 F.3d at 1068–71). In order to establish unenforceability based on inequitable conduct, Teva must prove, by clear and convincing evidence, that material information was intentionally withheld for the purpose of misleading or deceiving the patent examiner. *See Allied Colloids, Inc. v. American Cyanamid Co.*, 64 F.3d 1570, 1578 (Fed.Cir.1995) (citation omitted).

**[28]** A determination of inequitable conduct entails a two step analysis. First, the court must determine whether the withheld information meets a threshold level of materiality. A reference is considered material if there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. *See id.* This determination is not the end of the inquiry with respect to intent. The Federal Circuit has stated that, "materiality does not presume intent, which is a separate and essential component of inequitable conduct." *See Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 552 (Fed.Cir.1990) (internal citation omitted).

**[29]** After determining if the applicant withheld information that is material, the court must then determine whether the evidence demonstrates a threshold level of intent to mislead the PTO. *See Baxter*, 149 F.3d at 1327. "Intent to deceive cannot be inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent." *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1116 (Fed.Cir.1996). Therefore, in order to satisfy the intent to deceive ele-

ment of inequitable conduct, the conduct when viewed in light of all of the evidence, including evidence of good faith, must demonstrate sufficient culpability to require a finding of intent to deceive. *See Paragon Podiatry Lab., Inc. v. KLM Lab, Inc.*, 984 F.2d 1182, 1189 (Fed.Cir.1993).

**[30]** The initial determinations of materiality and intent to deceive are questions of fact. *See Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1261 (Fed.Cir.2001) (citation omitted). Once these facts are established, the court should then weigh the findings and their premises and determine, in its discretion, whether to hold the patent unenforceable. *See ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 547 (Fed.Cir.1998).

**B. Whether Dr. Yates Engaged In Inequitable Conduct Before the PTO Rendering The '329 Patent Unenforceable**

**[31]** Teva contends that Dr. Yates engaged in inequitable conduct before the PTO rendering the '329 Patent unenforceable. Specifically, Teva contends that Dr. Yates intentionally withheld the July 1996 edition of the *Lunar News* from the Patent Examiner.

In response, Merck contends that the July 1996 *Lunar News* was not considered material because it was cumulative to the cited prior art. Merck further contends that Dr. Yates did not make any material misrepresentations to the PTO, and that Teva cannot establish an intent to deceive the PTO by clear and convincing evidence.

**1. The Allegedly Withheld Prior Art**

In the Court's view, the July 1996 *Lunar News* has some degree of materiality because it has relevance to the claimed invention, specifically, the recommended once-weekly dosage level of alendronate for osteoporosis patients. Additionally,

the Court finds that it is not cumulative to the cited prior art, specifically the April 1997 *Lunar News* because, although the April edition mentions a 40 mg dose of alendronate it does not suggest a 40 or 80 mg dose in the context of once-weekly dosing as the July 1996 edition of the *Lunar News* does. However, as previously discussed, the Court finds that the July 1996 *Lunar News* does not reflect the claimed invention directly and does not render the claimed invention invalid as either obvious or anticipated. *See, e.g., Life Technologies, Inc. v. Clontech Labs. Inc.*, 224 F.3d 1320, 1325 (Fed.Cir.2000) (citing 35 U.S.C. § 103(a) and stating that "the path that leads an inventor to the invention is expressly made irrelevant to patentability by statute").

**2. Intent to Deceive**

The Court concludes that Teva has failed to meet its burden of demonstrating a prima facie showing of intent to deceive the PTO. As to this issue, Teva contends that Dr. Yates' testimony indicating that he did not read the July 1996 *Lunar News* was not credible in light of the fact that in September 1996, Dr. Yates received a memorandum discussing *Lunar News'* comments about alendronate, with the relevant portions of the July issue attached. Further, Teva argues that Dr. Yates' testimony that he did not focus on the July 1996 issue again on May 21, 1997 at a meeting with Lunar Corp., where the July 1997 issue was attached as an agenda item, is not credible.

The Court finds that this evidence of intent to deceive falls short of the applicable standard. Dr. Yates testified unequivocally that he had never seen the statements regarding once-weekly dosing of alendronate in the July 1996 *Lunar News* prior to this litigation. (Yates at 533–34; 572–573; 575). Additionally, in

reference to the September 1996 memo that was circulated with the July 1996 *Lunar News* as an attachment, the Court recognizes that there were twelve pages attached to the original memo and the relevant article in the July 1996 *Lunar News* was the last page. Based on this, the Court finds Dr. Yates' testimony that he did not read the July 1996 *Lunar News* article in September 1996, credible. Likewise, the Court does not find Teva's assertion that Dr. Yates should have read the article that was attached to the agenda at the May 1997 meeting, probative of Dr. Yates' intent to deceive because attendees, including Dr. Mazess, did not recall whether the once-weekly dosing concept was specifically addressed at the meeting. (Mazess Dep. at 180:19–181:7; Beckman Dep. at 131:1–23; Magri Dep. at 105:7–25; Sherwood Dep. at 146:17–23, 147:11–148:3). Further, the Court finds that even if once-weekly dosing was discussed at the meeting, the focus of the discussion was more likely than not centered on the April 1997 edition of the *Lunar News*, which was disclosed to the examiner, rather than the July 1996 edition because the April 1997 edition came out in the month preceding the meeting.

[32]  "In a case involving an omission of a material reference to the PTO, there must be clear and convincing evidence that the applicant made a deliberate decision to withhold a known reference." *Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1329 (Fed.Cir.1998). The Court concludes that Teva has proffered insufficient evidence of an intent to deceive on the part of Dr. Yates. Accordingly, the Court cannot conclude that Dr. Yates engaged in inequitable conduct before the PTO by failing to disclose material prior art.

### Conclusion

For the reasons discussed, the Court concludes that Teva has not proven that the patent-in-suit is invalid or that Merck engaged in inequitable conduct before the PTO.

An appropriate Order will be entered.

### ORDER

NOW THEREFORE, For The Reasons discussed in the Opinion issued this date, IT IS HEREBY ORDERED this 28th day of August 2003 that:

1) Defendant's Motion to Preclude Plaintiff Merck from Relitigating the Factual Findings Underlying the Decision in *Teva Pharmaceuticals Ltd. et al. Instituto Gentili Spa et al.* (D.I.113) is **DENIED**.

2) Plaintiff shall submit a Proposed Order within ten (10) days of its receipt of this Memorandum Opinion. Defendant may stipulate to Plaintiff's Proposed Order, or file any objections within ten (10) days of their receipt of the Proposed Order.



**Randall TESTERMAN, Plaintiff,**

v.

**The INTERNATIONAL UNION, Automobile, Aerospace and Agricultural Implement Workers of America (UAW); and Local Union 1183, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), Defendants.**

**No. CIV.A.98–620–KAJ.**

United States District Court,

D. Delaware.

Sept. 23, 2003.

Employee sued union, challenging union's withdrawal of appeal of employee's