# EXHIBIT U

**No. 04-1005**

IN THE

# United States Court of Appeals

FOR THE FEDERAL CIRCUIT

———◆◆◆———

MERCK & CO., INC.,

*Plaintiff-Appellee,*

—v.—

TEVA PHARMACEUTICALS USA, INC.,

*Defendant-Appellant.*

———————

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE IN CIVIL ACTION NO. 01-CV-0048,
JUDGE JOSEPH J. FARNAN, JR.

## REPLY BRIEF FOR DEFENDANT-APPELLANT
## TEVA PHARMACEUTICALS USA, INC.

James Galbraith
Maria Luisa Palmese
William G. James, II
KENYON & KENYON
One Broadway
New York, New York 10004
(212) 425-7200

*Attorneys for Defendant-Appellant
    Teva Pharmaceuticals USA, Inc.*

# CERTIFICATE OF INTEREST FOR
# TEVA PHARMACEUTICALS USA, INC.

Counsel for defendant-appellant Teva Pharmaceuticals USA, Inc., certifies the following:

    1.    The full name of every party represented by me is:

    Teva Pharmaceuticals USA, Inc.

    2.    The names of the real parties in interest represented by me are:

    *See* response to number 1.

    3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

    Teva Pharmaceuticals Europe B.V.
    Teva Pharmaceuticals Industries, Ltd.

4.    The names of all law firms and the partners or associates that appeared for the parties represented by me in the trial court or are expected to appear in this Court are:

James Galbraith
Maria Luisa Palmese
William G. James, II
Danae M. Schuster
KENYON & KENYON
One Broadway
New York, NY 10004
(212) 425-7200

Josy W. Ingersoll
YOUNG, CONAWAY, STARGATT
   & TAYLOR LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

October 20, 2003

/s/_____
James Galbraith
KENYON & KENYON
One Broadway
New York, New York 10004
(212) 425-7200
Attorney for defendant-appellant
Teva Pharmaceuticals USA, Inc.

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.   THE JULY 1996 *LUNAR NEWS* ANTICIPATES CLAIMS
     23 AND 37 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     A.   Merck Relies Solely on the District Court's Claim
          Construction Error . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     B.   The Specification Does Not Include a "Clear Definition"
          of "About" Contrary to its Ordinary Meaning . . . . . . . . . . . . . . . . . 3

     C.   The July 1996 *Lunar News* Anticipates the Claims . . . . . . . . . . . . . 7

     D.   The Lunar News Enables the Claimed Invention . . . . . . . . . . . . . . . . 9

II   MERCK DOES NOT DEFEND THE DISTRICT COURT'S LEGAL
     ERRORS ON OBVIOUSNESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     A.   The District Court Erred By Ignoring the Teachings of the *Lunar
          News* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

          1.   The District Court Erred in Discarding the Lunar News
               Disclosures Based On the Credentials of Their Author . . . . 16

          2.   The '329 Patent Discloses Nothing More than the Lunar
               News . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

     B.   The District Court Erred By Failing Properly to Analyze The
          Obviousness Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     C.   The Perception that Higher Weekly Doses of Alendronate Would
          Cause Increased Gastrointestinal Side Effects Did Not Exist . . . . . 21

          1.   The District Court's Finding that Persons Skilled in the Art
               Would Have Been Afraid of Once-Weekly Alendronate is
               Clearly Erroneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

          2.   Merck's Attacks On Dr. Russell Are Baseless . . . . . . . . . . . 26

D.    The Commercial Success of Once-Weekly Alendronate Does Not
      Demonstrate Nonobviousness  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# TABLE OF AUTHORITIES

**Page**

## Cases

*Amazon.com, Inc. v. Barnes & Noble.com, Inc.*
239 F.3d 1343, 57 USPQ2d 1747 (Fed. Cir. 2001)....................................27

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*
246 F.3d 1368, 58 USPQ2d 1508 (Fed. Cir. 2001)....................................11

*Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*
150 F.3d 1354, 47 USPQ2d 1516, (Fed. Cir.1998)....................................11

*Ciba-Geigy Corp. v. Alza Corp.*
864 F. Supp. 429, 33 USPQ 1018 (D.N.J. 1994), *aff'd in part and
rev'd in part*, 37 USPQ2d 1337 (Fed. Cir. 1995) (nonprecedential) ........13

*Constant v. Advanced Micro-Devices, Inc.*
848 F.2d 1560, 7 USPQ2d 1057 (Fed. Cir. 1988)....................................10

*In re Donohue*
766 F.2d 531, 226 USPQ 619 (Fed. Cir. 1985).........................................10

*In re Epstein*
32 F.3d 1559, 31 USPQ2d 1817 (Fed. Cir. 1994)....................................10

*In re Kaslow*
707 F.2d 1366, 1375, 217 USPQ 1089 (Fed. Cir. 1983)...........................16

*In re Lamberti*
545 F.2d 747, 192 USPQ...........................................................................16

*In re Oelrich*
579 F.2d 86, 198 USPQ 210, 214 (CCPA 1978) ......................................16

*In re Spada*
911 F.2d 705, 15 USPQ 1655 (Fed. Cir. 1990).........................................10

*In re Wiggins*
    488 F.2d 538, 179 USPQ 421 (CCPA 1973) ............................................. 10

*Interactive Gift Express, Inc. v. Compuserve Inc.*
    256 F.3d 1323, 59 USPQ2d 1401 (Fed. Cir. 2001)................................... 3

*Merck & Co. v. Biocraft Labs., Inc.*
    874 F.2d 804, 10 USPQ2d 1843 (Fed. Cir. 1989)................................... 19

*Texas Digital Sys. Inc. v. Telgenix, Inc.*
    308 F.3d 1193, 64 USPQ2d 1812 (Fed. Cir. 2002)................................... 3

## Statutes

21 U.S.C. § 355(c)(3)(D)(ii) ........................................................................ 30

21 U.S.C. § 355(j)(2)(A)(iii) ........................................................................ 8

35 U.S.C. § 102(a) ..................................................................................... 18

35 U.S.C. § 112 .......................................................................................... 10

## INTRODUCTION

Merck seeks this Court's endorsement of its '329 patent despite Merck's failure to identify a single contribution that its inventors made over the prior art, in particular the prior art disclosures of the April and July 1996 issues of *Lunar News*. Merck does not contend that the claimed invention adds anything to those disclosures, but argues that the *Lunar News* should be ignored because doctors would not have believed that the methods the author proposed would be safe. It urges the Court to discard the *Lunar News* because it does not include data supporting the safety of once-weekly alendronate, while at the same time it argues that the absence of such data from the '329 patent is not a defect. (Red Br. 57 n.7). The district court's analysis and Merck's theory boil down to the claim that Merck is entitled to patent Dr. Mazess's original concept because by reason of his education and the forum in which he chose to publish it, he would not have been able to convince doctors to adopt it, whereas Merck was not laboring under that disadvantage.

Merck's theory is specious. The '329 patent claims nothing more than employing once-weekly dosing of alendronate to treat and prevent osteoporosis – exactly what the *Lunar News* taught. It does not claim anything about tolerability or side effects, and whether the *Lunar News*

includes data about that topic is irrelevant. Merck's theory of prior art
nullification cannot be the law. Patent validity issues cannot turn on who
has what graduate degree. A prior art publication directed to persons skilled
in the art that teaches an invention cannot be disregarded because the later
patent's inventors or their assignee enjoy a greater measure of scientific
prestige.

## I.    THE JULY 1996 *LUNAR NEWS* ANTICIPATES CLAIMS 23 AND 37

### A.    Merck Relies Solely on the District Court's Claim Construction Error

The district court's failure to find that the July 1996 *Lunar News*
anticipated claims 23 and 37 derives from its claim construction error.
Although Merck disputes that the *Lunar News* discloses the dosage strengths
recited in those claims, it concedes that it discloses every other element of
the claimed invention. Thus, whether the district court's anticipation
holding can stand reduces to a legal question, freely reviewable here: What
is the correct construction of "about 70 mg" and "about 35 mg" in claims 23
and 37 — does it have what Merck concedes is its ordinary meaning of
"approximately" or does it have a special meaning of "on an alendronic acid
basis"?

Merck's special meaning argument is based on two sources: a passage from the specification that does not purport to define the disputed term, but instead defines "on an alendronic acid active basis," and an alleged "admission" by Dr. Russell with respect to that same passage. Merck's argument should be rejected and with it the district court's judgment based on that argument.

## B.    The Specification Does Not Include a "Clear Definition" of "About" Contrary to its Ordinary Meaning

Merck ignores the principle that any definition from a specification that purports to contradict the ordinary meaning of a term in a claim must clearly do so. *Texas Digital Sys. Inc. v. Telgenix, Inc.*, 308 F.3d 1193, 1204, 64 USPQ2d 1812, 1819 (Fed. Cir. 2002); *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331, 59 USPQ2d 1401, 1407 (Fed. Cir. 2001). Here, Merck and the district court rely exclusively on a passage that does not state that it is defining "about." Indeed, nothing in the specification provides any hint that the patentee was redefining a common English word to have precisely the opposite of its ordinary English meaning of "approximately."

The passage on which Merck relies merely states that when the patent employs the phrase "about 70 mg" in relation to an alendronic acid salt or hydrate, the quantity is "calculated based on 70 mg of alendronic acid."

3

(A999-1019, col. 11, line 65-col. 12, line 8). Both parties agree that the reason for calculating the quantity in that way is to provide a common denominator by ensuring that regardless of which alendronate salt or hydrate is employed, the same number of active molecules will be provided. (Blue Br. 25; Red Br. 30). Thus, the point of the passage is the basis on which the quantity is *calculated*, not the definition of "about."

Under Merck's construction, "about" signals the absence of any possibility of variation, no matter how minor, an interpretation exactly opposite to its ordinary meaning. This result is absurd, and contrary to this Court's articulated principles of claim construction. A departure from the ordinary meaning must be explicit to constitute lexicography by the patentee.

Merck also relies on an alleged "admission" by Teva's expert with respect to that same passage. The question to which Dr. Russell responded was:

> I understand, but it is what it says, and perhaps the person wanted to say if it's a certain salt one, you might use 71, and if it's a certain salt 2, you might use 73. Isn't that what's indicated in this?

(A435). Since the question was, to be charitable, less than clear, Dr. Russell's appropriate response was "possibly." The next question was, "But that's what the definition says; right?" to which Dr. Russell replied, "That is

the definition as it's described in the patent." (*Id.*).  The context does not make clear what the questioner was referring to or what Dr. Russell understood was the subject of the question.  Dr. Russell never accepted the idea that "about 70 mg" meant "exactly 70 mg," and when asked the question directly he confirmed his view that the passage was defining "on an alendronic acid basis," and was not defining "about."  (A499).

The district court erred in permitting this bizarre exchange over "a certain salt one," and "you might use 73" to override the ordinary meaning of "about."[1]  The district court's error was particularly striking, since its definition makes no sense in the context of both the remainder of the specification and the claims themselves.

Although Merck asserts that the district court's construction was based on "intrinsic evidence" (Red Br. 35), Merck does not address the fact that in at least 15 different places, the specification employs both "about [70] mg" and "on an alendronic acid basis" to refer to the same dosage strength.  (Blue Br. 26-27).  This consistent use of two separate descriptors for the same dosage strength demonstrates that they must supply different

---

[1]  Merck's principal inventor and two expert witnesses testified at trial, and its other two inventors provided deposition testimony.  None of them endorsed Merck's construction of "about."

information. Otherwise one or the other would be superfluous. Merck's

failure even to acknowledge this fact is a recognition that it cannot be

squared with the district court's construction of "about."

Merck's only other reference to the specification is to point out that

Examples 7 and 8 report the dosage strength to two decimal places. (Red

Br. 32). Merck argues that this expressed precision is inconsistent with the

ordinary meaning of "about." That in these examples the formulator

happened to measure the quantities with equipment capable of such

precision does not mean that "about" admits to no deviation from those

particular values. Construed in accordance with its ordinary meaning,

"about 70 mg" would permit a range of dosage strengths, even if each

individually, like the quantities in Examples 7 and 8, was reported to a

hundredth of a milligram.

