# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MERCK & CO., INC.,

              Plaintiff,

           v.

TEVA PHARMACEUTICALS USA, INC.,

              Defendant.

Civil Action No. 04-939 (GMS)

## DEFENDANT TEVA PHARMACEUTICALS USA, INC.'S OPPOSITION TO PLAINTIFF MERCK & CO., INC.'S MOTION TO REOPEN FACT AND EXPERT DISCOVERY AND OTHERWISE STAY THIS ACTION

June 16, 2006

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Josy W. Ingersoll (#1088)
Adam W. Poff (#3990)
The Brandywine Building
100 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600

*Attorneys for Defendant*
*Teva Pharmaceuticals USA, Inc.*

OF COUNSEL:

James Galbraith
Maria Luisa Palmese
A. Antony Pfeffer
**KENYON & KENYON LLP**
One Broadway
New York, NY 10004-1007
(212) 425-7200

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

SUMMARY OF THE ARGUMENT ................................................................... 1

STATEMENT OF FACTS .................................................................................. 2

I.    BACKGROUND ...................................................................................... 2

     A.    The Fosamax Once-Weekly Case ............................................... 2

     B.    The Risedronate Once-Weekly Case ........................................... 7

ARGUMENT ...................................................................................................... 9

I.    MERCK'S MOTION TO REOPEN DISCOVERY SHOULD BE
    DENIED .................................................................................................. 9

     A.    Merck Acquiesced in Teva USA's General Objection to Providing
         Discovery from Teva Ltd. ............................................................ 9

     B.    Merck Acquiesced in Teva USA's General Objection to Providing
         Discovery Not Related to U.S. Activities ................................... 13

     C.    Merck's Requests, Particularly in View of Teva USA's Objections
         to Which Merck Acquiesced, Did Not Encompass the Documents
         It Claims Were Concealed ......................................................... 14

     D.    Merck Knows and Has Known for Years that Both Teva USA and
         Teva Ltd. Have Relied on "Beagle Experiments" ................... 17

         1.    Teva Ltd.'s U.S. Patent No. 6,476,006, Merck's Trial Exhibit 301
             from the Once-Weekly Fosamax Case, Discloses the Same
             "Beagle Study" as the '685 Application ....................... 17

         2.    Teva USA and its Principal Trial Expert Relied on a Beagle Study
             in the Fosamax Once-Weekly Case ............................... 19

     E.    Teva USA's Contentions Are Not Inconsistent with the '685
         Application ................................................................................ 20

II.   MERCK'S MOTION FOR A STAY SHOULD BE DENIED ........................... 22

     A.    Merck's Bogus Rule 60(b) Complaint Does Not Justify a Stay .............. 22

     B.    Teva USA and the Public Will Be Prejudiced by a Stay .......................... 25

C.    Merck Will Not Be Prejudiced ................................................................. 25

CONCLUSION............................................................................................................ 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Clinchfield Railroad Co. v. Lynch,*
    700 F.2d 126 (4th Cir. 1983) ................................................................. 12

*Gleason v. Jandrucko,*
    860 F.2d 556 (2d Cir. 1988)................................................................. 23

*Herring v. United States,*
    424 F.3d 384 (3d Cir. 2005)................................................................. 23

*King v. First American Investigations, Inc.,*
    287 F.3d 91 (2d Cir. 2002)................................................................. 24

*Merck & Co. v. Teva Pharmaceuticals USA, Inc.,*
    288 F. Supp. 2d 601 (D. Del. 2003)................................................. 3, 5

*Merck & Co. v. Teva Pharmaceuticals USA, Inc.,*
    395 F.3d 1395 (Fed. Cir. 2005)............................................................ 6

*Penwalt Corp. v. Plough, Inc.,*
    85 F.R.D. 257 (D. Del. 1979) ............................................................ 11

**Statutes**

35 U.S.C. § 361.................................................................................... 13

**Rules**

Fed. R. Civ. P. 30(b)(6)........................................................................ 11

Fed. R. Civ. P. 60(b) ............................................................................ 22

## INTRODUCTION

Teva Pharmaceuticals USA, Inc. ("Teva USA") submits this brief in opposition to Merck & Co., Inc.'s ("Merck's") motion to reopen discovery and for a stay of proceedings. (D.I. 59.) As explained below, this motion has no merit and merely serves Merck's purpose of delaying this case.

## SUMMARY OF THE ARGUMENT

Essentially, Merck alleges that Teva USA "concealed" and did not produce in discovery a United States patent application that had been filed by Teva USA's parent company, Teva Pharmaceuticals Ltd. ("Teva Ltd."). This application, referred to as "the '685 application" (D.I. 61, Ex. F), describes a preclinical study that employed beagles as the test animal. According to Merck, the "revelation" that Teva Ltd. used beagles in one preclinical study is inconsistent with Teva USA's criticism of another entirely different type of study that was described in Merck's patents in suit in this case, and that happened to employ beagles.

Merck knows that the central premise of its motion is false: the '685 application is not a basis for any "revelation." Merck knows that it was not "concealed" and that it is not "inconsistent" with Teva USA's position in this case.

Moreover, at all relevant times Merck was well aware of another Teva Ltd. patent that described the same type of preclinical study employing the same methodology as the '685 application. Merck has had this document for years, yet neither it nor its experts ever mentioned the alleged inconsistency between Teva Ltd.'s use of beagles and Teva USA's criticism of Merck's beagle experiments.

Merck's purpose in bringing this motion is transparent: to delay the resolution of this case. Merck has an enormous economic interest in delaying the case as long as possible, since doing so accomplishes the dual purpose of keeping Teva USA out of the market and securing royalties under the patents in suit. Conversely, any delay potentially prevents Teva USA from marketing this valuable drug, and serves to deny to the public the benefits of the lower cost that generic competition would bring to the marketplace.

