**Trial Volume Number 3**
**March 6, 2003**

[2] Q: Yes.

[3] A: It has been shown before it is possible.

[4] Q: He says ibandronate, and says that can be [5] given as an injection every three months rather [6] than as an infusion. Do you see that?

[7] A: Absolutely. The fundamental problem here [8] is the following —

[9] Q: Let me ask you the question so we'll get [10] through this a little quicker, Doctor.

[11] A: Yes.

[12] Q: And you say that Boehringer Ingelheim ran [13] a trial with intermittent, with this kind of [14] cyclical therapy, and it didn't work, didn't show [15] a proper efficacy?

[16] A: Yes.

[17] Q: Boehringer Ingelheim wouldn't have ran [18] the trial unless they had a reasonable [19] expectation that it was going to work. They [20] wouldn't have run it, they wouldn't have invested [21] the money unless they thought it was going to [22] work?

[23] A: They had an expectation, yes.

[24] A: They had an expectation, it just turned

Page 674

[1] out they made a mistake?

[2] A: Yes.

[3] Q: And that's a big sophisticated [4] organization?

[5] A: Correct.

[6] Q: And they made a mistake?

[7] A: Yes.

[8] Q: So when Dr. Mazess makes this suggestion, [9] he's in pretty good company, isn't he? He's in [10] the company of a company that's sophisticated [11] about this these things?

[12] A: He's not a in a company. It's his not [13] his idea, he knows what's going on.

[14] Q: He is proposing this because he's [15] reporting news that there's a trial under way?

[16] A: Yes.

[17] Q: And he's trying to keep you a little more [18] informed; correct?

[19] A: Yes correct.

[20] Q: That's a reasonable thing to do, there's [21] a trial being carried out by a sophisticated [22] company, and he's reporting on that so people can [23] see what's happening; correct?

[24] A: That's what he says. Intravenous

Page 675

[1] administration is possible. As you rightly [2] pointed out. Here we have a drug which is the [3] only drug which has

shown up until now with good [4] anti-fracture efficacy, and we are trying now, [5] throwing around some suggestions to go someplace [6] else. That's why I'm saying I can't follow this [7] conversation.

[8] Q: The ibandronate situation, you seem to [9] think you were critical of him for proposing [10] that. But that was a trial that was going on at [11] the time by a very sophisticated pharmaceutical [12] company; correct?

[13] A: Absolutely correct.

[14] Q: And in fact, ibandronate, there's a, [15] they're trying that over again, aren't they?

[16] A: Not in this way. They did it [17] differently.

[18] Q: How did they do it?

[19] A: With oral.

[20] Q: Aren't they doing a trial even as we [21] speak on injection?

[22] A: They increased the dose, and they are [23] doing it under manufacture trial, shorter [24] intervals and higher doses.

Page 676

[1] Q: It's going on right now?

[2] A: It's going on right now.

[3] Q: They did an oral trial, a trial of oral [4] dosing of ibandronate with a cyclical regimen?

[5] A: Yes.

[6] Q: And that shows anti-fracture?

[7] A: That's the first time any trial had [8] showed that, and that was reported last year.

[9] Q: So Dr. Mazess was right in the sense that [10] he was correct in suggesting that cyclical or —[11] cyclical use of ibandronate can show [12] anti-fracture activity?

[13] A: Dr. Mazess from all the suggestion he's [14] making here, he's only at the end of the day [15] correct on only one regimen but with the wrong [16] dose.

[17] Q: The wrong dose being 80 milligrams?

[18] A: Yes.

[19] Q: You think that's the wrong dose?

[20] A: He doesn't suggest 70, does he?

[21] Q: But we would agree — would you agree [22] with me that 80 milligrams dose would be [23] effective to treat osteoporosis once a week?

[24] A: I told you, yes.

Page 677

[1] Q: So you say he's got a wrong dose?

[2] A: Yes.

[3] Q: But he's given you a safe and effective [4] dose?

[5] A: Why I'm saying that —

[6] Q: Could you answer my question, please?

[7] A: Yes.

[8] Q: I'm sorry.

[9] A: The "yes" is not referring to the [10] question. Can you repeat, please, your question.

[11] Q: He's suggesting a safe and effective [12] dose, 80 milligrams a week?

[13] A: And I said an effective dose, yes.

[14] Q: And you don't say a safe dose, because [15] you haven't seen 80 milligrams data?

[16] A: I haven't seen any data.

[17] Q: You've seen 70 milligrams?

[18] A: Today. At that time — today, yes.

[19] Q: Based on your state of knowledge today, [20] would you expect that —

[21] A: Most likely would be —

[22] Q: Safe and effective?

[23] Let me just ask the question so the [24] record is clear.

Page 678

[1] A: Yes.

[2] Q: The dose, Doctor, the dose of 80 [3] milligrams once a week based on today's knowledge [4] you know that would probably be safe and affect I [5] have?

[6] A: Most probably, yes, but needs to be [7] tested, of course.

[8] Q: And needs to be tested, but nevertheless [9] you would have a reasonable expectation it would [10] be safe —

[11] A: My expectation is more or less it's going [12] to be safe and effective, but it needs to be [13] tested.

[14] Q: Let's go back to the April '96 Lunar [15] News, which I believe to be a newer version. I [16] think it's Plaintiff's Exhibit 28, page 31. And [17] if we could go to the middle column. The [18] paragraph beginning "one" at the top of the page.

[19] Now, he talks about one of the [20] difficulties with oral alendronate is its low [21] bioavailability. When taken with water in a [22] fasting state, only about 0.8 percent of the oral [23] dose is bioavailable.

[24] And that's a true statement;

Page 679

[1] correct?

[2] A: Correct.

[3] Q: He says even coffee and juice reduces [4] this by 60 percent, and a meal reduces this by [5] greater than 85 percent.

[6] And that's pretty much a true [7] statement; correct?

[8] A: Correct.

[9] Q: He says that alendronate must be taken [10] after an overnight fast 30 to 60

minutes before [11] breakfast, and that was in accordance with [12] Merck's existing instructions at the time; [13] correct?

[14] A: Correct.

[15] Q: And subjects should remain seated or [16] standing. And he then says a small group of [17] patients have reported some upper GI distress if [18] this is not done. And that's correct, isn't it?

[19] A: I would not agree with the very small [20] group.

[21] Q: You would consider it larger than a very [22] small group?

[23] A: Yes.

[24] Q: But other than quarreling with the size

### Page 680

[1] of the group, would you agree?

[2] A: If this is not done, that's part of the [3] issue, because what he's referring here, GI side [4] effects in relation to taking the drug [5] incorrectly.

[6] So some of that refers to that. But [7] he misses the rest.

[8] Q: As far as it goes, though, it's correct?

[9] A: Yes.

[10] Q: This regime may be difficult for the [11] elderly to maintain chronically, and that's a [12] true statement; correct?

[13] A: Yes.

[14] Q: Then he says an intermittent treatment [15] program, for example, once per week or one week [16] every three months, with higher oral dosing needs [17] to be tested. Do you see that?

[18] A: Yes. I saw that.

[19] Q: So he's proposing using alendronate once [20] per week; correct with higher oral doses?

[21] A: He's proposing an intermittent drug.

[22] Q: And part of that intermittent — one [23] option of the intermittent, one option of that [24] program is once per week?

### Page 681

[1] A: Which is fundamentally different.

[2] Q: From what?

[3] A: Because once per week is not an [4] intermittent regimen.

[5] Q: You don't use the words — you don't say [6] intermittent to describe once per week?

[7] A: No.

[8] Q: You don't think anybody in his right mind [9] would use intermittent to describe —

[10] A: I don't think that anybody has used the [11] word intermittent to describe it, to my [12] knowledge, at least from the people knowledgeable [13] in the field.

[14] Q: And the use of intermittent to describe [15] once a week, that would demonstrate to you [16] ignorance of this field; is that right?

[17] A: It demonstrates to me that you cannot [18] dissociate between the two. So for him, in his [19] mind, once a week, and one week every three [20] months means exactly the same thing, which are [21] fundamentally different.

[22] Q: And nevertheless, it's clear to you when [23] he says once per week, what he means by once per [24] week? There's no ambiguity about that phrase?

