EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MERCK & CO., INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 04-939 (GMS) |
| | ) | |
| TEVA PHARMACEUTICALS USA, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**TEVA PHARMACEUTICALS USA, INC.'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

**I.      BACKGROUND**

1.      Plaintiff Merck & Co., Inc. ("Merck") is a corporation incorporated under the laws of the State of New Jersey, with its principal place of business at One Merck Drive, Whitehouse Station, NJ 08889. *Joint Statement of Uncontested Facts* at ¶ 1.

2.      Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a corporation incorporated under the laws of the State of Delaware, with its principal place of business at 650 Cathill Road, Sellersville, PA. *Joint Statement of Uncontested Facts* at ¶ 2.

3.      On November 30, 1999, United States Patent No. 5,994,329 ("the '329 patent") was issued. *Joint Statement of Uncontested Facts* at ¶ 3.

4.      Merck is the owner of the '329 patent. *Joint Statement of Uncontested Facts* at ¶ 4.

5.      On August 13, 2002, United States Patent No. 6,432,932 ("the '932 patent") was issued. *Joint Statement of Uncontested Facts* at ¶ 5.

6.      Merck is the owner of the '932 patent.  *Joint Statement of Uncontested Facts* at ¶ 6.

7.      Teva USA has filed Abbreviated New Drug Application ("ANDA") No. 77-132, including a certification under Title 21, United States Code § 355(j)(2) with the Food and Drug Administration ("FDA") for tablets containing 35 mg of risedronate sodium.  *Joint Statement of Uncontested Facts* at ¶ 7.

8.      Teva stipulates for the purposes of this trial that the commercial marketing of Teva USA's proposed 35 mg risedronate sodium tablets, in accordance with ANDA No. 77-132, would infringe claims 20 and 34 of the '329 patent if those claims are valid. *Joint Statement of Uncontested Facts* at ¶ 8.

9.      Merck stipulates that the date of invention for claims 20 and 24 of the '329 patent is July 22, 1997.  *Joint Statement of Uncontested Facts* at ¶ 9; *see also .Merck & Co. v. Teva Pharmaceuticals USA, Inc.,*  ("*Merck II*") 395 F.3d 1364, 1366 (Fed. Cir. 2005); *Merck & Co. v. Teva Pharmaceuticals USA*, *Inc.* ("*Merck I*") 288 F. Supp. 2d 601, 606 (D. Del. 2003).

10.      As set forth by the Federal Circuit in *Merck II*, the claim term "about" in the '329 and '932 patents should be given its ordinary meaning of  "approximately." *Merck II* at 1372; *Joint Statement of Uncontested Facts* at ¶ 11.

11.      As set forth in *Merck II*, claims 23 and 37 of the '329 patent, directed to the weekly dosing of the bisphosphonate alendronate for the treatment and prevention of osteoporosis, are obvious in light of the prior art.  *Merck II* at 1373.

### A.    Bone Biology and the Mechanism of Action of Risedronate

12.    Bone is the tissue that provides mechanical support to the body, enabling us to move around.  Bone is made up of a protein matrix, which is overlaid with mineral to give bone its hardness.  Two primary types of cells act in the maintenance of bone: i) osteoclasts, which break down bone, and ii) osteoblasts, which build new bone.

13.    The process of bone destruction and reformation is known as bone "remodeling."  In the normal bone remodeling process, osteoclasts attach to the bone surface, become activated, and erode away the bone material beneath them, leaving a defect in the bone structure.  The destruction of bone by osteoclasts is called bone "resorption."  Osteoblasts attach to the eroded surface of the defect created by the osteoclasts, lay down new bone, and then become quiescent.  In the normal healthy adult the remodeling process is balanced, *i.e.*, the same amount of bone is destroyed and built.

14.    In osteoporosis, bone destruction and formation are no longer balanced and bone is destroyed faster than it is replaced. Osteoporosis therefore can lead to bone that is thinner, weaker, more fragile, and porous.

15.    Osteoporosis is a serious, costly disease.  Osteoporosis patients include those who have lost bone mass but have no other clinical signs; such people are diagnosed with laboratory tests such as x-rays or bone density measurements.  Other osteoporosis patients, however, may be diagnosed after suffering a wrist or hip fracture, which is often the first sign of bone weakness.  Osteoporosis of the spine, and the resulting fractures of the vertebrae, results in stooping or bending of the back, and loss of stature.  In frail patients, hip fractures resulting from osteoporosis may be disabling,

leading to a decreased quality of life. Hip fractures leave some patients bed ridden, and can lead to increased mortality.

16.     Osteoporosis is treated primarily by inhibiting bone resorption — thus restoring the balance between bone destruction and bone formation. Risedronate treats osteoporosis by blocking the bone destroying effects of osteoclasts and thereby inhibiting bone resorption. A small portion of the ingested drug makes its way and adheres to the bone surface, where it resides until it is taken up by osteoclasts. The risedronate then inhibits the osteoclasts from resorbing bone. This process was well understood when Merck filed the '329 patent application in July 1997.

17.     Paget's disease is another common bone disease characterized by increased bone resorption. In Paget's disease, increased bone remodeling occurs in localized areas of the skeleton. Patients with Paget's disease also exhibit a spectrum of clinical problems, but Paget's disease is often diagnosed in patients without symptoms during routine blood tests or x-ray examinations, and treatment is often encouraged even in these asymptomatic patients. Depending on the site of involvement, if Paget's disease is not detected and treated early it can lead to increases in bone size, fractures, and deformity, potentially resulting in other complications. Like osteoporosis, Paget's disease is treated by inhibiting bone resorption with risedronate.

18.     The biological characteristics of bisphosphonates, including risedronate, require patients to follow a set of complicated and inconvenient dosing instructions. Because risedronate is bound up by metal ions (e.g., calcium) in food and beverages, patients are instructed to take the product upon arising in the morning, with plain water, a half an hour before eating. Because bisphosphonates were recognized to be potential

irritants to the esophagus, patients were instructed to take the product with a full glass of water and to sit or stand upright for at least one-half hour after taking the medication. The latter instruction insured that the tablets would enter the stomach efficiently, without being held up in the esophagus and potentially causing irritation. Patients, especially the very elderly, found these instructions to be inconvenient and difficult to adhere to on a daily basis, sometimes to the point of causing discontinuation of the medication.

### B.    The '329 Patent

19.    The '329 patent issued from U.S. Application No. 09/134,214 ("the '214 application"), filed August 14, 1998. The '214 application is a continuation of PCT/US98/14796, filed July 17, 1998, and claims priority to U.S. Provisional Application Nos. 60/053,535, filed July 23, 1997 and 60/053,351, filed July 22, 1997. As noted above, Merck stipulates that the invention date of the subject matter of the '329 patent is July 22, 1997. *Supra* at ¶ 9.

20.    The '329 patent discloses less frequent than daily administration of bisphosphonates, including risedronate, to inhibit bone resorption. The specification of the '329 patent focuses primarily on the use of alendronate on a less frequent than daily basis. Claims 20 and 34, the claims asserted by Merck in this action, relate specifically to the treatment and prevention of osteoporosis through the less frequent than daily administration of risedronate. These claims are dependent from several others and are summarized as follows:

> 20.    A method for treating osteoporosis in a mammal in need thereof comprising orally administering to said mammal a pharmaceutically effective amount of a bisphosphonate chosen from the group consisting of risedronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof, as a unit dosage according to a continuous schedule having a dosing interval selected from

the group consisting of once-weekly dosing, twice-weekly dosing, biweekly dosing, and twice-monthly dosing.

34.    A method for preventing osteoporosis in a mammal in need thereof comprising orally administering to said mammal a pharmaceutically effective amount of a bisphosphonate chosen from the group consisting of risedronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof, as a unit dosage according to a continuous schedule having a dosing interval selected from the group consisting of once-weekly dosing, twice-weekly dosing, biweekly dosing, and twice-monthly dosing.

The only difference between the two claims is that Claim 20 is directed to the "treatment" and Claim 34 is directed to the "prevention" of osteoporosis. Thus, the idea behind the asserted claims is straight-forward. Instead of taking a daily dose of risedronate to treat and prevent osteoporosis, risedronate could be taken once or twice a week, every other week, or twice a month.

21.    Although the asserted claims relate to the administration of risedronate on a less-frequent-than-daily basis for the management of osteoporosis in mammals, there are no data in the '329 patent relating to the administration of risedronate to mammals on a less-than-daily basis. As discussed below, the reason for this is that persons of skill in the art knew that the administration of risedronate on a less frequent than daily basis would be effective to treat and prevent osteoporosis without testing it. Thus, there are no data or examples demonstrating the efficacy of the claimed methods at treating or preventing osteoporosis.

22.    The only data provided in the patent are from a series of experiments on the esophagi of a few beagle dogs. In these experiments, eight beagles were anaesthetized, laid on their sides, and their esophagi were filled with various acidic solutions of bisphosphonates, including risedronate and alendronate. They were then killed and their esophagi examined for signs of irritation. Although Merck now leans

heavily on the results seen in these eight Beagles, those results do not include any data relating to less-than-daily administration of risedronate, instead providing less-than-daily administration data only for alendronate.