Even more telling than Merck's disregard for the specification is its

failure to address the fact that the district court's construction makes

nonsense out of the claims. If, as the district court held, "about 70 mg"

means nothing more than "70 mg on an alendronic acid basis," then the

"about 70 mg" limitation becomes superfluous. (Blue Br. 28-29). Merck

does not dispute that a construction that makes a claim limitation

superfluous is wrong. It merely asserts that the district court's construction

6

"does not render superfluous" any limitation (Red. Br. 33), but offers no explanation of how the court's construction avoids that result. Merck lamely attempts to distinguish the authorities Teva cites (Red Br. 33), but its distinctions are irrelevant, and Merck in fact does not dispute the proposition for which Teva cites those cases.

### C.    The July 1996 *Lunar News* Anticipates the Claims

Although Merck asserts that the district court found the evidence of anticipation "not credible" (Red Br. 37), in fact the court made no such finding. The district court's premise for its rejection of Teva's anticipation defense was its claim construction. None of its findings is applicable if that construction is wrong.

The district court did not accept Dr. Russell's opinion because he did not demonstrate that the dosage strengths were "the same," since "he did not take into account the Court's construction of the term 'about 70 mg'." (A41-42). Similarly, Merck's expert, Dr. Papapoulos, never testified that the 80 mg was not "about 70 mg" if "about" is given its ordinary meaning of "approximately." Finally, both Merck and the district court relied on FDA statutory requirements for dosage strengths. (Red Br. 38). The FDA requires a generic version to have the "same" dosage strength as the listed drug. 21 U.S.C. § 355(j)(2)(A)(iii). There is no dispute that 80 mg is not the

"same" as 70 mg.  The '329 patent, however, is not an FDA regulation; it was deliberately drafted more broadly to include dosage strengths that are "about" or "approximately" 70 mg and 35 mg.

Thus, Merck's argument entitled "The District Court Correctly Found That Teva Had No Evidence That Different Medicinal Doses Are the Same" (Red Br. 37-40) is beside the point.  Teva never contended that a 70 mg dose and an 80 mg dose were the "same."  Under the correct claim construction, Teva bore no burden to show that the doses were "the same" or even that they were "equivalent."  Teva's burden was to demonstrate that they were "about" the same, a burden that it met notwithstanding the district court's failure to make any findings with respect to it.  Every witness who addressed the issue, including Merck's inventor Dr. Santora, testified that in the context of administration of alendronate for the treatment and prevention of osteoporosis, 80 mg is "approximately" 70 mg and 40 mg is "approximately" 35 mg.[2]  (*See* Blue Br. 31-32; A231-33; A4876-76.1; A213-14; A436-37; A1630-33; A764-65; A770-72).

---

[2] Merck asserts that Dr. Santora did not testify that the two strengths were "the same." (Red Br. 39).  Merck again deliberately obfuscates the issue; Dr. Santora confirmed that the 80 mg was "approximately" 70 mg and that 40 mg was "approximately" 35 mg, as required by claims 23 and 37. (A4876-76.1).

The district court never weighed the evidence in light of the ordinary meaning of "about 70 mg" and "about 35 mg." Merck points to no evidence that contradicts that offered by Teva that 70 mg and 35 mg are "approximately" 80 mg and 40 mg in the context of the claimed invention. Under the correct claim construction, *the Lunar News* clearly and convincingly anticipates claims 23 and 37. The district court's judgment should be reversed.

**D.    The *Lunar News* Enables the Claimed Invention**

Merck claims that the July 1996 *Lunar News* did not "enable" the practice of the claimed invention because it did not include information to show that the side effects would be acceptable. Merck thus proposes a new standard for such prior art: it must include clinical data to demonstrate that the claimed invention is safe. Merck, however, asserts that the '329 patent, which likewise contains no human clinical or laboratory data, is excused from such a requirement. (Red Br. 57 n.7).

Merck cites no authority for such a double standard, and its argument ignores what enablement is. The statutory test for enablement of the prior art is essentially the same as that for a patent application. That is, the reference must describe how to "make and use the invention." 35 U.S.C. § 112. *See In re Epstein*, 32 F.3d 1559, 1568, 31 USPQ2d 1817, 1823 (Fed.

Cir. 1994); *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1569, 7 USPQ2d 1057, 1063 (Fed. Cir. 1988). The description is directed to a person of ordinary skill in the art, and requires only that such a person be able to make and use the invention without undue experimentation. *See In re Wiggins*, 488 F.2d 538, 543, 179 USPQ 421, 424 (CCPA 1973) ("a reference describing an oil refinery need not describe how to make bolts and rivets to be considered 'enabling.'").[3]

Here, the invention is administering a particular dosage strength of a known, commercially available drug at a particular interval. The claimed invention is carried out by swallowing pills, and is enabled by a disclosure of doing so. The *Lunar News* contains such a disclosure. It describes alendronate dosage strengths, 80 mg and 40 mg, that were already available in the marketplace, and states that they should be administered "once/week." Since 80 mg and 40 mg are "about" 70 mg and 35 mg, the *Lunar News* enabled patients to practice the invention by buying alendronate tablets

---

[3]  Merck relies on *In re Spada*, 911 F.2d 705, 15 USPQ 1655 (Fed. Cir. 1990), and *In re Donohue*, 766 F.2d 531, 226 USPQ 619 (Fed. Cir. 1985) (Red. Br. 43), neither of which supports Merck's argument. In *Spada*, the issue was not enablement, but instead whether the reference sufficiently "describe[d]" the claimed invention. In *Donohue*, the Court held that enablement of the prior art did not require that the disclosure actually have been carried out.

already on the market, and taking one or two of them once a week instead of once a day. Even if the district court's construction of "about 70 mg" and "about 35 mg" were correct, the *Lunar News* would still enable the claimed invention. Although 70 mg and 35 mg dosage forms were not commercially available in July 1996, Merck admitted that making them would have been "trivial," and presented "no technology issue." (*See* Blue Br. 36 n.6; A4865; A4867-68).

Merck's incoherent argument that the disclosure does not enable the invention because others would have been skeptical of it is unsupported by any authority, including the cases on which Merck relies. In fact, this Court has made clear that a reference can enable and therefore anticipate a claimed invention even if the reference itself disparages the invention and would thus deter a person of ordinary skill in the art from practicing it. *Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1360-61, 47 USPQ2d 1516, 1521-22 (Fed. Cir.1998); *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1378, 58 USPQ2d 1508, 1515 (Fed. Cir. 2001). Here, the *Lunar News* not only taught the patented invention, it affirmatively encouraged others to carry it out. Merck's expert conceded that following the *Lunar News* would result in a safe and effective treatment for

11

osteoporosis. (A764-65; 770-72). That some doctors would have been skeptical is irrelevant to its status and effect as prior art.

In support of its non-enablement argument, Merck asserts that the *Lunar News* disclosure "did nothing more than speculate." (Red Br. 43). First, the record does not support Merck's characterization. Merck's own expert testified that the July 1996 *Lunar News* was a "suggestion" to physicians to administer alendronate once per week, and the district court so found. (A761; A66). Indeed, as the district court noted, Merck never questioned that a person of ordinary skill in the art reading the *Lunar News* would know that once weekly dosing would be effective in treating and preventing osteoporosis. (A59).

Second, Merck is betrayed by the authority on which it relies. In *Bristol-Myers Squibb*, the claim for a drug dosing regimen included a specific limitation to "premedicating said patient with a medicament that reduces or eliminates hypersensitivity reactions." The prior art reference disclosed administering the same drug, described the unsuccessful result, and noted the problem of "hypersensitivity reactions." The reference then stated that "[f]urther studies are needed to see if pretreatment regimens, alternative schedules . . . or a reformulated preparation will permit the safe administration of the compound." This suggestion to carry out a study to

12

determine whether "premedication" would be effective was held to be an enabling disclosure of the specific claimed step of "premedication." 246 F.3d at 1378-80; 58 USPQ2d at 1515-16. *See also Ciba-Geigy Corp. v. Alza Corp.*, 864 F. Supp. 429, 33 USPQ 1018 (D.N.J. 1994), *aff'd in part and rev'd in part*, 37 USPQ2d 1337 (Fed. Cir. 1995) (nonprecedential) (statement in a letter to the editor that "another alternative *might be* transdermal application [of nicotine] much in the manner of nitroglycerine and scopolamine patches" (emphasis added) held to anticipate a claim to a transdermal nicotine patch). The July 1996 *Lunar News* is certainly much less speculative than the references in *Bristol-Myers Squibb* and *Ciba-Geigy*; it states positively that the proposed once-weekly regimen will "avoid dosing problems and reduce costs," two distinct motivations for adopting it. (A3102). Of course, "avoid[ing] dosing problems" is the principal advantage touted for the invention claimed in the '329 patent, filed for a year later.[4]

---

[4] Merck also notes that in *Bristol-Myers Squibb*, this Court reversed the grant of summary judgment with respect to certain of the dependent claims at issue because it was unclear that the reference's general disclosure was actually a disclosure of the specific pretreatment medications recited in them. (Red Br. 44-45). Contrary to Merck's assertion, this holding, which is irrelevant here, had nothing to do with "enablement."

Finally, Merck's real contention is not that the *Lunar News* is speculative, but that it "failed to address" the alleged "skepticism" doctors would have about the tolerability of once-weekly higher dose administration. Whether *Lunar News* in fact "failed to address" this concern or whether the concern even existed is irrelevant because the '329 patent makes no claim with respect to tolerability. A prior art reference need not extol the virtues of an invention to anticipate it. *See Bristol-Myers Squibb, supra.*

## II.     MERCK DOES NOT DEFEND THE DISTRICT COURT'S LEGAL ERRORS ON OBVIOUSNESS

In its opening brief, Teva demonstrated that the district court's approach to obviousness led to two errors. First, the district court dismissed the *Lunar News* disclosures instead of starting with their teachings. Second, the district court failed to analyze obviousness in view of the differences between the claimed invention and the prior art. By failing to follow the correct methodology, the district court reached the wrong result.

Merck never confronts these assignments of error because it has no answer to them. Instead, Merck focuses on the largely irrelevant facts making up Merck's litigation-inspired "fear defense." Merck recasts the facts as if the *Lunar News* references never existed, and as if Merck's inventors were the first to conceive of or disclose once-weekly

14

administration of alendronate for osteoporosis. But Merck was not first, and arguing that the *Lunar News* should not have been believed does not make it go away.

Teva's burden was to prove the facts demonstrating obviousness by clear and convincing evidence. Teva did so. It demonstrated the scope and content of the prior art: that the *Lunar News*, particularly the July 1996 issue, disclosed once-weekly administration of alendronate for the treatment and prevention of osteoporosis and a motivation for that regimen (to "avoid dosing problems"); and that, as the district court found, it was "known" that once-weekly administration of alendronate would be effective for osteoporosis. (A59). Teva also demonstrated the exceptionally high level of ordinary skill in the art, which the parties do not dispute. (*Id.*). Finally, Teva showed that at most the only difference between the prior art and the claimed invention is the precise dosage strength – 80 mg vs. 70 mg and 40 mg vs. 35 mg – a difference that is not meaningful in light of the fact that a person skilled in the art would have chosen 70 mg weekly for treatment and 35 mg weekly for prevention – seven times the daily dose. (A643-44; A776-78). Based on those facts, which are not disputed, the district court should have found the claimed invention obvious.

A.    **The District Court Erred By Ignoring the Teachings of the** *Lunar News*

    1.    **The District Court Erred in Discarding the** *Lunar News* **Disclosures Based On the Credentials of Their Author**

Neither the district court nor Merck cites any authority supporting the idea that prior art may be excluded from consideration because of the pedigree of the person who wrote it. The only relevant question is what a reference places in the public domain. Although Teva disputes Merck's mischaracterization of Dr. Mazess's knowledge and standing in the bone resorption and osteoporosis fields, his status is not relevant.[5] Prior art references must be considered for all that they disclose and fairly suggest. *In re Kaslow*, 707 F.2d 1366, 1375, 217 USPQ 1089, 1096 (Fed. Cir. 1983); *In re Oelrich*, 579 F.2d 86, 91, 198 USPQ 210, 214 (CCPA 1978); *In re Lamberti*, 545 F.2d 747, 750, 192 USPQ 278, 280 (CCPA 1976). There is no exception to that rule based on where the author went to school.