## STATEMENT OF FACTS

### I.    BACKGROUND

#### A.    The Fosamax Once-Weekly Case

Merck is the owner of a patent family that claims the once-weekly administration of certain members of a class of drugs called "bisphosphonates." The drugs referred to in Merck's patents are prescribed for the treatment of bone disease. All of them were known as effective at the time Merck applied for the patents, so that the only alleged novelty was the concept of administering the drugs on a less-frequently-than-daily basis, in particular once per week. One member of the family, U.S. Patent No. 5,994,329 ("the '329 patent") (D.I. 61, Ex. A), includes claims for the once-weekly administration of a drug called "alendronate" for the treatment and prevention of osteoporosis, a progressive and debilitating disease characterized by loss of bone mass and increased risk of fractures. Merck obtained the patent on November 30, 1999, based on an application filed in July 1997. The '329 patent protected Merck's once-weekly formulation of alendronate, which Merck has marketed as "Fosamax" since 2000.

In 2001, Teva USA supplemented an existing Abbreviated New Drug Application ("ANDA"). The supplement sought FDA approval to market Teva USA's generic

version of the once-weekly Fosamax formulation, and included a certification that the '329 patent was invalid. Merck thereupon sued Teva USA in this Court. *Merck & Co. v. Teva Pharmaceuticals USA, Inc.*, No. 01-048 (JJF). The complaint alleged that the use of Teva USA's proposed once-weekly alendronate product would infringe the '329 patent, and sought to enjoin Teva USA's marketing of that product.[1]

Teva USA defended primarily on the basis that the once-weekly administration of alendronate was anticipated by a prior art disclosure or would have been obvious in view of the prior art. Both parties' experts and all the inventors agreed that in 1997, persons skilled in the art would have understood that the claimed once-weekly regimen would be effective, and that it would have certain obvious advantages over the then-current once-daily formulation. To establish that this general understanding was published in the prior art, Teva USA relied on a publication called the *Lunar News*, which was a widely disseminated quarterly newsletter prepared by Dr. Richard Mazess, the president of a company called Lunar Corp., which manufactured equipment for measuring bone density. The evidence was undisputed that in July 1996, almost a year before Merck's invention date, a *Lunar News* article suggested the once-weekly dosing of bisphosphonates, specifically alendronate, for treatment of osteoporosis, and recommended the appropriate dosage strength. Thus, all the essentials of the claimed invention were disclosed in one place.

In the face of the prior art, Merck tried a novel attack. Conceding that the reference disclosed the essentials of the invention, Merck argued that it should

---

[1]    The procedural background is described in Judge Farnan's opinion. *Merck & Co. v. Teva Pharmaceuticals USA, Inc.*, 288 F. Supp. 2d 601 (D. Del. 2003), *rev'd*, 395 F.3d 1364 (Fed. Cir.), *cert. denied*, No. 05-236, 2005 U.S. LEXIS 7831 (Oct. 17 2005). (D.I. 61, Ex. T.)

nevertheless be disregarded because the *Lunar News* was not a "peer-reviewed" publication and because its author, Dr. Mazess, did not have an M.D. or a Ph.D. degree in precisely the "right" field. Merck claimed that because alendronate tablets were known occasionally to cause esophageal ulceration, increasing the dose from the daily level (10 mg) to the level necessary for once-weekly administration (70 mg) would have been counterintuitive to skilled medical practitioners. Thus, the suggestion from Dr. Mazess and his publication would have been insufficient to persuade skilled practitioners to follow his advice.

Teva USA's counter to that argument was two-fold: (1) it was legally irrelevant, and (2) it was factually wrong. The argument was irrelevant because whether a person skilled in the art would have been skeptical of the prior art has no bearing on the legal effect of that prior art. Thus, if the prior art teaches a patented invention, it is immaterial what the reaction of others would have been to it.

Teva USA also pointed out that the '329 patent itself did not include any clinical or other data showing any unexpected benefits of the once-weekly dose. The only experimental data in the patent was a report on a series of experiments on beagles in Example 1. These experiments involved anesthetizing beagles, bathing their immobilized esophagi in corrosive solutions of alendronate at various intervals, killing the dogs, dissecting their esophagi, and observing the damage caused by the solution.

At the trial of the action, Merck's witnesses made very little of these dog studies. Its principal expert, Dr. Socrates Papapoulos, never mentioned them in his testimony.

(Ex. A hereto at 627-711.)[2]  Merck's esophageal expert, Dr. Fennerty, conceded that nothing in the studies was "directly relevant" to human experience.  (*Id.* at 314.)  Even the author of the study, Merck veterinarian Dr. Peter, admitted that the study did not have "any bearing whatsoever on the clinical situation in which people take alendronate sodium."  (*Id.* at 210.)  Merck's post-trial brief did not mention the studies, and its post-trial findings of fact referred to them only as providing the inspiration to the Merck inventors, but did not suggest that they had any independent relevance to the issues in the case.  The district court made little of the dog studies; Judge Farnan's opinion mentions them only in passing:  "Merck also undertook internal studies to understand the problem, including dog studies."  288 F. Supp. 2d at 624.

Although Judge Farnan did not rely on the Merck dog experiments, he did accept Merck's argument that doctors would have been skeptical of the *Lunar News* article and would not have been inclined to follow its lead.  (*Id.* at 629.)  In view of that skepticism, he held that the claimed invention would not have been obvious.

On appeal, although Teva USA asked the court to overturn certain factual findings, its principal argument was not that Judge Farnan got the skepticism facts wrong, but instead that this skepticism was legally irrelevant.  That is, even accepting Judge Farnan's factual finding that doctors would have been skeptical of the *Lunar News*, the claims were invalid.  Teva USA argued that no legal basis exists for disregarding prior art merely because it would invite skepticism.  Indeed, some of the greatest innovations in history have been made by people with the "wrong" backgrounds, and were consequently

---

[2]     Portions of the trial transcript for the once-weekly Fosamax case are collected as Exhibit A.

greeted with initial skepticism.[3]  Thus, adding a prestigious and credible name to an old

concept does not make it patentable.