### Page 682

[1] A: Oh, no. That's clear.

[2] Q: And he's recognized that if you're going [3] to do it once per week, you have to use a higher [4] oral dose; correct?

[5] A: Yes.

[6] Q: And —

[7] A: Yeah.

[8] Q: Someone skilled in the art at this time [9] would have recognized that that higher oral dose [10] should be about 70 milligrams; correct, for the [11] treatment of osteoporosis?

[12] A: The real skilled in the art, yes.

[13] Q: And by July 1977, that is, sometime after [14] this publication, a 5-milligram dose had been [15] approved for prevention of osteoporosis; correct?

[16] A: I'm not familiar with exact date of [17] approval. But if you say that, I take your word [18] for it.

[19] Q: Okay. '97.

[20] A: I misspoke. July '97. [21] Does that help you? So by July '97.

[22] A: It was approved in July '97.

[23] Q: I think it was approved — I'll represent [24] that it was approved before July '97, but I'm

### Page 683

[1] not —

[2] A: So, yeah. I take your word if you say [3] that. I don't — I don't know.

[4] Q: Okay. I assume that I'm correct, and [5] the [5] record —

[6] A: Yeah.

[7] Q: — will belie that if I'm not.

[8] A: Mm-hmm.

[9] Q: Someone who was aware of that would [10] understand that the weekly dose should then be 35 [11] milligrams to correspond?

[12] A: Where am I?

[13] Q: The higher oral —

[14] A: Are we looking on the same —

[15] Q: The higher oral. If you're going to do [16] it once a week, the higher oral dose, that's [17] referring to what should be 35 milligrams a week?

[18] A: Why?

[19] Q: If it is — if you understood that the [20] five milligrams a week was available for [21] prevention on a daily basis.

[22] A: It doesn't.

[23] Q: I mean, 5 milligrams a day.

[24] A: He doesn't make any suggestion that the

### Page 684

[1] dose in once a week should be seven times the [2] daily dose.

[3] Where do you see that? I'm sorry.

[4] Q: Well, you told me just two minutes ago, [5] Doctor, that someone skilled in the art looking [6] at that would recognize that the higher oral dose [7] for treatment should be 70 milligrams a week.

[8] A: It would be 70, because we know that we [9] can do it like that, yes.

[10] Q: And because, and again, somebody looking [11] at that would understand that the higher oral [12] dose he's referring to for prevention should be [13] 35?

[14] A: I see what you mean. Yeah. That would [15] probably be about —

[16] Q: Okay. Let me show you an exhibit that we [17] used this morning. It's Defendant's 192.

[18] A: Do I have it here?

[19] Q: No. I'm going to put it up on —

[20] THE WITNESS: I have to find a [21] copy.

[22] MR. GALBRAITH: Let me just dig it [23] out. I apologize, Your Honor.

[24] BY MR. GALBRAITH:

### Page 685

[1] Q: Were you in the courtroom this morning [2] when Dr. Yates talked about this document?

[3] A: Which document?

[4] Q: The one that's on the board, Defendant's [5] Exhibit 192. I'll give you a copy of it.

[6] A: Yes. I was there at that meeting, but I [7] can't say that I can recall the details of that [8] meeting.

[9] Q: Okay. Well, if we could turn to the — [10] it's the letter — I think it's the second page [11] of the exhibit. If [12] you could blow up the second paragraph, Stan.

[13] A: What page should I look at?

[14] Q: I'm sorry. It's the third page of the [15] document, third page in from the top.

**Trial Volume Number 3**
**March 6, 2003**

**Merck & Co., Inc.  v.**
**Teva Pharmaceuticals USA**

[16] You see the background. This is a [17] background document submitted to the FDA from [18] Merck?

[19] A: Yes. Yes.

[20] Q: And this paragraph says, "This background [21] document summarizes the proposed MRL clinic". Do [22] you understand that to be Merck Research [23] Laboratories?

[24] A: Yes.

Page 686

[1] Q: Clinical development program with [2] alendronate at oral doses of 35 and 70 [3] milligrams, administered once weekly or twice [4] weekly in the treatment and prevention of [5] postmenopausal osteoporosis.

[6] And do you see down what — how they [7] refer to this in the second line from the bottom, [8] these intermittent dosing regimes?

[9] A: Where are you?

[10] Q: As described in the —

[11] A: Where should I look? Further down in the [12] same?

[13] Q: If you look —

[14] A: Yeah. Yes.

[15] Q: So —

[16] A: I see what they're writing.

[17] Q: So Merck describes —

[18] A: Yes.

[19] Q: — these once-a-week dosing regimens as [20] intermittent; is that correct?

[21] A: That is what they say here, yes.

[22] Q: And so you think Merck is using improper [23] terminology there?

[24] A: I'm not responsible for this for the

Page 687

[1] statements made by Merck. I said what was [2] scientifically sound at that time.

[3] Q: So you think that was scientifically [4] unsound?

[5] A: In that opinion, yes, despite the fact [6] that I'm here with — I mean, testifying on [7] behalf of Merck.

[8] Q: So if Dr. Mazess was scientifically [9] unsound to call that, his program intermittent, [10] call once a week intermittent, at least he's in [11] good company here; isn't that right?

[12] A: Absolutely. Absolutely.

[13] Q: Now, as I understand your testimony, you [14] were — you did receive the Lunar News. And [15] although I think you testified in your deposition [16] maybe, or maybe here that you didn't read the [17] articles regularly, but that you did find the [18] bibliographies quite useful at the time?

[19] A: Yes.

[20] Q: That's the principal use you made of the [21] Lunar News and to go through and use it to help [22] you as a source of primary sources, if you will?

[23] A: Yeah. It was before the internet era, so [24] it was a very useful source of references.

Page 688

[1] Q: Now, you testified some about all these [2] other dronates, if I can call them that, that [3] preceded alendronate. And is it fair to say that [4] as of July 1997, there was a lot more clinical [5] and real-world information available to those [6] skilled in the art about alendronate than there [7] was about any of these other predecessor [8] bisphosphonates?

[9] A: In terms of numbers of patients studied; [10] yes.

[11] Q: And I think you talked a little bit about [12] Paget's statements — Paget's patients. And is [13] it true that Paget's patients are often [14] discovered fortuitously during routine or during [15] other physical exams?

[16] A: Correct. Usually when you take blood for [17] other reasons, and you find a raised blood level.

[18] Q: And so a lot of these patients, a lot of [19] these people for whom this condition is [20] discovered, when it's discovered, they're not [21] coming in there for the pain of Paget's disease. [22] They're coming in there for some other reason, [23] and the doctor fortuitously discovers that or [24] notices that they have a biochemical market —

Page 689

[1] marker that he associates with Paget's disease; [2] is that right?

[3] A: In old clinical series, at least [4] published by the Men's Centers, these kind of [5] patient accounts for less than 10 percent of the [6] population treated.

[7] Q: But you would agree that often such [8] patients are treated, notwithstanding that they [9] don't have symptoms?

[10] A: I wouldn't use the word often. Today, [11] yes.

[12] As I explained earlier, today our [13] thoughts are different in the management of [14] Paget's disease. But at the time of question, [15] this was not the case.

[16] And you can see that from the clinic [17] series.

[18] Q: So you're saying today you would treat [19] these asymptomatic patients whereas a few years [20] ago the time in question here, in 1997, you would [21] not do so; is that right?

[22] A: I'm saying that today more and more of [23] these people are being

treated. At that time, it [24] was in the clinical practice, the smaller and

Page 690

[1] very, very small group of patients, as I said, [2] less than 10 percent.

[3] But people interested in Paget's [4] disease and trying to follow the natural course [5] of the disease where we were trying to get these [6] kind of patients to see whether what we're saying [7] today could be proved.

[8] Q: Well, as of 1997, do you think that it [9] was believed in the field that treatment should [10] be offered to asymptomatic patients with [11] involvement of skeletal areas that have a [12] potential to give rise to complications, that is, [13] is that the conventional standard?

[14] A: The answer is no. Certainly, the United [15] States, because the only available treatments for [16] treatment of Paget's disease at that time was [17] etidronate oral, which induces osteomalacia, and [18] you don't want to put an asymptomatic patient [19] with that, without symptoms, to put these [20] patients into this kind of treatment.