23. The '329 patent specification recognizes that the inconvenience of the dosing regimen for bisphosphonate provides motivation to administer bisphosphonates such as risedronate less frequently, and proposes the invention as a solution to that problem:

> [B]ecause bisphosphonates should be taken on an empty stomach followed by fasting and maintenance of an upright posture for at least 30 minutes, many patients find daily dosing to be burdensome. These factors can therefore interfere with patient compliance, and in severe cases even require cessation of treatment. ('329 patent at col. 2, line 67-col. 3, line 6).

> \*            \*            \*

> From a patient lifestyle standpoint, the methods of the present invention would also be more convenient than daily or cyclic dosing regimens. Patients would be subjected less frequently to the inconvenience of having to take the drug on an empty stomach and having to fast for at least 30 minutes after dosing. ('329 patent at col. 4, lines 14-19).

24. Although the '329 patent contains no data from the administration of bisphosphonates to humans according to the claimed schedule, the '329 patent specification states without qualification that the disclosed invention surprisingly results in fewer adverse gastrointestinal side effects:

> [T]hat the administration of a bisphosphonate at a high relative dosage at a low relative dosing frequency causes *less* adverse gastrointestinal effects, particularly esophageal effects, compared to the administration of a low relative dosage at a high relative dosing frequency.

('329 patent at col. 3, line 64-col. 4, line 2) (emphasis added). However, there is no evidence that the weekly, or any other less frequent than daily, administration

of risedronate or any other bisphosphonate provides a clinically significant safety advantage compared to the daily administration of risedronate.  In fact, Merck has never conducted a study that could demonstrate such an advantage.

        **C.**      **The '932 Patent**

25.     The '932 patent issued from U.S. Application No. 09/688,659 ("the '659 application"), filed September 2, 1999.  The '329 patent and the '932 patent claim priority to PCT/US98/14796, filed July 17, 1998, and to U.S. Provisional Application No. 60/053,351 ("the '351 application"), filed July 22, 1997.  While the '329 patent is a continuation of PCT/US98/14796, the '932 patent is a continuation-in-part of PCT/US98/14796.

26.     As a continuation-in-part of PCT/US98/14796, the specification of the '932 patent contains new matter not disclosed in PCT/US98/14796 or the '329 patent. The '932 patent disclosed for the first time dosage information for the once-weekly dosing of risedronate; specifically, it disclosed weekly dosing with a range of 7 mg to about 100 mg of risedronate, and 35, 40, 45, and 50 mg weekly dosages.

27.     Claim 6 of the '932 patent, rewritten in independent form, reads as follows:

> 6.     A method for treating or preventing osteoporosis in a mammal, said method comprising orally administering to said mammal about 35 mg, on an acid active basis, of risedronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof as a unit dosage according to a continuous schedule having a once-weekly dosing interval.

28.     Claim 6 calls for the administration of seven times the known daily dose of risedronate for the treatment and prevention of osteoporosis.

29.     The '351 application, filed July 22, 1997, does not provide written description support for the limitation of Claim 6 of a 35 mg dose of risedronate.

Accordingly, Claim 6 of the '932 patent is not entitled to a priority date of July 22, 1997.

Thus, the effective priority date and invention date for Claim 6 of the '932 patent is no

earlier than September 2, 1999, the date of filing of the '659 application.

II.     PROPOSED FINDINGS OF FACT ON ANTICIPATION

        A.     **U.S. Patent No. 5,869,471 Anticipates Claims 20 and 34 of the '329 Patent**

30.     U.S. Patent No. 5,869,471 ("the '471 patent") disclosed the oral

administration of a pharmaceutically effective amount of risedronate on a weekly basis

for the treatment of rheumatoid arthritis in humans.  The method of the '471 patent

includes the administration of a non-steroidal anti-inflammatory drug ("NSAID") to treat

the inflammation at the bone joint and the administration of a bisphosphonate, including

risedronate specifically, to treat the osteoporosis resulting from rheumatoid arthritis.

31.     The '471 patent discloses dosing intervals for the bisphosphonate ranging

from once daily to once every sixty days.  For example, the once-weekly administration

of risedronate is specifically disclosed in Example B of the '471 patent.  In treating

rheumatoid arthritis with a weekly administration of oral risedronate, the method

disclosed in the '471 patent results in the treatment and prevention of osteoporosis in

mammals in need thereof.

32.     The '471 patent thus discloses every element of Claims 20 and 34 of the

'329 patent.

33.     A person who followed the teaching of the '471 patent and administered a

weekly dose of risedronate would be safely and effectively treating and preventing

osteoporosis in mammals in need thereof.

34.     The '471 patent anticipates Claims 20 and 34 of the '329 patent.

B.    **Clinical Studies Conducted by the Procter & Gamble
Company Anticipate Claim 6 of the '932 Patent**

35.    The Procter & Gamble Company ("P&G") designed and proposed to the
FDA clinical trials involving the oral administration of a weekly dose of 35 mg of
risedronate for the treatment and prevention of osteoporosis.  P&G submitted the
proposals for Study Nos. 1999033 and HMR4000E/3001 to the FDA in January 1999,
and began orally administering 35 mg doses of risedronate to postmenopausal women on
a weekly dosing regimen on May 21, 1999.

36.    P&G's clinical trials were planned and launched before September 2,
1999, the filing date of the continuation-in-part application that led to the '932 patent.

37.    P&G's activities disclose every element of Claim 6 of the '932 patent.

38.    A person of ordinary skill in the art who followed P&G's activities and
administered a weekly dose of 35 mg of risedronate to post-menopausal women would
be safely and effectively treating and preventing osteoporosis in mammals in need
thereof.

39.    P&G's activities anticipate Claim 6 of the '932 patent.

III.    **PROPOSED CONCLUSIONS OF LAW ON ANTICIPATION**

40.    Because a patent is presumed valid (35 U.S.C. § 282), Teva has the burden
of proving that the asserted claims are invalid by clear and convincing evidence.  *Bristol-
Myers Squibb Co. v. Ben Venue Labs., Inc.,* 246 F.3d 1368, 1374 (Fed. Cir. 2001); *Atlas
Powder Co.* v. *IRECO Inc.,* 190 F.3d 1342, 1347 (Fed. Cir. 1999).  Neither U.S. Patent
No. 5,869,471 nor information regarding P&G's activities was before the USPTO during
the prosecution of the '329 and '932 patents.  The fact that this prior art was not before
the Examiner makes the presumption of validity associated with the '329 and '932

patents more easily overcome because no deference is due to the USPTO with respect to evidence that it did not consider. *Structural Rubber Products Co. v. Park Rubber Co.,* 749 F.2d 707, 714 (Fed. Cir. 1984) ("Deference is due the Patent and Trademark Office decision to issue the patent with respect to evidence bearing on validity which it considered but no such deference is due with respect to evidence it did not consider."); *EWP Corp. v. Reliance Universal Inc.,* 755 F.2d 898, 905 (Fed. Cir. 1985); *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1358-60 (Fed. Cir. 1984), *cert. denied,* 469 U.S. 821 (1984).

### A.    Anticipation under 35 U.S.C. § 102 (b)

41.    To be patentable, an invention must be new.  Under 35 U.S.C. § 102 (b), a person is not entitled to a patent if the claimed invention was ". . . described in a printed publication" more than one year before the application for patent was filed.  The novelty requirement ensures that the public is not deprived of information that is already within the public domain.  If the invention is not new, it is said to be anticipated.  A prior art reference anticipates a claimed invention if it discloses every limitation of the claim, either expressly or inherently.  *Karsten Mfg. Corp. v. Cleveland Golf Co.,* 242 F.3d 1376, 1383 (Fed. Cir. 2001); *Atlas Powder Co.,* 190 F.3d at 1346; *Ciba-Geigy Corp. v. Alza Corp.,* 864 F. Supp. 429, 434-35 (D.N.J. 1994), *aff'd in pertinent part,* 68 F.3d 487 (Fed. Cir. 1995).  Anticipation is a question of fact.  *In re Graves,* 69 F.3d 1147, 1151 (Fed. Cir. 1995).

42.    Claim 20 of the '329 patent claims a method for treating osteoporosis in a mammal in need thereof comprising orally administering to said mammal a pharmaceutically effective amount of a bisphosphonate chosen from the group consisting of risedronate, pharmaceutically acceptable salts or esters thereof, and

mixtures thereof, as a unit dosage according to a continuous schedule having a dosing interval selected from the group consisting of once-weekly dosing, twice-weekly dosing, biweekly dosing, and twice-monthly dosing.  Claim 34 of the '329 patent claims a method for preventing osteoporosis in a mammal in need thereof comprising orally administering to said mammal a pharmaceutically effective amount of a bisphosphonate chosen from the group consisting of risedronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof, as a unit dosage according to a continuous schedule having a dosing interval selected from the group consisting of once-weekly dosing, twice-weekly dosing, biweekly dosing, and twice-monthly dosing.  The only difference between the two claims is that claim 20 is directed to "treating" osteoporosis and claim 34 is directed to "preventing" osteoporosis.

43.    U.S. Patent No. 5,869,471 is a printed publication that was published more than one year before the earliest asserted filing date of July 22, 1997 of the '329 and '932 patents.  Accordingly, the '471 patent is prior art to the '329 and '932 patents.  35 U.S.C. § 102 (b).

44.    The '471 patent discloses the oral administration of a pharmaceutically effective amount of risedronate on a weekly basis for the treatment of rheumatoid arthritis in humans.  In treating rheumatoid arthritis in humans with a weekly administration of risedronate, the method disclosed in the '471 patent results in the treatment and prevention of osteoporosis in mammals in need thereof.