---

[5] Dr. Mazess directed the Bone Mineral Laboratory at the University of Wisconsin, he established bone densitometry as a viable diagnostic tool, founded the first manufacturer of bone densitometry measuring equipment, participated in and designed clinical trials in osteoporosis patients, and was widely published in the bone disease field. "Anthropologist" or not, he had vast experience in the area. (A4822-36; Blue Br. 11-12).

16

Nor is the absence of "peer review," on which the district court also relied, an excuse to discredit the prior art. The *Lunar News* was a "printed publication," which is all the statute requires. 35 U.S.C. § 102(a). Moreover, it was in the relevant field, and it was widely read by practitioners. Merck's principal trial expert read it (A781), and its principal inventor had a copy of the July 1996 article in his possession. (A76-77). The disclosures in the April and July 1996 *Lunar News* are scientifically correct (A772-74) and exhaustively documented with the citation of 30 references. Merck dealt with its author on a business and professional basis. In fact, in May 1997, before Merck's invention date, a Merck delegation, including a senior vice-president and Merck's principal inventor, visited Dr. Mazess to discuss business arrangements between Merck and Lunar Corp., as well as articles that had appeared in the *Lunar News*. (A623-627; A670-74; A1308; A1309-29; A1330; A4765-68; A4885-88).

Finally, Merck's patent application was likewise not "peer reviewed." Neither the district court nor Merck attempted to justify Merck's double standard – that a prior art publication must be peer reviewed to be effective against a patent application that is not.

### 2. The '329 Patent Discloses Nothing More than the *Lunar News*

Merck's attack on Dr. Mazess's credentials here is particularly inappropriate, since the '329 patent provides the public with nothing beyond what is disclosed in the *Lunar News*. Merck argues that the "failure of the *Lunar News* articles to address the known safety concerns or to discuss the side effect implications of high alendronate dosing for osteoporosis rendered their suggestions meaningless." (Red Br. 49). The district court apparently agreed with this argument. (A68). Even assuming that such safety concerns about weekly administration of alendronate existed in 1997, the '329 patent includes nothing more than does the *Lunar News* to dispel them, and by Merck's reasoning must also be "meaningless."

The '329 patent does not include data or reports of experimentation proving the workability of an idea that was contrary to some conventional wisdom. Merck's inventors had no such information. On the contrary, the patent provides nothing beyond what Dr. Mazess had already disclosed in the *Lunar News*. Specifically, the '329 patent includes no clinical trial data or results from studies in people proving the safety and effectiveness of the once-weekly administration of alendronate. (A642-43). Recognizing this weakness, Merck now feebly attempts to rely on the beagle experiments described in Example 1 in the '329 patent. (Red Br. 57). However, the

18

Merck scientist who conducted them testified that they were not relevant to

patients taking alendronate (A4859; A4862), and Merck's trial expert

testified that the dog experiments did not support the safety of once-weekly

administration of alendronate and that they were not relevant to human

experience. (A409).

Merck points out that human data are not required for patents on

pharmaceutical inventions (Red Br. 57 n.7), but neither are such data

required of a prior art reference to make it effective. Merck's '329 patent

did not convey to the public anything not already disclosed in the April and

July 1996 editions of the *Lunar News*, and Merck is not entitled to a patent

for applying its name and employing its prestige to buttress Dr. Mazess's

idea.

### B.    The District Court Erred By Failing Properly to Analyze the Obviousness Issue

The focus of the obviousness analysis is whether the claimed

invention ("the subject matter to be patented") would have been obvious to a

person of ordinary skill in the art in light of the differences between the prior

art and what is claimed. *See Merck & Co. v. Biocraft Labs., Inc.*, 874 F.2d

804, 808, 10 USPQ2d 1843, 1846 (Fed. Cir. 1989):

> [T]he proper focus of an obviousness inquiry is on whether 'the
> differences between the subject matter sought to be patented
> and the prior art are such that the subject matter as a whole

would have been obvious at the time the invention was made to
a person having ordinary skill in the art.'

(*See* Blue Br. 38-39).  The district court did not carry out this analysis.

The district court described the *Lunar News* and quoted the

appropriate sections.  Mentioning the prior art and quoting from it, however,

is not enough.  Merck asserts that the district court weighed the evidence in

coming to its decision. (Red Br. 47-48).  "Weighing the evidence" is no

substitute for the appropriate section 103 analysis.  Here, the district court

never considered whether administering 70 mg and 35 mg once per week

would have been obvious in view of a prior art disclosure of administering

80 mg and 40 mg once per week.  Thus, although the district court discussed

the *Lunar News*, in substance it failed to consider its teachings.

Merck does not dispute that the district court did not carry out the

requisite analysis.  Instead, it argues that Teva's arguments are "fraught with

hindsight." (Red. Br. 48).  The disclosures of the *Lunar News* are not

hindsight.  They are clear suggestions to administer alendronate once per

week at a dose approximately seven times the daily dose.  Whether many

physicians would have accepted the suggestions at the time is irrelevant.  Dr.

Mazess was the first to believe in this concept, and he disclosed it publicly

long before Merck's inventors had the same idea.  The public is entitled to

practice freely what Dr. Mazess placed in its domain.

The implications of the district court's approach highlight its error.

Under the district court's analysis, if rather than publish his idea in July

1996, Dr. Mazess had filed a patent application claiming it, when that patent

issued it would not be effective prior art against the '329 patent because Dr.

Mazess, the inventor, was an "anthropologist," his patent application was not

"peer reviewed," and it "did not overcome the known side effects of

alendronate. . . ." In fact, under the district court's analysis, if Dr. Mazess

had filed a patent application claiming his concept, and if the Patent Office

had declared an interference between his application and the application for

the '329 patent, Dr. Mazess would have lost for the same reasons even

though he was the prior inventor. No court has ever held, however, that the

teachings of a prior art patent can be disregarded, nor has any interference

been decided, based of the inventor's academic credentials or because the

patent application was not peer reviewed before it was filed.

### C. The Perception that Higher Weekly Doses of Alendronate Would Cause Increased Gastrointestinal Side Effects Did Not Exist

#### 1. The District Court's Finding that Persons Skilled in the Art Would Have Been Afraid of Once-Weekly Alendronate is Clearly Erroneous

Merck spends most of its brief cobbling together the "facts" that it

contends support the existence of a "dogma" in the art of osteoporosis

treatment in 1997 that "[i]n osteoporosis therapy, doses of alendronate higher than 20 mg were associated with an undesirable safety profile." (Red. Br. 46).  According to Merck, the inventors of the '329 patent departed from conventional approaches "without any reasonable expectation of success."  (Red Br. 47).  As discussed above, even if this were true, it would be irrelevant, because they did so a year too late – after Dr. Mazess had done the same thing and disclosed their invention to the public.  In any event, it is not true.

In the end, Merck cannot escape the pre-litigation admissions of its inventors that the state of the art foretold success, not failure, with a once-weekly regimen.  Merck first relies on several case reports of rare cases of esophageal erosion attributed to daily alendronate. (Red Br. 13-14).  Merck falsely states that Teva had urged that the articles "should not have been considered."  (Red Br. 53-54).  As explained in Teva's opening brief, Merck, scientists at the time, and the experts at trial all attributed these cases to "pill esophagitis," i.e., pills sticking in the patients' esophagi, principally because those patients failed to follow Merck's dosing instructions.  (Blue Br. 52). In early 1996, after Merck promulgated its "Dear Doctor" letter emphasizing the need to follow those instructions, the problem disappeared.  (Blue Br. 51).

Merck offered no evidence that those in the art actually held the view that a higher dose, administered only once per week, would cause an increased incidence of gastrointestinal side effects. Instead, Merck spins its story from a single study, the Chesnut report, which is the centerpiece of both Merck's case and the district court's opinion. As discussed in Teva's opening brief, the Chesnut study did not involve weekly administration of alendronate. It does not say that weekly dosing would be poorly tolerated or that no patient would be able to tolerate once-weekly doses of alendronate. (Blue Br. 53-55). Indeed, in the April 1996 issue of the *Lunar News* in which he disclosed once-weekly dosing of alendronate, Dr. Mazess cited the Chesnut study (A3066 ref. 4), and before this litigation provided a motive to take the opposite view, Merck also cited Chesnut in support of the idea of weekly dosing. (*See, e.g.*, A1726). The district court's finding that the paper supported "clearly documented and known dose related gastrointestinal side effects" that would have deterred once-weekly dosing of alendronate is clearly erroneous.[6]

---

[6] Merck also cites a Teva patent as confirming a "perception" in the art. (Red Br. 12). This patent is directed to a particular formulation for sustained release, and Merck deliberately omits the crucial fact that the passage it cites refers specifically to "sustained release doses." (A4414, col. 3, lines 38-39). Sustained release formulations and the problems associated with them have nothing to do with the issues here.

Recognizing the lack of support for its contention that there was an expectation of "dose-related" side effects with alendronate, Merck turns to evidence regarding experiences with other drugs — pamidronate, clodronate and etidronate — in an attempt to demonstrate that side effects were known to be "dose-related." (Red Br. 8-9). However, as the district court found, because of variability among these compounds, "results obtained with one bisphosphonate cannot be extrapolated readily to the whole class," and evidence regarding the use of etidronate, clodronate and pamidronate "holds little weight . . . given the unique characteristics of each bisphosphonate." (A60-61).

In the end, Merck's spin on the evidence is impeached by its own pre-litigation documents, most of which were authored by its inventors. Merck characterizes these documents as reflecting "the inventors' own rationales to overcome the skepticism about the use of high unit doses." (Red Br. 57). Merck, however, cannot escape these admissions. As discussed in Teva's opening brief, before this litigation, Merck's inventors presented evidence to Merck management, the FDA and the scientific community that once-weekly dosing would be "well tolerated," that it would be "unlikely to have a greater potential to induce upper GI irritation," and that weekly dosing should be "very well-tolerated." (Blue Br. 55-60). The inventors cited

Chesnut in coming to these conclusions, thus undermining Merck's

argument that it provided a significant deterrent to the idea of once-weekly

dosing.

In concluding that once-weekly dosing was likely to be well-tolerated,

Merck's inventors also relied on data from studies in Paget's patients.

Merck attempts to elide this point by arguing that in each of the documents

the inventors "consistently rely on the animal studies." (Red Br. 57).

However, even cursory review of the documents demonstrates that the

inventors relied on the Paget's disease data to demonstrate the expected side

effect profile of once-weekly dosing in osteoporosis.  In a March 1998

submission to the FDA, Merck stated:

> Experience in Paget's patients (up to 80 mg alendronate for 6
> months) suggests that dosing regimens of either 35 or 70 mg
> weekly, and 35 mg twice-weekly should be well-tolerated.

(A1711-14; A1735).

The district court concluded that data from Paget's studies were not

relevant because "it was well-known to those of ordinary skill in the art that

patients with Paget's disease tolerate higher doses of alendronate than

patients with osteoporosis."  (A65 n.8).  As demonstrated above, and in

Teva's opening brief, neither Merck nor its inventors held this view before

this litigation.  They never told the FDA or Merck management or the

scientific community that gastrointestinal data from Paget's patients could not be extrapolated to osteoporosis patients because of tolerability differences between the patient populations. To the contrary, Merck and its inventors extrapolated repeatedly from the Paget's data in drawing conclusions about the likely tolerability of higher doses of alendronate in osteoporosis patients. The district court's decision to set aside the data from Paget's patients was clearly erroneous.

### 2.    Merck's Attacks On Dr. Russell Are Baseless

In support of its "fear defense," Merck repeatedly criticizes Dr. Russell. According to Merck, that Dr. Russell did not make the patented invention himself is evidence of its unobviousness and impeaches Dr. Russell's testimony. Specifically, Merck asserts that if the invention was obvious, Dr. Russell would have instructed his consulting client, Procter & Gamble, to make a once-weekly version of its drug, risedronate.