> The Federal Circuit accepted Teva USA's argument.  As it succinctly stated:

> Indeed, to the extent the district court finds Merck's weekly-dosing idea
> non-obvious because it went against prevailing wisdom, the court still
> must explain why Merck and not Dr. Mazess should get credit for the idea.
> Because Merck's idea added nothing to what came before, the district
> court's answer comes down to nothing more than the credentials of the
> authors.  In this case that difference is not enough to avoid invalidating the
> claims.

*Merck & Co. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1395, 1375 (Fed. Cir. 2005).

In passing, the court mentioned what Merck conceded:  the patent contains no human,

animal or clinical data demonstrating the effectiveness of the claimed regimen.  It thus

adds nothing to the art that was not already set forth in the *Lunar News*.  With respect to

the dog studies, the court noted that they had been "discredited at trial" (*id.* at 1374),

certainly a fair assessment in view of the testimony of Merck's own experts that the

experiments had no relevance to human experience.  Nevertheless, in context, it is clear

that the focus of the Federal Circuit's opinion was its view that skepticism of the prior art

is not a relevant consideration, as long as the prior art makes the invention obvious and

enables its practice.[4]  Merck sought rehearing en banc.  The full court denied the petition,

and Merck then filed a petition for a writ of certiorari, which the Supreme Court denied.

---

[3]      The Wright brothers were bicycle mechanics when they invented the airplane, and
Albert Einstein was an examiner in the Swiss Patent Office when he conceived the theory
of relativity and the famous equation $E=mc^2$.  Their discoveries were initially not credited
in part because of their alleged lack of qualifications.

[4]      Judge Rader dissented with respect to a particular claim construction issue, which
the majority addressed even though it found the issue moot.  Although Merck persists in
referring to a "divided panel," Judge Rader's opinion nowhere states that he dissented
(continued...)

Not surprisingly, Merck's motion to stay rewrites history in describing the case and the issues it involved. Merck implies that the "beagle studies" played a central role in the case. Merck states that Teva USA "argued that Merck's patent claims were invalid because the only data in the '329 patent came from Merck's beagle experiments. . . ." (D.I. 60 at 21.) On the contrary, the issue in the case did not revolve around beagles. The primary issue was whether the asserted claims were anticipated by or would have been obvious in view of two issues of the *Lunar News*, which explicitly taught the merits of administering bisphosphonate drugs, including alendronate, once per week at seven times the typical daily dose. At no time did Teva USA argue that the patent claims were invalid because they relied on beagles; they were invalid because they parroted what another expert in the field had published in the prior art – in a publication that was read by everybody in the field, including the principal inventor and Merck's principal expert. All Teva USA ever argued about the beagle studies is that they were not designed to and do not demonstrate any clinical benefit in humans. Teva USA based this argument primarily on the testimony of Merck's own witnesses, including the Merck scientist who conducted the study.

**B.     The Risedronate Once-Weekly Case**

The drug risedronate is a member of the same class as alendronate. It is marketed for the same indications, principally the treatment of osteoporosis. Risedronate is not a Merck product; instead it is marketed by Procter & Gamble ("P&G") under the name "Actonel." However, the Merck patent family that covers the weekly administration of

---

from the ultimate conclusion:  that the claimed invention would have been obvious under either the majority's construction or that proposed by Merck.

Merck's alendronate also covers the weekly administration of risedronate. Indeed, the '329 patent that was litigated in the once-weekly Fosamax case covers that dosing regimen, although the claims at issue in that case did not. Merck has licensed the once-weekly patent family to P&G, and derives substantial royalties from P&G. Moreover, P&G and Merck are both "branded" producers. Thus, although Actonel and Fosamax compete for the same patient population, they do not compete on the basis of price.

When Teva USA filed its ANDA to market risedronate, Merck, as the patent owner, brought this action against Teva USA for infringement of the once-weekly patent family. Merck concedes that although the drugs are different, the issues in this case are essentially the same as those in the once-weekly Fosamax case, although Merck misstates what those issues are. As with the once-weekly Fosamax case, Teva USA does not argue that the "patent claims are invalid because the only data they rely upon is Merck's beagle experiments." (D.I. 60 at 3.) On the contrary, they are invalid for essentially the same reason the claims in the Fosamax case are invalid: the subject matter is disclosed in the prior art.

In any event, Merck knows that it is bound to lose this case eventually. (*See* D.I. 60 at 23-26 (discussion of Merck's collateral estoppel "problem").) Merck also knows that if Teva USA is permitted to market generic risedronate, Merck's royalty stream will dry up. In addition, since risedronate and alendronate are largely equivalent, Teva USA's generic risedronate will compete with Fosamax on the basis of price. Merck's potential economic loss is therefore enormous.

In the once-weekly risedronate case, Teva USA has stipulated to infringement of most of the asserted claims. There is no dispute as to the composition of Teva USA's proposed products or of the manner and purpose of their use. Because the remaining

8

issues in the case do not concern Teva USA's products, Merck took little fact discovery. In particular, Merck did not take a single fact deposition of Teva USA, and relied solely on document discovery, interrogatories, and requests for admission. All discovery is closed, and the pretrial conference is set for July 27. Trial is set for August 28.

## ARGUMENT

### I.  MERCK'S MOTION TO REOPEN DISCOVERY SHOULD BE DENIED

Merck's motion to reopen discovery rests entirely on what it claims were Teva USA's inadequate responses to two Merck document requests. According to Merck, Teva USA hid the fact that Teva Ltd., its corporate parent, had used beagles in a study that involved another drug, alendronate. Merck knows that it never asked specifically for information relating to beagle studies, and instead attempts to shoehorn that topic into two document requests that it served on Teva USA. Merck quotes the two requests and includes the set of requests in the appendix to its brief (D.I. 61, Ex. C), but in an exercise of breathtaking dishonesty, omits Teva USA's responses. Merck knows that when those requests are considered together with the responses, they will demonstrate that Teva USA fully complied with its obligations.