[21] And secondly, the other available [22] treatment, which became in the United States [23] available in the early 1990s was intravenous [24] pamidronate, which means that you're going to

Page 691

[1] take a patient without symptoms and admit to the [2] hospital, give infusions of pamidronate.

[3] So I believe that, at that time with [4] what we had available, treatment to patients with [5] no symptoms was not offered.

[6] Q: Let me put up on the screen an excerpt [7] from Dr. Fleisch — Fleisch's book, [8] Bisphosphonates In Bone Disease. And it's the [9] 1995 edition, and it's Defendant's 531.

[10] And if you —

[11] A: Can I have a copy as well, please?

[12] Q: Oh, yeah. I have an extra one.

[13] It's a little hard to see the screen, isn't it?

[14] screen,

[15] A: Thank you.

[16] Q: And you recognize this as the — as the [17] the — Dr. Fleisch's book about which you [18] testified?

[19] A: Yes.

[20] Q: Or an excerpt. Could you turn to Page [21] 72?

[22] A: Hold on. Let me —

[23] Q: And under treatment with drugs other than [24] bisphosphonates, it says, " Treatment should be

Page 692

[1] offered to all symptomatic patients, as well as [2] to asymptomatic patients wit involvement of [3] skeletal areas that have a potential to give rise [4] to complications, such as the skull, verbral [5] — "vertebral bodies, long bones, and near major [6] joints."

[7] Is that in accordance with the [8] standard of care in 1995?

[9] A: No. Because as I told — I explained to [10] you why, unless this was a time where alendronate [11] had already been approved.

[12] Had it been approved by then?

[13] Q: I don't know. I don't know when this [14] book came out, other than the year.

[15] A: Because at that stage in the United [16] States, the only available treatment were [17] etidronate, and intravenous etidronate. I don't [18] think that any responsible physician was going to [19] treat asymptomatic patients with that.

[20] But if you had, as we had in Europe, [21] oral clodronate, which was very — it was quite [22] potent for the disease, and it was very well [23] tolerated, then yes, a British doctor or a Dutch [24] doctor might treat such patient with the

Page 693

[1] availability with clodronate.

[2] Q: Okay. In 1997, by July of 1997, you [3] understand that the 40 milligram was approved in [4] the United States?

[5] A: And that is one way of thinking. It [6] started slow, slow change, and with the [7] introduction later of residronate, which can be [8] given for two months.

[9] Q: So you don't —

[10] A: Only.

[11] Q: — agree?

[12] A: So we started looking more and more into [13] this kind of population.

[14] Q: So you don't agree that in the — in [15] errancy of the Bible here; is that right?

[16] A: No, it's not that I don't agree. I'm [17] saying if I were in Europe, and I was reading, [18] and if I had clodronate available, I could do it.

[19] But if it were in the United States, [20] yes, I wouldn't follow the suggestion of [21] Professor Fleisch. And I don't think that [22] physicians in the United States were following at [23] that time this kind of approach.

[24] Q: And, Doctor, you've testified a little

Page 694

[1] bit about the Ettinger article, I think, at [2] Plaintiff's 124 in the book.

[3] A: What did you say? I'm sorry.

[4] Q: The Ettinger.

[5] A: Yes. Yes. What time?

[6] Q: 124.

[7] A: Yes.

[8] Q: And I thought — I thought I heard you [9] refer to that as a clinical study; is that right?

[10] A: I said it was a report rather than a [11] study.

[12] Q: It was a report. Okay.

[13] A: And I made a very clear comment, I think, [14] regarding the scientific value of that particular [15] article.

[16] Q: And the scientific value is essentially [17] zero; correct?

[18] A: Not zero, no. But, I mean, because the [19] people have done surveys, so on and so on, so [20] it's not zero. But it's not scientifically very [21] interesting.

[22] On the other hand, it's clinically [23] extremely important.

[24] Q: Do you know what position Merck took when

Page 695

[1] this article came out?

[2] A: No.

[3] Q: Are you aware that Merck issued press [4] releases and tried to stop the publication of [5] this article?

[6] A: I'm not aware of that. That's the first [7] time I've heard about it.

[8] Q: And that Merck strongly disagreed with [9] this article and the companion article that went [10] with it?

[11] A: I don't know that.

[12] MR. GALBRAITH: Put 534 up. ·

[13] THE WITNESS: Do I need the paper [14] or?

[15] BY MR. GALBRAITH:

[16] Q: I'm going to show it to you. I put it up [17] on the screen.

[18] I'll give you a copy of Defendant's [19] 534, which is a Merck statement on the [20] publication of the Ettinger surveys.

[21] Have you read this before?

[22] A: No.

[23] Q: Do you see in the second full paragraph [24] it says, We strongly disagree with the conclusion

Page 696

[1] of both parties?

[2] A: Can I — can I read it —

[3] Q: Sure.

[4] A: — quickly because —

[5] MR. LYNCH: Objection, Your Honor. [6] This is — this is an effort to get an anti-Merck [7] document up with some someone who's never dealt [8] with it before.

[9] MR. GALBRAITH: Your Honor, he [10] testified about the survey. I think I'm entitled [11] to explore his views about

Merck's reaction to [12] it.

[13] THE COURT: Mm-hmm. All right. [14] The objection is noted [15] THE WITNESS: Objection? So what [16] do I d now?

[17] I'm reading that; right?

[18] MR. GALBRAITH: Okay.

[19] BY MR. GALBRAITH:

[20] Q: Do you see that Merck strongly disagreed [21] with the conclusions of the articles?

[22] A: In the second paragraph?

[23] Q: Yes.

[24] A: Yes. I see that.

Page 697

[1] Q: And did you take Merck's views of these [2] articles into account before you gave your [3] opinions?

[4] A: No. And I can understand why Merck [5] disagrees with this document.

[6] Q: Because they don't think — they don't [7] think it's scientifically sound; right?

[8] A: No. No. No.

[9] Merck has the data from the clinical [10] trials, which show no difference between the [11] groups. I mean, it is very well-tolerated [12] alendronate, equally well to placebo, so they [13] have this document.

[14] And here comes a study from daily [15] practice, which does not fit with what they had [16] collected up until then. And I believe because [17] they didn't have any such data themselves, they [18] disagree with that.

[19] But I'm not speaking for Merck now, [20] because I don't know what their position is. But [21] that's how I would do that.

[22] On the other hand, myself, who I can [23] both interpret clinical trials and take part in [24] clinical trials, but at the same time, I have

Page 698

[1] real-life experience. I can see the point of [2] Dr. Ettinger, because Ettinger's experience, [3] although exaggerated a bit, fit very well. My [4] experience fit very well with big studies that we [5] have done Phase IV in the Pharmaco-Vigilant [6] studies, et cetera.

[7] So it was very clear to me.

[8] Q: You don't agree with Merck that the [9] studies and conclusions reached by Ettinger in [10] these studies are scientifically accurate and [11] potentially harmful to patients?

[12] A: That's a statement of Merck. I'm not [13] responsible for the statement.

[14] Q: I know you're not responsible. But I'm [15] not saying it's your statement, but I'm

asking you [16] whether you agree or disagree. It's the [17] statement on the last page, the overall [18] assessment.

[19] A: Where do I look?

[20] Q: Last page of the exhibit.

[21] A: Finally?

[22] Q: Well, —

[23] A: It starts with finally?

[24] Q: Starting with, Finally, as we started

---

Page 699

[1] earlier, we felt that the conclusions reached by [2] Ettinger, et al, in both of these two studies are [3] scientifically inaccurate and potentially harmful [4] to patients.

[5] Do you agree with that statement?

[6] A: I agree that what they say scientifically [7] isn't correct, and I told you before that. And [8] the statement that they can be potentially [9] harmful to patients, I disagree with that [10] statement.

[11] Q: Now doctor just so I'm clear, you have [12] never prescribed the 40 milligram alendronate [13] dose; is that right?

[14] A: Never. It was not available in the [15] Netherlands, and I believe in the whole of [16] Europe.

[17] Q: And you would agree with me, would you [18] not, that in terms of predicting whether the [19] 70-milligram dose would be tolerated — would be [20] well tolerated by patients, 70-milligram [21] once-a-week dose would be well tolerated by [22] patients, that the pamidronate data is not as [23] relevant as the clinical data with respect to [24] alendronate used in Paget's patients?