45.    The '471 patent discloses every limitation of Claims 20 and 34 of the '329 patent, and therefore anticipates these claims.

46.     Claims 20 and 34 of the '329 patent do not require that the once-weekly administration of alendronate meet any standard of safety or tolerability for patients. Nevertheless, even if the claims contained such a limitation, it would inherently be met by the disclosure of the '471 patent. *In re Cruciferous Sprout Patent Litigation,* 301 F.3d 1343, 1349-50 (Fed. Cir. 2002), *cert. denied,* 155 L.Ed.2d 227 (2003); *Atlas Powder,* 190 F.3d at 1347; *Titanium Metals Corp.* v. *Banner,* 778 F.2d 775, 782 (Fed. Cir. 1985); *U-Fuel, Inc. (NV) v. Highland Tank* & *Mfg. Co.,* 228 F. Supp. 597, 607 (E.D. Pa. 2002).

47.     Merck contends that a person of ordinary skill in the art would have rejected the teachings of higher once-weekly doses of bisphosphonates for osteoporosis because of an expectation of increased gastrointestinal side effects.  While Merck's defense is baseless, it has no bearing on the issue of anticipation in any event.  The concept of "teaching away" from an invention is inapplicable to an anticipation analysis and the Court should not consider it.  *Bristol- Myers Squibb Co.,* 246 F.3d at 1378; *Celeritas Technologies* v. *Rockwell Int'l Corp.,* 150 F.3d 1354, 1361 (Fed. Cir.1998).

## B.     Anticipation under 35 U.S.C. § 102 (g)

48.     Under 35 U.S.C. § 102 (g), a person is not entitled to a patent on an invention if the claimed invention was made by another in the United States before the applicant and not abandoned, suppressed, or concealed.  35 U.S.C. § 102 (g)(2); *Corona Cord Tire Co. v. Dovan Chem. Corp.*, 276 U.S. 358 (1928); *Monsanto Co. v. Mycogen Plant Science, Inc.*, 261 F.3d 1356, 1362 (Fed. Cir. 2001); *Sandt Technology, Ltd. v. Resco Metal and Plastics Corp.*, 264 F.3d 1344, 1350 (Fed. Cir. 2001); *Kimberly-Clark Corp. v. Procter & Gamble Distributing Co., Inc.*, 973 F.2d 911, 915 (Fed. Cir. 1992); *New Idea Farm Equip. Corp. v. Sperry Corp.*, 916 F.2d 1561, 1566 (Fed. Cir. 1990).  An

issued patent may be anticipated under 35 U.S.C. § 102 (g)(2) by the prior conception

and reduction to practice by another of the patentee's invention. *Texas Instruments, Inc.*

*v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1177 (Fed. Cir. 1993). Prior invention may

be shown in either of two ways: a challenger may show (1) that it reduced the invention

to practice before the patentee, or (2) that it was the first to conceive the invention and

then exercised reasonable diligence in reducing the invention to practice. *Mycogen*

*Plant Science, Inc. v. Monsanto Co.*, 243 F.3d 1316, 1332 (Fed. Cir. 2001).

49.     P&G orally administered weekly 35 mg doses of risedronate to

postmenopausal women in clinical trials that were planned and conducted before

September 2, 1999, the filing date of the continuation-in-part application that led to the

'932 patent. P&G designed and proposed to the FDA in January 1999 clinical trials

involving the weekly dosing of 35 mg of risedronate for the treatment and prevention of

osteoporosis. P&G then first administered a 35 mg dose of risedronate to

postmenopausal patients on a weekly dosing regimen in Study No. 1999033 on May 21,

1999. P&G continued the administration of 35 mg of risedronate weekly for the

treatment of osteoporosis in Study HMR4000E/3001.

50.     P&G's activities demonstrate the conception and reduction to practice as

of May 21, 1999 of the invention claimed in Claim 6 of the '932 patent of orally

administering about 35 mg of risedronate on a once-weekly dosing schedule to treat or

prevent osteoporosis. P&G's activities were not abandoned, suppressed or concealed.

P&G promptly sought and received FDA approval for a once-weekly 35 mg dose of

risedronate on May 17, 2002, and launched their product in June 2002. Claim 6 of the

'932 patent is therefore anticipated by P&G's activities under 35 U.S.C. § 102 (g)(2).

### IV.    PROPOSED FINDINGS OF FACT ON OBVIOUSNESS

#### A.    The Level of Ordinary Skill in the Art

51.    The person of ordinary skill in the art, at the time of the inventions of the '329 and '932 patents, was a scientist with an M.D. and/or Ph.D. degree, or the equivalent, working in the field of and doing research on osteoporosis.  Such a person would also be familiar with the publications and technical literature in the field of bisphosphonates and osteoporosis.

#### B.    The Prior Art Taught the Weekly Administration of Risedronate for the Treatment and Prevention of Osteoporosis

52.    The prior art disclosed the weekly oral administration of risedronate to humans to inhibit bone resorption, thus treating and preventing osteoporosis.  Thus, the prior art explicitly discloses the invention claimed in the '329 patent.

#### 1.    The '471 Patent

53.    Well before Merck's invention date of July 22, 1997, the '471 patent disclosed the oral administration of a pharmaceutically effective amount of risedronate on a weekly basis for the treatment of rheumatoid arthritis in humans.  In treating rheumatoid arthritis with a weekly administration of risedronate, the method disclosed in the '471 patent concomitantly results in the treatment and prevention of osteoporosis in mammals.

#### 2.    PCT Application WO95/30421

54.    PCT Application WO95/30421 to Goodship *et al.*, published November 16, 1995, disclosed the use of bisphosphonates to inhibit bone resorption.  Goodship discloses the oral administration of risedronate on a weekly basis at a dosage that

corresponds to that used in treatment of bone diseases, such as Paget's disease or osteoporosis. *See* Goodship at 6-7.

### 3.     The Lunar News

55.     The once-weekly administration of bisphosphonates for the management of osteoporosis was disclosed in a publication called *Lunar News* in 1996. The April and July 1996 *Lunar News* articles are prior art publications to the Merck patents under 35 U.S.C. § 102 (a). *Joint Statement of Uncontested Facts at ¶ 10.*

56.     *Lunar News* was a periodical distributed approximately quarterly by Lunar Corporation, a Wisconsin-based company involved in the manufacture of "bone densitometers." Bone densitometers — devices that allow accurate, quantitative measurement of the amount of bone a patient has — form the basis for the diagnosis and clinical management of many osteoporotic patients. Lunar Corporation was founded and led by Dr. Richard Mazess, a Professor Emeritus at the University of Wisconsin with a Ph.D. in physical anthropology, and a research background in medical physics and physiology.

57.     In 1996, Lunar Corporation and Dr. Mazess were recognized leaders in the bone densitometry field. Dr. Mazess developed some of the first bone densitometers and is credited with making bone densitometry available for widespread use in the management of osteoporosis. In 1996 Dr. Mazess was President and CEO of Lunar, and was the author of the articles appearing in *Lunar News*.

58.     Dr. Mazess was a person working in the field of, or doing research on, osteoporosis, and he is skilled in the relevant art. *Merck II at* 1376.

59.    Each issue of the *Lunar News* was distributed to 15-20,000 physicians and others working in the field of osteoporosis.  *Id*. at 1368 n.5.

60.    Copies of the *Lunar News* were received at and circulated within Merck, including to Dr. Yates, the principal inventor of the '329 patent.  The *Lunar News* provided review articles on various topics related to bone disease and osteoporosis.  The publication provided exhaustive reviews of the literature on various topics; the bibliographies of each edition included hundreds of articles.  The *Lunar News* was recognized as a valuable resource in terms of providing current references in the pre-internet era.

61.    The April and July 1996 *Lunar News* articles are prior art publications to the Merck patents under 35 U.S.C. § 102 (a).  *Joint Statement of Uncontested Facts at ¶ 10.*

### a.    April 1996 *Lunar News*

62.    In a section entitled "Update: Bisphosphonate," the April 1996 edition of the *Lunar News* discloses once-weekly dosing of bisphosphonates.  The April 1996 edition discusses the difficulties of the dosing regimen of bisphosphonates, alendronate in particular, and then proposes once-weekly dosing of bisphosphonates as a solution:

> One of the difficulties with alendronate is its low oral bioavailability. When taken with water in a fasting state, only about 0.8% of the oral dose is bioavailable.  Even coffee or juice reduces this by 60%, and a meal reduces it by >85%.  Alendronate must be taken, after an overnight fast, 30-60 minutes before breakfast.  Subjects should remain seated or standing; a very small group of patients have reported some upper gastrointestinal distress if this is not done.  This regime may be difficult for the elderly to maintain chronically.  *An intermittent treatment program (for example, once per week, or one week every three months), with higher oral dosing, needs to be tested.*

(April 1996 *Lunar News* at 31) (citations omitted) (emphasis added).

63.     A person of skill in the art in 1996 reading this passage would have understood the phrase "needs to be tested" to mean that a once-weekly bisphosphonate dosing regimen should be examined in a clinical trial so that it could be approved for use in patients.  Such clinical trial testing is a step that must be carried out for every drug, regardless of the state of knowledge or any expectation of success beforehand.