Merck's argument is specious. Nothing in the record bears on whether an alternative dosing regimen for risedronate would or would not have been obvious. The record contains no evidence about its mode of action, effectiveness, bioavailability over time or the scope and content of the prior art with respect to it. In fact, the July 1996 *Lunar News*, the most relevant prior art reference with respect to weekly alendronate, does not

mention risedronate.  Thus, whether weekly risedronate dosing would have been obvious or unobvious is, as far as this record is concerned, unknown and irrelevant to the issues here.[7]

Similarly, Merck refers to statements by Dr. Russell about bisphosphonates other than alendronate that allegedly support Merck's position that gastrointestinal side effects were expected to be dose-related. Like all of the evidence regarding the other bisphosphonates, this evidence is irrelevant to expectations with alendronate.  (A60-61).

Finally, Merck falsely characterizes a 2002 declaration Dr. Russell submitted in a Canadian lawsuit.  Merck selectively quotes from the document, arguing that with respect to side effects, Dr. Russell refused to extrapolate from Paget's disease to osteoporosis.  First, Dr. Russell's declaration concerned etidronate not alendronate, and thus is not relevant to the issues in this case.  Moreover, at trial Dr. Russell explained that the side effect under consideration was not a gastrointestinal issue, but instead the bone mineralization problem associated uniquely with etidronate, and that the issue was whether one could extrapolate doses from one population to

---

[7]  In any event, whether Dr. Russell made the invention is irrelevant. *Amazon.com, Inc. v. Barnes & Noble.com, Inc.*, 239 F.3d 1343, 1364, 57 USPQ2d 1747, 1762 (Fed. Cir. 2001) ("Whatever [the expert] did or did not personally realize at the time . . . is irrelevant").

the other in terms of that side effect. (A467-71). Merck's characterizations

of Dr. Russell are false, and do not support Merck's contention that the

claimed invention would not have been obvious.

### D.    The Commercial Success of Once-Weekly Alendronate Does Not Demonstrate Nonobviousness

Merck includes statistics showing that alendronate is a big seller, and

that alendronate sales continued to rise after the weekly version replaced the

daily dose. Whether weekly alendronate is successful is not an issue. The

issue instead is whether that success proves anything about the

nonobviousness of the claimed invention.

Quotations from court decisions about the probative nature of

commercial success (Red Br. 59-60) are not pertinent when they are taken

from their contexts, as Merck has done. Merck does not dispute the

rationale for the consideration of commercial success: when present it may

show that the solution the inventor devised was not obvious to persons

skilled in the art because they had the incentive to fulfill a market demand

and could not do so. (Blue Br. 61-62). Nor does Merck dispute the

converse of that principle: that if barriers to entry unrelated to the patented

invention precluded others from participating in the market, the patentee's

success cannot be probative of unobviousness. Merck concedes the

existence of such barriers here.

Specifically, from 1988, when it acquired the '077 patent, until 2007, when that patent expires, Merck has a legal exclusivity over the administration of alendronate at any dose, and during the relevant period here, 1995 through 2000, it also had a "new chemical entity" exclusivity, independent of patent rights. *See* 21 U.S.C. § 355(c)(3)(D)(ii). Thus, at all relevant times Merck had sole control over the marketplace. Every potential competitor knew that even if it developed a new alendronate product, it would be unable to sell it. It defies common sense to believe that under those circumstances, a competitor would even consider making the enormous investment required to bring a new drug product to market, whether or not it was obvious to do so.

The commercial success of weekly alendronate shows that it was a good idea – precisely as the *Lunar News* had taught. Good ideas are patentable only if they are not obvious, and Merck's success says nothing about whether that idea would have been obvious.

Recognizing the problem it faces, Merck cites to other drugs, such as risedronate, marketed by Proctor & Gamble. (Red Br. 60). Merck does not explain what risedronate has to do with this case. Again, the record contains no evidence about whether weekly administration of risedronate would have

29

been obvious, or what the prior art landscape with respect to risedronate was.

Merck's reliance on Teva's own sustained release formulation patent is likewise misplaced. (Red Br. 60-61). That patent was not even filed for until long after both the *Lunar News* was published and '329 patent had issued. The record contains no evidence of what Teva was doing in 1996, or whether Teva had any "incentive" to make weekly dosage forms of alendronate in 1996, particularly when that drug was subject to at least a five-year FDA exclusivity.

Finally, the fact that Teva seeks approval to market a generic version of Merck's drug does not mean that the dosage regimen would not have been obvious, only that it is a valuable product for the reasons expressed in the *Lunar News* – it "avoids dosing problems." Teva seeks only to do what is taught by the *Lunar News*: market alendronate for osteoporosis treatment and prevention.

30

## CONCLUSION

For the foregoing reasons and for the reasons set forth in Teva's

principal brief, the district court's judgment should be reversed.

Respectfully submitted,

April 15, 2004

James Galbraith
Maria Luisa Palmese
William G. James, II
KENYON & KENYON
One Broadway
New York, NY 10004
(212) 425-7200

Attorneys for defendant-appellant
Teva Pharmaceuticals USA, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on this date I served the foregoing Reply Brief of Defendant-Appellant Teva Pharmaceuticals USA, Inc. on plaintiff-appellee Merck & Co., Inc. by causing two copies thereof to be delivered by overnight courier to

Nicolas G. Barzoukas, Esq.
Howrey Simon Arnold & White LLP
750 Bering Drive
Houston, TX,

counsel for Merck & Co.

April 15, 2004

James Galbraith

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of F.R.A.P. 32(a)(7)(c).  This brief contains 6640 words.

April 15, 2004

_____
James Galbraith

RECORD PRESS, INC., 157 Chambers Street, N.Y. 10007—9863—(212) 619-4949
www.recordpress.com

# EXHIBIT V

**1364**    395 FEDERAL REPORTER, 3d SERIES

determined that the MOU was an enforceable agreement and that it would not be necessary to resume a full trial on the merits of the case, there were only limited avenues to establish a basis for appeal, namely, by interlocutory or final judgment.

Genesis could have sought permission under 28 U.S.C. § 1292(b) and (c)(1) to immediately appeal the interlocutory judgment and order of the district court, or Genesis could have made the required payment pursuant to the MOU with the appropriate certification of receipt by Silicon. None of these avenues was followed, therefore there is no interlocutory or final judgment from which an appeal can be taken. Since under 28 U.S.C. § 1295(a)(1) this Court cannot review a decision by a district court that is not final, we dismiss this case for lack of jurisdiction.

*DISMISSED*

*COSTS*

No costs.



MERCK & CO., INC., Plaintiff–
Appellee,

v.

TEVA PHARMACEUTICALS USA,
INC., Defendant–Appellant.

No. 04–1005.

United States Court of Appeals,
Federal Circuit.

DECIDED: Jan. 28, 2005.

**Background:** Owner of patent for osteoporosis drug sued proposed manufacturer of generic version for infringement. The United States District Court for the District of Delaware, Joseph J. Farnan, Jr., J., 288 F.Supp.2d 601, held for owner, and competitor appealed.

**Holdings:** The Court of Appeals, Gajarsa, Circuit Judge, held that:

(1) "about" 70/35 mg of alendronate monosodium trihydrate, called for in patent claims, meant approximately those amounts, and

(2) patent was invalid as obvious.

Reversed.

Rader, Circuit Judge, dissented and filed opinion.

**1. Federal Courts ⟳776, 850.1**

On appeal from a bench trial, appellate court reviews district court's conclusions of law de novo and its findings of fact for clear error.

**2. Federal Courts ⟳853**

District court's factual finding is "clearly erroneous" when, despite some supporting evidence, reviewing court on entire evidence is left with definite and firm conviction that mistake has been committed.

See publication Words and Phrases for other judicial constructions and definitions.

**3. Patents ⟳324.5**

Patent claim construction is question of law, reviewed de novo.

**4. Patents ⟳324.5, 324.55(4)**

Patent obviousness is question of law, reviewed de novo, based on underlying factual determinations, which are reviewed for clear error. 35 U.S.C.A. § 103.

**5. Patents ⟳16(2, 3), 16.13, 36.1(1)**

Factual determinations underlying finding of patent invalidity on ground of obviousness include (1) scope and content of prior art, (2) level of ordinary skill in the art, (3) differences between claimed invention and prior art, and (4) objective indicia of nonobviousness. 35 U.S.C.A. § 103.

**6. Patents ⟜101(2)**

"About" 70/35 mg of alendronate monosodium trihydrate, called for in claims of patent for osteoporosis drug, meant approximately those amounts; statement in specification which could have been taken as requiring exactly amount called for was insufficiently clear to warrant abandonment of term's ordinary meaning.

**7. Patents ⟜165(3)**

To properly construe patent claim term, court first considers intrinsic evidence, starting with language of claim.

**8. Patents ⟜161**

Generally, patent claim terms should be construed consistently with their ordinary and customary meanings, as determined by those of ordinary skill in the art.

**9. Patents ⟜162, 167(1)**

Patent-construing court must examine specification to determine whether patentee acted as his or her own lexicographer of term that otherwise has ordinary meaning to person of skill in the art.

**10. Patents ⟜162, 167(1.1)**

When patentee acts as his or her own lexicographer in redefining meaning of particular claim terms away from their ordinary meaning, he or she must clearly express that intent in specification; statement in specification must have sufficient clarity to put one reasonably skilled in art on notice that inventor intended to redefine claim term.

**11. Patents ⟜157(1)**

Patent claim construction that gives meaning to all terms of claim is preferred over one that does not do so.

**12. Patents ⟜16.25**

Patent for osteoporosis drug, calling for once-weekly dosage at seven times daily dose in order to overcome dose-related side effect, was invalid as obvious in light of widely-circulated prior art articles by industry expert calling for same strategy to overcome same side effect, even though articles were not published in peer-reviewed journal and author did not possess professional credentials. 35 U.S.C.A. § 103.

**13. Patents ⟜36.2(9)**

Commercial success of patented osteoporosis drug did not weigh against finding of patent invalidity on ground of obviousness where author of allegedly invalidating prior art articles was not in position to commercially exploit idea. 35 U.S.C.A. § 103.

**Patents ⟜328(2)**

4,621,077.   Cited.

**Patents ⟜328(2)**

5,994,329.   Invalid and Not Infringed.

————————

John F. Lynch, Howrey Simon Arnold & White, LLP, of Houston, Texas, argued for plaintiff-appellee. With him on the brief were Nicolas G. Barzoukas and Richard L. Stanley. Of counsel on the brief were Paul D. Matukaitis, Edward W. Murray and Gerard M. Devlin, Merck & Co., Inc., of Rahway, New Jersey.

James Galbraith, Kenyon & Kenyon, of New York, New York, argued for defendant-appellant. With him on the brief were Maria Luisa Palmese and William G. James, II.

Before RADER, GAJARSA, and PROST, Circuit Judges.

GAJARSA, Circuit Judge.

Teva Pharmaceuticals USA, Inc. ("Teva") appeals the final judgment of the United States District Court of Delaware, which, after a bench trial, found Merck & Co.'s ("Merck") U.S. Patent No. 5,994,329 (issued Nov. 30, 1999) ("the '329 patent")

not invalid as anticipated or obvious. The district court further found the '329 patent to be enforceable, and the '329 patent claims 23 and 37 constructively infringed by Teva's Abbreviated New Drug Application ("ANDA") under 35 U.S.C. § 271(e)(2)(A) of the Hatch–Waxman Act. *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 288 F.Supp.2d 601 (D.Del.2003) ("*Merck*"); *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, No. 01–CV–0048, Order (D.Del. Sept. 24, 2003) (Final Judgment Order Pursuant to Fed.R.Civ.P. 54(b)) ("*Final Judgment Order*").[1]

We disagree with the district court's construction of the claim term "about" in claims 23 and 37 of the '329 patent. Because we further hold claims 23 and 37 obvious in light of the prior art, we vacate the judgment of the district court and hold the claims invalid and not infringed.