### A.  Merck Acquiesced in Teva USA's General Objection to Providing Discovery from Teva Ltd.

As document requests usually do, Merck's requests attempt to cast a wide net. As responses usually do, Teva USA's responses attempt to limit the width of that net. Teva USA did so in two ways: generally and specifically. First, Teva USA generally objected to producing documents from its corporate parent, Teva Pharmaceutical Industries Ltd. Merck had directed its requests to "Teva," a term it defines as follows:

>     A.    "Teva" shall mean Teva Pharmaceuticals USA, Inc., and
> shall include (a) any divisions, departments, parents, subsidiaries, other
> organizational or operational units, and agents of Teva Pharmaceuticals
> USA, Inc., including but not limited to Teva Pharmaceuticals Industries
> Ltd.; . . . .

(D.I. 61, Ex. C at 1.)  Since the case only involved specific products – the dosage forms

of risedronate that were to be marketed in the United States – Teva USA objected to the

breadth of the definition:

>     3.    Teva objects to Definition A of Merck's document requests
> because it is overly broad and unduly burdensome and because it seeks to
> impose an obligation upon Teva to inquire about or search for documents
> and things that are not within its possession, custody, or control within the
> meaning of Fed. R. Civ. P. 34.  Teva will respond to the document
> requests with respect to Teva Pharmaceuticals U.S.A., Inc., and the term
> "Teva" in these responses shall mean Teva Pharmaceuticals U.S.A., Inc.
> only.

(Ex. B hereto at 2.)  Thus, from the outset, Merck was on notice that Teva USA did not

intend voluntarily to seek document production from its corporate parent.

Merck does not dispute that the first limitation, restricting the undertaking to

produce documents only from Teva USA, excludes the '685 application.  Merck

recognizes, as it must, that the experimental work was carried out in Israel by employees

of Teva Ltd.  Thus, Teva USA's response also excluded the "lab data, protocol, and

documents detailing why the reasons why the experiments were performed."  (D.I.60 at

12.)

At no time did Merck question Teva USA's limitation.  Its response now – over

one year later – is to argue that the limitation was unjustified (a "farce," according to

Merck).  Merck asserts that Teva Ltd. and Teva USA are not separate corporations, and

operate as "one and the same."  As "support" for this allegation, Merck notes that a

representative of Teva Ltd. attended the once-weekly alendronate trial.  Merck, however,

does not connect this fact to any allegation that Teva Ltd. and Teva USA ignored their corporate separateness. That the parent corporation was interested in a major litigation involving its subsidiary is hardly surprising, and does not imply that the two companies are the same. Merck also notes that in response to a Rule 30(b)(6) notice of deposition, Teva USA produced a witness who was employed by Teva Ltd. Again, nothing in Rule 30(b)(6) requires a party to provide as the deponent an employee of that party. In fact, the rule authorizes a party to designate someone other than one of its employees if that person "consent[s] to testify on its behalf." Fed. R. Civ. P. 30(b)(6). Merck also points out that Teva USA's counsel kept Teva Ltd. informed of the advice given to Teva USA. Again, nothing sinister can be inferred from the fact that a parent corporation desires to be informed of developments that affect its major subsidiary, and that the subsidiary desires to keep the parent in the loop.

Merck cites cases in which a court has determined, after exhaustive analysis of the facts of the case, that a party had "control" of certain documents in the possession of the related non-party corporation. Contrary to what Merck implies, those decisions do not articulate a "rule" that seeking discovery from a party automatically entitles the discovering party to documents from related entities. *See, e.g., Penwalt Corp. v. Plough, Inc.*, 85 F.R.D. 257 (D. Del. 1979) (party not required to produce documents from related non-party corporation). Here, Merck never sought the analysis that those cases indicate is required.[5]

---

[5]      Merck also contends that because Teva USA and Teva Ltd. are represented by the same law firm, the documents in that firm's office that belong to one party are under the "control" of the other. Kenyon & Kenyon LLP has documents from thousands of clients. To say that therefore each client "controls" the documents of all the others is ridiculous.

The overriding consideration, however, is that whether Merck now thinks that the corporate separation between Teva Ltd and Teva USA was a "farce" is irrelevant, because Merck knew Teva USA's position throughout discovery. Teva USA made timely objections to Merck's discovery requests and acted within the scope of those objections. Merck knew that Teva USA contended that because Teva Ltd. was not a party, the corporate separateness justified Teva Ltd.'s not responding to discovery directed to Teva USA. Teva USA made its position clear and unambiguous. Moreover, Merck knew from the documents it received that Teva USA was acting in accordance with its position, because Teva USA in fact did not produce documents from Teva Ltd. Having made its position clear by entering an objection, the burden was on Merck to challenge it, either formally or informally. *Clinchfield Railroad Co. v. Lynch,* 700 F.2d 126, 132 n.10 (4th Cir. 1983) ("Once a party registers, by way of a timely response, an objection to a discovery request, 'the initiative rests with the party seeking their production to move for an order compelling it.'") (citations omitted). Merck never did so; it never sought documents from Teva Ltd., and having received the documents from Teva USA, it took no further discovery. To complain about Teva USA's responses more than a year after they were made and seven months after fact discovery has closed is absurd.