---

Page 700

[1] A: I wouldn't agree entirely with you, [2] because the pamidronate has also been used in all [3] types of patient populations. So you have a good [4] profile.

[5] And then you go to see what happened [6] with alendronate. Of course, you can't use the [7] data of pamidronate only to talk about [8] alendronate. This is obvious.

[9] You need to look at the data of [10] alendronate itself.

[11] Q: Well, on a scale of relevance, wouldn't [12] you put alendronate in Paget's a bit higher up [13] than pamidronate in osteoporosis?

[14] A: I don't honestly know.

[15] Q: Could we —

[16] A: Most probably, yes, I would say, because [17] it's — it is the relevant drug, although in a [18] different disease. But I would use my thinking, [19] and my extrapolations combined with the data I [20] have in osteoporosis for alendronate.

---

[21] If I didn't have any data on [22] osteoporosis alendronate, and you would ask me, [23] Dr. Papapoulos, we're going to do something in [24] osteoporosis. We have data with pamidronate and

---

Page 701

[1] in osteoporosis, and we have data with [2] alendronate in Paget's disease.

[3] What are you going to do? [4] Then, there, most probably, I'm [5] going to combine the experience and the weight of [6] the data in Paget's with alendronate. But if I [7] have data in osteoporosis, and this fits in tying [8] with my data with pamidronate in osteoporosis, [9] then I don't have to look anywhere else.

[10] Q: Now, in your — in the Netherlands, as I [11] understand it, the withdrawal rate from [12] alendronate in your daily — in the daily dose is [13] in the order of 12 percent; is that correct?

[14] A: That is absolutely correct.

[15] Q: For GI side effects?

[16] A: For GI side effects. And we know that in [17] the study with 11,000 patients where we had about [18] 12-percent withdrawals due to GI side effects [19] within the first six weeks. It is in my [20] deposition.

[21] Q: And those are patients taking the [22] 10-milligram dose?

[23] A: The 10-milligram, yeah. Mm-hmm.

[24] So my experience,

---

Page 702

[1] Pharmaca-Vigilance, and Ettinger's experience is [2] different from the clinical trials.

[3] Q: If we could look at Plaintiff's Exhibit [4] 115 that you testified to in your direct.

[5] A: What did you say? I'm sorry.

[6] Q: 115.

[7] A: I don't think I have 115.

[8] Q: 115?

[9] A: Sorry.

[10] Q: I believe you should have it. It's the [11] Kanis article.

[12] A: The paper of Dr. Kanis.

[13] Q: And this is — you referred to a passage [14] from this book. Sorry, from this article, and it [15] appears on Page 10 of the article.

[16] A: Yes, sir.

[17] Q: Is the — and the statement you referred [18] to says most frequently reported side effects is [19] gastric intolerance, which is dose dependent, and [20] occurs in about 10 percent of patients after oral [21] treatment with doses of 40 milligrams daily or [22] more.

[23] Now, is that — do you understand [24]

---

that to be a reference to the — to the Chestnut

---

Page 703

[1] data?

[2] A: It may be, it may not be, because he is [3] not referring specifically to that.

[4] Q: He gives no reference at all to what?

[5] A: Yeah. It may have been to that.

[6] But the point is, as I said before, [7] here I have an authority writing it.

[8] Q: I'm sorry, Doctor. I just have a [9] question for you.

[10] A: Oh, I'm sorry. I thought —

[11] Q: And that is: Are you aware of — did you [12] hear the testimony that Merck had no other [13] 40-milligram studies —

[14] A: Yes.

[15] Q: — in osteoporosis?

[16] A: Yes.

[17] Q: Other than the 10 milligram study, —

[18] A: Yes.

[19] Q: So you assume this is the Chestnut study?

[20] A: Now, that we're discussing that, yeah. [21] When I read the article back in 1995, no.

[22] Q: You don't assume —

[23] A: And every other person skilled in the art [24] would not read it like that. You could say oh,

---

Page 704

[1] perhaps this is the other study, the Chestnut, or [2] perhaps since he's not reporting anything, [3] perhaps he means something different.

[4] So I'm talking about the time of [5] publication.

[6] Q: So every time you saw this reference to [7] 10 percent of patients reporting gastric [8] intolerance at 40 milligrams daily, you assumed [9] it was, each time it's reported, it's a different [10] study?

[11] It didn't occur to you that it might [12] be the same study?

[13] A: It might be the same study, but I wasn't [14] sure, because I was surprised because there was [15] no physician involved in this study that didn't [16] refer to their study. So because it was never [17] referred to, I couldn't — I couldn't make any [18] kind of conclusion of that.

[19] Q: So because there was no reference, nobody [20] told you what study it was, you could say — you [21] could conclude it's maybe another study?

[22] A: Maybe.

[23] Q: Maybe it's not?

[24] A: Maybe.

**Merck & Co., Inc.  v.**
**Teva Pharmaceuticals USA**

Trial Volume Number 3
March 6, 2003

Page 705

[1] Q: Okay.

[2] A: For me, the most important thing was the [3] conclusion of Dr. Kanis.

[4] Q: And when Dr. Fleisch reports the similar [5] observation, again, that comes from the Chestnut [6] study, doesn't it?

[7] A: That's probably — yes, I mean.

[8] Q: That's not work by —

[9] A: Yes.

[10] Q: Dr. Fleisch doesn't do clinical trials; [11] right?

[12] A: Of course not.

[13] Q: Doctor, I'm putting up on the screen a [14] copy of — and I think it's a chapter written by [15] you, from a book called The Aging Skeleton. And [16] it's Defendant's Exhibit 527.

[17] A: Can I have a copy of it?

[18] Q: I'm getting a copy.

[19] I have a copy.

[20] A: Thank you.

[21] Q: Is this a chapter that you wrote?

[22] A: Yes.

[23] Q: And on the Page 543, which is the fourth, [24] the fifth page of the exhibit —

Page 706

[1] A: Which one are you saying?

[2] Q: 543.

[3] A: 543.

[4] Q: In the first full paragraph, it begins [5] with bisphosphonates.

[6] A: Yes.

[7] MR. LYNCH: Objection, Your Honor. [8] I've never received a copy of this exhibit [9] before.

[10] The last one we have is 523. I'm [11] just saying we weren't told.

[12] MR. GALBRAITH: This is [13] cross-examination. I don't know what kind of [14] rule that we have that provides cross-examination [15] exhibits are —

[16] MR. LYNCH: Your Honor, my thought [17] was that if this is an exhibit for impeachment, [18] it's fine. But then if it's not an exhibits, [19] it's used for impeachment. That's what I had [20] understood the rule was. If you want it to be [21] an exhibit, it's an exhibit.

[22] MR. GALBRAITH: Your Honor, the [23] exhibit I used for impeachment, or tried to [24] impeach with Dr. Russell, they put the numbers on

Page 707

[1] later and sent them to us.

[2] I'm just putting them on in advance.

[3] MR. LYNCH: That's what this is?

[4] BY MR. GALBRAITH:

[5] Q: Well, any way. Sorry, Dr. Papap-

oulos.

[6] A: Please carry on.

[7] Q: Do you see the chapter, the [8] paragraph [8] beginning Bisphosphonates?

[9] A: Oh, yes, I do.

[10] Q: And he says in referring to [11] bisphosphonates, you say rather, in the second [12] sentence differences. Do you see that?

[13] A: Yes.

[14] Q: Differences also exist in their [15] pharmacological and toxicological pro-files as [16] well as in their mechanism of action. It is, [17] therefore, important that the specific properties [18] of every individual bisphosphonate be deter-mined [19] and that result obtained with one bisphosphonate, [20] not be ex-trapolated readily to the whole class.

[21] And that's a statement that you [22] endorsed today; is that correct?

[23] A: This is an excellent statement to which I [24] referred also earlier of during in this

Page 708

[1] afternoon.

[2] MR. GALBRAITH: I have no further [3] questions, Your Honor. Thank you.

[4] BY MR. LYNCH:

[5] Q: One thing I want to go back to. You have [6] this little discussion with Mr. Galbraith about [7] treating Paget's pat-ients.