**b.     July 1996 *Lunar News***

64.     In July 1996, Lunar published another issue of the *Lunar News* disclosing weekly dosing of bisphosphonates, this time with express dosages for the bisphosphonate alendronate.  The July 1996 *Lunar News* discussed the problem of the inconvenience of the bisphosphonate dosing regimen, and again presented once-weekly dosing as a solution:

> The limited bioavailability of alendronate (0.8%) requires that it be taken on an empty stomach upon awakening with a full glass of water (not tea, coffee, or juice), and the patient must remain upright for 30 to 60 minutes. A few elderly women can tolerate this regime for a only [sic] week or two.

> *              *              *

> *The difficulties with oral bisphosphonates may favor their episodic (once/week), or cyclical (one week each month) administration*.  Even oral alendronate potentially could be given in a 40 or 80 mg dose once/week to avoid dosing problems and reduce costs.

(July 1996 *Lunar News* at 23 (citations omitted) (emphasis added)).

65.     The April 1996 and July 1996 *Lunar News* articles suggested the weekly dosing of bisphosphonates.  *Merck II* at 1368, 1375.

66.     By July 1997 the bisphosphonate risedronate was known by those of ordinary skill in the art to be effective in inhibiting bone resorption, even when administered on a weekly basis, and had already been administered on a weekly basis to

treat and prevent osteoporosis associated with rheumatoid arthritis.  The '471 patent and

Goodship disclose the weekly oral administration of risedronate to humans to inhibit

bone resorption, thus treating and preventing osteoporosis.  By that time risedronate had

also been disclosed to be effective in treating and preventing osteoporosis  The *Lunar*

*News* teaches the use of orally administered weekly dosing of bisphosphonates in the

treatment and prevention of osteoporosis.  Thus, one of ordinary skill in the art would

have considered the teachings of the *Lunar News* articles to apply to risedronate.

67.     By September 1999, a person of ordinary skill in the art would have also

known that the weekly dose of risedronate for the treatment and prevention of

osteoporosis would be seven times the daily dose of 5 mg that was under consideration

for approval by the FDA.  Therefore, one of ordinary skill in the art would have known

in 1999 that the effective weekly dose of risedronate would be 35 mg.

68.     A person of ordinary skill would also have have predicted that the weekly

dosing of risedronate taught in the '471 patent, Goodship, and the *Lunar News* articles to

be effective in the treatment and prevention of osteoporosis as of July 1997.  The

biological properties of risedronate were well known long before 1997, and pre-clinical

studies had demonstrated to persons skilled in the art that risedronate would exhibit a

sustained response on bone resorption without the need for daily dosing.  For this reason,

the person of skill in the art had a reasonable basis to believe that the proposed weekly

regimen would be effective.

### C.     There Are No Differences Between the Prior Art and the Claimed Inventions

69.     The prior art in this case discloses the weekly administration of oral

risedronate for the treatment and prevention of osteoporosis in mammals in need thereof;

there is no difference between the teachings of the '471 patent, Goodship, and the *Lunar News* articles and the claimed invention.  Nevertheless, additional prior art available in 1997 supplies any differences between the alleged inventions and the '471 patent, Goodship, and the *Lunar News*.

>    1.     **The Prior Art Demonstrated that a Less-Than-Daily Dosing Regimen of Risedronate Would Effectively Inhibit Bone Resorption**

70.     Tang *et al.*, J. Bone Min. Res. 7(9): 1093-104 (1992) disclosed that the twice-weekly administration of risedronate was effective in preventing bone loss after bone restoration was achieved using an anabolic agent, prostaglandin E2 (PGE2).  *See id.* at 1100-01.

71.     Jee *et al.*, J. Bone Min. Res. 10 (6): 963-70 (1995) demonstrated that risedronate continued to inhibit bone resorption even after treatment with risedronate was discontinued.  In Jee, a group of rats was treated with a combination of anabolic agent and risedronate twice-weekly for 60 days, followed by 60 days without the combination treatment.  The study results demonstrated that risedronate continued to inhibit bone resorption in the rats even after cessation of treatment with risedronate.  *See id.* at 969.

72.     Ma *et al*., J. Bone Min. Res. 10 (6): 1726-34, 1726 (1995) disclosed that risedronate was a superior agent for inhibiting bone resorption due to the compound's long term retention in bone: "risedronate at the dose level employed [i.e. twice weekly] is far superior to 17 beta-estradiol or calcitonin because of its long retention in bone . . ."

73.     U.S. Patent No. 5,730,715, entitled *Method for the Iontophoretic Administration of Bisphosphonates* disclosed on June 14, 1996 that the administration of bisphosphonates such as risedronate at higher than daily doses in less frequent intervals

would be effective in inhibiting bone resorption due to their long retention time in bone. (Col. 2, lines 38-44).

74.    Seedor *et al.*, J. Bone Min. Res. 6 (4), 339-46, 340 (1991) disclosed that the bone resorption effect of bisphosphonates such as risedronate depended on the total dose administered rather than the dosing frequency.

75.    These publications disclose that risedronate would effectively inhibit bone resorption, and thus would treat and prevent osteoporosis, when administered on a less-than-daily dosing regimen.

### 2.    Persons of Skill In the Art Would Have Known that the Weekly Dose Should Be About Seven Times the Daily Dose

76.    It is undisputed that risedronate is taken up in the bone after administration, and it resides in the bone for a very long time.  In fact, John Yates, one of the claimed inventors of the subject matter of the Merck patents, has acknowledged the long residence time of bisphosphonates, including risedronate.  *See Yates Tr.* at 15:18-16:2.  Seedor *et al.* also taught that it is the total dose of bisphosphonate administered over time, and not the frequency of dosing, that determines a bisphosphonate's effect on bone resorption.  Based on this information, a person of skill in the art as of July 1997 would have known that the weekly dose of risedronate should be about seven times the daily dose.

### D.    A Motivation Existed to Employ Once-Weekly Dosing

77.    The dosing difficulties of bisphosphonates were well-known to persons skilled in the art.  Patients taking bisphosphonates were required to take the drug before eating, with a full glass of water, and were told to remain upright for half an hour.  This regimen was highly inconvenient, and was responsible for some patients discontinuing

treatment with bisphosphonates, and for others failing to follow the dosing instructions. Any dosing regimen that could reduce the inconvenience would have been welcomed.

78.     Both the April and July 1996 *Lunar News* articles explain the motivation for a once-weekly dose as increasing patient compliance, by making it easier to take the drug (and incur the inconvenience of the rigorous dosing regimen less frequently). *Merck II* at 1373.  Thus, the prior art provided the motivation to make the claimed invention.

### E.     The Prior Art Taught That the Administration of Larger Doses of Risedronate Were Safely Tolerated

79.     A study by Valentin-Opran disclosed as early as 1990 that daily doses of 10 to 30 mg of risedronate were well-tolerated.

80.     The '471 patent disclosed that the following doses of risedronate were administered without any negative effects or safety concerns: 60 mg daily (Col. 50, line 44); 210 mg weekly (Col. 50 lines 50-51); 35 mg daily (Col. 50, lines 63-64); 105 mg (Col. 51, lines 5-6) weekly; and other dose sizes.  The '471 patent thus confirmed in 1992 the safety of administering doses of risedronate as high as 210 mg once a week to human subjects.

81.     Studies by Brown and Bekker in 1994 and 1996, respectively, also demonstrated that risedronate was well-tolerated with no significant side effects when administered at 30 mg daily.

82.     A daily 30 mg dose of risedronate was also approved by the FDA and marketed by P&G for the treatment of Paget's Disease in September 1998.

83.     The safety of a 30 mg daily dose of risedronate was thus established at least a year before Merck first disclosed a 35 mg dose in the filing of the continuation-in-part application that lead to the '932 patent.

      **F.**     **Physicians Would Not Have Been Deterred From Administering a Less Frequent Than Daily Dose of Risedronate**

      **1.**     **Risedronate Was Not Associated With Adverse Gastrointestinal Events**

84.     No deterrent existed in the prior art to discourage a person of ordinary skill in the art from following the teachings of the '471 patent, Goodship, and the *Lunar News* and administering risedronate once-weekly at about seven times the daily dose. No significant adverse events were reported or associated with the use of risedronate at any dose studied as of mid-1997.  In fact, the study results published as of 1997 demonstrated that the incidence of adverse events experienced in risedronate treatment groups is similar to the rates seen in placebo groups.

85.     Risedronate's tolerability was confirmed by other studies as of 1999, before the application leading to the '932 patent was filed.

86.     Physicians in both mid 1997 and in 1999 would not have expected that a biweekly 17.5 mg dose or a weekly 35 mg dose of risedronate for the treatment or prevention of osteoporosis would cause a significant increase in the incidence or severity of gastrointestinal or esophageal side effects compared with a smaller daily dose of risedronate.

2.     **The Rare Severe Adverse Events Associated with Alendronate Would Not Have Been a Deterrent to the Less Frequent Than Daily Dosing of Risedronate**

87.     Merck does not contend that the prior art did not teach the weekly administration of bisphosphonates, including risedronate, for the treatment and prevention of osteoporosis.  Instead, Merck contends that a person of ordinary skill in the art would have rejected the teachings of higher less frequent than daily doses of bisphosphonates, including risedronate, for osteoporosis because of an expectation of increased gastrointestinal side effects.  Merck, however has no data to support this contention.  It relies instead on data from other bisphosphonates, including alendronate, which, for the reasons below, does not support Merck's contention.