## I. BACKGROUND

### A. '329 Patent

Merck owns the '329 patent. The '329 patent, entitled "Method for Inhibiting Bone Resorption," teaches a method of treating and preventing osteoporosis through less-than-daily administration of bisphosphonate compounds. '329 patent, col. 1, ll. 15–25. The patent was filed on August 14, 1998, and Merck stipulated at trial that it would not allege an invention date prior to July 22, 1997 for the claims at issue. *Merck*, 288 F.Supp.2d at 606.

Bisphosphonates are a family of chemical compounds that are known to selectively inhibit the bone destruction process that contributes to osteoporosis and other bone diseases. '329 patent, col. 1, ll. 45–50. Bisphosphonates include, among other compounds, alendronate, risedronate, tiludronate, pamidronate, ibandronate, zolendronate, and etidronate. *Id.* at col. 1, ll.

54–65; col. 2, ll. 28–31. At issue in this case are once-weekly dosages of alendronate monosodium trihydrate.

Bisphosphonates are not readily absorbed by the gastrointestinal ("GI") tract. The medications thus require rigorous dosing instructions: a patient must take the medicine on an empty stomach and remain upright and fasting for thirty minutes after ingestion. '329 patent, col. 2, ll. 3–24. In addition, the compounds are known to have adverse GI side effects that physicians believed to be related, in part, to (a) irritation to the patient's esophagus, or (b) the size of the dose. *Id.* at col. 2, ll. 23–46.

Before the '329 patent issued, standard osteoporosis treatments consisted of small daily doses of bisphosphonates to avoid GI complications. *Id.* at col. 1, ll. 54–61; col. 2, ll. 34–35, 44–46. According to the patent, however, the adverse GI side-effects resulting from repetitive irritation to the GI tract were the primary concern in the field. *Id.* at col. 2, ll. 65–67; col. 3, l. 57—col. 4, l. 13. The inventors trumpeted the reduced-frequency dosing schedule disclosed in the '329 patent as decreasing the irritating effect of the compounds, as well as increasing patient compliance with the rigorous dosing instructions. *Id.* at col. 3, ll. 57–64; col. 4, ll. 14–23.

This case involves dependent claims 23 and 37 of the '329 patent. At trial, the parties agreed to cast the text of these claims in independent form, incorporating all the dependent limitations:

23. A method *for treating* osteoporosis in human comprising orally administering *about 70 mg* of alendronate monosodium trihydrate, on an alendronic acid basis, as a unit dosage according to a continuous schedule having a dosing interval of once-weekly.

---

1. On appeal, Teva does not challenge the district court's determination that the '329 patent is enforceable or that it would be infringed by Teva's proposed drug product.

MERCK & CO. v. TEVA PHARMACEUTICALS USA 1367
Cite as 395 F.3d 1364 (Fed. Cir. 2005)

37. A method *for preventing* osteoporosis in human comprising orally administering *about 35 mg* of alendronate monosodium trihydrate, on an alendronic acid basis, as a unit dosage according to a continuous schedule having a dosing interval of once-weekly.

'329 patent, col. 21, ll. 24–27 (claim 23) (emphasis added); col. 22, ll. 24–26 (claim 37) (emphasis added). We note that the only differences between claim 23 and claim 37 are (1) the dosage amount of alendronate monosodium trihydrate (70 mg or 35 mg) and (2) whether the method is directed to treating or preventing osteoporosis.

Merck has Food and Drug Administration ("FDA") approval to market both a once-weekly and a relatively diminished daily dose of alendronate monosodium trihydrate, which it does under the trade name Fosamax. *Merck*, 288 F.Supp.2d at 605.

B. *Litigation*

In late 2000, Teva amended an existing ANDA and sought FDA approval to market generic versions of Merck's once-weekly Fosamax supplement in 35 mg and 70 mg quantities.[2] *Merck*, 288 F.Supp.2d at 605–06; Teva Br. at 4. Merck subsequently filed suit against Teva under 35 U.S.C. § 271(e)(2)(A), alleging Teva's ANDA filing was an act of infringement.[3]

According to the trial court, Merck acted as its own lexicographer and through the specification redefined the ordinary meaning of "about" in claims 23 and 37—which both parties agree has the ordinary meaning "approximately"—to something quite different. *Merck*, 288 F.Supp.2d at 612–16. Thus, the district court concluded the terms "about 35 mg" in claim 37 and "about 70 mg" in claim 23 mean *exactly* 35 (or 70) mg of alendronic acid.[4]

Relying on this construction of "about," the district court dismissed Teva's allegations that the claims at issue were (1) anticipated by a July 1996 *Lunar News* article or (2) rendered obvious by an April 1996 *Lunar News* article combined with the July 1996 article.[5] The trial court found both articles qualified as prior art publications under 35 U.S.C. § 102(a). *Merck*, 288 F.Supp.2d at 618–19. The

2. Teva filed one amendment for the once-weekly 70 mg dosage, and later filed another for the once-weekly 35 mg dosage. *Merck*, 288 F.Supp.2d at 605–06. Merck separately sued Teva for infringement, under 35 U.S.C. § 271(e)(2)(A), based on each ANDA amendment. *Id.* The district court consolidated those suits in the present action.

3. The present case relates to another action between the two parties involving Merck's daily formulation of Fosamax. The district court found Teva's proposed generic daily alendronate compound would infringe Merck's patent on that drug, and this court affirmed that decision. *Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367 (Fed.Cir.2003). In this action the parties agreed to be bound by the judgment from this court on issues relating to the daily formulation. As a result, the only issues before the district court in this case related to the '329 patent. *Merck*, 288 F.Supp.2d at 606.

4. That is, the trial court construed "the disputed claim terms 'about 70/35 mg' to mean the equivalent of 70/35 mg of alendronic acid when taking into account molecular weight variances for its derivatives that carry accessories." *Merck*, 288 F.Supp.2d at 616.

5. *Lunar News* is a quarterly newsletter distributed to approximately 15,000 to 20,000 physicians and others in the medical art by Lunar Corporation, a manufacturer of bone densitometry equipment used to diagnose osteoporosis. *Merck*, 288 F.Supp.2d at 618–19; Teva Br. at 11–12. The author of each article is Dr. Mazess, who has a doctorate degree in anthropology, but does not have formal training in pharmacology. *Id.* Teva points out, however, that Dr. Mazess directed the Bone Mineral Laboratory at the University of Wisconsin, established bone densitometry as a diagnostic tool, founded the first manufacturer of bone densitometry measuring equipment (Lunar), was Lunar's first president, has participated in and designed clinical trials for

April 1996 article in *Lunar News* recommends weekly dosages of alendronate to improve patient compliance:

> [O]ne of the difficulties with alendronate is its low oral bioavailability. When taken with water in a fasting state, only about 0.8% of the oral dose is bioavailable. Even coffee or juice reduces this by 60%, and a meal reduces it by >85%. Alendronate must be taken, after an overnight fast, 30–60 minutes before breakfast. Subjects should remain seated or standing; a very small group of patients have reported some upper gastrointestinal distress if this is not done. This regime may be difficult for the elderly [to] maintain chronically. *An intermittent treatment program (for example, once per week, or one week every three months), with higher oral dosing, needs to be tested.*

*Update: Bisphosphonate, Lunar News,* Apr. 1996, at 31 (emphasis added).

The July 1996 *Lunar News* article further emphasizes the need for a once-weekly dose of Fosamax because "[s]ome United States physicians are reluctant to treat [patients with Fosamax] because of: a) side effects; b) difficulty of dosing; and c) high costs ($700/year)." The author suggests:

> The difficulties with oral bisphosphonates may favor their episodic (*once/week*) or cyclical (one week each month) administration. Even oral alendronate potentially could be given in a *40 or 80 mg dose once/week* to avoid dosing problems and reduce costs.[6]

*Update: Bisphosphonate, Lunar News,* July 1996, at 23 (emphasis added).

Regarding anticipation, the trial court held the July 1996 article does not "expressly or inherently disclose the dosage amounts for alendronate in claims 23 and 37" because there was no evidence that 40 mg and 80 mg of alendronate contains "the same number of alendronate core molecules" as found in 35 mg and 70 mg, respectively, of alendronic acid. *Merck,* 288 F.Supp.2d at 618–20.

As for obviousness, the district court concluded the suggestion of weekly treatment was not "clinically useful or obvious in July 1997 because of the known dose-related gastrointestinal side effects" associated with the daily formulation of Fosamax. *Merck,* 288 F.Supp.2d at 628. Although it is undisputed that a once-weekly dosage was known to be efficacious, the court determined that the *Lunar News* articles could not overcome doctors' concerns associated with higher dosages because the *Lunar News* articles were not published in peer-reviewed journals or authored by one skilled in the art. *Merck,* 288 F.Supp.2d at 628–29.

Finding the '329 patent not invalid as anticipated or obvious, the district court delayed the effective date of the FDA approval of Teva's ANDA until the '329 patent expires and enjoined commercial sale of Teva's generic treatment. *Final Judgment Order* at 1. This appeal followed. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

osteoporosis treatment, and is widely published in the bone disease field.

**6.** Teva argues that the 40 mg and 80 mg amounts were recommended because 40 mg tablets of alendronate monosodium trihydrate were commercially available for those who suffer from Paget's disease, a bone disorder that also responds to bisphosphonate treatment. The standard daily dose of Fosamax is

5 mg or 10 mg. Exact multiples of the standard daily dose corresponding to the amount of Fosamax administered in a week, i.e., 35 mg or 70 mg, were not commercially available at the time of the 1996 *Lunar News* articles. Thus, Teva argues, the 40 and 80 mg dosages should be viewed as teaching the '329 patent's seven-fold increase in daily dosages (5 and 10 mg), in terms of the 40 mg doses then-available on the market.

## II.  DISCUSSION

### A.  *Standard of Review*

**[1, 2]**  On appeal from a bench trial, this court reviews the district court's conclusions of law *de novo* and findings of fact for clear error.  *Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1058 (Fed.Cir.2004); *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1123 (Fed.Cir.2000).  A finding is clearly erroneous when, despite some supporting evidence, "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

**[3–5]**  The court reviews claim construction, a question of law, *de novo*.  *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed.Cir.1998) (en banc).  Obviousness is a question of law based on underlying factual determinations.  *Richardson–Vicks, Inc. v. Upjohn Co.*, 122 F.3d 1476, 1479 (Fed.Cir.1997).  The court reviews an obviousness ruling *de novo*, but reviews the underlying factual findings for clear error.  *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *Golden Blount*, 365 F.3d at 1058.  The underlying factual determinations include (1) the scope and content of the prior art, (2) the level of ordinary skill in the art, (3) the differences between the claimed invention and the prior art, and (4) objective indicia of nonobviousness.  *Graham*, 383 U.S. at 17–18, 86 S.Ct. 684.

### B.  *Claim Construction*

In finding that Merck acted as its own lexicographer, the district court relied on the following passage from the specification:

Because of the mixed nomenclature currently in use by those or [sic] ordinary skill in the art, reference to a specific weight or percentage of bisphosphonate compound in the present invention is on an active weight basis unless otherwise indicated herein.  *For example the phrase "about 70 mg of bone resorption inhibiting bisphosphonate selected from the group consisting of alendronate, pharmaceutically acceptable salts thereof and mixtures thereof, on an alendronic acid weight basis" means that the amount of bisphosphonate compound selected is calculated based on 70 mg of alendronic acid.*

'329 patent, col. 10, l. 65—col. 11, l. 8 (emphasis added).  According to the district court's opinion, the patentee uses the phrase "about 35 [or 70] mg" to account for variations in the molecular weight of the different derivatives of alendronic acid and to deliver *exactly* 35 (or 70) mg of alendronic acid.  *Merck*, 288 F.Supp.2d at 613.  For example, the court noted that alendronate monosodium trihydrate, which is used in Fosamax, requires an atom of sodium for each molecule.  *Id.* at 613–14.  If a heavier metal were chosen, such as potassium, the weight of the derivative compound would have to increase to deliver exactly the same number of molecules of the active alendronate compound found in 35 [or 70] mg of alendronic acid.  *Id.* at 614.  The district court thus construed the term "about 35 [or 70] mg" to mean the amount of the derivative compound that gives *exactly* 35 [or 70] mg of the active compound.