Finally, Merck points out that an application corresponding to the '685 application was filed in the United States Patent and Trademark Office ("PTO") as an "international application" under the Patent Cooperation Treaty ("PCT") in December 2003. (D.I. 61, Ex. G.) Under PCT practice, an international application is filed in a "receiving office," in this case, the PTO. The application lists one or more "designated states," *i.e.,* countries in which the applicant may later choose to file separate "national"

12

applications corresponding to the international application. The applicant may elect any or all of these designated states. Here, the international application as filed indicates that Teva USA was designated as an "applicant" only for a single one of approximately 120 designated states – Barbados ("BB"). (*Id.* at 1.) This designation meant that *if* Teva Ltd. had decided to file a national phase application in Barbados, it would have assigned it to Teva USA, and Teva USA would have filed it there.[6] Thus, for Teva USA to have had control over the application, Teva Ltd. would have had to assign it to Teva USA for Barbados, the designated state, and Teva USA would have had to file it in Barbados. Neither event occurred. No application was ever prepared for filing in Barbados (the deadline for doing so has passed), so that Teva USA today and at all relevant times has had no interest in the '685 application or anything corresponding to it.

**B.  Merck Acquiesced in Teva USA's General Objection to Providing Discovery Not Related to U.S. Activities**

In addition to the its general objection to providing discovery from Teva Ltd., Teva USA also objected to providing discovery not related to U.S. activities. Teva USA made this objection because it was clear that there was no dispute about the operative facts relating to Teva USA and the products in issue. The documents Teva USA provided disclosed every relevant facet of Teva USA's proposed products and their use. In this case, virtually the only issues remaining for trial are those relating to the validity of the patents. For these reasons, Teva USA advised Merck that it was limiting all its undertakings to produce documents to those relating to activities within the United States:

---

[6]      Designating Teva USA as the applicant on an international application permits Teva Ltd. to employ the PTO as the receiving office, because Teva USA is an American corporation. *See* 35 U.S.C. § 361 (requiring that applicants on international applications that are initially filed in the United States must be "nationals or residents" of the United States).

> 5.    To the extent that Merck's document requests purport to
> require production of documents not related to making, using, importing,
> promoting or selling products in the United States, Teva objects to them as
> overly broad, unduly burdensome and seeking information that is
> irrelevant to any issue in this lawsuit or not reasonably calculated to lead
> to the discovery of admissible evidence.

(Ex. B at 2.)

Nothing in the '685 application relates to activities within the United States, much

less any "product" for the United States.  The activities referred to in the application are

experiments conducted in Israel.  Teva USA's General Objection 5 specifically excluded

all documents dealing with those experiments.  Again, Merck was free to challenge the

scope of this objection, either formally or informally.  It did neither.  Having failed to do

so during discovery, Merck is not entitled to do so now.

### C.    Merck's Requests, Particularly in View of Teva USA's Objections to Which Merck Acquiesced, Did Not Encompass the Documents It Claims Were Concealed

In any event, even if a patent application could be considered within Teva USA's

control when the only right Teva USA had was the *possibility* that it might *later* acquire

the opportunity to file another application based on it, Teva USA did not conceal

anything, because the discovery that Merck sought covers neither that application nor the

work underlying it.

Merck singles out its Requests 44 and 45 as those to which Teva USA did not

adequately respond.  Merck ignores that Teva USA limited its undertaking to respond to

them by incorporating the general objections as well as specifically objecting to their

scope.  Teva USA's response to Request 44 made its undertaking clear:

> Request for Production No. 44:
>     All documents and things relating to Defendant's research and
>     development of tablets containing risedronate.

Response to Request for Production No. 44:

Teva objects to this request to the extent the phrase "research and development" is overly broad and unduly burdensome. Teva additionally objects to this request to the extent that it calls for information that is protected by the attorney-client privilege and/or the work-product doctrine, or is otherwise immune from discovery. Subject to the foregoing Specific and General Objections, Teva will produce relevant, non-privileged documents in the possession, custody, or control of Teva that can be located by a reasonable search.

(Ex. B at 25.)

The '685 application relates to an idea that the inventors had to improve the bioavailability of alendronate. The bioavailability of a drug is the fraction of the dose of the drug that is actually absorbed into the bloodstream. (D.I. 61, Ex. F at 5, lines 6-10.) Alendronate is not very bioavailable, which means that most of the dose is excreted instead of being absorbed. The inventors surmised that pre-dosing with a vitamin D derivative, followed by administering the alendronate several hours later, would cause the body to absorb more of the alendronate than it otherwise would.

This idea has nothing to do with "development of tablets containing risedronate," which is the subject of Request 44. In fact, the application mentions "risedronate" only about twice, in passing, and never in connection with "tablets." The word "tablet" appears in the application only in describing the commercially available dose of another drug, alendronate. (*Id.* at 8, line 15.) The application contains no data relating in any way to risedronate, much less to risedronate tablets. Moreover, the invention of the application – "pre-dosing" with vitamin D – is not an approved treatment for anything, and has nothing to do with the administration of the risedronate products that are the subject of Teva USA's ANDA. Indeed, it would be illegal for Teva USA or anyone else to market products to be used according to the invention of the '685 application, and it

15

would be illegal for Teva USA to recommend the use of its own products in connection

with the regimen of the '685 application.

Nor is the '685 application responsive to Request 45. That request, together with

Teva USA's response, is set forth below:

> Request for Production No. 45:
> All documents and things relating to patent applications, including the patents themselves, filed in any country by Defendant referencing, referring, or relating to risedronate.

> Response to Request No. 45:
> Teva objects to this request as overly broad, unduly burdensome, and seeking information that is irrelevant to any claim or defense of a party in this litigation and/or not reasonably calculated to lead to the discovery of admissible evidence to the extent that it requires production of documents not related to making, using, importing, promoting or selling products in the United States. Teva additionally objects to this request to the extent that it calls for information that is protected by the attorney-client privilege and/or the work-product doctrine, or is otherwise immune from discovery. Subject to the foregoing Specific and General Objections, Teva will produce relevant, non-privileged documents in the possession, custody, or control of Teva that can be located by a reasonable search.