[8] Go to 531. You had some discussion, [9] about two sentences.

[10] A: 531, you say?

[11] Q: Yes. That's the — the chapter from

[12] A: From Fleisch.

[13] Q: Dr. Fleisch; right?

[14] A: Yes. 70.

[15] You said 73.

[16] Q: 72?

[17] A: 72. Yes.

[18] Q: Now, you concentrated — could you get [19] that up there?

[20] No. This is — this is 531.

[21] (Following a discussion held off the [22] record:)

[23] BY MR. LYNCH:

[24] Q: We'll put up — we don't have this one,

Page 709

[1] either?

[2] A: I mean, —

[3] MR. LYNCH: We didn't get this one, [4] either.

[5] THE WITNESS: I have it here.

[6] MR. LYNCH: I was asleep at the [7]

switch.

[8] THE WITNESS: I have it here. I [9] read it.

[10] BY MR. LYNCH:

[11] Q: You have it. You have it. Okay.

[12] Now, —

[13] MR. GALBRAITH: Do you want us to [14] put it up Mr. Lynch?

[15] MR. LYNCH: Yeah, put it up.

[16] THE WITNESS: It's at Page 572?

[17] BY MR. LYNCH:

[18] Q: 531, Page 572.

[19] All right. Now, good. [20] You focused on — counsel was [21] suggesting to you that Paget's patients should be [22] treat-ed if they're asymptomatic. Let's take a [23] look at everything that Dr. Fleisch said.

[24] A: I saw that he says, Dr. Fleisch, however,

Page 710

[1] many patients, especially those of whom [2] diagnosed were fortuitous, and who have no [3] symptoms need no treatment. So at the end of [4] the day, I was not so much in difference with his opinions.

[5] Q: Now, one thing. In connection, you [6] testified about the tolerability that Paget's [7] patients and osteoporosis patients have shown to [8] a number of bisphosphonates; is that correct?

[9] A: For a number, no. I said I have the [10] experience from pamidronate.

[11] Q: You have the experience, and the [12] literature reflects that there is such a [13] situation for alendronate as well?

[14] A: Yes.

[15] Q: Is that correct?

[16] A: Yes.

[17] Q: Now, and you indicated that that was [18] something you could not ex-plain?

[19] A: Yes.

[20] Q: My question is: Do you have an opinion [21] as to whether the fact that there is a difference [22] in the toleration level between those two kinds [23] of patients is something that's widely re-cognized [24] or recognized by those skilled in this metabolic

Page 711

[1] bone disease or not?

[2] MR. GALBRAITH: Objection. Beyond [3] the scope of cross.

[4] THE WITNESS: Sorry?

[5] THE COURT: Objection is noted. [6] Beyond the scope.

[7] You can answer.

[8] THE WITNESS: Can I carry on?

[9] THE COURT: Yes, you may.

[10] THE WITNESS: Certainly for people [11] who have experience in using these drugs both in [12] package and in osteoporosis.

[13] BY MR. LYNCH:

[14] Q: I'm sorry. Do you have an opinion that [15] they would have such an understanding?

[16] A: That physicians who use bisphosphonates [17] in treating both Paget's and also osteoporosis [18] would probably have this understanding.

[19] MR. LYNCH: No further questions, [20] Your Honor.

[21] THE COURT: All right. Thank you [22] Doctor.

[23] THE WITNESS: Thank you.

[24] MR. BARZOUKAS: Your Honor, Merck

Page 712

[1] calls Dr. Christopher Vellturo.

[2] MR. GALBRAITH: Your Honor, would [3] this be an okay place to take a break for us to [4] reorganize?

[5] THE COURT: I was going to take a [6] break at 3:00 to deal with a conference. But we [7] can break now.

[8] MR. GALBRAITH: That's fine. We can [9] break at 3:00.

[10] THE CLERK: Please state and spell [11] your full name for the record, please. [12] Christopher Vellturo, V-E-L-L-T-U-R-O.

[14] CHRISTOPHER VELLTURO, [15] the witness herein, having first been [16] duly sworn on oath, was examined and [17] testified as follows:

[18] DIRECT EXAMINATION

[20] BY MR. BARZOUKAS:

[21] Q: Good afternoon, Dr. Vellturo.

[22] A: Good afternoon.

[23] Q: Dr. Vellturo, could you just briefly [24] summarize for us your educational experience?

Page 713

[1] A: Yes. I have a bachelor of science degree [2] in applied mathematics and economics from Brown [3] University in Province, Rhode Island, and a Ph.D. in [4] economics from MIT in Cambridge, [5] Massachusetts.

[6] Q: Did you concentrate your study in any [7] particular areas?

[8] A: Yes, I did. At MIT, you have to choose [9] two fields that are going to be your field of [10] specialty, and I chose and pursued industrial [11] organization and econometrics.

[12] Q: And could you explain for us those [13] disciplines briefly?

[14] A: Sure. Industrial organization is a

[15] subdiscipline of something called microeconomics. [16] And what industrial organization does is it [17] studies how markets form and how firms interact [18] and compete in those markets and how — not only [19] between each other, but how they interact and [20] compete for customers, as well. So that's [21] industrial organization.

[22] Econometrics is the application of [23] statistical and possibilistic theory and [24] applications to economic data.

Page 714

[1] Q: And Dr. Vellturo, what have you done [2] since you finished with your studies?

[3] A: Since that time, I've taken those two [4] specialty fields, industrial organization and [5] econometrics, and I have applied them to a wide [6] variety of specific market problems in the [7] context of many different markets in many [8] different kinds of issues.

[9] Q: Have you concentrated professionally in [10] any particular areas?

[11] A: No. I'd say that my work has been pretty [12] broad based. I've done a lot of merger work [13] that's taken me before various regulatory [14] agencies in the United States and around the [15] world. I've done some work for commercial [16] success issues in patent cases such as this. [17] I've done work on damages issues in patent cases. [18] It's been a very broad array.

[19] MR. BARZOUKAS: Your Honor, Merck [20] offers Dr. Vellturo as an expert in economics.

[21] MR. GALBRAITH: No objection.

[22] BY MR. BARZOUKAS:

[23] Q: Dr. Vellturo, did you receive an [24] assignment with respect to this case?

Page 715

[1] A: I did.

[2] Q: And could you describe the assignment?

[3] A: I think the assignment I received was to [4] evaluate whether Fosamax once weekly had been [5] commercially successful in the marketplace, and [6] whether that success could be attributed to the [7] characteristics of the product associated with [8] the Daifotis patents.

[9] Q: And did you reach any conclusions after [10] your analysis?

[11] A: Yes, I did.

[12] Q: And what were those conclusions?

[13] A: There were two. The first would be that [14] once weekly was indeed a commercially successful [15] product, and that its commercial success could be

[16] at least in part, significant part, attributable [17] to the Daifotis patents.

[18] Q: Now, did you perform any background work [19] in order to do your analysis?

[20] A: I did.

[21] Q: And what did you do?

[22] A: Let's see. I certainly read the patents. [23] That was an interesting exercise. I looked at [24] business documents of the parties in this case

Page 716

[1] that were produced. I collected some publicly- [2] available information, as well. I went and met [3] with Merck individuals who are involved in both [4] the osteoporosis side of their business and also [5] their market research people. I collected data [6] from a number of sources, including IMS, a very [7] extensive and common source for information on [8] prescriptions of pharmaceuticals. And I put that [9] all together, and I've conducted an analysis of [10] commercial success, and I was asked to write a [11] report about my findings, and I did so. And I [12] was, I think, deposed sometime in January, and [13] here I sit.

[14] Q: You mentioned IMS. Could you explain a [15] little bit more what IMS is?

[16] A: IMS is a — they used to be a subsidiary [17] of Dunn & Bradstreet, but I think they've spun [18] off on their own now; they're independently [19] incorporated.

[20] They're a data collection firm, and [21] they specialize in the medical industry, but they [22] particularly specialize in collecting data on [23] prescribing patterns of physicians but also [24] prescriptions volumes as they flow through drug

Page 717

[1] stores and other avenues.

[2] Q: Do you have any knowledge particularly [3] about the underlying data that they collect?

[4] A: Yeah, I do. I actually worked on a [5] merger for IMS, actually a series of mergers for [6] IMS over the last five to seven years. I've [7] spent a great deal of time with their business [8] people and their data people.