88.     After Merck launched alendronate in 1995, it became aware of the occurrence of certain esophageal side effects of alendronate that were perceived to be of an increased severity compared to the gastrointestinal side effects seen in Merck's phase III clinical trials with that drug.  In its clinical trials, Merck had observed an incidence of upper gastrointestinal side effects, including esophageal side effects, in patients taking alendronate sodium that was not significantly different from the incidence in patients taking placebo.  The adverse events of the more severe type reported in 1996 were not seen in Merck's clinical trials.

89.     The more severe gastrointestinal adverse events reported after Merck launched alendronate were all related to esophageal injury and occurred in a very small percentage of the patients taking the drug.  In fact, De Groen et al. reported in October 1996 in the *New England Journal of Medicine* that only 51 such cases had been seen in 475,000 patients taking the drug world wide (approximately 1 out of every 10,000 patients).  In a March 1996 presentation to the FDA addressing the issue, Merck stated

that the number of severe cases reported to that time was in fact lower than the number of such cases expected in the same population over the same time regardless of their medications. Additionally, the cases of esophagitis were for the most part reversible with proper treatment.

90.     Merck investigated the case reports and determined that the esophagitis case reports were associated primarily with tablets "sticking" in the esophagus because patients failed to follow the dosing instructions (*i.e.*, so-called "pill esophagitis"), in contrast to non-specific side effects, to which Merck did not assign a specific cause. Merck reported these conclusions to the FDA in March and October of 1996. The literature, specifically the article by De Groen, taught that complications related to alendronate were due to prolonged contact of the drug with the esophagus. *Merck II* at 1373.

91.     Merck responded to the issue by re-emphasizing the dosing instructions. In March 1996, Merck sent out a "Dear Doctor" letter (*id.*), informing physicians about the "infrequent" cases of esophagitis, stating that in a "large majority" of the cases patients appeared not to have complied with the dosing instructions, and advocating "strict compliance" with those instructions. In addition, Merck's sales representatives reemphasized the importance of the dosing instructions in meetings with doctors. Merck took no other actions to deal with the issue of esophagitis associated with alendronate.

92.     After Merck sent the "Dear Doctor" letter, the reported incidence of complications with alendronate fell to almost nothing even as the number of patients prescribed the drug doubled by October 1996. *Id.*

93.     The low incidence of these esophageal effects and the description of the cases led gastroenterologists to conclude at the time, as Merck had, that the likely cause of the reports was "pill esophagitis."

94.     In July 1997, there was no expectation that administering a higher once-weekly dose of alendronate would be associated with a greater incidence or severity of esophagitis.  Merck could not determine a dose-response relationship between the administration of alendronate and the severe esophagitis cases because the cases were so rare.

95.     In July 1997 there was no reason for concern among physicians that risedronate, if properly administered, would cause esophageal injury through a pill esophagitis mechanism.  No significant adverse events or esophageal injury had been reported for risedronate.  Moreover, because the incidences of severe esophageal adverse events occurring with alendronate were attributed to improper dosing, physicians would not have been deterred from administering a 35 mg once-weekly dose of risedronate on this basis.  In addition, there was a perception among physicians that risedronate was better tolerated and safer than alendronate.

96.     In fact, once-weekly administration would have been expected to decrease the incidence of severe esophagitis cases because it would (1) improve patient compliance with the dosing instructions, which were intended to ensure safe passage of the drug to the stomach, and (2) decrease the frequency of administration, thereby decreasing the chances of a tablet "sticking" in the esophagus.

### 3.    Chesnut Would Not Have Been a Deterrent to Once-Weekly Dosing of Risedronate

97.    Merck relies on a publication by Chesnut *et al.* to support the claim that there would have been a deterrent to less frequent than daily dosing of risedronate.  The results of Chesnut, standing alone, would not have deterred a person of ordinary skill in the art from following the teachings of the '471 patent, Goodship, and the *Lunar News* articles and administering a less frequent than daily oral dose of risedronate for the treatment and prevention of osteoporosis.  Viewing Chesnut within the framework of all the pertinent information in July 1997 reinforces that conclusion.  The Chesnut study thus represents the only clinical data on which Merck's fear defense rests.

98.    Chesnut *et al.* reported in 1995 that seven out of 63 post-menopausal osteoporotic women taking 40 mg alendronate per day dropped out of a study because of mild gastrointestinal adverse effects, compared with smaller percentages of dropouts in the groups taking lower dosages of alendronate daily.  The side effects described in Chesnut were mild and non-specific, and not severe or serious like those described in the case reports.

99.    Chesnut discussed only the gastrointestinal side effects associated with alendronate, not risedronate; in addition, Chesnut relates to daily dosing, not weekly dosing.  Moreover, Chesnut drew no conclusion regarding the statistical significance of these results.  In fact, the Chesnut data demonstrates that 90 percent of postmenopausal osteoporotic patients tolerated a larger 40 mg dose daily dose of alendronate.  Furthermore, the paper fails to provide adequate information to compare the characteristics of the patients in the alendronate-treated groups, nor does it provide details regarding the patients who dropped out or complained of problems.

100.    The results reported in Chesnut have not been supported by other researchers.

101.    Chesnut's reported discontinuation rate for patients taking 40 mg of *alendronate daily* would not have deterred a person of skill in the art from administering a 35 mg of *risedronate weekly* to treat and prevent osteoporosis.

102.    Prior to any litigation involving the once-weekly administration of bisphophonates, Merck's position was that the Chesnut data supported the safety of Merck's proposed weekly doses of alendronate. In a 1998 presentation to the FDA, Merck cited the Chesnut data as a part of the evidence that weekly dosing of bisphosphonates for treatment and prevention of osteoporosis should be "very well tolerated." In that presentation, Merck characterized the Chesnut data as demonstrating that "90% of postmenopausal patients with osteoporosis remained on alendronate treatment at 40 mg daily for one year."

### 4.    Experience with Other Prior Art Bisphosphonates also Would Not Have Deterred Less Frequent Than Daily Dosing of Risedronate

103.    Evidence of dose-related gastrointestinal effects with other bisphosphonates would also not have deterred less frequent than daily dosing of risedronate.

104.    By July 1997, there was a substantial amount of data available from pre-clinical trials on the use and tolerability of risedronate. This data consistently found that at every daily dose risedronate had been found to be "well tolerated."

105.    Further, a general prejudice existed against inferring expectations regarding one bisphosphonate from the results observed with a different bisphosphonate.

In 1999, Merck's expert Dr. Papapoulos wrote that because of differences in their mechanisms of action, as well as their pharmacological and toxicological profiles, results from one bisphosphonate cannot be extrapolated to the whole class:

> Differences also exist in their pharmacological and toxicological profiles, as well as in their mechanism of action. It is, therefore important that the specific properties of every individual bisphosphonate be determined and that results obtained with one bisphosphonate not be extrapolated readily to the whole class.

(Papapoulos, S., *Bisphosphonates,* The Aging Skeleton, Chap. 44, pp. 541-549 (1999)). This applies to alendronate as well as other bisphosphonates.

106. A person of ordinary skill in the art would not ignore the preclinical data for risedronate, and rely on reports relating to other compounds that had never been approved for use in osteoporosis in the U.S. The side effects seen with the other prior art bisphosphonates were different in both type and associated dose. For example, the primary side effects seen with etidronate and clodronate were associated with the lower gastrointestinal tract (e.g., diarrhea), not the upper gastrointestinal tract (e.g., nausea and heartburn), which Merck focused on in this case. Also, the effects observed with the prior art bisphosphonates were seen at much larger doses than the doses used with risedronate.

5.      **Merck's reliance on data from Paget's patients demonstrates that the Paget's experience is relevant to the expected tolerability of once-weekly bisphosphonate therapy**

107.    The data from Paget's studies demonstrates that 30 mg of risedronate daily was well-tolerated, providing compelling evidence as of July 1997 that a once-weekly dose of 35 mg of risedronate would be well-tolerated.

108.    Merck relied on data from Paget's patients when evaluating the safety of weekly dosing of alendronate. As of May 20, 1997, in an internal "Tactical PAC" review seeking management approval to proceed with a once-weekly dosing program for alendronate, Merck's scientists relied on Paget's data to support the expected tolerability of the once-weekly dosing regimen. Merck stated that the Paget's data supported the safety of the proposed once-weekly alendronate regimen:

> There is human safety data available on these higher doses. The largest experience is derived from the Paget's Disease studies including data on over 150 patients randomized to receive 3-6 months of daily treatment with alendronate 40 or 80 mg. This data is supplemented by short term clinical pharmacology studies with doses up to 100 mg. In all theses (*sic*) studies, *the 40 and 80 mg doses were well tolerated even when given on a daily basis*, although daily treatment with alendronate 40 mg was associated with a moderate increase in upper GI adverse events in the Phase II study of treatment of osteoporosis (Protocol 026).

(emphasis added). In view of the Paget's data, Merck's scientists did not regard the tolerability of weekly dosing as a significant concern, stating that higher once-weekly dosing would be "unlikely to have a greater potential to induce upper GI irritation."

109.    Similarly, in a March 1998 submission to the FDA, Merck maintained the position taken internally in 1997 that the data from Paget's disease studies provided an expectation that a once-weekly dose would be well-tolerated:

> Experience in Paget's disease (up to 80 mg alendronate for 6 months) suggests that dosing regimens of either 35 or 70 mg weekly, and 35 twice-weekly should be well-tolerated.

(MR 0066697).