**[6–9]**  We reverse the district court's construction of "about" and hold that such term should be given its ordinary meaning of "approximately."[7]  To properly con-

---

7.  The dissent frames the dispute in terms of the entire phrase "about 70[35] mg of alen-

dronate monosodium trihydrate, on an alendronic acid basis." Post at 2:22–3:2. Not-

strue a claim term, a court first considers the intrinsic evidence, starting with the language of the claims. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996). Generally claim terms should be construed consistently with their ordinary and customary meanings, as determined by those of ordinary skill in the art. *Brookhill–Wilk 1, LLC v. Intuitive Surgical, Inc.,* 334 F.3d 1294, 1298 (Fed. Cir.2003). While in some cases there is a presumption that favors the ordinary meaning of a term, *Tex. Digital Sys. v. Telegenix Inc.,* 308 F.3d 1193, 1202 (Fed. Cir.2002), the court must first examine the specification to determine whether the patentee acted as his own lexicographer of a term that already has an ordinary meaning to a person of skill in the art. *See, e.g., Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1250 (Fed.Cir.1998); *Brookhill–Wilk,* 334 F.3d at 1299.

[10] When a patentee acts as his own lexicographer in redefining the meaning of particular claim terms away from their ordinary meaning, he must clearly express that intent in the written description. *See, e.g., Bell Atl. Network Servs. v. Covad Communications Group, Inc.,* 262 F.3d 1258, 1268 (Fed.Cir.2001). We have re-

peatedly emphasized that the statement in the specification must have sufficient clarity to put one reasonably skilled in the art on notice that the inventor intended to redefine the claim term. *Id.; see also Elekta Instrument S.A. v. O.U.R. Sci. Int'l, Inc.,* 214 F.3d 1302, 1307 (Fed.Cir. 2000) ("Absent an express intent to impart a novel meaning, claim terms take on their ordinary meaning."); *Renishaw,* 158 F.3d at 1249 ("The patentee's lexicography must, of course, appear 'with reasonable clarity, deliberateness, and precision' before it can affect the claim.") (quoting *In re Paulsen,* 30 F.3d 1475, 1480 (Fed.Cir. 1994)); *Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.,* 308 F.3d 1167, 1177–78 (Fed.Cir.2002) (stating that the "presumption in favor of the claim term's ordinary meaning is overcome, however, if a different meaning is clearly and deliberately set forth in the intrinsic evidence"). In the present case, the passage cited by the district court from the specification for Merck's definition of "about" is ambiguous. It fails to redefine "about" to mean "exactly" in clear enough terms to justify such a counterintuitive definition of "about."

The phrase's ambiguity arises from the fact that it can easily be read as Teva

---

withstanding this contention, the district court identified the "disputed claim terms" as "about 70 / 35 mg." *Merck,* 288 F.Supp.2d at 616. In its brief to this court, Merck likewise stated the issue as whether the district court properly construed the aforementioned limitation (not disputed term) on grounds that the '329 patent expressly defined "about 70 mg" as calculated "based on 70 mg of alendronic acid." *See* Appellee Br. at 3 (statement of issues). We agree with Merck, and the district court, that the dispute concerns the proper meaning of "about." We thus understand the dissent to argue that meaning is fixed by the context of the claim and the language of the written description.

It is correct to look first to those sources for the meaning at issue. *See Vitronics,* 90 F.3d at 1582. However, as is noted above when

the intrinsic evidence does not clearly establish its own lexicography, it is proper to determine the ordinary meaning of the term. For that reason we ascribe "about" its ordinary meaning here.

Moreover, the dissent pursues a philosophical argument as to the deference which should be given to the trial court. Claim construction being a legal matter it is reviewed *de novo* and this is still the law notwithstanding the desire of some members of this court to consider creating an exception to that rule. *See Cybor,* 138 F.3d at 1462–63 (Plager, J., concurring); *id.* at 1463–66 (Mayer, C.J., concurring in judgment); *id.* at 1473–75 (Rader, J., dissenting). Therefore, if we apply proper legal precedent as the majority has done in this case, the result is clear and obvious.

does—as a way of explaining what is meant by the use of the phrase "alendronate acid active basis" rather than as a way of radically redefining what is meant by "about." The district court construed the phrase "about 70 [or 35] mg" to mean that one should administer approximately 70 (or 35) mg of the *derivative compound*, such that the end result is that the patient is administered exactly 70 (or 35) mg of alendronic acid. In other words, the district court determined that the quantity specified in the claims (35 or 70 mg) modifies the amount of the *derivative compound* rather than the *active compound*. Under such a construction, the term "about" informs one of ordinary skill in the art to select whatever quantity of the derivative compound necessary to give exactly 35 (or 70) mg of alendronic acid; for alendronate monosodium trihydrate, the word "about" thus meant that 45.68 mg (or 91.35 mg) of that compound should be delivered—the amount necessary to give exactly 35 (or 70) mg of alendronic acid.

Unlike the limiting definition of "about" adopted by the district court, Teva's interpretation of the paragraph in question would mean that "70 [or 35] mg" refers to the amount of the *active compound* to be administered rather than the amount of the derivative compound. The term "about" in the claims would then serve to modify the quantity of the *active compound* in a way consistent with its normal definition of "approximately." Under this construction, the modifying phrase "about 70 [or 35] mg" would refer to approximately 70 (or 35) mg of *alendronic acid.*[8]

The claim construction urged by Merck and adopted by the district court reads the

sentence of the passage underlined above out of context. In the sentence before the highlighted sentence, the patentee informs those of ordinary skill in the art that, when the patent refers to a certain amount of a bisphosphonate compound, it is actually instructing them to administer a certain amount of the active component of the compound rather than the compound itself, i.e., that one should calculate the amount dispensed on an "active weight basis." This preceding sentence thus acts to specify a common denominator to be used for all derivatives of alendronic acid. The underlined sentence merely gives a specific example—that of an alendronate derivative—to show what is meant by using the phrase "active weight basis."

Given that the passage that Merck relies on is amenable to a second (and more reasonable) interpretation, we hold Merck did not clearly set out its own definition of "about" with "reasonable clarity, deliberateness, and precision," and thus failed to act as its own lexicographer. *In re Paulsen,* 30 F.3d at 1480.

As further support for this conclusion, we note that other parts of the specification also suggest that "about" should be given its ordinary meaning of "approximately." The specification repeatedly describes a range of acceptable dosage amounts, with the patentee emphasizing that unit dosages will vary. For example, the specification suggests that a once-weekly dosage amount could contain anywhere from *about* 17.5 mg to *about* 70 mg of any alendronate compound on an alendronate acid active basis, with *about* 35 mg and *about* 70 mg being only two examples of a unit dosage:

---

8. Merck argues that the district court's construction is supported by the fact that "about" was not used twice in the underlined sentence cited by Merck, i.e., that the specification does not state that "the amount of bisphosphonate compound selected is cal-

culated based on *about* 70 mg of alendronic acid." (emphasis added). While Merck's grammatical savvy is noted, we believe that the omission of a second "about" is likely an inadvertent error rather than the product of meticulous drafting.

For once-weekly dosing, an oral unit dosage comprises from *about 17.5 mg to about 70 mg of the alendronate compound, on an alendronic acid active weight basis. Examples* of weekly oral dosages include a unit dosage which is useful for osteoporosis prevention comprising about 35 mg of the alendronate compound, and a unit dosage which is useful for treating osteoporosis comprising about 70 mg of the alendronate compound.

'329 patent, col. 12, ll. 56–63 (emphasis added). In addition to the above passage, at another point in the specification the range for the normal unit dosage is further widened to "about 8.75 to about 140 mg." '329 patent, col. 12, ll. 52–55 (stating that "a unit dosage typically comprises from about 8.75 mg to about 140 mg of an alendronate compound on an alendronic acid active weight basis"). The specification thus suggests the patentee contemplated a range of dosages, further compromising Merck's proposition that it acted as its own lexicographer in defining "about" to mean "exactly." [9]

[11] Finally, our construction of "about" eliminates the problem pointed out by Teva that the district court's construction of the term "about" renders other parts of the claim superfluous. As Teva notes, the specification uses both the term "about" and "on an alendronic acid basis" at least 15 times to describe a dosage strength. If, as Merck urges, "about 35 [or 70] mg" means exactly 35 (or 70) mg of alendronic acid, then the oft-repeated phrase "on an alendronic acid active basis" would be unnecessary since such an understanding would be clear simply by using the term "about." A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so. *Elekta,* 214 F.3d at 1307 (construing claim to avoid rendering the 30 degree claim limitation superfluous); *Gen. Am. Transp. Corp. v. Cryo–Trans, Inc.,* 93 F.3d 766, 770 (Fed.Cir.1996) (rejecting the district court's claim construction because it rendered superfluous the claim requirement for openings adjacent to the end walls). By construing "about" to mean its accepted and ordinary meaning of "approximately," the phrase "alendronic acid basis" is no longer excess verbiage, but is instead necessary because it is the noun that "about 35 [or 70] mg" modifies.

Because the patentee did not clearly redefine "about" in the specification, and because the district court construed the claim term in a manner inconsistent with the specification, we reverse the district court's claim construction. We thus hold that the term "about" should be given its ordinary and accepted meaning of "approximately."

### C. *Invalidity*

In light of the corrected claim construction we find reversible error in the district court's obviousness analysis. A patent claim is invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a) (2000). The ultimate issue of obviousness turns on four factual determinations: (1) the scope and content of the prior art, (2) the level of ordinary skill in the art, (3) the differences between the claimed invention and the prior art, and (4)

---

**9.** We also note that Examples 7 and 8 in the '329 patent do not contradict the construction we adopt on appeal because they are only examples of the tablets that could be prepared according to the patent. Neither example clearly states that the only embodiment of the claims would be the exact formulations described therein.

objective indicia of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). As explained below, we find clear error in the trial court's findings on these underlying facts.[10] On reviewing these factual bases, we conclude the district court also erred in refusing to invalidate claims 23 and 37 for obviousness in view of the 1996 *Lunar News* articles.

[12] The central issue concerns the differences between the aspects of the invention claimed at claims 23 and 37, and the teachings of the *Lunar News* articles. As the district court necessarily recognized, there are more similarities than differences. These claims, and the July 1996 article, both teach administering alendronate once a week instead of once a day. These claims read in light of the specification, and the July 1996 article, both indicate—and it has been conceded as known in the art at the time [11]—that for treating or preventing osteoporosis a once-weekly dosage at seven times the daily dose would be as effective as seven daily doses. The '329 patent, and both the April and July 1996 articles, explain the motivation for a once-weekly dose as increasing patient compliance, by making it easier to take the drug (and incur the inconvenience of the rigorous dosing regimen less frequently). Although the claims teach 70 or 35 mg doses rather than the 80 or 40 mg doses disclosed in the July 1996 article, Dr. Arthur C. Santora—one of the co-inventors on the '329 patent—admitted against Merck's interest that a once-weekly 40 mg dose would be as effective as seven daily 5 mg doses, and a once-weekly 80 mg dose would be as effective as seven daily 10 mg doses, in preventing or treating osteoporosis. There was no great leap required of

those skilled in the art to go from 40 or 80 mg once a week, the pills available at the time to treat patients with Paget's disease, to a 35 or 70 mg pill once a week. The district court's conclusion that the claims are not obvious cannot rest on any of these similarities between the claimed invention and the two *Lunar News* articles.

The district court distinguished the two *Lunar News* articles on grounds that they failed to explain how the once-weekly dosing overcame concerns in the art with adverse GI side effects. *Merck*, 288 F.Supp.2d at 628–29. We are left with the firm conviction that this distinction is misplaced. As noted, the district court found those in the art had identified two types of adverse GI problems with alendronate. The first, and most significant, involved esophageal injury or repetitive irritation of the esophagus. The district court, reviewing the October 1996 article by DeGroen in the *New England Journal of Medicine*, expressly recognized the literature taught that complications related to alendronate were due to "prolonged contact of the drug with the esophagus." *Merck*, 288 F.Supp.2d at 627. Confronted with this problem, Merck revised its dosing instructions and sent the clarifying materials to prescribing physicians in a March 1996 "Dear Doctor" letter. After Merck sent this letter, the reported incidence of GI distress fell to almost nothing even as the number of patients being prescribed Fosamax doubled by October 1996. Although the '329 patent focuses on this adverse GI side-effect, it provides no additional motivation to overcome this problem beyond the motivation described in the two articles. The '329 patent, both articles, and the prevailing knowledge of those skilled

---

10. It makes no difference to this conclusion whether the court begins with the claim construction set forth by the panel or the dissent. In either case, the district court erred in find-

ing the '329 patent was not invalid as obvious in view of the *Lunar News* articles.