(Ex. B at 25-6.)

Teva USA thus made clear that it would not produce patent applications and

patents that did not relate to the products at issue, which were to be marketed in the

United States. As discussed above, Merck cannot and does not claim that the '685

application relates to any commercial product, much less a product for the United States

market. The pre-dosing method of improving bioavailability that is the sole subject of

the '685 application is not approved. In fact, the dosage strengths of risedronate and

alendronate are calibrated in accordance with the known bioavailability of the drug. If

the method of the '685 application were shown to be effective in humans, that dosage

strength would be too high, and Teva USA could not market its proposed products for use

in connection with it.

**D.    Merck Knows and Has Known for Years that Both Teva USA and Teva Ltd. Have Relied on "Beagle Experiments"**

      **1.    Teva Ltd.'s U.S. Patent No. 6,476,006, Merck's Trial Exhibit 301 from the Once-Weekly Fosamax Case, Discloses the Same "Beagle Study" as the '685 Application**

The bankruptcy of Merck's motion is demonstrated by the fact that the allegedly "inconsistent" position of Teva USA was already part of the trial record in the once-weekly Fosamax case, yet Merck made nothing of it during the trial, in post-trial briefing, on appeal, or in the Supreme Court. The district court record in that case includes another Teva Ltd. patent that contains the same information as the '685 application. In particular, after trial, the court permitted Merck add to the record U.S. Patent No. 6,476,006 ("the '006 patent"), which had issued to Teva Ltd. (The '006 patent is Exhibit A to D.I. 61, Ex. O.)

The '006 patent does not claim a new drug; instead, it is directed to a particular tablet construction that can be used with a number of drugs, including alendronate. In briefing the once-weekly Fosamax case, Merck seized on an ambiguous sentence in the patent specification, which, according to Merck, suggests that the deleterious effects of alendronate are dose-related, a position that, again, according to Merck, was inconsistent with certain arguments Teva USA made at trial. On appeal, it made essentially the same argument.

However, in all its discussion of the '006 patent – in the district court, the Federal Circuit (twice), and the Supreme Court – Merck never mentioned that it contains as Example 13 a report of a study involving beagles. In the study, the dogs were administered the claimed tablets, their urine was collected, and the bioavailability (area under the curve or "AUC") determined:

> Tablets from example 11 were administered to 3 beagle dogs in a
> crossover design versus an immediate release alendronate formulation.
> Urine samples were collected for 48 hours and an overall AUC for
> alendronate was determined.

(D.I. 61, Ex. O at Ex. A, col. 14, ll. 16-24.)  The study design is essentially identical to

that discussed in the '685 application, whose "withholding" is the basis for Merck's

motion.  Merck's lawyers in that case are the same cast of characters that represent Merck

here.  They have known all along that the '006 patent describes a bioavailability study

carried out by Teva Ltd. that is essentially identical to the study described in the '685

application that Merck says was concealed.  The very argument that Merck says was

made possible for the first time by the "revelation" of the '685  application was in fact

available to it all along.  Merck never made that argument.  Instead, Merck discussed

other aspects of the '006 patent, but never mentioned the disclosure that it now says is so

critical that it would have led Merck to victory in the once-weekly Fosamax case.  Thus,

the entire premise of Merck's motion is false.  Merck knew when it filed its motion in

this case that the '685 application was not a "revelation," but instead was in all material

respects equivalent to evidence of which it had been aware for three years:  (1) a patent

document, (2) owned by Teva Ltd., (3) that revealed that Teva Ltd. had conducted

bioequivalence studies using alendronate and beagles.

In an effort to distinguish the '685 application from the '006 patent, Merck makes

the laughable argument that the '006 patent included other experimental data in addition

to the beagle study, whereas the only experiment reported in the '685 application

involves beagles.  The relevance of this "fact" is not apparent.  The experiments in both

documents obtain exactly the same information by measuring exactly the same thing for

exactly the same drug using exactly the same technique:  bioavailability of alendronate

by measuring the amounts of drug found in the urine of beagles to which the drug is administered.  Merck further tries to dismiss the '006 patent by referring to its description as "rudimentary," and comprising "a mere eight lines."  (D.I. 60 at 10.)  The premise of Merck's entire argument, however, is that Teva Ltd. relied on such tests, not that it wrote them up with any particular degree of detail.  That reliance is set forth explicitly in the '006 application, which Merck and its lawyers have had for more than three years.

Finally, Merck complains that it did not have the opportunity to take the depositions of the '685 application inventors.  (D.I. 60 at 13.)  These inventors, however, are all inventors on the '006 patent.  If Teva Ltd.'s beagle tests were important to Merck, it could have noticed their depositions based on their connection with the beagle experiments described in that document.

### 2.    Teva USA and its Principal Trial Expert Relied on a Beagle Study in the Fosamax Once-Weekly Case

In addition to the '006 patent's disclosure of Teva Ltd.'s employment of beagles, as Merck knows, in the once-weekly Fosamax case Teva USA actually relied on a prior art reference entirely focused on a study employing beagles.  Initially, Merck asserted claim 1 of the '329 patent, which claimed "inhibiting bone resorption in a mammal" by administering alendronate on a less often than daily basis.  Teva USA contended that a prior publication (the "Reddy article," Ex. C hereto), which included a discussion of a pre-clinical alendronate study involving beagles, anticipated claim 1.  The title of the Reddy article could not have been more descriptive: *Alendronate Treatment of Naturally Occurring Periodontitis in Beagle Dogs*.  Teva USA's principal expert, Dr. Russell, relied on this reference in his expert report.  (The relevant portion is Ex. D hereto.)  At no time did Merck question Dr. Russell about his reliance on that article, and at no time did

Merck make any argument that Teva USA's and Dr. Russell's reliance on beagle data was inconsistent with their criticism of the '329 patent.