[9] And so aside from the fact that I [10] use it all the time when I study pharmaceutical [11] industries, I've actually worked with them and [12] specifically spent time with them understanding [13] how they collect their information.

[14] MR. BARZOUKAS: Your Honor, you [15] mentioned you were going to take a break at 3:00, [16] and this may be a good point to do so.

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MERCK & CO., INC.,

        Plaintiff,

    v.

TEVA PHARMACEUTICALS U.S.A., INC.,

        Defendant.

Civil Action No. 04-939 (JJF)

## DEFENDANT'S RESPONSE AND OBJECTIONS TO PLAINTIFF MERCK & CO., INC.'S FIRST SET OF REQUESTS FOR THE PRODUCTION OF DOCUMENTS AND THINGS

Defendant, Teva Pharmaceuticals U.S.A., Inc. ("Teva"), pursuant to Rule 34 of the Federal Rules of Civil Procedure and Delaware Local Rule 26.1, hereby submits its response and objections to the First Request for the Production of Documents and Things by plaintiff, Merck & Co., Inc. ("Merck").

## GENERAL OBJECTIONS

1.    Teva objects to Merck's document requests and "Definitions and Instructions" to the extent that they attempt to impose obligations beyond those imposed by the Federal Rules of Civil Procedure and/or by the Local Rules of the United States District Court for the District of Delaware.

2.    Teva objects to Merck's document requests to the extent that they call for information that is protected by the attorney-client privilege and/or the work-product doctrine, or is otherwise immune from discovery. Inadvertent disclosure of such information shall not constitute a waiver of any privilege or other basis for objecting to discovery, nor shall it

constitute a waiver of the right of Teva to object to the use of, and/or seek the return of, any such information that may be inadvertently disclosed.

3.    Teva objects to Definition A of Merck's document requests because it is overly broad and unduly burdensome and because it seeks to impose an obligation upon Teva to inquire about or search for documents and things that are not within its possession, custody, or control within the meaning of Fed. R. Civ. P. 34. Teva will respond to the document requests with respect to Teva Pharmaceuticals U.S.A., Inc., and the term "Teva" in these responses shall mean Teva Pharmaceuticals U.S.A., Inc. only.

4.    Teva objects to the production of documents reflecting any trade secrets or other proprietary or confidential information to persons other than outside (*i.e.*, trial) counsel for Merck until a protective order has been entered.

5.    To the extent that Merck's document requests purport to require production of documents not related to making, using, importing, promoting or selling products in the United States, Teva objects to them as overly broad, unduly burdensome and seeking information that is irrelevant to any issue in this lawsuit or not reasonably calculated to lead to the discovery of admissible evidence.

6.    To the extent that Merck's document requests fail to identify a specific period of time from which documents must be produced, or include any period of time more recent than the date Merck filed its complaint in this action, Teva objects to them as overly broad, unduly burdensome and seeking information that is irrelevant to any issue in this lawsuit or not reasonably calculated to lead to the discovery of admissible evidence. Unless otherwise stated, Teva will produce documents not otherwise objected to for that were prepared prior to the date Merck filed the complaint in this action.

7. Teva's representation that documents or things will be produced in response to a particular request shall not be construed as a representation that any such documents actually exist or are within Teva's possession, custody, or control.

8. All responses are made on an express reservation of the General Objections set forth above, and any Specific Objections set forth below.

## SPECIFIC RESPONSES AND OBJECTIONS

Without waiver of the foregoing General Objections, which are incorporated by reference into each of the following Specific Responses and which shall be deemed as limiting each of the following Specific Responses, and without conceding the relevance or materiality of the subject matter of any document or document request, Teva responds as follows:

Request for Production No. 1:
All documents and things that constitute, refer, or relate to the patents-in-suit.

Response to Request for Production No. 1:

Teva objects to this request to the extent that it imposes an obligation upon Teva to inquire about or search for documents and things that are not within its possession, custody, or control within the meaning of Fed. R. Civ. P. 34. Teva further objects to this request to the extent that it calls for information that is protected by the attorney-client privilege and/or the work-product doctrine, or is otherwise immune from discovery. Subject to the foregoing Specific and General Objections, Teva will produce relevant, non-privileged documents in the possession, custody, or control of Teva that can be located by a reasonable search.

Request for Production No. 2:
All opinions, legal or otherwise, relating to the validity, invalidity, infringement, non-infringement, enforceability, non-enforceability, liability, or license (either express or implied) to Defendant for any of the patents-in-suit or any other defense.

Response to Request for Production No. 2:

      Teva objects to this request as vague and ambiguous in its use of the terms "or otherwise"

and "non-enforceability". Teva objects to this request to the extent that it calls for information

that is protected by the attorney-client privilege and/or the work-product doctrine, or is otherwise

immune from discovery. Subject to the foregoing Specific and General Objections, Teva will

produce relevant, non-privileged documents in the possession, custody, or control of Teva that

can be located by a reasonable search.

Request for Production No. 3:

      All documents and things, including correspondence and communications with counsel,
relating to the validity, invalidity, infringement, non-infringement, enforceability, non-
enforceability, liability, or license (either express or implied) to Defendant for any of the
patents in-suit or any other defense.

Response to Request for Production No. 3:

      Teva objects to this request as vague and ambiguous in its use of the term "non-

enforceability". Teva objects to this request to the extent that it calls for information that is

protected by the attorney-client privilege and/or the work-product doctrine, or is otherwise

immune from discovery. Subject to the foregoing Specific and General Objections, Teva will

produce relevant, non-privileged documents in the possession, custody, or control of Teva that

can be located by a reasonable search.

Request for Production No. 4:

      All documents and things relating to patent clearances, freedom to operate opinions or
other mechanisms to avoid infringement or willful infringement by Defendant of the
patents-in-suit.

Response to Request for Production No. 4:

      Teva objects to this request to the extent that the phrases "other mechanisms to avoid

infringement", "patent clearances", and "freedom to operate" are vague and ambiguous. Teva

further objects to this request to the extent that it calls for information that is protected by the

-4-

attorney-client privilege and/or the work-product doctrine, or is otherwise immune from discovery. Subject to the foregoing Specific and General Objections, Teva will produce relevant, non-privileged documents in the possession, custody, or control of Teva that can be located by a reasonable search.

Request for Production No. 5:

All documents and things relating to any policies or practices of Defendant concerning patent clearances, freedom to operate opinions or other mechanisms to avoid infringement or willful infringement by Defendant of the patents of others.

Response to Request for Production No. 5:

Teva objects to this request to the extent that the phrase "other mechanisms to avoid infringement" is vague and ambiguous. Teva also objects to this request as vague, ambiguous, overly broad, and unduly burdensome to the extent that it calls for documents relating to "the patents of others." Teva additionally objects to this interrogatory to the extent that it calls for information not relevant to any claim or defense of a party in this action and/or not reasonably calculated to lead to the discovery of admissible evidence. Teva further objects to this request to the extent that it calls for information that is protected by the attorney-client privilege and/or the work-product doctrine, or is otherwise immune from discovery. Subject to the foregoing Specific and General Objections, Teva will produce relevant, non-privileged documents in the possession, custody, or control of Teva that can be located by a reasonable search.

Request for Production No. 6:

Abbreviated New Drug Application No. 77-132, including all amendments and supplements thereto.

Response to Request for Production No. 6:

Teva objects to this interrogatory as overly broad and to the extent that it calls for information not relevant to any claim or defense of a party in this action and/or not reasonably calculated to lead to the discovery of admissible evidence. Subject to the foregoing Specific and

General Objections, Teva will produce relevant, non-privileged documents in the possession,

custody, or control of Teva that can be located by a reasonable search.

Request for Production No. 7:
    All Abbreviated New Drug Applications, including all amendments and supplements
    thereto, filed by Defendant with the FDA for risedronate.

Response to Request for Production No. 7:
    Teva objects to this interrogatory as overly broad and to the extent that it calls for

information not relevant to any claim or defense of a party in this action and/or not reasonably

calculated to lead to the discovery of admissible evidence. Subject to the foregoing Specific and

General Objections, Teva will produce relevant, non-privileged documents in the possession,

custody, or control of Teva that can be located by a reasonable search related to ANDA No. 77-

132.