110.    Elsewhere, Merck drew both on the Paget's data and the data from

Chesnut in concluding that a once-weekly dose should be well-tolerated:

> Oral doses of alendronate up to 80 mg daily for up to six months have been well-tolerated in patients with Paget's disease, and approximately 90% of postmenopausal patients with osteoporosis remained on alendronate treatment at 40 mg daily for one year.  Thus, alendronate dosing regimens of either 35 or 70 mg weekly, and 35 twice-weekly should be well-tolerated.

(MR 0066688).

111.    Slides for the FDA presentation held a few weeks later reiterated that

"Evidence for Safety" was found in the Paget's studies where patients were treated with

"80 mg/day for 3 to 6 months in 42 patients with good tolerability…"  (DTX 155 at 6).

The same slide notes that there had been "[f]ew reports of UGI [upper gastrointestinal]

AEs [adverse events] from marketed use of 40 mg."  (Id.).

112.    In 2000, all three of the inventors listed on the '329 patent authored a

publication setting out the rationale for once-weekly alendronate in osteoporosis.  Under

the heading "Safety and Tolerability Studies in Humans," the inventors again cited the

Paget's data as providing an expectation that a once-weekly dosing regimen would be

tolerated by osteoporotic patients:

> Convincing human tolerability data for a higher dose of alendronate came from clinical trials of alendronate in the treatment of Paget's disease.  Treatment with 40 mg alendronate daily for up to 1 year was associated with tolerability profiles comparable to those of the control agent (placebo or etidronate), and no patient discontinued alendronate treatment due to a serious drug-related adverse event.

(MK 0223123).  As support for that proposition, the inventors cited the Paget's disease

studies relied upon here by Teva, i.e., the studies by Siris, Reid, and Khan.

113.    Documents prepared by Merck's scientists, primarily the inventors on the

'329 patent, demonstrate that the Paget's experience is relevant to the question of the

expected tolerability of less frequent than daily therapy. The Paget's data indicates that less frequent than daily doses of risedronate should be well-tolerated.

### G.    There Is No Evidence of "Unexpected Results"

114.    The '329 patent states that the once-weekly dosing regimen provides "less gastrointestinal effects" than daily dosing. However, this alleged advantage is not supported by scientific evidence. Since the gastrointestinal effects of 5 mg daily risedronate are comparable to placebo, the assertion that the once-weekly regimen could demonstrate "less" effects is not logical. Both Merck's and Teva's experts testify that no clinically significant difference exists between daily and weekly regimens in terms of gastrointestinal effects. Merck can not make a safety claim for less frequent than daily dosing over once-daily dosing of risedronate, and has never conducted a study that would support such a claim.

115.    The assertion in the patent is also not supported by the literature based on actual clinical practice, which demonstrates that risedronate is well tolerated and does not lead to significant adverse gastrointestinal effects when dosed either at a low relative dosage at a high relative dosing frequency or at a high relative dosage at a low relative dosing frequency. Further, there is no data in the patent comparing the teachings of the prior art to the claimed twice-weekly, bi-weekly, and twice monthly dosing of risedronate.

116.    The only data that Merck alleges it had that was not possessed by people of skill in the art in July 1997 are the results of its dog studies. However, this data does not relate to the less frequent than daily dosing of risedronate. Furthermore, the evidence demonstrates that the Merck dog studies are not even relevant to the clinical

administration of alendronate, or any bisphosphonate including risedronate, to patients. In the particular dog studies relied on by Merck, the dogs were anaesthetized and then administered a solution of a bisphosphonate (alendronate, risedronate, or tiludronate) while lying down. The solution was then allowed to remain in the esophagus for 30 minutes. This dosing scenario bears no relationship whatsoever to the clinical experience of dosing bisphosphonates generally, or risedronate in particular. In the clinical scenario, risedronate is not administered to patients as a solution, but as a tablet.

117.    Patients do not take risedronate, or any bisphoshonate, orally while anaesthetized and supine, and the drug is never deliberately allowed to remain in contact with the esophagus for an extended period. Merck's own instructions for dosing of its bisphosphonate alendronate (to take the pill while upright, with a full glass of water, and remain upright thereafter) are designed to facilitate rapid passage of the tablet through the esophagus. The Merck scientist who carried out the beagle studies has testified that the studies assumed that a patient would not follow the dosing instructions and that Merck's dog studies were not designed to simulate clinical experience.

118.    Furthermore, the experimental model makes predictions that are completely inconsistent with actual observations, and so no valid conclusions can be drawn from it. The Merck dog study suggests that daily dosing with alendronate will consistently result in severe esophageal damage, yet Merck's clinical studies show that in actual patients who took the drug on a daily basis and followed the dosing instructions, the incidence of mild nonspecific gastrointestinal adverse esophageal events was no greater than for placebo, and the incidence of severe side effects was extremely low. The Merck scientist who performed the studies presented as Example 1 confirmed

that clinical predictions could not be made from the dog data.  In any event, Merck's dog studies do not provide any data to support the conclusion that the twice-weekly dosing of bisphosphonates results in a lower incidence of esophageal side effects.

119.    Notwithstanding the flawed methodology of the Merck dog studies, they contain no data on the gastrointestinal effects of less-than-daily administration of risedronate.

### H.    There Is No Connection Between Any "Commercial Success" of Weekly ACTONEL® and the Claimed Inventions

#### 1.    Dr. Vellturo's Diffusion Model Is Flawed

120.    Merck's expert, Dr. Vellturo, provided a report in which he provides his opinion that the introduction of ACTONEL® OaW increased the sales of all ACTONEL® products by approximately a factor of three as of the end of 2005.  Dr. Vellturo's calculations, however, suffer from a number of critical problems, rendering them unreliable as a basis for assessing the incremental benefits attained by P&G as a result of introducing ACTONEL® OaW.

121.    Dr.  Vellturo uses a "diffusion model" to analyze the success of ACTONEL®.  A diffusion model is designed to measure the spread of an innovation through a specific social system.  The authors of the paper on which Dr. Vellturo based his diffusion model caution against its use as a forecasting tool, the very use for which Dr. Vellturo employed it.  The adoption of a new technology may follow an S-shaped diffusion curve across its entire life cycle; however, the use of a diffusion model to predict when adoption will accelerate or where it will terminate is likely to lead to erroneous conclusions.  Thus, the type of approach taken by Dr. Vellturo, even if implemented properly, cannot be relied upon to generate reasonable estimates of the

future sales of a product based on a limited history of data early in the life cycle of that product.

122.    Furthermore, in order for a diffusion model to be effective in modeling the spread of an innovation, certain restrictive, underlying assumptions must describe the innovation to be modeled, none of which apply to ACTONEL®.  The use of a diffusion model to analyze ACTONEL® is inappropriate because several of the key assumptions underlying the use of a diffusion model are not met.

123.    In a diffusion model, the number of potential adopters must not increase or decrease over time. This factor is not met with an analysis of the potential adopters of ACTONEL®.  The number and percentage of Americans with low bone mass is continually increasing; a study by the National Osteoporosis Foundation in 2002 projected that the prevalence of osteoporosis and low bone mass would increase by about 2.3 percent annually through 2010.  The authors of the paper describing the diffusion model used by Dr. Vellturo discuss this type of situation and state that it may result in incorrect forecasts: "if the fundamental diffusion model were applied to a diffusion process that is dynamic, incorrect parameter estimates and/or incorrect forecasts may result to the extent that [the number of potential users] fluctuates."

124.    Dr. Vellturo's model is also fundamentally flawed because he used the wrong data to generate it.  As a surrogate for "adopters," Dr. Vellturo estimated the values for a variable he called "net new prescriptions."  This variable is not used by industry and values for this cannot be found directly in the documents that Dr. Vellturo references.  Instead he estimates the values for this variable using an untested methodology.  Dr. Vellturo uses these estimates to further calculate an estimate of the

number of adopters at each point in time, which he calls "cumulative net new prescriptions."

125.    In fact, under Dr. Vellturo's methodology of estimating these values, "cumulative net new prescriptions" is more appropriately a measure of the number of *users* of ACTONEL®, rather than the number of *adopters*, since a person who discontinues use of the product would cause Dr. Vellturo's measure of "cumulative net new prescriptions" to decline, when in fact the actual number of adopters had not changed.  The fact that Dr. Vellturo's measure of "cumulative net new prescriptions" declines in eight of the last ten months of data indicates this problem with his measure of adopters. In a diffusion model, the number of adopters cannot decrease.  Therefore, the assumption that Dr. Vellturo's analysis is unreliable because the data relied upon does not represent the number of adopters.

126.    The diffusion model of the type used by Dr. Vellturo assumes that the impact of within-firm and external influences on the sales of a product are constant throughout the period.  Therefore, to the extent that actual influences change over time, a basic diffusion model will provide an inaccurate representation of the market.  The model fails to account for the fact that upon the introduction of ACTONEL® OaW, P&G and its partner, Sanofi-Aventis, increased their promotional spending significantly.  In the three fiscal years subsequent to launch, they increased detailing and marketing spending by 5 percent, 19 percent, and 24 percent, respectively adoption of ACTONEL®.  Dr. Vellturo's model does not account for this change in the factors influencing adoption of ACTONEL®.