11. *See Merck*, 288 F.Supp.2d at 624.

in the art, recognized that to the extent "dosing problems" were related to repetitive irritation of the esophagus (from patients getting pills stuck in their throats), taking fewer pills each week could reduce the attending GI problems.[12] Thus, the district court clearly erred in finding any significant difference between the claimed invention and the two articles as to this type of GI problem.

The district court found a second adverse GI side-effect related to the size of the dose, which Merck argued gave rise to "the expectation by physicians in the field during 1996–1997 that alendronate sodium at doses over 20 mg would not be well-tolerated in the prevention and treatment of osteoporosis." *Merck*, 288 F.Supp.2d at 624; *see also id.* at 622–23, 627–30 (discussing Chesnut study). Neither the '329 patent nor the *Lunar News* articles explain how a higher once-weekly dosing regimen would avoid this set of dose-related adverse side effects. The '329 patent sets forth no human clinical or laboratory data showing the safety and tolerability of the treatment methods claimed by the patent. The only data provided in the '329 patent was generated in beagles, an experiment discredited at trial and disregarded by the district court in its decision. So while the district court may be correct in finding *Lunar News* articles may have invited skepticism based on concerns for dose-related GI problems, the claimed invention adds nothing beyond the teachings of those articles. Thus, the district court

clearly erred in finding any difference between the claimed invention and the articles on this point.

The district court's only remaining distinction between the claimed invention and the two *Lunar News* articles goes to the probative value of the articles. The trial court wrote that it "[was] not persuaded that the two *Lunar News* articles, not published in peer-reviewed journals or authored by one skilled in the art, either alone or in combination, overcame the serious side effect concerns associated with higher dosage units of alendronate sodium." *Merck*, 288 F.Supp.2d at 629. Although these indicia of reliability—whether a study is peer-reviewed, and the credentials of the author—properly go to weight when the trial court has not excluded evidence as unreliable and irrelevant, the district court's reliance on these factors to distinguish Merck's claimed invention is, again, misplaced. First, as noted above, these factors provide no relevant distinction between the articles and the claimed invention because the '329 patent also fails to explain how its higher dosing would overcome these dose-related side-effects. Second, as explained below the district court's finding the author of the *Lunar News* articles not skilled in the relevant art is inconsistent with the court's own definition of the relevant art. Thus, the extent to which the district court discounts the probative value of the two articles based on the credentials of the author calls for closer scrutiny and

---

12.  As the '329 patent states:

[I]t is found that the administration of a biphosphonate at a high relative dosage at a low relative dosing frequency causes less adverse gastrointestinal effects, *particularly esophageal effects*, compared to the administration of a low relative dosage at a high relative dosing frequency. . . . Such administration methods of the present invention would be especially beneficial in treating patients that have been identified as suffer-

ing from or are susceptible to upper gastrointestinal disorders, e.g., gastrointestinal reflux disease (i.e.''GERD''), esophagitis, dyspepsia (i.e. heartburn), ulcers, and other related disorders. In such patients conventional bisphosphonate therapy could potentially exacerbate or induce such upper gastrointestinal disorders.

'329 patent, col. 3, l. 57—col. 4, l. 13 (emphasis added).

casts doubt on the findings that depend on this reasoning.

In short, the district court clearly erred in distinguishing the claimed invention from the two *Lunar News* articles offered as section 103 prior art. Contrary to the district court's findings, these articles support the conclusion that Merck's claims 23 and 37 are invalid as obvious.

For similar reasons we find the district court's characterization of the scope and content of the prior art favors invalidating claims 23 and 37 as obvious. The district court described its larger task as identifying "a showing of the teaching or motivation to combine prior art references." *Merck*, 288 F.Supp.2d at 625 (quoting *In re Gartside*, 203 F.3d 1305, 1319 (Fed.Cir. 2000)). But as shown above, in this case the *Lunar News* articles contain the relevant teaching of the weekly dosing claimed in the '329 patent. The "specific combination" of elements in claims 23 and 37 differs from the disclosure in the *Lunar News* articles only in terms of a minor difference in the dosage; without this difference, the *Lunar News* articles would anticipate claims 23 and 37 under section 102. For the *Lunar News* articles to render claims 23 and 37 obvious, the district court need only have found a suggestion or motivation to modify the dosages from those in the articles to those in the claims. *See, e.g., SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1356 (Fed.Cir.2000). But as noted above, Merck's own inventors admit the difference in dosing amount is obvious. If anything, concern over dosing amount suggests lowering the weekly dosage—from 80 to 70 mg, and from 40 to 35 mg, just as Merck did. The district court thus clearly

erred to the extent it found lacking any motivation to combine existing knowledge with the *Lunar News* articles to reach the claimed invention.

The district court failed to ascertain the required motivation to combine references to achieve the claimed invention, and it ignored the plain teachings of the *Lunar News* articles. As the court stated, "the issue is when viewing the mosaic of prior art, whether those of ordinary skill in the art would have had the motivation to formulate a once-weekly seven-fold daily dose of alendronate, despite safety concerns." *Merck*, 288 F.Supp.2d at 626.

The *Lunar News* articles had clearly suggested the once-weekly dosing. They did so, as noted above, and as described in the '329 patent, to avoid or minimize problems related to dosing frequency. And as shown above, the district court itself found this particular set of problems were of greatest concern in the art. Indeed, to the extent the district court finds Merck's weekly-dosing idea non-obvious because it went against prevailing wisdom, the court must still explain why Merck and not Dr. Mazess should get credit for the idea. Because Merck's idea added nothing to what came before, the district court's answer comes down to nothing more than the credentials of the authors. In this case that difference is not enough to avoid invalidating the claims.[13]

The district court answered its own question incorrectly, because its analysis of the prior art fails to credit its own distinction between the "safety concerns" from dosing frequency and dosing amount. As noted above, the claimed invention does not address the problems with the dosing

---

**13.** Although the court is unsure whether an obviousness ruling can ever turn solely on the credentials of the inventors and prior art authors, where the prior art has been admitted, it need not decide that question here. As

noted below, by the district court's own functional definition (if not its actual finding) Dr. Mazess was one of skill in the art, and the *Lunar News* was widely circulated in the field.

**1376**    **395 FEDERAL REPORTER, 3d SERIES**

amount, but only the more widespread problems of the dosing frequency. The court's review of the scope and content of the prior art itself focuses on this concern with "prolonged contact of the drug with the esophagus." *Merck*, 288 F.Supp.2d at 627. This understanding of the prior art does not support a conclusion that the claimed invention as a whole was non-obvious in view of the prior art. *See Para–Ordnance Mfg. v. SGS Importers Int'l Inc.*, 73 F.3d 1085, 1087 (Fed.Cir. 1995); *In re Kaslow*, 707 F.2d 1366, 1374 (Fed.Cir.1983). Insofar as the district court relied on safety concerns related to dosing frequency, the prior art favors the conclusion that taking pills once a week was obvious.

Thus, the scope and content of the prior art confirms that the invention claimed in claims 23 and 37 would have been obvious in view of the *Lunar News* articles. To the extent the district court interpreted the scope of the prior art otherwise, that was clear error.

We likewise find clear error in the district court's conclusion that Dr. Mazess was not skilled in the relevant art. The district court failed to credit the evidence showing Mazess's *Lunar News* was widely distributed among those working in the field of osteoporosis. Moreover, while we recognize the importance academic or professional training plays in establishing expert qualifications or the probative value of a section 103 reference, we think the district court failed to give proper credit to the fact that Dr. Mazess was an expert in osteoporosis. In focusing on Dr. Mazess's academic training, the district court ignored its own finding that one of skill in the art would be someone "working in the field of, or doing research on, osteoporosis." Thus, the district court erred in dismissing or minimizing the probative value of the *Lunar News* articles.

Finally, the district court erred in its weighing of secondary considerations of non-obviousness. Although the district court correctly found Merck's once-weekly dosing of Fosamax was commercially successful, in this context that fact has minimal probative value on the issue of obviousness. *Merck*, 288 F.Supp.2d at 629–30. Commercial success is relevant because the law presumes an idea would successfully have been brought to market sooner, in response to market forces, had the idea been obvious to persons skilled in the art. Thus, the law deems evidence of (1) commercial success, and (2) some causal relation or "nexus" between an invention and commercial success of a product embodying that invention, probative of whether an invention was non-obvious. *See Graham*, 383 U.S. at 17–18, 86 S.Ct. 684 ("Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy."); *McNeil–PPC, Inc. v. L. Perrigo Co.*, 337 F.3d 1362, 1370 (Fed.Cir. 2003).

**[13]**  That rationale has no force in this case. In *Graham* the Supreme Court relied on the reasoning from a law review note discussing commercial success. *See Graham*, 383 U.S. at 17–18, 86 S.Ct. 684, *citing* Note, *Subtests of "Nonobviousness": A Nontechnical Approach to Patent Validity.* 112 U. Pa. L.Rev. 1169, 1175 (1964). The article suggested "[t]he possibility of market success attendant upon the solution of an existing problem may induce innovators to attempt a solution. If in fact a product attains a high degree of commercial success, there is a basis for inferring that such attempts have been made and have failed." As our predecessor

court explained in *In re Fielder*, 471 F.2d 640, 644 (C.C.P.A.1973), "[t]hese rationales, presumably approved by the [Supreme] Court, tie commercial success and the like directly to the practical, financial source of impetus for research and development." But that chain of inferences fails on these facts. Although commercial success might generally support a conclusion that Merck's claimed invention was non-obvious in relation to what came before in the marketplace, the question at bar is narrower. It is whether the claimed invention is non-obvious in relation to the ideas set forth in the *Lunar News* articles. Financial success is not significantly probative of that question in this case because others were legally barred from commercially testing the *Lunar News* ideas. Dr. Mazess, for example, could not put his ideas to practice in 1996—he could only exhort Merck to try it. They did.

In this case Merck had a right to exclude others from practicing the weekly-dosing of alendronate specified in claims 23 and 37, given (1) another patent covering the administration of alendronate sodium to treat osteoporosis, U.S. Pat. No. 4,621,077 (issued Nov. 4, 1986); and (2) its exclusive statutory right, in conjunction with FDA marketing approvals, to offer Fosamax at any dosage for the next five years. 21 U.S.C. § 355(c)(3)(D)(ii) (2000). Because market entry by others was precluded on those bases, the inference of non-obviousness of weekly-dosing, from evidence of commercial success, is weak. Although commercial success may have probative value for finding non-obviousness of Merck's weekly-dosing regimen in some context, it is not enough to show the claims at bar are patentably distinct from the weekly-dosing ideas in the *Lunar News* articles. Thus, we conclude the district court misjudged this factor as confirming its conclusion of non-obviousness.

In short, we find the relevant *Graham* factors establish claims 23 and 37 of the '329 patent are obvious in view of the April 1996 and July 1996 *Lunar News* articles. Thus, we reverse the district court and hold claims 23 and 37 invalid.

## III. CONCLUSION

We reverse the district court's claim construction and hold that "about" should be construed consistently with its ordinary meaning of "approximately." In addition, we vacate the district court's determination that the '329 patent was not invalid as obvious. We hold claims 23 and 37 invalid as obvious and not infringed. The district court's judgment of infringement is therefore

REVERSED.

### COSTS

No costs.

RADER, Circuit Judge, dissenting.

This case shows the consequences of paying only lip service to the often-cited, but rarely-followed lexicographer rule and the basic jurisprudential principle of according trial courts proper deference.