**E.    Teva USA's Contentions Are Not Inconsistent with the '685 Application**

The reason Merck did not make the argument in the once-weekly Fosamax case that it is making now is that it was specious – Merck knew it then and knows it now.  The beagle study in the '329 patent has nothing to do with the studies recorded in the '685 application and the '006 patent.

The Merck study was directed at a problem that had surfaced after Fosamax was introduced in 1996:  injury caused by prolonged contact between alendronate and sensitive esophageal tissues.  In the Merck beagle study, the beagles were first anesthetized.  While they were immobile, solutions of alendronate were poured down their throats and allowed to remain in contact with their esophagi for a half hour.  This dosing was carried out at different intervals (once per day, twice per week, etc.).  Each dog was killed after the last dose, and its esophagus dissected and examined microscopically.  (D.I. 61, Ex. A, col. 14, l. 10-col. 17, l. 20.)  Teva USA's principal criticism of the study was that it did not model human clinical experience, and therefore was not germane to what happened to patients who actually took the drug.  Merck's experts agreed with this assessment.

The study described in the '685 application was conducted for an entirely different purpose and is fundamentally different in design.  It is a bioequivalence study, not a study of tissue damage.  In it, the beagles were dosed with the study drug; later, the concentration of the drug in their urine was measured.  (D.I. 61 , Ex. F at 8-11.)  Thus, in the Teva Ltd. experiments, esophageal damage is not an issue; the study does not look at

the dogs' esophagi.  Conversely, the Merck study is not systemic; it makes no attempt to determine how much drug is absorbed.  Indeed, in the Merck study, the drug never gets to the dogs' stomachs, and is therefore never absorbed.  The fact that both studies involved beagles does not make them the same study, and Merck knows it.

Merck's excerpt from the deposition testimony of a Teva USA expert witness in this case (D.I. 60 at 11) does not support its argument.  Merck asked Dr. Markowitz whether in the Teva Ltd. experiments the alendronate was administered in accordance with the instructions that Merck provides to human patients.  Dr. Markowitz said that it was not administered that way; instead, it was mixed with dog food.  Apparently Merck argues that it is "inconsistent" for Teva Ltd. to rely on beagle tests in which the dogs do not follow Merck's instructions for administration while at the same time Teva USA criticizes Merck's tests, which also do not employ Merck's dosing recommendations.

The key distinction is that the Merck experiments were supposed to test what happened to the esophagus when the drug was administered to people.  By not administering it in a way that was even close to the way people take the drug, Merck did not duplicate that environment, as its own witnesses admitted.  Teva Ltd.'s experiments, on the other hand, had nothing to do with esophageal damage.  Instead, they were designed to determine the amount of the drug absorbed into the bloodstream.  Whether the drug got to the stomach via a pill followed by a glass of water (as Merck's dosing instructions require) or whether it got there by being ingested along with dog food made no difference to the experimental model.

The "inconsistency" argument was frivolous, which is why Merck never made it.  It has not become less frivolous with the passage of time.  Merck's allegations that Teva

USA concealed the pertinent evidence are childishly false, and are made solely for the purpose of delaying the inevitable resolution of this case.

## II.     MERCK'S MOTION FOR A STAY SHOULD BE DENIED

### A.     Merck's Bogus Rule 60(b) Complaint Does Not Justify a Stay

In addition to reopening discovery, Merck also moves to stay this action pending the resolution of *Merck & Co. v. Teva Pharmaceuticals USA, Inc.*, C.A. 06-310 (GMS), which it filed on May 10. That action seeks to reopen the judgment in the once-weekly Fosamax case based on essentially the same arguments Merck offers in support of its motion to stay. That is, because Merck did not "know" about the Teva Ltd. beagle studies, it was disabled in attacking Teva USA's criticism's of its own beagle studies.

Merck's complaint is another stall tactic, and when Merck filed it, Teva USA moved to dismiss it for failure to state a claim. (C.A. 06-310, D.I. 6.) In light of that motion, Merck filed an amended complaint, which is essentially duplicative of the first. (C.A. 06-310, D.I. 9.) Teva USA will shortly file a motion to dismiss the amended pleading.

To prevail in an action to reopen a judgment that is filed more than a year after the judgment is entered, a plaintiff must allege and prove a "fraud upon the court." Fed. R. Civ. P. 60(b). The "fraud upon the court" standard that must be met to support an independent action under Rule 60(b) is "narrower in scope" than "fraud between the parties" which will suffice to support a Rule 60(b)(3) motion filed within one year of judgment. *Gleason v. Jandrucko*, 860 F.2d 556, 558 (2d Cir. 1988) ("[T]he type of fraud necessary to sustain an independent action attacking the finality of a judgment is narrower in scope than that which is sufficient by timely motion."). The Third Circuit has articulated a demanding standard for determining whether a fraud upon the court has

occurred that will support an independent action under Rule 60(b). To obtain relief, a party must prove: (1) an intentional fraud; (2) by an officer of the court; (3) which is directed to the court; and (4) that in fact deceives the court. *Herring v. United States*, 424 F.3d 384, 390 (3d Cir. 2005). Further, the Third Circuit agrees with other circuits that a "fraud upon the court" requires the most egregious conduct directed to the court itself, and must be supported by clear and convincing evidence. *Id.* at 387.