Request for Production No. 8:
    All pharmaceutical applications, including all amendments and supplements thereto,
    relating to risedronate filed by Defendant with any regulatory agency, either in the United
    States or a foreign country.

Response to Request for Production No. 8:
    Teva objects to this request as vague, ambiguous, overly broad, and unduly burdensome

to the extent that it calls for documents relating to "[a]ll pharmaceutical applications." Teva

further objects to this request to the extent that it requires production of documents not related to

making, using, importing, promoting or selling products in the United States, as overly broad,

unduly burdensome, and seeking information that is irrelevant to any claim or defense of a party

in this litigation and/or not reasonably calculated to lead to the discovery of admissible evidence.

Teva further objects to this request to the extent that it calls for information that is protected by

the attorney-client privilege and/or the work-product doctrine, or is otherwise immune from

discovery. Subject to the foregoing Specific and General Objections, Teva will produce relevant,

non-privileged documents in the possession, custody, or control of Teva that can be located by a reasonable search related to ANDA No. 77-132.

Request for Production No. 9:
    All documents and things relating to or constituting correspondence or other communications, including but not limited to draft documents and correspondence, among Defendant and/or between Defendant and/or any other person and any foreign or domestic regulatory agency, including but not limited to the FDA or a foreign counterpart to the FDA concerning risedronate.

Response to Request for Production No. 9:
    Teva objects to this request as overly broad, unduly burdensome, and seeking information that is irrelevant to any claim or defense of a party in this litigation and/or not reasonably calculated to lead to the discovery of admissible evidence to the extent that it requires production of documents not related to making, using, importing, promoting or selling products in the United States. Teva additionally objects to this request to the extent that the phrase "foreign counterpart" is vague, ambiguous, overly broad, and unduly burdensome. Teva further objects to this request to the extent that it calls for information that is protected by the attorney-client privilege and/or the work-product doctrine, or is otherwise immune from discovery. Subject to the foregoing Specific and General Objections, Teva will produce relevant, non-privileged documents in the possession, custody, or control of Teva that can be located by a reasonable search related to correspondence with the FDA about ANDA No. 77-132.

Request for Production No. 10:
    All documents and things relating to the patent certifications made by Defendant as part of an Abbreviated New Drug Application for risedronate.

Response to Request for Production No. 10:
    Teva objects to this request as vague and ambiguous to the extent that it calls for documents related to "an Abbreviated New Drug Application for risedronate." Teva further objects to this request to the extent that it calls for information that is protected by the attorney-

client privilege and/or the work-product doctrine, or is otherwise immune from discovery. Subject to the foregoing Specific and General Objections, Teva will produce relevant, non-privileged documents in the possession, custody, or control of Teva that can be located by a reasonable search related to ANDA No. 77-132.

Request for Production No. 11:
    All documents and things relating to the timing, schedule, timetable or projection of approval of Defendant's Abbreviated New Drug Application for risedronate.

Response to Request for Production No. 11:
    Teva objects to this request as vague and ambiguous to the extent that it calls for documents related to "Defendant's Abbreviated New Drug Application for risedronate", and to the extent that it uses the terms "timing, schedule, timetable or projection of approval". Teva objects to this request to the extent that it calls for information not relevant to any claim or defense of a party in this action and/or not reasonably calculated to lead to the discovery of admissible evidence. Teva additionally objects to this request to the extent that it calls for information that is protected by the attorney-client privilege and/or the work-product doctrine, or is otherwise immune from discovery. Subject to the foregoing Specific and General Objections, Teva will produce relevant, non-privileged documents in the possession, custody, or control of Teva, that can be located by a reasonable search related to ANDA No. 77-132.

Request for Production No. 12:
    All documents and things related to Teva's Notice of Patent Certification.

Response to Request for Production No. 12:
    Teva objects to this request as overly broad, unduly burdensome, and seeking information that is irrelevant to any claim or defense of a party in this litigation and/or not reasonably calculated to lead to the discovery of admissible evidence to the extent that it calls for "all documents" related to Teva's Notice of Patent Certification. Teva further objects to this request

to the extent that it calls for information that is protected by the attorney-client privilege and/or

the work-product doctrine, or is otherwise immune from discovery. Subject to the foregoing

Specific and General Objections, Teva will produce relevant, non-privileged documents in the

possession, custody, or control of Teva that can be located by a reasonable search related to

ANDA No. 77-132.

Request for Production No. 13:
        All documents and things relating to Defendant's decision to file a paragraph IV patent
certification as part of an Abbreviated New Drug Application for risedronate.

Response to Request for Production No. 13:
        Teva objects to this interrogatory to the extent that it calls for information not relevant to

any claim or defense of a party in this action and/or not reasonably calculated to lead to the

discovery of admissible evidence. Teva objects to this request to the extent that it calls for

information that is protected by the attorney-client privilege and/or the work-product doctrine, or

is otherwise immune from discovery. Subject to the foregoing Specific and General Objections,

Teva will produce relevant, non-privileged documents in the possession, custody, or control of

Teva that can be located by a reasonable search related to ANDA No. 77-132.

Request for Production No. 14:
        All documents and things relating to the first awareness of the patents-in-suit by
Defendant.

Response to Request for Production No. 14:
        Teva objects to this request to the extent that the phrase "first awareness" is vague and

ambiguous. Teva additionally objects to this request as overly broad, unduly burdensome, and

seeking information that is irrelevant to any claim or defense of a party in this litigation and/or

not reasonably calculated to lead to the discovery of admissible evidence. Teva further objects to

this request to the extent that it calls for information that is protected by the attorney-client

privilege and/or the work-product doctrine, or is otherwise immune from discovery. Subject to

the foregoing Specific and General Objections, Teva will produce relevant, non-privileged documents in the possession, custody, or control of Teva that can be located by a reasonable search.

Request for Production No. 15:
    All documents and things created before the filing of this suit concerning or constituting any search for publications and documents relating to any of the patents-in-suit.

Response to Request for Production No. 15:
    Teva objects to this request to the extent that the phrase "any search" is vague, ambiguous, overly broad, and unduly burdensome. Teva further objects to this request to the extent that it imposes an obligation upon Teva to inquire about or search for documents and things that are not within its possession, custody, or control within the meaning of Fed. R. Civ. P. 34. Teva additionally objects to this request as overly broad, unduly burdensome, and seeking information that is irrelevant to any claim or defense of a party in this litigation and/or not reasonably calculated to lead to the discovery of admissible evidence. Teva further objects to this request to the extent that it calls for information that is protected by the attorney-client privilege and/or the work-product doctrine, or is otherwise immune from discovery. Subject to the foregoing Specific and General Objections, Teva will produce relevant, non-privileged documents in the possession, custody, or control of Teva that can be located by a reasonable search.

Request for Production No. 16:
    All documents and things that Defendant contends support an allegation that any claim of any of the patents-in-suit is invalid.

Response to Request for Production No. 16:
    Teva objects to this request to the extent that it calls for information that is protected by the attorney-client privilege and/or the work-product doctrine, or is otherwise immune from discovery. Subject to the foregoing Specific and General Objections, Teva will produce relevant,

non-privileged documents in the possession, custody, or control of Teva that can be located by a reasonable search.

Request for Production No. 17:
      All documents and things forming the basis of, or relating to, Defendant's contention that any of the claims of the patents-in-suit is not, and/or will not be, infringed by Defendant.

Response to Request for Production No. 17:
      Teva objects to this request to the extent that the phrase "forming the basis of" is vague and ambiguous. Teva further objects to this request to the extent that it calls for information that is protected by the attorney-client privilege and/or the work-product doctrine, or is otherwise immune from discovery. Subject to the foregoing Specific and General Objections, Teva will produce relevant, non-privileged documents in the possession, custody, or control of Teva that can be located by a reasonable search related to the compositions that are the subject of ANDA No. 77-132.

Request for Production No. 18:
      All documents and things forming the basis of, or relating to, any and all defenses pleaded by Defendant that any claim of the patents-in-suit is invalid.