127.    Dr. Vellturo's model depends on the nature of the innovation remaining static over time.  During the period upon which he bases his forecasts, Dr. Vellturo includes prescriptions for both the 30-mg and 5-mg formulations of ACTONEL®. However, as recognized by Dr. Vellturo, during this period the 30-mg formulation began to be used increasingly off-label for treatment and prevention of osteoporosis, rather than for its originally intended purpose of treating Paget's disease.  During the 12 months prior to the introduction of ACTONEL® OaW, total prescriptions for the 30-mg version of ACTONEL® increased by about 300 percent, presumably due to the increasing off-label use. Thus, the adoption estimated by Dr. Vellturo is that of a combination of five uses (the treatment of Paget's disease, the once-a-day treatment of osteoporosis, the once-a-day prevention of osteoporosis, the once-a-week treatment of osteoporosis, and the once-a-week prevention of osteoporosis), which change in relative importance during the sample period.

128.    Dr. Vellturo's model gives nonsensical results.  Dr. Vellturo's model purports to show that, but-for the introduction of ACTONEL® OaW in June 2002, sales of ACTONEL® new users would have essentially halted within months, gaining only 15 percent additional "cumulative net new prescriptions" through the end of 2005.  Thus, Dr. Vellturo's model is based on the assumption that ACTONEL® had essentially reached the end of its adoption curve only two years after it was first introduced.  This result is arbitrary and contrary to the basic trend in the data.

> 2. **Rather than Establishing the "Importance" of the Once-Weekly Patents, Merck's License to P&G Demonstrates that the Patents Are Not an Important Component of ACTONEL®'s Success.**

129.    Under the terms of a license to the once-weekly patents granted by Merck to P&G, P&G agreed to pay Merck a two percent royalty.  A royalty rate of 2 percent in the pharmaceutical industry generally falls toward the low end of typical rates, which range from 10-15% to 2-5%.  Merck's willingness to license a direct competitor at such a low rate implies that the parties believe the Merck patents are *not* an important component of ACTONEL®'s success.

130.    In fact, Merck's FOSAMAX® and P&G's ACTONEL® are direct competitors.  Merck has suffered significant reduction in profit from FOSAMAX® sales due to the introduction of ACTONEL® OaW—despite the royalty revenue from P&G.  Merck's lost profits have likely exceeded its royalty revenue from the P&G license by a factor of more than ten to one.  Had both parties believed that the Merck patents were valid and would be infringed by P&G, then the negotiation between them would likely have yielded a royalty rate substantially higher than 2 percent.

131.    Given this result, which was anticipated by the industry, it is clear that had Merck believed that withholding a license from P&G could have prohibited P&G from entering the market, it would have done so.  Alternatively, if Merck had believed the techniques claimed by the Merck patents contributed any substantial part of the value of ACTONEL® OaW, it could have demanded a royalty much higher than 2 percent of net sales from P&G.

132.    Through December 2005, P&G had generated about $2.1 billion in net revenues from sales of ACTONEL® OaW.  Absent these sales, Merck's profits would likely have been at least $1 billion greater.  In contrast, Merck's license to P&G for the Merck patents has generated only about $40 million in royalties.  Thus, rather than confirming the "commercial importance" of the Merck patents, Merck's license of these patents to a known competitor at a royalty rate of only 2 percent indicates that they were not an important component of the success of ACTONEL®.

## V.    PROPOSED CONCLUSIONS OF LAW ON OBVIOUSNESS

### A.    The Legal Standards for Obviousness

133.    The patent laws (35 U.S.C. § 100 *et seq.*) prohibit an inventor from obtaining a patent on an invention that would have been obvious to a person of ordinary skill in the art at the time the invention was made.  This prohibition is set forth in §103 (a) of the patent statute, which provides:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in § 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

134.    Because a patent is presumed valid, 35 U.S.C.§ 282, a *prima facie* case of obviousness under 35 U.S.C. § 103 must be established by clear and convincing evidence by the party asserting invalidity.  *American Hoist* & *Derrick Co. v. Sowa* & *Sons, Inc.,* 725 F.2d 1350, 1358-60 (Fed. Cir. 1984), *cert. denied,* 469 U.S. 821 (1984); *Lindemann Maschinenfabrik GMBH v. American Hoist* & *Derrick Co.,* 730 F.2d 1452, 1459 (Fed.Cir. 1984); *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1534 (Fed. Cir. 1983).  Thus, Teva must prove that the asserted claims of the '329 and '932 patents are invalid under § 103 by clear and convincing evidence.

135.    The determination of whether an invention would have been obvious

under 35 U.S.C. § 103 is a question of law, but this determination is decided based on

underlying facts.  *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *In re Berg*, 320

F.3d 1310, 1312 (Fed. Cir. 2003); *Sibia Neurosciences, Inc. v. Cadus Pharma. Corp.*,

225 F.3d 1349, 1355 (Fed. Cir. 2000).  The factual findings that underlie a determination

of obviousness are: 1) the scope and content of the prior art; 2) the level of ordinary skill

in the art; and 3) the differences between the claimed subject matter and the prior art.

*Ryko Mfg.* Co. *v. Nu-Star, Inc.*, 950 F.2d 714, 716 (Fed. Cir. 1991); *Perkin-Elmer Corp.

v. Computervision Corp.*, 732 F.2d 888, 894 (Fed. Cir. 1984).

136.    The question of obviousness is whether the prior art, taken as a whole,

provided some teaching, suggestion or incentive that would have rendered the claimed

invention obvious to a person of ordinary skill in the art.  *In re Napier*, 55 F.3d 610 (Fed.

Cir. 1995) (stating the test for obviousness as whether the prior art "would have rendered

the claimed invention obvious to one of ordinary skill in the art"); *Brown and

Williamson Tobacco Co. v. Philip Morris, Inc.*, 229 F.3d 1120, 1124 (Fed. Cir. 2000); *In

re Mayne*,104 F.3d 1339, 1341 (Fed. Cir. 1997).  When obviousness is based on a single

prior art reference, there must be some suggestion or motivation to modify the teachings

of that reference to produce the claimed invention.  *B.F. Goodrich Co. v. Aircraft

Braking Systems Corp*.7, 2 F.3d 1577, 1582-83 (Fed. Cir. 1996); *Nursery Supplies, Inc.

v. Lerio Corp.,* 45 U.S.P.Q.2d (BNA) 1332, 1334 (M.D. Pa. 1997) ("This suggestion or

motivation to modify need not be expressly stated" in the prior art reference); *see also

Milliken Research Corp. v. Dan River, Inc.*, 739 F.2d 587,602 (Fed. Cir. 1984*); In re*

*Bozek*, 416F.2d 1385, 1390 (C.C.P.A. 1969) (the suggestion may come from "common sense of the person of ordinary skill in the art.").

137.    An obviousness determination under § 103 requires an evaluation of prior art references with respect to the claimed invention. *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 766 F.2d 281, 294 (Fed. Cir. 1985), *cert. denied*, 475 U.S. 1017 (1986); *Lear Siegler; Inc. v. Aeroquip Corp.*, 733 F.2d 881,890 (Fed. Cir. 1984). Relevant prior art includes that which is "reasonably pertinent to the particular problem with which the inventor was involved." *Stratoflex.*, 713 F.2d at 1535 (quoting *In re Wood*, 599 F.2d 1032, 1036 (C.C.P.A. 1979); *In re GPAC, Inc.*, 57 F.3d 1573, 1577 (Fed. Cir. 1995); *In re Dillon*, 919 F.2d 688, 694 (Fed. Cir. 1990), *cert. denied* 500 U.S. 904 (1991).

> **B.    The Inventions of Claims 20 and 34 of the '329 Patent and Claim 6 of the '932 Patent Are Invalid Under 35 U.S.C. § 103 Because the Inventions Would Have Been Obvious to a Person of Skill in the Art at the Time the Inventions Were Made**

138.    Claims 20 and 34 of the '329 patent and Claim 6 of the '932 patent are invalid under § 103 because the claimed inventions would have been obvious to a person of ordinary skill in the art prior to July 22, 1997, the invention date Merck alleges in this case.  Claim 6 of the '932 patent would also have been obvious to a person of ordinary skill in the art as of September 2, 1999, when the continuation-in-part application that lead to the '932 patent was filed.

> **1.    The Claimed Inventions Were Obvious**

139.    There is no dispute regarding the facts demonstrating that the less frequent than daily dosing of risedronate was obvious in July 1997.  The prior art to the '329 patent disclosed the less frequent than daily, and in particular the weekly, administration

of bisphosphonates and taught a motivation to administer them this way, e.g.

convenience.  It was known at the time that because of risedronate's biological

properties, the weekly administration of risedronate would be effective to inhibit bone

resorption as well as to treat and prevent osteoporosis.  In fact, this had already been

done .  Furthermore, the person of skill in the art in July 1997 would have known that

the effective weekly dose of risedronate would be seven times the daily dose.

140.    Moreover, a person of skill in the art would have expected less frequent

than daily administration of risedronate to be well-tolerated.  *In re Longi,* 759 F.2d 887,

897 (Fed. Cir. 1985) ("Only a reasonable expectation of success, not absolute

predictability is necessary for a conclusion of obviousness."); *see also In re Merck* &

*Co., Inc.,* 800 F.2d 1091, 1097 (Fed. Cir. 1986).  Obviousness does not require absolute

predictability.  *In re Lamberti,* 545 F.2d 717, 750 (C.C.P.A. 1976).

141.    Thus, the subject matter of Claims 20 and 34 of the '329 patent and Claim

6 of the '932 patent would have been obvious to a person of ordinary skill in the art at

the time of invention.