### Elect the Lexicographer Option at Your Own Risk

With this court's claim constructions wavering between the plain meaning rule (often a subtle way for judges to impose their own semantic subjectivity on claim terms, *see, e.g., K–2 v. Salomon*, 191 F.3d 1356 (Fed.Cir.1999) ("permanent" affixation of the wheels to the skate boot in the context of in-line skates did not include a bolt that could only be reached by tearing apart the shoe)) and the "specification über alles" rule (often a way for judges to import limitations not included in the claim, *see, e.g., Phillips v. AWH Corp.*, 363 F.3d 1207,

**1378**          **395 FEDERAL REPORTER, 3d SERIES**

1213–14 (Fed.Cir.2004), *vacated, reh'g en banc granted,* 376 F.3d 1382 (Fed.Cir. July 21, 2004)), a patent applicant might suppose that the best option to define the scope of the claim language might be the lexicographer rule. Under the lexicographer rule, an inventor acts as an independent lexicographer and can even give claim terms a meaning "inconsistent with its ordinary meaning." *Boehringer Ingelheim Vetmedica, Inc. v. Schering–Plough Corp.,* 320 F.3d 1339, 1347 (Fed.Cir.2003) (citing *Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1325–26 (Fed.Cir.2002)); *see also Teleflex,* 299 F.3d at 1325 ("[A]n inventor may choose to be his own lexicographer if he defines the specific terms used to describe the invention 'with reasonable clarity, deliberateness, and precision.'" (quoting *In re Paulsen,* 30 F.3d 1475, 1480 (Fed.Cir.1994))). Indeed, this court often acknowledges that an applicant, acting as a lexicographer, may define "black" as "white." *See Hormone Research Found., Inc. v. Genentech, Inc.,* 904 F.2d 1558, 1563 (Fed.Cir.1990) ("It is a well-established axiom in patent law that a patentee is free to be his or her own lexicographer and thus may use terms in a manner contrary to or inconsistent with one or more of their ordinary meanings."); *see also, e.g., Int'l Rectifier Corp. v. IXYS Corp.,* 361 F.3d 1363, 1373 (Fed.Cir.2004) (patentee defining "annular," which ordinarily means in the shape of a ring, to describe structures that are not circular or curved, but polygonal). In this case, the patentee used the lexicographer rule to define a lengthy phrase. In its definition, the patentee defined the phrase with precise values. The patentee's definition, however, fell five letters short of success because the phrase included the word "about." This court seized on that word, gave it an ordinary meaning, and cast aside the lexicographer rule without a convincing explanation. Moreover, this court overturned the result of a lengthy district court trial

for the sole reason that the trial court applied this court's lexicographer rule. I find it hard to explain to the district court how it erred by following this court's rules.

The disputed term in claim 23 of the '329 patent is the phrase "about 70 mg of alendronate monosodium trihydrate, on an alendronic acid basis." Similarly, the disputed term in claim 37 is the phrase "about 35 mg of alendronate monosodium trihydrate, on an alendronic acid basis." Teva contends that this court should parse out one word in that phrase, "about," and accord that single word its ordinary meaning of "approximately." Merck, on the other hand, contends that the term "about" is inseparable from the entire phrase, which it defines under the lexicographer rule to account for the variability in the active ingredient weight that would result from the use of a salt of alendronic acid.

The specification shows the proper interpretation of the disputed phrase. *See Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996) ("The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication."). In the specification of the '329 patent, the patentee exercised the lexicographer option and defined the disputed phrase as follows:

> Because of the mixed nomenclature currently in use by those o[f] ordinary skill in the art, reference to a specific weight or percentage of a bisphosphonate compound in the present invention is on an acid active weight basis, unless otherwise indicated herein. For example, the phrase "about 70 mg of a bone resorption inhibiting bisphosphonate selected from the group consisting of alendronate, pharmaceutically acceptable salts thereof, and mixtures thereof, on an alendronic acid active weight basis" means that the amount of the bisphosphonate

compound selected is calculated based on 70 mg of alendronic acid.

'329 patent, col. 10, l. 65—col. 11, l. 8.

In a passage that classically invokes this court's lexicographer doctrine, the patentee clearly, deliberately, and precisely defined the phrase "about 70 mg of a bone resorption inhibiting bisphosphonate selected from the group consisting of alendronate, pharmaceutically acceptable salts thereof, and mixtures thereof, on an alendronic acid active weight basis." The patentee set forth that entire term with quotations, including the word "about" and then stated unambiguously that the "*phrase . . . means* that the amount of the bisphosphonate compound selected is calculated based on 70 mg of alendronic acid." '329 patent, col. 11, ll. 2—8 (emphases added). The choice of the words "phrase" and "means," combined with the use of quotation marks to set the phrase off from the rest of the sentence, unmistakably notify a reader of the patent that the patentee exercised the option to define the entire phrase without respect to its ordinary meaning as understood by one of ordinary skill in the art at the time of the invention. *See Multiform Desiccants, Inc. v. Medzam Ltd.*, 133 F.3d 1473, 1477 (Fed.Cir.1998).

To underscore the choice to define the phrase as a lexicographer, the patentee explains the reason that this phrase needs definition—"[b]ecause of the mixed nomenclature currently in use by those o[f] ordinary skill in the art." '329 patent, col. 10, ll. 65–66. Therefore, even a casual reader, let alone one with skill in this art, would immediately recognize that the patentee intended to avoid any ambiguity inherent in "mixed nomenclature" by explicitly defining the entire phrase. *See Paulsen*, 30 F.3d at 1480 (" 'Where an inventor chooses to be his own lexicographer and to give terms uncommon meanings, he must set out his uncommon definition in some man-

ner within the patent disclosure' so as to give one of ordinary skill in the art notice of the change." (quoting *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed.Cir.1992))).

The language of this definition explains further the scientific reason that an express definition is necessary. Alendronate monosodium trihydrate is a bisphosphonate selected from the group consisting of alendronic acid, pharmaceutically acceptable salts thereof, and mixtures thereof. A salt or a mixture may require a different weight to achieve the same number of bisphosphonate molecules present in 70 mg of alendronate.

The patentee did not leave this difference vague, however, but instructed that the precise dose in claim 23—"about 70 mg of alendronate monosodium trihydrate, on an alendronic acid basis"—means that the amount of alendronate monosodium trihydrate is calculated based on 70 mg of alendronic acid. Similarly, the disputed language of claim 37—"about 35 mg of alendronate monosodium trihydrate, on an alendronic acid basis"—means that the amount of alendronate monosodium trihydrate is calculated based on 35 mg of alendronic acid. The word "about" in the defined phrase takes into account the variability of the weight of the active ingredient that would result from using different salts of alendronic acid in the tablets, instead of the acid itself. In other words, a heavier salt would require more by weight to achieve the same number of alendronate molecules. For example, *about* 70 mg of alendronate sodium, on an alendronic acid active basis, contains the same number of molecules of alendronate as 70 mg of alendronic acid, regardless of the actual weight of the alendronate sodium in the tablet.

With respect to the word "about," the patentee included that word in the entire

phrase expressly defined in the specification and set off by quotation marks. Therefore, this court cannot, without disturbing the patentee's express definition of the entire phrase, abstract that term out of its context and supply an ordinary meaning. Thus, by abstracting "about" out of the patentee's express definition, this court's opinion defeats the patentee's choice of words, punctuation, and phraseology and instead extracts a single word from its context in the phrase. Accordingly, the majority rewrites the express definition either by moving the word "about" outside of the quotation marks of the defined phrase or by inserting the word "about" into the definitional portion of the sentence so that it would read "the amount of the bisphosphonate compound is calculated based on *about* 70 mg of alendronic acid." If the patentee had chosen either of those two phraseologies, the majority opinion might be correct in its analysis. But because the patentee did not, this court cannot give any principled reason that the district court erred in applying the lexicographer rule. Contrary to this court's rules, this opinion rewrites the specification and substitutes language not chosen by the patentee. *See, e.g., Chef Am., Inc. v. Lamb Weston, Inc.,* 358 F.3d 1371, 1374 (Fed.Cir.2004) (repeating the well-established rule that "courts may not redraft claims").

Throughout the patent, the applicant remained faithful to the disputed phrases in claims 23 and 37 consistent with the specified lexicography, thus completely dispelling any notion of ambiguity in the term "about." In particular, Examples 7 and 8 corroborate the express definition. Example 7 states that "[t]ablets containing about 35 mg of alendronate, on an alendronic acid active basis, are prepared using the following weights of ingredients" and lists alendronate monosodium trihydrate requiring a mass of 45.68 mg. *See* '329 patent, col. 19, ll. 14—21. Similarly, example 8 states that "[a] liquid formulation containing about 70 mg of alendronate monosodium trihydrate, on an alendronic acid active basis, per about 75 mL of liquid is prepared using the following weights of ingredients" and lists alendronate monosodium trihydrate having a mass of 91.35 mg. *Id.* at col. 19, ll. 44—52. In these examples, the applicant supplied an exact weight that equates with "about 70 mg of alendronate . . . on an alendronic acid active basis." Accordingly, the district court did not err in construing "the disputed claim terms 'about 70/35 mg' to mean the equivalent of 70/35 mg of alendronic acid when taking into account molecular weight variances for its derivatives that carry accessories." *Merck*, 288 F.Supp.2d at 616. The district court followed this court's rules.

### Deference to Trial Courts: Time for "Truth in Advertising?"

This is the classic "close case," so close in fact that ultimately two federal judges (one of whom conducted an entire bench trial on this issue) and the United States Patent and Trademark Office agreed with Merck & Co., and two federal judges agreed with Teva Pharmaceuticals. The United States District Court of Delaware tried this case from March 4—7, 2003, then issued a 75–page opinion analyzing the claims and arguments in consummate and accurate detail. *Merck & Co. v. Teva Pharms. USA, Inc.,* 288 F.Supp.2d 601 (D.Del.2003). This court received the typical briefs from the parties, an appendix containing selected portions of the record, and heard a total of approximately thirty minutes of argument by the parties on the issues before this court. Despite the district court's superior tools and time to evaluate the complete record, to hear and inquire from expert and fact witnesses, to delve into countless related details, to probe the scientific and semantic context, and to entertain argument as

long as necessary for clarity, this court with its reading three briefs before its half-hour hearing becomes enamored with its own analysis of a very close issue and reverses the district court.

This court often hears criticism from district court judges that its reversal rate on claim construction issues far exceeds that of other circuit courts. *See, e.g.,* Symposium, *The Law, Technology and the Future of the Federal Circuit: A Panel Discussion: Claim Construction from the Perspective of the District Judge,* 54 Case W. Res. L.Rev. 671 (2003) (*Symposium I* ) (district judges discussing problems with this court's high reversal rate on claim construction issues); *see* Gregory J. Wallace, Note, *Toward Certainty and Uniformity in Patent Infringement Cases after Festo and Markman: A Proposal for a Specialized Patent Trial Court with a Rule of Greater Deference,* 77 S. Cal. L.Rev. 1383, 1391 (2004) (discussing various studies regarding this court's reversal rate on claim construction issues). In response, nearly every judge on this court has publicly professed to accord some level of deference to district courts regardless of this court's *de novo* review of claim construction issues. *See, e.g., Symposium I* at 680 (a district court judge stating "I have certainly heard a number of federal circuit judges agree, that the CAFC gives some deference to a well-reasoned opinion,

as a practical matter"); Symposium, *The Past, Present and Future of the Federal Circuit: Judicial Constellations: Guiding Principles as Navigational Aids,* 54 Case W. Res. L.Rev. 757, 761 (2004) (judge of the Federal Circuit stating: "Review is really not *de novo* after all. It is unfortunate that there is no label in between *de novo* and clear error review. Functionally, claim construction falls in this middle ground."). Either the Federal Circuit accords deference in accordance with its public protestations or it does not in accordance with its legal standard barring any deference. If the former, this court has a "truth in advertising" problem. Its actual practice clashes with its professed legal duty. If the latter, this court has a different kind of "truth in advertising" problem.

In this case, this court eschews all deference, a particularly striking choice in the face of a very close case and a district court whose diligent and intelligent process and resolution earned more respect than it received. I am not entirely sure which aspect of the "truth in advertising" problem this case illustrates, but it certainly makes any protestations of deference in fact sound rather hollow.