Merck's complaint nowhere alleges facts showing a fraud "upon the court." Instead, it relies solely on the alleged withholding of the '685 application.[7] The short answer to Merck's complaint is that withholding documents during discovery is not a "fraud upon the Court," because it is not directed to the court. The only statements Merck cites that were transmitted to a court are excerpts from Teva USA's post-trial and appellate briefs. (D.I. 60 at 19-20.) These statements were supported by the trial record, in particular the testimony of Merck's expert and the Merck employee who devised the tests. If they had not been supported, Merck could have responded by pointing out that infirmity. It did not do so. At most, Merck's allegations reflect the fact that Teva USA's attorneys successfully argued their version of the facts and their theory of the law of obviousness. That the Federal Circuit resolved the issues in Teva USA's favor does not mean that Teva USA committed a fraud. *See King v. First American Investigations, Inc.*, 287 F.3d 91, 95-96 (2d Cir. 2002) (finding that the plaintiff's allegations that the defendant committed fraud on the court amounted to nothing more than complaining that

---

[7]    Although the amended complaint also refers to the PCT application (C.A. 06-310, D.I. 10, Ex. G), that document could not have been withheld because it did not exist until after the trial of the once-weekly Fosamax case.

the plaintiff disputed the defendant's version of the law and facts, and thus did not state a claim for fraud on the court).

Moreover, the record shows that Teva USA never withheld anything. As in this case, there Teva USA objected to providing discovery from Teva Ltd., and made that objection clear. (Ex. E hereto at 5.) Teva USA also objected to providing discovery not related to its ANDA products that were in issue in the litigation. (*Id.*) Merck accepted both limitations without comment. Thus, the '685 application was excluded from the universe of documents the parties agreed that Teva USA would produce because (1) it was as Teva Ltd. document, and (2) it did not relate to Teva USA's ANDA products.

Although Teva USA also did not search for documents such as the '006 patent because they were likewise excluded by both objections, Merck found the patent through its own investigation, and referred to it in post-trial and appeal briefing. As discussed above, that patent discloses the same kind of beagle study as the '685 application. Despite Merck's assertion that knowledge of Teva Ltd.'s beagle experiments would have enabled it to win the case, it never made the argument it makes now, even though the '006 patent provided the same vehicle for doing so as the "withheld" '685 application.

Scrounging through the record for a "false representation" by Teva USA, Merck refers to a discovery motion that it brought in the once-weekly Fosamax case to compel production from Teva USA (D.I. 60 at 17-18) and to Teva USA's counsel's response (D.I. 61, Ex. Q). First, that letter cannot be a "fraud upon the court" because it was directed to Merck, not the court. More important, nothing in it is false. Merck implies that that the motion was directed to documents in the hands of Teva Ltd. It was not; it specifically targeted documents allegedly in the files of certain Teva USA employees in the United States. (Ex. F hereto.) Teva USA's counsel's letter response states nothing

more than that the files of those persons had been searched.  Merck points to no statement in the letter that is not true.  That is, Merck nowhere claims that those persons' files were not searched, or that they were searched and documents were found and then concealed.

**B.    Teva USA and the Public Will Be Prejudiced by a Stay**

This is an ANDA case.  Merck's patents represent a barrier to FDA approval of Teva USA's application for approval of this important drug.  A stay potentially will delay Teva USA's ability to get to market, and the law provides no vehicle by which Teva USA can be compensated for revenues it might lose because of the delay.

Similarly, if Merck's patents are not valid, they should not be barriers to the public's being permitted to purchase low-cost risedronate.  This drug is primarily directed to older women, many of whom live on fixed incomes.  For many such women, the cost of pharmaceuticals represents a substantial burden.  If indeed Merck's patent monopoly is not justified, it should be dismantled as soon as reasonably possible.

**C.    Merck Will Not Be Prejudiced**

Discovery in this case closed in October 2005.  Before it closed, Merck had every opportunity to explore the issue of what information might be in the hands of Teva Ltd. Merck was uninterested.  It never challenged Teva USA's transparent decision not to produce Teva Ltd. documents or documents unrelated to its U.S. products.  Merck has no basis on which to complain.  Moreover, as discussed above, if Merck wants to make its baseless beagle impeachment argument, it now has and has had for years the information necessary to do so.

Merck's complaint is part of its tactics to delay this action.  As Merck points out, it will probably lose the risedronate once-weekly case.  When that happens, Merck will no longer receive royalties from P&G, and it will face the specter of generic competition

25

that will erode the market for Fosamax, one of its biggest products.  Merck should not be permitted to use the court process to manipulate the pharmaceutical market.  The public has an interest in having this case resolved.  Merck's motion to stay should be denied.

## CONCLUSION

Merck's purpose in bringing this motion is transparent:  to delay and prejudice a pending case.  Merck's motion should be denied, and the case should be tried in accordance with the existing schedule.

Respectfully submitted,

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

June 16, 2006

Josy W. Ingersoll (#1088)
Karen L. Pascale (#2903)
Adam W. Poff (#3990)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600

OF COUNSEL:

*Attorneys for Defendant*
*Teva Pharmaceuticals USA, Inc.*

James Galbraith
Maria Luisa Palmese
A. Antony Pfeffer
**KENYON & KENYON LLP**
One Broadway
New York, NY 10004-1007
(212) 425-7200

## CERTIFICATE OF SERVICE

I, Josy W. Ingersoll, hereby certify that on June 16, 2006, I caused to be electronically

filed a true and correct copy of the foregoing document with the Clerk of the Court using

CM/ECF, which will send notification that such filing is available for viewing and downloading

to the following counsel of record:

> Mary B. Graham, Esquire
> Morris, Nichols, Arsht & Tunnell
> 1201 N. Market Street
> Wilmington, DE 19801

I further certify that on June 16, 2006, I caused a copy of the foregoing document to be

served by hand delivery on the above-listed counsel of record and on the following non-

registered participants in the manner indicated:

### BY E-MAIL

> Nicolas G. Barzoukas, Esquire
> Suzy S. Harbison, Esquire
> Weil, Gotshal & Manges LLP
> 700 Louisiana, Suite 1600
> Houston, TX 77002

> _____
> Josy W. Ingersoll (#1088)
> YOUNG CONAWAY STARGATT & TAYLOR, LLP
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, Delaware 19801
> Telephone: (302) 571-6600
> jingersoll@ycst.com
> Attorneys for Teva Pharmaceuticals USA, Inc.