Response to Request for Production No. 18:
      Teva objects to this request to the extent that the phrase "forming the basis of" is vague and ambiguous. Teva further objects to this request to the extent that it calls for information that is protected by the attorney-client privilege and/or the work-product doctrine, or is otherwise immune from discovery. Subject to the foregoing Specific and General Objections, Teva will produce relevant, non-privileged documents in the possession, custody, or control of Teva that can be located by a reasonable search.

Request for Production No. 19:
      All documents and things forming the basis of, or relating to, Defendant's contention that any of the claims of the patents-in-suit is invalid as lacking a written description.

<u>Response to Request for Production No. 19:</u>

Teva objects to this request to the extent that the phrase "forming the basis of" is vague and ambiguous. Teva further objects to this request to the extent that it calls for information that is protected by the attorney-client privilege and/or the work-product doctrine, or is otherwise immune from discovery. Subject to the foregoing Specific and General Objections, Teva will produce relevant, non-privileged documents in the possession, custody, or control of Teva that can be located by a reasonable search.

<u>Request for Production No. 20:</u>

All documents and things forming the basis of, or relating to, Defendant's contention that any of the claims of the patents-in-suit is invalid as the specification does not enable the claims.

<u>Response to Request for Production No. 20:</u>

Teva objects to this request to the extent that the phrase "forming the basis of" is vague and ambiguous. Teva further objects to this request to the extent that it calls for information that is protected by the attorney-client privilege and/or the work-product doctrine, or is otherwise immune from discovery. Subject to the foregoing Specific and General Objections, Teva will produce relevant, non-privileged documents in the possession, custody, or control of Teva that can be located by a reasonable search.

<u>Request for Production No. 21:</u>

All documents and things forming the basis of, or relating to, Defendant's contention that any of the claims of the patents-in-suit is invalid as indefinite.

<u>Response to Request for Production No. 21:</u>

Teva objects to this request to the extent that the phrase "forming the basis of" is vague and ambiguous. Teva further objects to this request to the extent that it calls for information that is protected by the attorney-client privilege and/or the work-product doctrine, or is otherwise immune from discovery. Subject to the foregoing Specific and General Objections, Teva will

produce relevant, non-privileged documents in the possession, custody, or control of Teva that

can be located by a reasonable search.

<u>Request for Production No. 22:</u>
 All documents and things forming the basis of, or relating to, Defendant's contention that
any of the claims of the patents-in-suit is invalid as lacking utility.

<u>Response to Request for Production No. 22:</u>
 Teva objects to this request to the extent that the phrase "forming the basis of" is vague

and ambiguous. Teva further objects to this request to the extent that it calls for information that

is protected by the attorney-client privilege and/or the work-product doctrine, or is otherwise

immune from discovery. Subject to the foregoing Specific and General Objections, Teva will

produce relevant, non-privileged documents in the possession, custody, or control of Teva that

can be located by a reasonable search.

<u>Request for Production No. 23:</u>
 All documents and things forming the basis of, or relating to, Defendant's contention that
any of the claims of the patents-in-suit is anticipated.

<u>Response to Request for Production No. 23:</u>
 Teva objects to this request to the extent that the phrase "forming the basis of" is vague

and ambiguous. Teva further objects to this request to the extent that it calls for information that

is protected by the attorney-client privilege and/or the work-product doctrine, or is otherwise

immune from discovery. Subject to the foregoing Specific and General Objections, Teva will

produce relevant, non-privileged documents in the possession, custody, or control of Teva that

can be located by a reasonable search.

<u>Request for Production No. 24:</u>
 All documents and things forming the basis of, or relating to, Defendant's contention that
any of the claims of the patents-in-suit is invalid as obvious.

WP3:1115673.1

999999.0755

<u>Response to Request for Production No. 24:</u>

Teva objects to this request to the extent that the phrase "forming the basis of" is vague and ambiguous. Teva further objects to this request to the extent that it calls for information that is protected by the attorney-client privilege and/or the work-product doctrine, or is otherwise immune from discovery. Subject to the foregoing Specific and General Objections, Teva will produce relevant, non-privileged documents in the possession, custody, or control of Teva that can be located by a reasonable search.

<u>Request for Production No. 25:</u>

All documents and things relating to any legal or administrative proceedings concerning the manufacture, importation, sale, and/or offer for sale of pharmaceutical formulations of risedronate in the U.S. by Defendant or any other person.

<u>Response to Request for Production No. 25:</u>

Teva objects to this request to the extent that the phrase "administrative proceedings" is vague, ambiguous, overly broad, and unduly burdensome. Teva additionally objects to this request to the extent that the phrase "or any other person" is overly broad and unduly burdensome, and imposes an obligation upon Teva to inquire about or search for documents and things that are not within its possession, custody, or control within the meaning of Fed. R. Civ. P. 34. Teva further objects to this request to the extent that it calls for information that is protected by the attorney-client privilege and/or the work-product doctrine, or is otherwise immune from discovery. Subject to the foregoing Specific and General Objections, Teva will produce relevant, non-privileged documents in the possession, custody, or control of Teva that can be located by a reasonable search related to ANDA No. 77-132.

<u>Request for Production No. 26:</u>

All documents and things concerning any indemnification provided to or received by, or granted by Defendant against or for the infringement of any of the patents-in-suit.

<u>Response to Request for Production No. 26:</u>

Teva objects to this request to the extent that the phrase "indemnification" is vague, ambiguous, overly broad, and unduly burdensome. Teva further objects to this request to the extent that it calls for information that is protected by the attorney-client privilege and/or the work-product doctrine, or is otherwise immune from discovery. Subject to the foregoing Specific and General Objections, Teva will produce relevant, non-privileged documents in the possession, custody, or control of Teva that can be located by a reasonable search.

<u>Request for Production No. 27:</u>

All documents and things concerning any insurance provided to or received by, or granted by Defendant against or for the infringement of any of the patents-in-suit.

<u>Response to Request for Production No. 27:</u>

Teva objects to this request to the extent that the phrase "any insurance" is vague, ambiguous, overly broad, unduly burdensome, and seeking information that is irrelevant to any issue in this lawsuit or not reasonably calculated to lead to the discovery of admissible evidence. Teva objects to this request to the extent that it calls for information that is protected by the attorney-client privilege and/or the work-product doctrine, or is otherwise immune from discovery. Subject to the foregoing Specific and General Objections, Teva will produce relevant, non-privileged documents in the possession, custody, or control of Teva that can be located by a reasonable search.

<u>Request for Production No. 28:</u>

All documents and things relating to U.S. or foreign lawsuits, investigations, or administrative proceedings regarding Defendant's production of risedronate.

<u>Response to Request for Production No. 28:</u>

Teva objects to this request to the extent that the phrases "investigations" and "administrative proceedings" are vague, ambiguous, overly broad, unduly burdensome, and seeking information that is irrelevant to any issue in this lawsuit or not reasonably calculated to

lead to the discovery of admissible evidence. Teva further objects to this request to the extent that it calls for information related to "foreign lawsuits" as seeking information that is irrelevant to any issue in this lawsuit or not reasonably calculated to lead to the discovery of admissible evidence. Teva additionally objects to this request to the extent that it calls for information that is protected by the attorney-client privilege and/or the work-product doctrine, or is otherwise immune from discovery. Subject to the foregoing Specific and General Objections, Teva will produce relevant, non-privileged documents in the possession, custody, or control of Teva that can be located by a reasonable search related to U.S. lawsuits, investigations, and/or administrative proceedings related to ANDA No. 77-132.

Request for Production No. 29:

    All documents and things relating to any manufacture, importation, use, sale, and/or offer for sale of pharmaceutical formulations of risedronate in the U.S. by Defendant or any other person.

Response to Request for Production No. 29:

    Teva objects to this request to the extent that the phrase "or any other person" is overly broad and unduly burdensome, and imposes an obligation upon Teva to inquire about or search for documents and things that are not within its possession, custody, or control within the meaning of Fed. R. Civ. P. 34. Teva additionally objects to this request to the extent that it calls for information that is protected by the attorney-client privilege and/or the work-product doctrine, or is otherwise immune from discovery. Subject to the foregoing Specific and General Objections, Teva will produce relevant, non-privileged documents in the possession, custody, or control of Teva that can be located by a reasonable search.

Request for Production No. 30:

    All documents and things relating to any supply agreement for risedronate.

999999.0755