## 2.    Unexpected Results Are Irrelevant Here, and Are Not Present In Any Event

142.    Because the invention of the asserted claims would have been obvious,

and because the prior art disclosed the principal advantage of the invention — enhanced

convenience and compliance — whether or not the invention provided other advantages

not disclosed in the prior art is irrelevant.  By virtue of the disclosures of the prior art,

including the *Lunar News*, the '471 patent, and Goodship, the public was in possession

of the invention; Merck cannot take it away by alleging that it provided other benefits.

*In re Wiseman,* 596 F.2d 1019, 1023 (C.C.P.A. 1979).

143.    Even if such undisclosed advantages were relevant, however, Merck would have the burden of establishing their existence, which it can not do.  *In re Woodruff,* 919 F.2d 1575, 1578 (Fed. Cir. 1990); *In re Inland Steel Co.,* 265 F.3d 1354,1365 (Fed. Cir. 2001); *In re Peterson*, 315 F.3d 1325, 1330 (Fed. Cir. 2003).  "It is well settled that unexpected results must be established by factual evidence.  Mere arguments or conclusory statements in the specification do not suffice" to establish patentability.  *In re DeBlauwe,* 736 F.2d 699, 705 (Fed. Cir. 1984); *see also Inland Steel,* 265 F.3d at 1366; *In re Mayne,* 104 F.3d 1339, 1343 (Fed. Cir. 1997).  When applicant asserts that an invention achieves "unexpected (*i.e.*, superior) results, those results must logically be shown as superior *compared* to the results achieved with other articles." *DeBlauwe,* 736 F.2d at 705.  An applicant that relies on comparative tests to rebut a case of obviousness must compare his claimed invention to the closest prior art.  *Id.*

144.    Although the patent specification states that the dosing regimen provides "less gastrointestinal effects," an advantage Merck touts as "unexpected," this alleged advantage is not supported by scientific evidence.  *See e.g., DeBlauwe,* 736 F.2d at 705.

145.    No clinically significant difference exists between the daily and weekly regimens in terms of gastrointestinal effects, and Merck has never conducted a study that would support such a difference.  Merck's dog studies do not support any difference in the side effect profiles of daily versus less frequent than daily risedronate treatment.  First, Merck's dog studies are not relevant to the actual clinical administration of risedronate.  Second, the studies do not provide any data relating to less frequent than daily treatment with risedronate from which a comparison of daily versus weekly treatment could be made.

### 3.     Commercial Success Is Not Probative In This Case

146.    Commercial success can be relevant to an obviousness inquiry when it demonstrates that there was sufficient financial incentive for someone to try and solve the problem or long felt need in the market. *Minnesota Mining & Mfg. Co. v. Research Medical Inc.,* 679 F. Supp. 1037, 1154 (D. Utah 1987) ("Commercial success is considered relevant to lack of obviousness on the rationale that competitors would have been economically motivated to make the invention sooner if it had been truly obvious."); *Cosden Oil & Chem. Co. v. American Hoechst Co.*, 543 F. Supp. 522,5 41 (D. Del. 1982) ("The probative value of commercial success evidence, however, depends in large part on whether, given the surrounding circumstances, it will support an inference that the market potential was sufficiently strong to motivate others who must have tried and failed to solve the problem.  Here, we know there were no failures of others."); *Chicago Rawhide Mfg. Co. v. Crane Packing Co.*, 523 F.2d 452,459 (7th Cir. 1975), *cert. denied*, 423 U.S.1091 (1976).

147.    The alleged commercial success of once-weekly ACTONEL® is immaterial to the issue of obviousness in this case because only one entity, the Procter & Gamble Company, was allowed by law to market risedronate for the first five years after it was approved by the FDA.  This new chemical exclusivity ("NCE") prevented any one else from using risedronate until March of 2003.  *See* 21 U.S.C. § 355(c)(3)(D)(ii) (2000).  Thus, no one else had the incentive to develop new dosing forms of risedronate because no one else could bring an improved dosage form to market.  Accordingly, even if Merck could prove that once-weekly risedronate was a "commercial success," that success would be irrelevant to the obviousness issue. *Merck II* at 1376.

148.   Furthermore, commercial success alone is not sufficient to establish that the product is the result of an invention. *Anderson's-Black Rock, Inc. v. Pavement Salvage Co.,* 396 U.S. 57, 61 (1969); *In re Inland Steel Co.,* 265 F.3d 1354, 1366 (Fed. Cir. 2001); *Brown & Williamson Tobacco Corp.* v. *Philip Morris Inc.,* 29 F.3d 1120, 1131 (Fed. Cir. 2000); *Richardson-Vicks Inc. v. The Upjohn Co.,* 122 F.3d 1476, 1483 (Fed. Cir. 1997); *Motorola, Inc.* v. *Interdigital Technology Corp.,* 121 F.3d 1461, 1472 (Fed. Cir. 1997) ("In reaching an obviousness determination, a trial court may conclude that a patent claim is obvious, even in the light of strong objective evidence tending to show non-obviousness."); *Ryko,* 950 F.2d at 719 (noting that the weight of secondary considerations may be of insufficient weight to override a determination of obviousness based on primary considerations); *Newell* Cos. v. *Kenney Mfg. Co.,* 864 F.2d 757, 769 (Fed. Cir. 1988) ("although the record shows a highly successful product, the record also establishes such a strong case of obviousness based on admissions and the teachings of the prior art, . . . that the objective evidence of nonobviousness does not persuade us to reach a contrary conclusion.").  In this case, the asserted claims are clearly obvious in view of the prior art.  Moreover, Merck has not shown that any commercial success of the once-weekly risedronate product is sufficient to override the finding of obviousness.

### 4.   Merck Has the Burden of Proving "Commercial Success"

149.   To be probative of nonobviousness, the commercial success of a patented product must be attributable to the features of the claimed invention, rather than other business considerations. *Brown*, 229 F.3d at 1130 ("A nexus between commercial success and the claimed features is required."); *Riverwood Int'l Corp. v. Mead Corp.*, 212 F.3d 1365,1367 (Fed. Cir. 2000), *cert. denied*, 121 S. Ct. 567 (2000) (a trial court

did not err in finding that (1) the patent owner "presented some evidence of commercial success" but (2) "much of that success was attributable to factors outside the scope of claims 1 and 13 of the ... patent."); *see also Pfaff v. Wells Electronics, Inc.,* 124 F.3d 1429, 1439 (Fed.Cir.1997), *aff'd,* 525 U.S. 55 (1998) ("[N]o evidence suggests that the [patented] socket's commercial success was related to the barb element") (citing Stratoflex, *Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1539 (Fed. Cir. 1983) (requiring nexus between merits of invention and evidence of secondary considerations)); *In re Huang,* 100 F.3d 135, 140 (Fed. Cir. 1996).

150.    Commercial success cannot consist solely of sales figures.  Among other things, there should be evidence of market share, of growth in market share, and of replacing earlier units sold by others. *In re Baxter Travenol Labs,* 952 F.2d 388, 392 (Fed. Cir. 1991) ("information solely on numbers of units sold is insufficient to establish commercial success"); *Nursery Supplies Inc. v. Lerio Corp.,* 45 U.S.P.Q.2d (BNA) 1332, 1335 (M.D. Pa. 1997) (citing *Kansas Jack, Inc.* v. *Kuhn,* 719 F.2d 1144, 1151 (Fed. Cir.1983)).  "For example, a market leader who led with sales of a prior product cannot establish a nexus by the fact that it then led with a new product." *Nursery Supplies,* 45 U.S.P.Q.2d at 1335 (citing *Pentec Inc. v. Graphic Control Corp.,* 776 F.2d 309, 316 (Fed. Cir. 1985)).

151.    Merck bears the burden of demonstrating that any commercial success of once-weekly risedronate is attributable to the invention, *i.e.*, to the once-weekly dosing regimen. *Richardson-Vicks, Inc.*, 122 F.3d at 1483.  Merck can not show either that the once-weekly risedronate product was a "commercial success" or that any such success is causally related to the claimed invention.  Merck's evidence is based on an econometric

model that is inappropriate because several of the key assumptions underlying the model
are not met in the case of ACTONEL®; thus the model used by Merck in attempting to
establish commercial success does not accurately depict the market. Merck's analysis
also did not consider any of the other significant events that were occurring in the
marketplace that would have tended to contribute to the sales of once-weekly
risedronate, or the promotional spending and detailing activities of P&G that also
affected the sales of the once-weekly risedronate product.

152.    Merck can not demonstrate that the sales of once-weekly risedronate were
attributable in any way to the invention claimed in the '329 and '932 patents, as
distinguished from the benefits of the drug itself and the other factors that existed in the
marketplace.

153.    Merck's reliance on the taking of a license to the once-weekly Merck
patents by P&G as an indicator of the "importance" of these patents to ACTONEL®'s
success is misplaced and lacks a reasonable basis. The two percent royalty agreed to by
Merck is lower than would be expected of a valid, infringed, and enforceable patent, and
indicates that the parties do not believe that the Merck patents are an important
component of ACTONEL®'s success. When placed in context, *i.e.*, Merck's licensing
allows ACTONEL® to compete directly against its own once-weekly product, resulting
in its lost profits likely exceeding its royalty from P&G by a factor of ten to one,
Merck's license to P&G signifies the insignificance attributed to the Merck patents by
the parties.